# No. 23-

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————

IN RE KREINDLER & KREINDLER LLP

———————

KREINDLER & KREINDLER LLP,

*Nonparty-Petitioner*,

v.

KINGDOM OF SAUDI ARABIA,

*Defendant-Respondent.*[*]

———————

On Petition for a Writ of Mandamus
to the United States District Court
for the Southern District of New York,
The Honorable George B. Daniels,
No. 1:03-md-1570-GBD-SN

———————

## PETITION FOR A WRIT OF MANDAMUS

———————

Emily Kirsch
Paul Niehaus
KIRSCH & NIEHAUS PLLC
950 Third Avenue, 19th Floor
New York, NY 10022
(212) 832-0170

Edward M. Spiro
  *Counsel of Record*
Raymond D. Moss
MORVILLO ABRAMOWITZ
  GRAND IASON & ANELLO PC
565 Fifth Avenue
New York, NY 10017
(212) 856-9600
espiro@maglaw.com

*Counsel for Nonparty-Petitioner Kreindler & Kreindler LLP*

———————

[*] For a list of all parties to this multidistrict litigation, see *In re Terrorist Attacks on September 11, 2001*, No. 1:03-md-1570 (S.D.N.Y.).

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ ii

RELIEF SOUGHT ..................................................................................1

ISSUE PRESENTED ...............................................................................4

BACKGROUND ......................................................................................5

    A.    The 9/11 Multidistrict Litigation and Plaintiffs' Executive Committee for Death and Injury Claims ...............................................5

    B.    The Consultant's Leak of a Deposition Transcript to Yahoo! News and His Written Confession ...........................................7

    C.    The Magistrate Judge's "Contempt Hearing" ....................................13

    D.    The Magistrate Judge's Immediate and Ongoing Rule 37 Sanctions Without Notice ..................................................................15

    E.    The District Judge Misconstrues Rule 37 and Ignores *Apex* ..............18

STANDARD OF REVIEW ......................................................................18

ARGUMENT ........................................................................................19

I.    The Firm's Right to Issuance of the Writ—Based on Rule 37(b)(2)'s Text and *Apex*'s Holding—Is Clear and Indisputable ..................................19

II.    A Writ of Mandamus Is Not Only Appropriate, But Called For, Under the Circumstances .................................................................27

III.    The Firm Has No Other Adequate Means to Obtain Relief .........................31

CONCLUSION ....................................................................................34

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. City of Bessemer*,
  470 U.S. 564 (1985) ........................................................................ 27

*Apex Oil Co. v. Belcher Co. of New York*,
  855 F.2d 1009 (2d Cir. 1988) .................................................. *passim*

*Armamburu v. Healthcare Fin. Servs., Inc.*,
  2007 WL 2020181 (E.D.N.Y. July 6, 2007) .................................... 28

*Bloom v. Azar*,
  976 F.3d 157 (2d Cir. 2020) ............................................................ 22

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991) .......................................................................... 25

*Cheney v. U.S. Dist. Court for Dist. of Columbia*,
  542 U.S. 367 (2004) ........................................................... 19, 27, 31

*Copeland v. Rosen*,
  194 F.R.D. 127 (S.D.N.Y. 2000) ..................................................... 28

*Cunningham v. Hamilton Cnty.*,
  527 U.S. 198 (1999) ........................................................................ 33

*De Beers Consol. Mines v. United States*,
  325 U.S. 212 (1945) ........................................................................ 19

*Doe v. Menefee*,
  391 F.3d 147 (2d Cir. 2004) ............................................................ 33

*Eisner v. Enhanced Recovery Co., LLC*,
  407 F. Supp. 3d 132 (E.D.N.Y. 2019) ............................................. 28

*Fonar Corp. v. Magnetic Resonance Plus, Inc.*,
  128 F.3d 99 (2d Cir. 1997) .............................................................. 24

*Genger v. Sharon*,
  2012 WL 3854883 (S.D.N.Y. Sept. 5, 2012) .................................. 28

*Grider v. Keystone Health Plan Cent., Inc.*,
  580 F.3d 119 (3d Cir. 2009) ............................................................. 24

*Guzik v. Albright*,
  2019 WL 1448358 (S.D.N.Y. Feb. 8, 2019) .................................... 28

*In re Air Disaster in Lockerbie*,
  No. MDL 799 (E.D.N.Y.) ................................................................... 29

*In re City of New York*,
  607 F.3d 923 (2d Cir. 2010) ............................................................. 19

*In re E.E.O.C.*,
  207 F. App'x 426 (5th Cir. 2006) ..................................................... 33

*In re F.C.C.*,
  217 F.3d 125 (2d Cir. 2000) ............................................................. 20

*In re United States*,
  945 F.3d 616 (2d Cir. 2019) ............................................... 19, 27, 31

*Ins. Ben. Administrators, Inc. v. Martin*,
  871 F.2d 1354 (7th Cir. 1989) ......................................................... 24

*Kleiman v. Chertoff*,
  2007 WL 9706519 (E.D.N.Y. July 10, 2007) .................................. 28

*Mackler Prods., Inc. v. Cohen*,
  146 F.3d 126 (2d Cir. 1998) ............................................................. 26

*Mallard v. U.S. Dist. Ct. for S. Dist. of Iowa*,
  490 U.S. 296 (1989) .......................................................................... 30

*Markey v. Lapolla Indus., Inc.*,
  2015 WL 5027522 (E.D.N.Y. Aug. 25, 2015) ................................. 28

*Markus v. Rozhkov*,
  615 B.R. 679 (S.D.N.Y. 2020) ......................................................... 28

*Medhekar v. U.S. Dist. Ct. for the N. Dist. of California*,
  99 F.3d 325 (9th Cir. 1996) ............................................................. 33

*Milltex Indus. Corp. v. Jacquard Lace Co.*,
    55 F.3d 34 (2d Cir. 1995) ................................................................ 26

*New Pac. Overseas Grp. (U.S.A.) Inc. v. Excal Int'l Dev. Corp.*,
    252 F.3d 667 (2d Cir. 2001) ........................................................... 31

*NPF Franchising, LLC v. SY Dawgs, LLC*,
    37 F.4th 369 (6th Cir. 2022) .......................................................... 23

*Padovani v. Bruchhausen*,
    293 F.2d 546 (2d Cir. 1961) ...................................................... 31, 32

*Pavelic & LeFlore v. Marvel Entertainment Group*,
    493 U.S. 120 (1989) ....................................................................... 22

*Philip Morris Inc. v. Nat'l Asbestos Workers Med. Fund*,
    214 F.3d 132 (2d Cir. 2000) ........................................................... 30

*Pichardo v. C.R. Bard, Inc.*,
    2015 WL 13784565 (S.D.N.Y. Jan. 26, 2015) ............................... 28

*Richardson Greenshields Sec., Inc. v. Lau*,
    825 F.2d 647 (2d Cir. 1987) ........................................................... 30

*Richardson-Merrell Inc. v. Koller*,
    472 U.S. 424 (1985) ....................................................................... 33

*Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*,
    280 F.R.D. 147 (S.D.N.Y. 2012) .................................................... 28

*Schlagenhauf v. Holder*,
    379 U.S. 104 (1964) ....................................................................... 30

*Schoenberg v. Shapolsky Publishers, Inc.*,
    971 F.2d 926 (2d Cir. 1992) ........................................................... 25

*SEC v. McNulty*,
    137 F.3d 732 (2d Cir. 1998) ...................................................... 28, 29

*SEC v. Rajaratnam*,
    622 F.3d 159 (2d Cir. 2010) ........................................................... 20

*Shipstad v. One Way or Another Prods., LLC*,
  2017 WL 2462657 (S.D.N.Y. June 6, 2017) ..................................................... 28

*Singh v. Lintech Elec., Inc.*,
  2021 WL 3914478 (E.D.N.Y. July 20, 2021)................................................... 28

*Sun River Energy, Inc. v. Nelson*,
  800 F.3d 1219 (10th Cir. 2015) ........................................................................ 23

*U.S. ex rel. Eisenstein v. City of New York*,
  556 U.S. 928 (2009)................................................................................... 20, 21

*United States v. Prevezon Holdings Ltd.*,
  839 F.3d 227 (2d Cir. 2016) ............................................................................. 29

*United States v. Tillman*,
  756 F.3d 1144 (9th Cir. 2014) ............................................................ 29, 32, 33

*Wilson v. Citigroup, N.A.*,
  702 F.3d 720 (2d Cir. 2012) ............................................................................. 25

*Wolters Kluwer Fin. Servs., Inc. v. Scivantage*,
  564 F.3d 110 (2d Cir. 2009) ............................................................................. 25

*Yukos Cap. S.A.R.L. v. Feldman*,
  977 F.3d 216 (2d Cir. 2020) ............................................................................. 25

**Statutes**

28 U.S.C. § 636(e)(6)............................................................................................ 2

28 U.S.C. § 1292(b) ............................................................................................ 32

28 U.S.C. § 1651(a) ............................................................................................ 18

**Rules**

Fed. R. Civ. P. 11(c)(1)................................................................................. 22, 25

Fed. R. Civ. P. 26(g) .......................................................................................... 25

Fed. R. Civ. P. 37(a)(5)(A) ................................................................................ 21

Fed. R. Civ. P. 37(b)(2)(A) ........................................................................*passim*

Fed. R. Civ. P. 37(b)(2)(B) ........................................................ 21

Fed. R. Civ. P. 37(b)(2)(C) ................................................... 20, 21

Fed. R. Civ. P. 37(c) (1987) .............................................. *passim*

Fed. R. Civ. P. 37(c)(2) ............................................................ 23

Fed. R. Civ. P. 37(d)(3) ............................................................ 21

**Other Authorities**

Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment ...................... 22

Fed. R. Civ. P. 37 advisory committee's note to 1970 amendment ...................... 25

Fed. R. Civ. P. 37 advisory committee's note to 1993 amendment ...................... 22

Fed. R. Civ. P. 37 advisory committee's note to 2000 amendment ...................... 25

Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment ...................... 25

# RELIEF SOUGHT

This petition for a writ of mandamus arises out of the long-running multidistrict litigation concerning the terrorist attacks on September 11, 2001. For nearly twenty years, nonparty-petitioner Kreindler & Kreindler LLP (the "Firm")'s attorneys have served on the Plaintiffs' Executive Committee for Death and Injury Claims and, since 2016, have prosecuted the claims of 9/11 victims and families against defendant-respondent Kingdom of Saudi Arabia ("KSA").

Mandamus is the only relief available to correct the District Court's ongoing contravention of law. Magistrate Judge Sarah Netburn imposed immediate and harsh sanctions against the Firm under Federal Rule of Civil Procedure 37(b)(2) without notice and without evidence of wrongdoing by a party. District Judge George B. Daniels then refused to stay the sanctions, disregarding Rule 37(b)(2)'s words and this Court's holding in *Apex Oil Co. v. Belcher Co. of New York*, 855 F.2d 1009 (2d Cir. 1988), which require misconduct by "a party" before a court has authority to issue Rule 37 sanctions.

After a consultant, John Fawcett, confessed to the Firm that he leaked a deposition transcript to Yahoo! News in violation of governing protective orders, the Firm informed the District Court that same day. In response, Magistrate Judge Netburn scheduled a "contempt hearing," suspecting involvement by Firm attorneys. Consistent with the requirements under the Federal Magistrates Act of 1968, she

expressed her intention to certify her findings and recommendations to Judge Daniels. 28 U.S.C. § 636(e)(6). The hearing was remarkable: Judge Netburn, among other things, effectively appointed KSA's counsel as the prosecutor; granted KSA invasive discovery into the Firm's communications and work product over a five-month period; precluded Firm attorneys from discussing the matter with each other during the month before the hearing; denied the Firm's requests to exchange exhibits before the hearing; and sequestered the testifying Firm attorneys during the hearing.

Nevertheless, all Firm email, text, and phone communications, documents, and testimony confirmed that Fawcett acted alone and deceived the Firm. Fawcett evaded detection by downloading the transcript onto a flash drive, brought it home, and emailed the transcript to the reporter from his personal computer via a personal encrypted account. He then deleted the email, destroyed the flash drive, and lied to attorneys when questioned during the Firm's investigation. No attorney was aware of his betrayal until he confessed to the Firm when he and other employees were presented with a declaration to sign under penalty of perjury.

Almost one year later, Judge Netburn imposed immediate, sweeping sanctions against the Firm under Rule 37(b)(2) without notice, rather than issue contempt findings and recommendations. Ignoring the direct evidence, she inferred that it was more likely than not that one attorney knew or tacitly approved of the leak while

others closed their eyes during the investigation to keep from knowing. She immediately removed the Firm from the Executive Committee after nearly twenty years directing this multidistrict litigation and imposed significant monetary penalties, including barring any award of common benefit funds for the Firm's work after the leak. It is undisputed that Judge Netburn *did not* find clear-and-convincing evidence that any attorney violated the protective orders, the requisite standard at the contempt hearing and under the court's inherent powers.

The Firm requested that Judge Daniels maintain the decades-long status quo during his review of the sanctions, which he summarily denied. Judge Daniels first adopted Judge Netburn's findings without independent review of the record, even though her findings overlooked contemporaneous emails and other documentary evidence showing both a lack of awareness by, and Fawcett's ongoing deceit of, the Firm. In one conclusory sentence on the legal question, Judge Daniels stated that "Rule 37(b) applies to attorneys as well as parties," while failing to address *Apex*'s holding that "Rule 37(c) does not permit sanctions against a party's attorney" because the term "party" does not include the party's attorney, 855 F.2d at 1013, and Rule 37(b)(2)'s requirement of "party" misconduct as the foundation for sanctions.

The actions of Magistrate Judge Netburn, and in turn Judge Daniels, constitute a clear abuse of discretion and a usurpation of power. Their contravention of Rule 37(b)(2)'s words and *Apex*'s holding is indisputable. Judge Netburn's unfounded

opinion and Judge Daniels's repetition of its findings is causing—and will continue to cause—harm to the Firm's and its attorneys' professional reputations and to 9/11 plaintiffs' case against KSA. There are no other available means to obtain vacatur of the opinion, which is both factually untrue and *ultra vires*. A writ is not only appropriate here—it is called for. This Court should grant the writ, vacate the sanctions order, and direct the District Court to confine itself to the lawful exercise of its authority.

## ISSUE PRESENTED

Whether the District Court's ongoing Rule 37(b)(2) sanctions against Firm attorneys constitute a clear abuse of discretion or usurpation of power, where (i) this Court held in *Apex* that "a party" under Rule 37(c) does not include its attorney; (ii) Rule 37(b)(2) authorizes sanctions only if "a party" violates a discovery order; and (iii) in refusing to stay sanctions, the District Judge summarily adopted the Magistrate Judge's findings, disregarded Rule 37(b)(2)'s text, and contravened *Apex*'s holding.

# BACKGROUND

The factual background is based on documentary evidence, unless otherwise indicated.

## A. The 9/11 Multidistrict Litigation and Plaintiffs' Executive Committee for Death and Injury Claims

In the aftermath of the 9/11 terrorist attacks, plaintiffs across the country brought lawsuits against defendants that contributed material aid to the hijackers. These actions were consolidated in the Southern District of New York in 2003. In this litigation, the Firm, along with co-counsel, represents more than 830 estates of those killed on 9/11, as well as thousands of immediate surviving family members and more than 10,000 victims who suffered personal injury. A111.[1] Founded in 1950, the Firm specializes in aviation disaster litigation and successfully represented victims of the Pan Am 103 terror bombing in their action against Libya.

In June 2004, District Judge Richard Conway Casey established two Plaintiffs' Executive Committees, one representing the interests of wrongful death and personal injury plaintiffs (the "Committee") and the other representing commercial plaintiffs. Dkt.248-2¶1. Judge Casey appointed several Firm attorneys to the Committee, including James Kreindler (Co-Chair), Justin Green (Co-Liaison Counsel), Andrew Maloney (Member), and Marc Moller (Member). *Id.*¶¶4-6. Since

---

[1] "A" refers to the Appendix, while "Dkt." refers to the District Court's docket, which includes the contempt hearing transcripts, Dkt.7347, Dkt.7349 (together, "Tr."), and exhibits, Dkt.8768.

2005, Maloney has served as Co-Liaison Counsel, with Green serving as a Member. A113.

The Committee, in addition to administrative responsibilities, "shall have final authority with respect to matters pertaining to the claims of its constituents," and "shall conduct all pretrial proceedings … on behalf of all plaintiffs." Dkt.248-2¶¶9-10. The Committee handles motions practice, prepares discovery requests and responses, hires investigators, identifies nonparty witnesses and experts, conducts depositions, and coordinates the work of plaintiffs' counsel. *Id.*¶11. Non-members may only give "advice and suggestions" to the Committee, or present "individual and divergent positions" at pretrial conferences. *Id.*¶13.

Since 2016, the Firm has led the prosecution of claims by death and injury plaintiffs ("Plaintiffs") against KSA and its officials under the Justice Against Sponsors of Terrorism Act. A111-13. The Firm's attorneys have handled nearly every aspect of this complex case against KSA, from conducting a world-wide investigation, to handling motions practice, to obtaining witness statements and expert reports, to taking and defending over 30 depositions. A111-16, A248-51 (detailing work).[2] The investigation into KSA's involvement in the terror attacks is active and requires daily work. A112. The Firm has developed trusted relationships

---

[2] Other Committee members agree, A384-86, A389-90, while some disagree without stating why, A125.

with its investigators and experts, A116, some of whom place themselves at risk overseas, Dkt.8768-18.at.1.

Prior to the leak, the team interacted on an almost daily basis with Fawcett, *see, e.g.*, Dkt.8768-88, -89, -90 (phone records), who was a consultant of the Firm for more than twenty years.

## B. The Consultant's Leak of a Deposition Transcript to Yahoo! News and His Written Confession

In June 2021, the Firm deposed Musaed al Jarrah, a former Saudi official, regarding his involvement in the 9/11 attacks. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████ At the time of the FBI interview, Jarrah worked at the Saudi Embassy in Washington, D.C. but now resides in Morocco. Dkt.8768-60¶4. The U.S. government did not prosecute Jarrah.

In a post-leak statement that Judge Netburn found Fawcett "had drafted himself … in his own words," A40, Fawcett confessed, "After the revelations at the deposition that he was a child pornographer, I could not allow Musaed al Jarrah's criminal acts to remain secret, when I had the opportunity to do something about it." Dkt.8768-76. He wrote, "If the Saudi [and U.S. governments] continue to protect Musaed al Jarrah rather than prosecute him, then the public at least must be

forewarned in order to have some chance to protect themselves. The only venue for such warning is the media." *Id.* Before joining the Firm as a consultant, Fawcett worked for a humanitarian aid organization overseas, and adopted two children from Morocco after learning about the country's history of child sex trafficking. Dkt.8768-60¶4.

In late June and early July 2021, Fawcett communicated on his personal phone and Signal app about the deposition with Yahoo! News reporter Michael Isikoff, one of several reporters covering Saudi involvement in 9/11. Dkt.8768-66; Dkt.8768-88.at.1. On or about July 5, Fawcett downloaded the transcript from the Firm network onto a USB flash drive, emailed the document from his personal laptop via an encrypted personal account, and deleted the email and destroyed the flash drive. Dkt.8768-59¶¶7,9. "I did so," he wrote, "to prevent the partners and staff of [the Firm] from knowing about my intended action and to prevent them from stopping me." Dkt.8768-76. It is undisputed that there was no evidence of Fawcett's misconduct on the Firm's network or devices.

In late June 2021, Isikoff and his staff were in communication with Kreindler about appearing on his podcast to discuss the 9/11 litigation, Dkt.8768-56.at.6,10, including the Firm's interview of Jamal Khashoggi prior to his murder and the U.S. government's invocation of the state secrets privilege over 9/11 investigatory documents, Dkt.8768-46.at.5,13-14. Kreindler was interviewed by Isikoff on July 1,

Dkt.8768-56.at.6, and the episode aired on July 10. In his post-leak declaration, Fawcett swore under penalty of perjury that after he leaked the transcript, he called Isikoff because he was "worried that if [Isikoff] published an article around the same time as he aired the podcast with Jim Kreindler, people would assume that Jim Kreindler had given Isikoff the information about Jarrah, even though I knew that Jim hadn't done so, didn't know I'd done it, and hadn't encouraged me to do it or suggested I do it." Dkt.8768-59¶8. On July 13, Isikoff emailed Kreindler to follow up on the status of the Firm's "request to DOJ to lift the state secrets privilege and [protective] order," noting that he was "planning on writing something this week." Dkt.8768-6. Kreindler responded, "Still working on [the] motion. Too many chefs." *Id.*

On July 15, Isikoff published his article about how the FBI attempted to flip Jarrah based on his possession of child pornography. Dkt.8768-47. The following morning, Maloney, a former federal prosecutor in the Southern District of New York, started investigating whether the Firm was the source of the leak. That day, Maloney questioned Fawcett about the transcript; Fawcett claimed that he had only sent a copy to a consultant overseas. *See* Dkt.8768-19; *accord* Tr.252:1-10 (Maloney), Tr.407:6-9 (Pounian); Tr.436:12-438:19 (Fawcett). Maloney then directed the Firm's IT head, John Hartney, to determine whether anyone at the Firm had emailed the transcript to Isikoff directly, Dkt.8768-19, or whether "it was

emailed to[ ]*anyone* outside of" the Firm "who may have in turn sent it to Isikoff," Dkt.8768-15 (emphasis in email). Hartney identified the two instances of employees sending the transcript outside of the Firm to authorized individuals via Firm email and confirmed that no one had downloaded the transcript from the Firm's cloud-based storage system. Dkt.8768-56¶¶6,11; Dkt.8768-8. The transcript was accessible on the Firm's internal server within a share drive which, under Firm policy and practice, was off limits to individuals that had not signed the protective orders. Dkt.8768-56¶5; Dkt.8768-83.

In a July 22 email to the team, Maloney wrote that "it is fair to say … no Jarrah depo transcript was sent outside the firm save for one sent by John Fawcett to one of our investigating consultants, who signed the protective order." Dkt.8768-20. Fawcett was copied on that email yet remained silent. (The Firm later identified an email in which a paralegal sent the transcript to an authorized co-counsel.) The investigation, which did not collect and search its employees' personal devices, was materially identical to the investigations of other law firms, including counsel for KSA. *Compare, e.g.*, Dkt.8768-56, *with* Dkt.6981-4(Ex.D1)¶¶4-9.[3]

On July 23, KSA requested that the District Court investigate the transcript leak or authorize KSA's counsel to investigate—and sought to include the deposition

---

[3] For a catalogue of Firm email communications throughout the investigation, see Dkt.8768-1 to -32.

transcripts of two additional KSA officials within the investigation. Dkt.8768-35.at.4-5. Firm attorneys conferred and agreed that KSA's demands were overbroad and elected to wait for the District Court to direct the parties, rather than volunteer information to their adversary, including the identities of Firm investigators abroad. Dkt.6988; *accord* Tr.262:6-15. On August 12, after KSA's counsel and other members of the Plaintiffs' Executive Committees submitted declarations, Judge Netburn issued an order directing Kreindler, Maloney, Benett, and Pounian to submit declarations "as to whether anyone with the firm or anyone acting on its direction shared the Al Jarrah deposition transcript with anyone unauthorized by" the protective orders. Dkt.7011.at.2. She noted that Kreindler's appearance on Isikoff's podcast "certainly suggests an opportunity for Mr. Kreindler to have breached" the protective orders. *Id.* The attorneys submitted declarations under penalty of perjury by the August 16 deadline, unequivocally disclaiming any knowledge of how Isikoff received the transcript. Dkt.7016.

On August 30, Judge Netburn ordered supplemental declarations from all Firm employees who accessed the transcript; other plaintiffs' firms and defense firms that accessed the transcript; and the court reporter service. Dkt.7082. After a media organization moved to intervene on First Amendment grounds, the deadline for submission was ultimately extended to September 27. Dkt.7134.at.24.

Before the deadline, Benett emailed Pounian that, although she had become "irritated" by the investigation, it was "probably better to add" more information to the supplemental declarations than "what [Judge Netburn] asked for." Dkt.8768-25. Confident that it was not the source of the leak, the Firm thought KSA might be using the court's investigation to ascertain the Firm's investigation efforts and litigation strategy, Dkt.6988.at.1-2; Dkt.7359.at.2-5, and was concerned for the safety of consultants working overseas, Dkt.8768-18. Benett prepared supplemental declarations for employees' review for accuracy and signature. Dkt.8768-17, -32.

In the days before the September 27 deadline, Fawcett stopped responding to outreach from Firm attorneys about his declaration. Dkt.8768-31. On the morning of the deadline, Fawcett texted and phoned his personal attorney, Liz Crotty, and then called Benett to confess his misconduct. Dkt.8768-90.at.3; Dkt.8768-95. Benett was stunned and reported the news to other attorneys who were equally shocked and upset, Tr.269:11-25, Tr.271:1-8, and reported Fawcett's misconduct to the court that same day, Dkt.8768-34.at.1.

Fawcett prepared a draft of his declaration containing his written confession and sent it from his personal email to Benett and Pounian. Dkt.8768-33. Speaking with Fawcett throughout the day, Dkt.8768-90.at.2-3, Benett and Pounian worked with Fawcett to finalize his declaration for submission, Dkt.8768-84. The final version mirrored Fawcett's written confession and included one additional sentence:

"I had a personal interest because Musaed al Jarrah worked for Saudi Arabia as a diplomat in Morocco for many years and still lives there, my own children are from that country, and I know from my prior international humanitarian and human rights work that Morocco has a dreadful history of child sex tracking."  Dkt.8768-60¶4. Fawcett testified that, "At the time I signed [it], I felt that was my declaration." Tr.467:12-19.

The Firm attorneys and several employees submitted sworn declarations, averring that they first learned of Fawcett's misconduct when he confessed on September 27.  Dkt.8768-34.

On September 30, Fawcett submitted a second declaration that detailed further why he leaked the transcript, his destruction of the evidence, and his additional communications with Isikoff.  Dkt.8768-59.

## C.    The Magistrate Judge's "Contempt Hearing"

On October 4, Judge Netburn scheduled an evidentiary hearing; ordered that Kreindler, Maloney, Benett, Pounian, Hartney, and Fawcett appear as witnesses; and, in the month before the hearing, ordered the witnesses "not to discuss further the issues within the scope of this hearing with" each other or anyone else at the Firm.  Dkt.7167.at.1-2.  Judge Netburn deemed "the witnesses' previously filed declarations as their direct testimony" and stated that KSA's counsel would "cross-

examine the witnesses but shall not be limited in scope by their direct testimony." *Id.*at.2.

On October 21, Judge Netburn granted KSA broad discovery into the Firm's communications and work product and noted that, following the hearing, she "intend[ed] to issue findings of fact and to recommend remedies to District Judge Daniels." Dkt.7277.at.1. The Firm produced extensive discovery of privileged materials to its adversary, including email, text, and voicemail communications, phone and computer server records, and attorney work-product from June 2021 through October 2021. No document suggested—let alone demonstrated—that the Firm knew or closed its eyes to the leak.

Before the hearing, Judge Netburn characterized the forthcoming proceeding as a "contempt hearing" and ordered that the "witnesses will be sequestered" until they testify to "prevent against the possible coordination of testimony," and will be "required to remain in the courtroom after their testimony." Dkt.7310.at.3. On October 29, Judge Netburn denied via email the Firm's request for the parties to exchange exhibits in advance of the hearing.

At the November 1 and 2, 2021 contempt hearing, the six witnesses testified in accordance with the documentary evidence. KSA moved to reopen discovery after the hearing, which was denied.

Following the contempt hearing, Judge Netburn ordered the Firm and KSA to submit simultaneously proposed findings of facts and conclusions of law, and she did not permit reply briefing.  Dkt.7317; Tr.491:17-492:14.  In its submission, the Firm argued that clear-and-convincing evidence did not support contempt or inherent power sanctions.  A2-3.  KSA argued that Judge Netburn had authority to sanction the Firm under inherent powers *and* Rule 37(b)(2).  A12-14.  Judge Netburn never previously identified Rule 37(b)(2) as a basis for sanctions, and KSA failed to disclose *Apex* as adverse precedent in its submission.  *Id.*[4]  The Firm requested oral argument "in connection with the Contempt Hearing" because "all briefing was submitted concurrently" and "the parties raise[d] important and unique issues of law and fact."  Dkt.7418.

### D.    The Magistrate Judge's Immediate and Ongoing Rule 37 Sanctions Without Notice

On September 21, 2022, Judge Netburn denied oral argument and, without notice, ordered immediate Rule 37(b)(2) sanctions against the Firm.  A78-79.  She expressly declined to recommend sanctions under the court's contempt or inherent powers, stated that contempt powers were "cumbersome," "restrictive," and would cause "delay" through certification and further proceedings before the District

---

[4] Nondisclosure occurred despite eleven attorneys, five paralegals, the firm's research director, and a research analyst billing their time to the contempt hearing. Dkt.8685.at.7.

Judge, and that inherent powers were "equally problematic." A75, A50 n.15. She stated, without elaboration, that Rule 37(b)(2) was "flexible." A76. She did not mention that Rule 37(b)(2)—unlike contempt and inherent powers—permits sanctions based on a mere preponderance of evidence, including imputing one person's conduct to another. *See infra* Part I.3. Accordingly, she concluded it was more likely than not that Fawcett and Kreindler "deliberate[ly] coordinat[ed]" to leak the transcript, that other attorneys were "at best, willfully blind to their scheme" and "at worst, active[ly] collu[ding] in a cover-up," and that the leak was part of the Firm's "litigation strategy to use press attention to force [KSA] into a settlement." A51-53, A59-60.

Judge Netburn conceded that her opinion was based on "circumstantial evidence." A51. Regarding Kreindler's knowledge, she speculated that two "suspicious" one-minute-long phone calls between Kreindler and Fawcett on June 28, 2021 were really part of "discussions about how to get the [transcript] into Isikoff's hands." A52-53; Dkt.8768-88.at.1-2 (stamped 12:22 p.m. and 12:23 p.m.). She also speculated that Kreindler and Fawcett had a private phone call on July 22 regarding Fawcett's misconduct, A30-33, despite phone records demonstrating that Pounian was on the entire 46-minute conference call and his declaration stating the call's work-related agenda, Dkt.7359-1. She found Maloney's investigation to be "lackadaisical," "paltry," "facially deficient," and "almost designed to avoid

implicating Fawcett," A53-59, and criticized him for failing to take steps that no other firm performed, *see, e.g.*, A28 ("Maloney did not review personal devices of [Firm] staff."). She identified purported "knowingly misleading statements" by attorneys in their declarations, without evidence that any inaccuracy was intentional or material to the leak investigation. A38-44. And although she had previously stated that "standing alone there is nothing wrong with" Kreindler's press statements about the 9/11 litigation, Dkt.7011.at.2, she concluded that such statements evidenced the Firm's supposed motive: a "litigation strategy" to "force" KSA into a settlement through "press attention." A51. She also concluded that the transcript was not particularly "important" to the litigation as it did not appear to contain any "smoking guns or dramatic confessions." A57, A63.

Judge Netburn immediately removed the Firm from the Committee, after two decades of leadership and years developing the case against KSA; barred any award of common benefit funds for the Firm's work after the leak; and required the Firm to pay KSA's attorneys' fees and expenses to litigate the leak, A72-73, which counsel claims is nearly $1.5 million, Dkt.8685.at.1 Judge Netburn also effectively removed Green and Moller from the Committee, despite no alleged misconduct, notice of sanctions individually, or involvement in the contempt proceedings. A79.

### E. The District Judge Misconstrues Rule 37 and Ignores *Apex*

The Firm filed a motion by proposed order to show cause for a stay of its immediate removal from the Committee, A80-118, which Judge Daniels denied two weeks later in a brief order on procedural grounds, A127-28. The Firm then filed Rule 72 objections to the sanctions with Judge Daniels and renewed its stay motion—seeking preservation of a twenty-year status quo—until Judge Daniels resolved the objections. A129-181, A245-75. The Firm argued that Rule 37(b)(2) "requires 'party' misconduct as the foundation for any sanctions, including sanctions against an attorney"; that *Apex* held that a Rule 37(c) "party" does not include its attorney; and that Judge Netburn overlooked documentary evidence that undermines the central findings in her opinion. A260. Oral argument was held on December 8, 2022. A279. On January 11, 2023, Judge Daniels denied the Firm's stay request after he summarily adopted Judge Netburn's factual findings and, in one sentence, held that "Rule 37(b) applies to attorneys as well as parties" without mentioning the rule's text or *Apex*'s holding. A391-98 & n.1. He stated that he "cannot allow [the Firm] to lead the Plaintiffs' investigation of 9/11 when the firm proved utterly incapable of leading an investigation into the firm's own illegal activity." A397-98.

### STANDARD OF REVIEW

The All Writs Act empowers federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions." 28 U.S.C. § 1651(a). "The

traditional use of the writ in aid of appellate jurisdiction … has been to confine the court against which mandamus is sought to a lawful exercise of its prescribed jurisdiction." *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 380 (2004) (cleaned up).  Although there is no "technical definition of 'jurisdiction,'" federal courts issue the writ when faced with "a judicial usurpation of power or a clear abuse of discretion."  *Id.*

To issue the writ, (1) the petitioner must show that its "right to issuance of the writ is clear and indisputable"; (2) the issuing court "must be satisfied that the writ is appropriate under the circumstances"; and (3) the petitioner must "have no other adequate means to attain the relief [it] desires."  *Id.* at 380-81.  "These hurdles, however demanding, are not insuperable."  *Id.* at 381; *In re United States*, 945 F.3d 616, 622 (2d Cir. 2019) (same).

## ARGUMENT

### I. The Firm's Right to Issuance of the Writ—Based on Rule 37(b)(2)'s Text and *Apex*'s Holding—Is Clear and Indisputable

This Court issues the writ in "exceptional circumstances amounting to a judicial usurpation of power *or* a clear abuse of discretion."  *In re City of New York*, 607 F.3d 923, 943 (2d Cir. 2010).  A court usurps its power when the court has "no judicial power to do what it purports to do."  *De Beers Consol. Mines v. United States*, 325 U.S. 212, 217 (1945).  It commits a clear abuse of discretion when it clearly and indisputably "base[s] its ruling on an erroneous view of the law or on a

clearly erroneous assessment of the evidence." *SEC v. Rajaratnam*, 622 F.3d 159, 171 (2d Cir. 2010) (quotations omitted). "In this case, the two uses of mandamus overlap and reinforce one another." *In re F.C.C.*, 217 F.3d 125, 137 (2d Cir. 2000).

Rule 37(b)(2)'s text makes clear that "a party" excludes an attorney or law firm. If there were any dispute on the issue, this Court in *Apex* ended it long ago.

**1.** Rule 37(b)(2) sanctions are authorized only where "a party" or "a party's" corporate official violates a discovery order. The rule is clear:

> *If a party* or *a party's* officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit discovery, … the court where the action is pending may issue further just orders.

Fed. R. Civ. P. 37(b)(2)(A) (emphasis added). The predicate "[*i*]*f*" requires a violation of a discovery order by "a party" or "a party's" corporate official *before* a court "may" issue a "just orders" sanction. And "a party," by its plain terms, is "one by or against whom a lawsuit is brought." *U.S. ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 933-34 (2009) (cleaned up) (discussing Rule 37); *see Apex*, 855 F.2d at 1013-14. Because there was no alleged "party" violation here, the District Court's ongoing Rule 37(b)(2) sanctions against the Firm are unauthorized by law.

Other provisions of Rule 37 confirm this conclusion. Although Rule 37(b)(2)(A) does not mention an attorney, Rule 37(b)(2)(C) authorizes a district court to "order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure" to obey the

discovery order under Rule 37(b)(2)(A) or to produce another person for examination under Rule 37(b)(2)(B). Rule 37(a) and Rule 37(d) similarly authorize a district court to order the "attorney advising" the disobedient party to pay reasonable expenses, including attorney's fees, caused by a party's failure to make a disclosure or respond to a discovery request. *See* Fed. R. Civ. P. 37(a)(5)(A), (d)(3). Thus, while Rule 37 authorizes some monetary sanctions against *the attorney advising* the disobedient party, such sanction is only derivative of wrongdoing *by the party*.

The theory that "a party" under Rule 37(b)(2) really means "any attorney, law firm, or party" violates multiple canons of textual interpretation. That idea renders superfluous other parts of Rule 37. For example, it would be redundant to authorize monetary sanctions against "the disobedient party, *the attorney advising that party, or both*." Fed. R. Civ. P. 37(b)(2)(C) (redundancy emphasized); *see also* Fed. R. Civ. P. 37(a)(5)(A), (d)(3) (similar language). And although identical words are presumed to bear the same meaning throughout a text, the word "party" would have different meanings throughout Rule 37's subsections. By contrast, the plain meaning of the term "party"—i.e., the "one by or against whom a lawsuit is brought," *Eisenstein*, 556 U.S. at 933 (cleaned up)—gives effect to every clause and word of Rule 37's text.

The drafters' decisions to require party conduct as the grounds for any sanctions under Rule 37 was intentional. Rule 11 authorizes a district court to sanction "any attorney, law firm, or party that violated the rule or is responsible for the violation," and "[a]bsent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee." Fed. R. Civ. P. 11(c)(1). In 1993, following the Supreme Court's decision in *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120 (1989), the drafters amended Rule 11 to expressly reference "any attorney, law firm, or party" or firm "employee" responsible for the violation but amended Rule 37 without the same modification. *See* Fed. R. Civ. P. 11 advisory committee's note (1993 amendment); Fed. R. Civ. P. 37 advisory committee's note (1993 amendment). By 1993, multiple circuits held that "a party" under Rule 37(c) did not include its attorney. *See infra* Part I.2. Unlike Rule 37, Rule 11 authorizes sanctions if the attorney or law firm "violated" or is "responsible for" the violation, including for violations by an "employee." *See Bloom v. Azar*, 976 F.3d 157, 161 (2d Cir. 2020) (*expressio unius* canon).

**2.** If there were ever a dispute whether "a party" really meant "an attorney, law firm, or party" under Rule 37, this Court in *Apex* ended it. There, the district court sanctioned the law firm Shea & Gould "under Rule 37(c) for failing to admit four factual matters" during discovery. 855 F.2d at 1011-13. Rule 37(c) then stated:

> *If a party fails* to admit the genuineness of any document or the truth of any matter as requested under Rule 36, and if the party requesting the admissions thereafter proves the genuineness of the document or the truth of the matter, the requesting party may apply to the court for an order requiring the other party to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees.

Fed. R. Civ. P. 37(c) (1987) (emphasis added).[5]

On appeal, this Court reversed the district court, holding that "Rule 37(c) does not permit sanctions against a party's attorney." *Apex*, 855 F.2d at 1013. The Court reasoned that "[b]y its express terms, Rule 37(c) applies only to a party"; inferred from "the other subsections of Rule 37 expressly providing for the imposition of sanctions against a party's attorney that the drafters intended to omit attorneys from the coverage of subsection (c)"; and ultimately "decline[d] to adopt [the] suggestion that [the Court should] construe Rule 37(c) broadly in order to fill a so-called 'gap' in the federal rules." *Id.* at 1014. Below, Judge Daniels did not even attempt to explain how, given *Apex*, the term "party" under Rule 37(c) somehow has a different meaning than under Rule 37(b).

Lest there be any doubt, every sister circuit that has defined a Rule 37 "party" has followed *Apex*'s lead. *See NPF Franchising, LLC v. SY Dawgs, LLC*, 37 F.4th 369, 383 (6th Cir. 2022); *Sun River Energy v. Nelson*, 800 F.3d 1219, 1226-27 & n.7

---

[5] Current Rule 37(c)(2) is substantively and structurally identical to former Rule 37(c). *Compare* Fed. R. Civ. P. 37(c)(2), *with* Fed. R. Civ. P. 37(c) (1987).

(10th Cir. 2015); *Grider v. Keystone Health Plan Cent.*, 580 F.3d 119, 141 (3d Cir. 2009); *Ins. Ben. Administrators, Inc. v. Martin*, 871 F.2d 1354, 1360 (7th Cir. 1989).

**3.** This textual analysis and *Apex* were repeatedly presented to Judge Daniels across four separate briefs and at oral argument, but he *ignored* them in his order denying a stay. Instead, Judge Daniels uncritically stated that "Rule 37(b) applies to attorneys as well as parties." A393 (citing *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 128 F.3d 99, 102-03 (2d Cir. 1997) (per curiam)). That view cannot square with *Apex*'s holding that "Rule 37(c) does not permit sanctions against a party's attorney." 855 F.2d at 1013.

*Fonar*, as the Firm argued below, involved party misconduct as the basis for sanctions. There, the failure of the party's president, and designated Rule 30(b)(6) witness, to appear at his deposition served as the foundation for sanctions. 128 F.3d at 100-03. Monetary sanctions were imposed under Rule 37(b) against both the party and the "attorney advising" the disobedient party, for "his role in [the president]'s failure to appear for deposition." *Id.* at 101-02 & n.2. *Fonar* did not discuss *Apex*, analyze the meaning of a Rule 37 "party," or authorize Rule 37(b)(2) sanctions absent party misconduct.

To be sure, a district court is not without authority to sanction an individual attorney for their violation of a discovery order. Rule 37's advisory notes repeatedly state that where, as here, the rule does not authorize the district court to impose

sanctions, the court may "resort to inherent power."  *See* Fed. R. Civ. P. 37 advisory

committee's note (1970 amendment); *see also id.* (2000 amendment); *id.* (2015

amendment).   Inherent power sanctions can serve "as a useful backstop against

discovery abuses that do not clearly violate Rules 26(g) and 37."  *Yukos Cap.*

*S.A.R.L. v. Feldman*, 977 F.3d 216, 236 (2d Cir. 2020).  The federal rules "simply

… provide courts with an additional tool by which to control the judicial process"

and do not "displace the[ir] inherent power."  *Chambers v. NASCO, Inc.*, 501 U.S.

32, 48 n.13 (1991).

But sanctions under inherent power require a different evidentiary standard

than Magistrate Judge Netburn applied (without notice) here.[6]  There must be "clear

and convincing evidence of bad faith" to issue "sanctions under the court's inherent

power."   *Yukos*, 977 F.3d at 235.   Bad faith is "personal" and "may not

automatically" be "imputed" on others.  *See Wolters Kluwer Fin. Servs., Inc. v.*

*Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009) (quotations omitted).  In other words,

the court's "factual findings of bad faith must be characterized by a high degree of

---

[6] Judge Netburn's failure to provide "specific notice of … the standard by which [the Firm's] conduct will be assessed, and … of the authority under which sanctions are being considered," and pivot to Rule 37 after the contempt hearing, *Wilson v. Citigroup, N.A.*, 702 F.3d 720, 725 (2d Cir. 2012) (quotations omitted), violated clearly established law.  *See, e.g.*, *Schoenberg v. Shapolsky Publishers, Inc.*, 971 F.2d 926, 934 (2d Cir. 1992) (insufficient notice of Rule 37(b) sanction where court ordered counsel to show cause "why sanctions should not be imposed … pursuant to Rule 11 … or other authority"), *abrogated on other grounds by Bassett v. Mashantucket Pequot Tribe*, 204 F.3d 343 (2d Cir. 2000).

specificity" as to each individual attorney. *Milltex Indus. Corp. v. Jacquard Lace Co.*, 55 F.3d 34, 38 (2d Cir. 1995) (quotations omitted). This heightened standard is particularly important when a court acts as the "accuser, fact finder and sentencing judge, not subject to restrictions of any procedural code and at times not limited by any rule of law governing the severity of sanctions that may be imposed." *Mackler Prods., Inc. v. Cohen*, 146 F.3d 126, 128 (2d Cir. 1998).

Given the dearth of evidence of involvement in the leak by any attorney over a two-day hearing, Magistrate Judge Netburn did not—and could not—find clear-and-convincing evidence that any attorney acted in bad faith. A50 n.15, A75-76. Accordingly, no evidence supports inherent power sanctions, and neither the law nor Judge Netburn's circumstantial "evidence" supports Rule 37(b)(2) sanctions against the Firm.

**4.** Finally, Judge Daniels clearly abused his discretion in denying the stay for a separate reason: Rather than independently review the record, he summarily adopted Magistrate Judge Netburn's factual findings without explanation. A391-98 & n.1. Judge Netburn overlooked documentary evidence—including contemporaneous emails and phone records—that undermines her finding that the Firm knew about the leak and covered its eyes during its investigation. *See supra* Background; A261-70 (cataloging overlooked evidence). Judge Netburn did not credit the testimony of Firm attorneys that was confirmed by objective evidence.

This Court can (and should) "find clear error" in Judge Daniels's summary adoption of Magistrate Judge Netburn's erroneous findings because, among other flaws, "[d]ocuments or objective evidence" contradict her findings. *Anderson v. City of Bessemer*, 470 U.S. 564, 575 (1985).

## II.    A Writ of Mandamus Is Not Only Appropriate, But Called For, Under the Circumstances

In determining whether to issue the writ, this Court may consider "a range of factors" including whether the petition presents a "novel and significant question of law" *or* a "legal issue whose resolution will aid in the administration of justice." *In re United States*, 945 F.3d at 628 (quotations omitted). Because both factors (and others) are presented here, it is "appropriate under the circumstances" for this Court to issue the writ. *Cheney*, 542 U.S. at 381.

**1.** The specific question of whether federal courts are authorized to sanction attorneys under Rule 37(b)(2) where the violation of a discovery order was not by "a party" or "a party's" corporate official is novel and significant. This Court in *Apex* addressed the meaning of the term "party" under Rule 37(c), holding that the term does not include the party's attorney or its law firm. *See* 855 F.2d at 1013-14. That holding applies equally to Rule 37(b)(2). Given the multitude of discovery orders issued in this Circuit—one of the busiest circuits in the country by any measure—issuance of the writ will assist  judges in their consideration of discovery sanctions moving forward.

**2.** Resolving this issue will also aid in the administration of justice in this Circuit. While some judges are aware of *Apex*'s holding,[7] many are not. Some judges, for example, have directly contravened *Apex* by imposing monetary sanctions against counsel under Rule 37(c).[8] Other judges have misconstrued dicta in *Apex* as permitting sanctions against counsel under other provisions of Rule 37 for attorney-based (not party-based) violations.[9] And still other judges (apparently unaware of *Apex*) have sanctioned counsel's conduct under Rule 37 while citing *SEC v. McNulty*, 137 F.3d 732 (2d Cir. 1998)—an opinion that post-dates *Apex* and involves the fact-intensive inquiry of whether a court should "impute" an attorney's conduct to the client for purposes of a Rule 60 or Rule 55 default judgment.[10] That inquiry turns on whether the client makes an evidentiary showing that he

---

[7] *See, e.g.*, *Singh v. Lintech Elec.*, 2021 WL 3914478, at *10 n.5 (E.D.N.Y. July 20, 2021); *Eisner v. Enhanced Recovery Co.*, 407 F. Supp. 3d 132, 139 (E.D.N.Y. 2019); *Guzik v. Albright*, 2019 WL 1448358, at *4 (S.D.N.Y. Feb. 8, 2019); *Pichardo v. C.R. Bard, Inc.*, 2015 WL 13784565, at *2 n.1 (S.D.N.Y. Jan. 26, 2015); *Genger v. Sharon*, 2012 WL 3854883, at *7 n.71 (S.D.N.Y. Sept. 5, 2012); *Kleiman v. Chertoff*, 2007 WL 9706519, at *9 (E.D.N.Y. July 10, 2007).

[8] *See, e.g.*, *Markey v. Lapolla Indus.*, 2015 WL 5027522, at *22-25 (E.D.N.Y. Aug. 25, 2015), *report and recommendation adopted*, 2016 WL 324968 (E.D.N.Y. Jan. 26, 2016); *Ritchie Risk-Linked Strategies Trading (Ireland) v. Coventry First LLC*, 280 F.R.D. 147, 157 (S.D.N.Y. 2012).

[9] *See, e.g.*, *Markus v. Rozhkov*, 615 B.R. 679, 694, 701 (S.D.N.Y. 2020); *Armamburu v. Healthcare Fin. Servs.*, 2007 WL 2020181, at *5 (E.D.N.Y. July 6, 2007).

[10] *See, e.g.*, *Shipstad v. One Way or Another Prods., LLC*, 2017 WL 2462657, at *3, *5 (S.D.N.Y. June 6, 2017); *Copeland v. Rosen*, 194 F.R.D. 127, 133 (S.D.N.Y. 2000), *remanding sanctions determination*, 25 F. App'x 17 (2d Cir. 2001).

"attempt[ed] to monitor counsel's handling of the lawsuit." *Id.* at 740. Resolving this issue will settle the law and "offer useful guidance to the district courts" during discovery. *United States v. Prevezon Holdings Ltd.*, 839 F.3d 227, 238 (2d Cir. 2016).

**3.** The longer the Firm and its attorneys must wait for Magistrate Judge Netburn's ongoing sanctions to (inevitably) be vacated, the greater the damage to their reputations and business. *See United States v. Tillman*, 756 F.3d 1144, 1150 (9th Cir. 2014) (granting writ). Their "professional reputations are the essence of their livelihood," and matter "to the court, to clients, to colleagues, and to the public." *Id.* at 1151. "[T]he existence of the sanctions order may influence judges to think twice before appointing" the Firm as lead counsel in future complex cases, *id.*, despite its qualifications and long history of integrity and success. *See, e.g.*, *In re Air Disaster in Lockerbie*, No. MDL 799 (E.D.N.Y.) (Pan Am Flight 103 bombing). Numerous clients and colleagues have asked Firm attorneys about the accusations in the sanctions order, too. "In a specialized arena," like aviation disasters, "the professional circle is even more circumscribed." *Tillman*, 756 F.3d at 1151. And given the press focus on the 9/11 litigation, the sanctions order has been broadcast to a national audience. "Although the damage is already done in part, there is no reason to prolong it; through mandamus [this Court] can offer [the Firm and its attorneys] some relief." *Id.*

**4.** The Supreme Court has a long and consistent history of providing relief where a district court usurps judicial power under federal statutes and rules. In *Mallard v. U.S. District Court for the Southern District of Iowa*, 490 U.S. 296, 301-09 & n.8 (1989), for example, the Supreme Court held the district court "plainly acted beyond its 'jurisdiction'" when it required counsel to represent an indigent litigant in a civil case because, based on its plain text, the federal law did not "authorize the imposition of sanctions should a lawyer decide not to serve." Likewise, in *Schlagenhauf v. Holder*, 379 U.S. 104, 111 (1964), the Supreme Court held that the district court usurped judicial power when it ordered a mental and physical examination of a defendant under former Rule 35, "an issue of first impression that called for the construction and application of Rule 35 in a new context."

This Court shares that history. In *Philip Morris Inc. v. National Asbestos Workers Medical Fund*, 214 F.3d 132, 135 (2d Cir. 2000), for example, this Court accepted review and held that "the timing requirement in Rule 23(c)" generally requires class certification motions to be decided before trial.[11] Similarly, in *Richardson Greenshields Securities, Inc. v. Lau*, 825 F.2d 647, 652 (2d Cir. 1987), this Court held that, absent extraordinary circumstances, "a court has no power to

---

[11] The Court issued an opinion but ultimately did not issue the writ because, unlike here, Judge Jack B. Weinstein never made "a definitive ruling" on when he would address the motion. *Philip Morris*, 214 F.3d at 135.

prevent a party from filing pleadings, motions or appeals authorized by the Federal Rules of Civil Procedure." And in *Padovani v. Bruchhausen*, 293 F.2d 546, 548 (2d Cir. 1961), the Court held that the course followed by the district court "not only [wa]s unauthorized, but [wa]s at odds with the purpose and intent of [Rule] 16."

Under the circumstances, issuance of the writ of mandamus is not only appropriate—it is called for.

## III.    The Firm Has No Other Adequate Means to Obtain Relief

Absent issuance of a writ, the Firm has "no other adequate means to obtain the relief [it] seeks." *Cheney*, 542 U.S. at 380-81 (quotations omitted). This requirement is satisfied where (1) relief is not available through the regular appeals process and (2) the district court has foreclosed the relief sought in the petition. *In re United States*, 945 F.3d at 623.

**1.** The ordinary appeals process does not afford the Firm an adequate means to obtain relief. As an initial matter, Judge Daniels's order denying a stay of the Rule 37 sanctions against the Firm and its attorneys is not an immediately appealable collateral order. *See, e.g.*, *New Pac. Overseas Grp. (U.S.A.) Inc. v. Excal Int'l Dev. Corp.*, 252 F.3d 667, 670 & n.1 (2d Cir. 2001) (mini-*en banc*). Nor is certification an "adequate" means of relief: Judge Daniels's refusal to even engage with the Firm's arguments demonstrates his (erroneous) belief that there is no "substantial ground for difference of opinion" on the issue and, because sanctions here do not

touch the merits of the case, certification is unlikely to "materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).

The regular appeals process likewise fails to afford an "adequate" means to obtain vacatur of the ongoing sanctions.  The underlying litigation commenced in 2002, over twenty years ago, and the case against KSA began in earnest in 2016, nearly seven years ago.  If history is a guide, it is no exaggeration to say that the resolution of this expansive multidistrict litigation (and an appealable final decision) is years—if not a decade—away.

What's more, there is no guarantee of a final decision to appeal because only the Firm, not a client, was sanctioned.  An attorney—as a nonparty—depends on the client's case for appellate review, which is unlikely if there is a settlement or favorable judgment.  *See Tillman*, 756 F.3d at 1151.  Waiting for a final judgment in this long-running litigation would involve years of delay that will "damage or prejudice" professional reputations "in a way that is not correctable on appeal."  *Id.* (quotations omitted).

**2.**  With ongoing harm to the Firm's reputation and Plaintiffs' case against KSA, the Firm should not have to wait for Judge Daniels's *pro forma* resolution of its objections before seeking a writ.  *Padovani*, 293 F.2d at 548.  Despite briefing and oral argument which showed that the District Court did not have authority to sanction the Firm—or its attorneys—based on a preponderance of evidence under

Rule 37(b)(2), Judge Daniels permitted Rule 37 sanctions anyways. A393-94. Nor is there any dispute that Magistrate Judge Netburn did not (and could not) identify clear-and-convincing evidence of bad faith to sanction Firm attorneys under inherent powers. *See Doe v. Menefee*, 391 F.3d 147, 164 (2d Cir. 2004) (collecting reversals).

Circuits have issued writs where a district court's denial of stay was a clear abuse of discretion with potential immediate harmful effects. *See, e.g.*, *Medhekar v. U.S. Dist. Ct. for the N. Dist. of California*, 99 F.3d 325, 326-27 (9th Cir. 1996); *In re E.E.O.C.*, 207 F. App'x 426, 429-30 (5th Cir. 2006). Indeed, the Supreme Court has repeatedly endorsed attorneys seeking a writ of mandamus where, as here, "the trial court declines to stay enforcement of the [sanctions] order and the result is an exceptional hardship itself likely to cause an injustice." *Cunningham v. Hamilton Cnty.*, 527 U.S. 198, 211 (1999) (Kennedy, J., concurring) (citing *Richardson-Merrell Inc. v. Koller*, 472 U.S. 424, 435 (1985)).

Absent issuance of the writ, "there is no other avenue for relief from the immediate and ongoing harm to [the Firm and its attorneys'] professional reputation," *Tillman*, 756 F.3d at 1151, and the needless harm to Plaintiffs' efforts to hold KSA to account, A111-17.

**CONCLUSION**

This Court should issue a writ of mandamus, vacate the sanction order, and confine the District Court to the lawful exercise of its authority.

Dated:  February 2, 2023
        New York, NY

                                        Respectfully submitted,

                                         _/s/ Edward M. Spiro_____

Emily Kirsch                            Edward M. Spiro
Paul Niehaus                              *Counsel of Record*
KIRSCH & NIEHAUS PLLC                   Raymond D. Moss
950 Third Avenue, 19th Floor            MORVILLO ABRAMOWITZ
New York, NY 10022                       GRAND IASON & ANELLO PC
(212) 832-0170                          565 Fifth Avenue
                                        New York, NY 10017
                                        (212) 856-9600
                                        espiro@maglaw.com

      *Counsel for Nonparty-Petitioner Kreindler & Kreindler LLP*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that:

1.      This petition complies with the type-volume limitation of Fed. R. App. P. 21(d)(1) because it contains 7,799 words, excluding the parts of the petition exempted by Fed. R. App. P. 21(a)(2)(C) and Fed. R. App. P. 32(f), as determined by the word-count feature of Microsoft Word.

2.      This petition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font.


Dated:   February 2, 2023
         New York, NY

                                         /s/ Raymond D. Moss
                                        Raymond D. Moss

## CERTIFICATE OF SERVICE

I hereby certify that, on February 2, 2023, an electronic copy of the foregoing petition, including the accompanying appendix, was served on all parties to the proceeding before the United States District Court for the Southern District of New York using the court's ECF system. *See In re Terrorist Attacks on September 11, 2001*, No. 1:03-md-1570 (S.D.N.Y.). I also caused a copy of the foregoing petition and accompanying appendix to be served by USPS Express Mail on defendant-respondent Kingdom of Saudi Arabia and by hand delivery on the District Court at:

| | |
|---|---|
| Michael K. Kellogg | The Honorable George B. Daniels |
| Mark C. Hansen | United States District Court for the |
| Gregory G. Rapawy |   Southern District of New York |
| Andrew C. Shen | Daniel Patrick Moynihan |
| KELLOGG HANSEN TODD | United States Courthouse |
|   FIGEL & FREDERICK PLLC | 500 Pearl Street, Room 1310 |
| Sumner Square | New York, NY 10007 |
| 1615 M Street, N.W., Suite 400 | |
| Washington, D.C. 20036 | |
| (202) 326-7900 | |
| mkellogg@kellogghansen.com | |

*Attorneys for Defendant-Respondent*
*Kingdom of Saudi Arabia*


  */s/ Edward M. Spiro*
Edward M. Spiro

## SUPPLEMENTAL CERTIFICATE OF SERVICE

I hereby certify that, on February 2, 2023, an electronic copy of the foregoing petition and accompanying appendix (collectively, the "Petition") was served on all parties to the proceeding before the United States District Court for the Southern District of New York using the court's ECF system. *See In re Terrorist Attacks on September 11, 2001*, No. 1:03-md-1570 (S.D.N.Y.), ECF No. 8856-1. I also caused a copy of the Petition to be served on February 2, 2023 by USPS Express Mail on defendant-respondent Kingdom of Saudi Arabia ("KSA") and by hand delivery on the District Court at the following addresses:

Michael K. Kellogg
Mark C. Hansen
Gregory G. Rapawy
Andrew C. Shen
KELLOGG HANSEN TODD
  FIGEL & FREDERICK PLLC
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
mkellogg@kellogghansen.com

*Attorneys for Defendant-Respondent
Kingdom of Saudi Arabia*

The Honorable George B. Daniels
United States District Court for the
  Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street, Room 1310
New York, NY 10007

After serving the Petition on all parties to the proceeding before the District Court, KSA's counsel objected to the public filing of one sentence in the Background section of the Petition (Page 7, Section B, second sentence). We asked the District Court Clerk's Office to issue a provisional seal of the Petition to provide the

Petitioner an opportunity to assess KSA's objection. Petitioner disagreed with KSA's position but, to avoid burdening the District Court with unnecessary motion practice, agreed with KSA that all parties should be provided access to the unredacted Petition at ECF No. 8856-1, with a redacted copy of the Petition available to the public. On February 6, 2023, Magistrate Judge Sarah Netburn granted in part and denied in part the unopposed motion. She permitted Petitioner to file a redacted Petition on the public docket and required any MDL counsel who wants access to the unredacted Petition at ECF No. 8856-1 to email her Chambers. On February 7, 2023, an electronic copy of the redacted Petition was served on all parties to the proceeding before the District Court using the court's ECF system. *See In re Terrorist Attacks on September 11, 2001*, No. 1:03-md-1570 (S.D.N.Y.).

> /s/ Edward M. Spiro
> Edward M. Spiro

# No. 23-

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

—————————

IN RE KREINDLER & KREINDLER LLP

—————————

KREINDLER & KREINDLER LLP,

*Nonparty-Petitioner*,

v.

KINGDOM OF SAUDI ARABIA,

*Defendant-Respondent.*[*]

—————————

On Petition for a Writ of Mandamus
to the United States District Court
for the Southern District of New York,
The Honorable George B. Daniels,
No. 1:03-md-1570-GBD-SN

—————————

## APPENDIX
## (Pages A1 to A398)

—————————

Emily Kirsch
Paul Niehaus
KIRSCH & NIEHAUS PLLC
950 Third Avenue, 19th Floor
New York, NY 10022
(212) 832-0170

Edward M. Spiro
   *Counsel of Record*
Raymond D. Moss
MORVILLO ABRAMOWITZ
   GRAND IASON & ANELLO PC
565 Fifth Avenue
New York, NY 10017
(212) 856-9600
espiro@maglaw.com

*Counsel for Nonparty-Petitioner Kreindler & Kreindler LLP*

[*] For a list of all parties to this multidistrict litigation, see *In re Terrorist Attacks on September 11, 2001*, No. 1:03-md-1570 (S.D.N.Y.).

# TABLE OF CONTENTS

**Page**

Firm's [Excerpted] Proposed Findings of Fact and Conclusions of Law, dated Nov. 24, 2021 (Dkt. 7386) ......................................................... A1

Saudi Arabia's [Excerpted] Proposed Findings of Fact and Conclusions of Law, dated Nov. 24, 2021 (Dkt. 7389) ............................................. A4

Magistrate Judge Netburn's Order Imposing Sanctions, dated Sept. 21, 2022 (Dkt. 8544) ........................................................... A15

Firm's Motion by Proposed Order to Show Cause for a Stay, dated Oct. 4, 2022 (Dkt. 8607) ...................................................... A80

    Memorandum of Law in Support of Motion, dated Oct. 4, 2022 (Dkt. 8608) ...................................................... A82

    Letter Motion Requesting Oral Argument, dated Oct. 4, 2022 (Dkt. 8609) ...................................................... A110

    Corrected Declaration of Andrew J. Maloney, III, dated Oct. 5, 2022 (Dkt. 8613) .................................................... A111

Saudi Arabia's Letter to Judge Daniels, dated Oct. 6, 2022 (Dkt. 8616) ................................................ A119

Firm's Letter to Judge Daniels, dated Oct. 7, 2022 (Dkt. 8617) ................................................ A122

Letter from J. Flowers and S. Carter (Committee Members) to Judge Daniels, dated Oct. 11, 2022 (Dkt. 8620) ................................................ A125

Judge Daniels's Order Denying First Motion for a Stay, dated Oct. 17, 2022 (Dkt. 8642) ............................................. A127

Firm's Rule 72 Objections to Order Imposing Sanctions, dated Oct. 25, 2022 (Dkt. 8681) ............................................. A129

Firm's Renewed Notice of Motion to Stay Nonmonetary Sanctions,
dated Nov. 3, 2022 (Dkt. 8700) ............................................................. A176

Supplemental Declaration of Andrew J. Maloney, III,
dated Nov. 3, 2022 (Dkt. 8701) ...................................................... A178

Saudi Arabia's Opposition to Rule 72 Objections,
dated Nov. 15, 2022 (Dkt. 8751) ............................................................ A182

Saudi Arabia's Opposition to Renewed Stay Motion,
dated Nov. 17, 2022 (Dkt. 8760) ........................................................... A230

Firm's Reply in Support of Renewed Stay Motion,
dated Nov. 25, 2022 (Dkt. 8772) ........................................................... A245

Firm's Reply in Support of Rule 72 Objections,
dated Dec. 1, 2022 (Dkt. 8781) ............................................................. A255

Letter from R. Haefele and S. Carter (Committee Members) to Judge
Daniels, dated Dec. 2, 2022 (Dkt. 8787) ................................................. A276

Transcript of Oral Argument for Renewed Stay Motion and Objections,
dated Dec. 8, 2022 (Dkt. 8801) ............................................................. A279

Letter from M. Baumeister (Committee Member) to Judge Daniels,
dated Dec. 11, 2022 (Dkt. 8795) ........................................................... A384

Letter from R. Haefele and S. Carter (Committee Members) to Judge
Daniels, dated Dec. 13, 2022 (Dkt. 8799) ............................................... A387

Letter from F. Granito (Committee Member) to Judge Daniels,
dated Dec. 13, 2022 (Dkt. 8800) ........................................................... A389

Order Denying Renewed Stay Motion,
dated Jan 12, 2023 (Dkt. 8828) ............................................................. A391

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) ECF Case |
|---|---|

This document relates to:                    **ORAL ARGUMENT REQUESTED**

All Actions

**KREINDLER & KREINDLER, LLP'S PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

KIRSCH & NIEHAUS PLLC
Emily Bab Kirsch
Paul R. Niehaus
Lisa Frey (*Of Counsel*)
150 East 58th Street, 22nd Floor
New York, NY  10155
212-832-0170
917-744-2888
*Attorneys for Kreindler & Kreindler, LLP,
Megan Benett, John Hartney, James
Kreindler, Andrew Maloney, Steven Pounian*

Dated:  November 24, 2021
        New York, New York

A1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... iii

PRELIMINARY STATEMENT ..................................................................................................... 1

PROPOSED FINDINGS OF FACT ............................................................................................... 3

    I.      BACKGROUND ..................................................................................................... 3

          A.    The Jarrah Deposition and Subsequent Leak ..................................... 3

          B.    Initial Response ................................................................................... 4

          C.    John Fawcett is Revealed as the Source of the Leak ........................... 6

    II.     PROCEDURAL HISTORY OF THE HEARING ........................................... 8

          A.    The Scope and Subjects of the Hearing .............................................. 8

          B.    Pre-Hearing Discovery ........................................................................ 9

          C.    The November 1-2, 2021 Hearing ..................................................... 11

          D.    Kreindler & Kreindler's Role in the 9/11 Litigation .......................... 12

    III.    EVIDENCE ADDUCED IN CONNECTION WITH THE HEARING ....... 15

          A.    John Fawcett Carried Out the Leak by Misleading Kreindler &
               Kreindler and by Intentionally Evading Security Measures ............... 15

          B.    There Is No Evidence That Anyone Other
               Than Mr. Fawcett Participated In The Breach ................................... 18

          C.    The Evidence Establishes That Neither Kreindler & Kreindler nor any of
               its Attorneys or Personnel Had Knowledge of or Participation in
               Fawcett's Leak Despite the Firm's Immediate and Continuing Investigation ..... 19

          D.    Additional Evidence Adduced at the Hearing Corroborates That
               Neither Kreindler & Kreindler Nor Any of Its Attorneys or
               Personnel Had Any Knowledge of or Involvement in Fawcett's Leak ............... 22

          E.    There Is No Evidence That Any Party Submitted False Or
               Knowingly Misleading Statements To The Court ................................. 25

    IV.    OTHER SPECULATION AND INNUENDO BY THE KINGDOM
          THAT KREINDLER & KREINDLER HAD ANY INVOLVEMENT IN
          FAWCETT'S BREACH ARE IMPROPER AND WITHOUT SUPPORT ................. 30

CONCLUSIONS OF LAW ......................................................................................................... 35

    I.      THE RECORD LACKS PROOF OF A *PRIMA FACIE* CASE OF  CONTEMPT BY
          CLEAR AND CONVINCING EVIDENCE AGAINST KREINDLER & KREINDLER
          OR ANY OF ITS ATTORNEYS ............................................................... 35

          A.    Civil Contempt is a Drastic and Inappropriate Remedy ...................... 35

          B.    A Magistrate Judge Has the Power on a Contempt Motion to Determine
               Whether or Not to Certify Facts to the District Judge for Further Proceedings ... 37

i

**A2**

C.      The Kingdom Failed to Establish a *Prima Facie* Case for Contempt
        Against Kreindler & Kreindler for Violation of the Protective Orders ............... 38

D.      The Kingdom has Failed to Establish a *Prima Facie* Case Against
        Kreindler & Kreindler for Submitting False Statements to the Court ................. 43

II.     NO CONTEMPT SANCTIONS ARE WARRANTED
        AGAINST KREINDLER & KREINDLER...................................................... 47

        A.      Compensatory Damages are Not Warranted......................................... 48

        B.      Compliance Sanctions Are Not Warranted........................................... 49

III.    THERE IS NO BASIS FOR THE COURT TO IMPOSE SANCTIONS ON
        KREINDLER & KREINDLER PURSUANT TO ITS INHERENT POWERS ........... 50

        A.      The Court May Not Impose Sanctions Without A Finding of Bad Faith ............. 50

        B.      Because the Record Is Devoid of Any Finding of
                Bad Faith, None of the Potential "Remedies" Listed
                by the Court in Its October 4 Order Should be Imposed. ..................................... 51

RESERVATION OF RIGHTS ................................................................................. 56

CONCLUSION....................................................................................................... 57

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| _____ | ) | |
| IN RE:  TERRORIST ATTACKS ON | ) | Civil Action No. 03 MDL 1570 (GBD) (SN) |
| SEPTEMBER 11, 2001 | ) | ECF Case |
| _____ | ) | |

This document relates to:  *All Actions*

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
## OF THE KINGDOM OF SAUDI ARABIA RELATING TO
## KREINDLER & KREINDLER LLP'S VIOLATION
## OF THE COURT'S PROTECTIVE ORDERS

Michael K. Kellogg
Mark C. Hansen
Gregory G. Rapawy
Andrew C. Shen
KELLOGG, HANSEN, TODD, FIGEL
   & FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036-3209
(202) 326-7900
(202) 326-7999 (fax)

*Attorneys for the Kingdom of Saudi Arabia*

A4

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................... viii

I.      INTRODUCTION ...................................................................................................... 1

II.     PROPOSED FINDINGS OF FACT ............................................................................ 4

        A.      The MDL and FBI Protective Orders Govern the Use of
                Confidential Information in This Litigation ............................................. 4

        B.      Kreindler & Kreindler's Attorneys and Professionals Neither
                Understand nor Follow the MDL and FBI Protective Orders ................... 7

        C.      Kreindler & Kreindler Stores Confidential and Protected Material
                in Locations with Minimal or Nonexistent Safeguards ........................... 8

                1.      Kreindler & Kreindler's internal Case Media server had no
                        ability to limit or track access to confidential material ............... 9

                2.      Kreindler & Kreindler's cloud-based ShareFile server does
                        limit and track access to confidential material ........................ 10

                3.      Kreindler & Kreindler's email server contains confidential
                        material ................................................................................... 11

                4.      Kreindler & Kreindler employees save confidential
                        material on their personal devices and email accounts ............ 11

                5.      Fawcett saved confidential material on Dropbox .................... 11

        D.      Kreindler's Litigation Strategy Includes Frequent Press
                Appearances in Which He Disparages and Violates the Protective
                Orders .................................................................................................... 12

                1.      Kreindler and others express disgust and hate for the
                        Court's protective orders .......................................................... 12

                2.      Kreindler, working with Fawcett, violated the MDL
                        Protective Order in 2017 by disclosing confidential
                        information to the press ............................................................ 13

                3.      Kreindler disclosed confidential information in a 2019
                        speech at Dartmouth College and received a second
                        warning from the Court .............................................................. 15

4.      Kreindler disclosed confidential information in a 2021
        episode of the podcast *Conspiracyland* with Isikoff..................................15

E.   Fawcett Is or Was an Integral Member of the Kreindler & Kreindler
     Team with Unfettered Access to Protected Materials and Duties
     That Include Press Contacts..................................................................................16

F.   Kreindler & Kreindler Took Al Jarrah's Deposition with the
     Concealed Assistance of a Former FBI Agent........................................................18

G.   Kreindler Discussed the Confidential Al Jarrah Deposition with
     Isikoff, and Fawcett Sent Isikoff the Transcript ....................................................20

     1.      Kreindler and Isikoff discussed the deposition, and
             Kreindler discussed Isikoff's information requests with
             Fawcett.....................................................................................................20

     2.      Fawcett discussed the deposition with Isikoff and sent
             him the transcript ...................................................................................21

     3.      Fawcett destroyed or concealed evidence of his actions ..........................21

     4.      Both Kreindler and Fawcett continued to communicate
             with Isikoff..............................................................................................23

H.   Isikoff's Article Disclosed the Protective Order Violation, and
     Kreindler & Kreindler Purported To Investigate ....................................................23

     1.      Maloney began the investigation already confident that
             Kreindler & Kreindler was not the source of the leak ..............................24

     2.      No one asked Fawcett directly whether he sent Isikoff
             the transcript............................................................................................25

     3.      Maloney did not investigate Kreindler & Kreindler's
             contacts with Isikoff.................................................................................26

     4.      Maloney did not investigate most of the locations in which
             Kreindler & Kreindler stored the transcript or other
             confidential materials...............................................................................26

     5.      Maloney did not follow up on the two email searches that
             he did instruct Hartney to conduct...........................................................28

     6.      Maloney did not discover Fawcett's communications with
             Isikoff because he did not search personal devices or emails...................29

      7.      Maloney did not require Fawcett or anyone else to sign a
             sworn declaration ...................................................................................30

I.    Saudi Arabia's Inquiry About the Violation Triggered Calls
    Between Kreindler and Fawcett – and Fawcett and Personal
    Defense Counsel ..................................................................................................31

      1.      Fawcett's communications with Kreindler and Crotty
             strongly suggest discussions about the protective order
             violation ...................................................................................................31

      2.      Kreindler and Fawcett denied discussing the violation, and
             Fawcett falsely denied seeking legal advice from Crotty .........................32

      3.      Pounian's later declaration contradicts Kreindler's and
             Fawcett's testimony .................................................................................33

J.    Kreindler & Kreindler Made False Representations in July and
    August To Avoid or Delay Investigation of the Violation ....................................34

      1.      Pounian's July 23 email and Kreindler & Kreindler's July
             27 letter made false representations to Saudi Arabia and
             to the Court ..............................................................................................34

      2.      Kreindler & Kreindler declined to file any voluntary
             declarations ..............................................................................................36

      3.      The Court's August 16 Order directed Kreindler & Kreindler
             to submit declarations concerning the leak.................................................36

      4.      Kreindler & Kreindler's August 16 declarations made false
             and misleading statements to the Court ......................................................37

K.    Kreindler & Kreindler Failed To Comply with the Court's August
    30 Order and Made False and Misleading Statements...........................................39

      1.      Hartney conducted limited additional email searches and
             failed to produce the results as described in his declaration.....................40

      2.      Benett and Pounian prepare false and misleading
             declarations ..............................................................................................40

      3.      Kreindler & Kreindler admitted that its prior representations
             to the Court were false and drafted a declaration for Fawcett ....................44

      4.      Fawcett's declaration contained new false statements and
             did not identify or produce communications as directed by
             the Court...................................................................................................49

5. Kreindler & Kreindler submitted additional false, misleading, and noncompliant declarations with its September 27, 2021 letter ..................................................................................................52

  a. Kreindler's declaration.................................................................52

  b. Maloney's declaration.................................................................54

  c. Benett's declaration ...................................................................55

  d. Pounian's declaration.................................................................55

  e. Hartney's declaration .................................................................55

6. Kreindler & Kreindler's September 27, 2021 letter to the Court made additional false statements ......................................................57

L. Kreindler & Kreindler Prepared and Filed a Supplemental Fawcett Declaration and Letter Making More False and Misleading Statements..................................................................................................58

1. Fawcett's September 30, 2021 declaration made false statements.................................................................................58

2. Kreindler & Kreindler's September 30, 2021 letter made false and misleading statements.................................................59

M. Kreindler & Kreindler Failed To Inform Fawcett of Serious Conflicts of Interest Before Causing Him To Incriminate Himself......................62

N. Post-Hearing Discovery Shows That Kreindler & Kreindler Violated Court Orders and Made False and Misleading Statements To Conceal the Violation ......................................................................63

III. PROPOSED CONCLUSIONS OF LAW ..........................................................66

A. Kreindler & Kreindler Willfully Violated the Protective Orders Through Fawcett's and Kreindler's Acts and Omissions ......................................66

1. Fawcett willfully violated the MDL Protective Order and willfully or recklessly violated the FBI Protective Order .........................66

2. Fawcett purposefully destroyed or concealed evidence of the violations................................................................................68

3. Kreindler recklessly or with gross negligence caused or failed to prevent Fawcett's violation of the MDL and FBI Protective Orders ............................................................69

4.  Kreindler recklessly created a culture of disdain and disrespect for the Court's orders within his firm ......................................70

5.  Kreindler recklessly failed to supervise Fawcett despite giving him unlimited access to confidential information and press contacts ...................................................................................71

6.  Kreindler was grossly negligent in failing to ensure that MDL Protected Information was kept secure ............................................72

7.  Kreindler personally violated the protective order by disclosing confidential information to Isikoff............................................74

8.  Kreindler & Kreindler is responsible for Fawcett's and Kreindler's conduct.................................................................................75

    a.  Fawcett acted within the scope of his agency or employment with the firm and for its perceived benefit ........................................................................................75

    b.  Kreindler acted and failed to act within the scope of his agency for the firm and for its perceived benefit ....................76

B.  Through Its Attorneys, Kreindler & Kreindler Made False and Misleading Statements in the July 23 Email, the July 27 Letter, and the August 16 Declarations ...........................................................................77

    1.  As of the July 23, July 27, and August 16 statements, Kreindler knew or should have known that Fawcett had violated the protective orders...................................................................78

    2.  As of the July 23, July 27, and August 16 statements, Maloney, Benett, and Pounian knew or should have known that Maloney's investigation was unreasonable and incomplete ...............................................................................................79

        a.  Maloney did not conduct a reasonable investigation and knew it was not complete........................................................79

        b.  Benett and Pounian knew or should have known that they could not reasonably rely on Maloney's investigation.................................................................................81

    3.  Kreindler & Kreindler is responsible for its attorneys' misrepresentations...........................................................................................81

C.      Kreindler & Kreindler Violated the August 30 Order and Made
        Misrepresentations to the Court in the September 27 and
        September 30 Letters and the Declarations ...........................................82

        1.      Kreindler's declaration violated the Court's order and made
                false statements and misleading omissions...................................82

        2.      Maloney's declaration violated the Court's order and made
                false statements and misleading omissions...................................83

        3.      Benett's and Pounian's declarations violated the Court's
                order and made false and misleading statements.......................84

        4.      Hartney's declaration violated the Court's order and made
                false and misleading statements...................................................85

        5.      Fawcett's September 27 declaration violated the Court's
                order and made false statements ..................................................85

        6.      Fawcett's September 30 declaration violated the Court's
                order and made false and misleading statements.......................86

        7.      Benett also made false and misleading statements in the
                September 27 and September 30 letters.....................................87

        8.      Kreindler & Kreindler is responsible for its attorneys' and
                Fawcett's conduct .......................................................................87

D.      The Court Has Authority To Impose Sanctions Under Rule 37
        and the Court's Inherent Powers...........................................................88

        1.      Rule 37 authorizes severe sanctions for willful and
                bad-faith misconduct...................................................................88

        2.      The Court has inherent power to sanction bad-faith
                misconduct ..................................................................................89

E.      The Court Should Impose Appropriate Remedies To Enforce
        Its Orders and Ensure Future Respect for Its Authority .......................90

        1.      The Court should remove all Kreindler & Kreindler
                attorneys from the Plaintiffs' Executive Committee for
                Personal Injury Claims and terminate their access to
                confidential information in the MDL..........................................90

        2.      The Court should certify to Judge Daniels the facts that
                show civil and criminal contempt ...............................................95

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

3.     The Court should consider disciplinary and criminal referrals....................96

4.     The Court should award attorneys' fees .....................................................98

5.     The Court should draw an adverse inference from
destruction of evidence ..............................................................................98

**A11**

**FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW**

    **D.**    **The Court Has Authority To Impose Sanctions Under Rule 37 and the Court's Inherent Powers**

        **1.**    **Rule 37 authorizes severe sanctions for willful and bad-faith misconduct**

301.    Rule 37(b) of the Federal Rules of Civil Procedure authorizes this Court to impose various sanctions for a "fail[ure] to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2)(A). The Court may hold "[b]oth parties and counsel . . . personally liable for expenses, 'including attorney's fees,' caused by the failure to comply." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 763 (1980) (quoting Fed. R. Civ. P. 37(b)(2)(C)).

302.    A protective order restricting the use of confidential information provided in discovery, such as the MDL Protective Order and the FBI Protective Order, is "an order to provide or permit discovery" within the meaning of Rule 37(b). *See City of Almaty, Kazakhstan v. Ablyazov*, 2018 WL 1229730, at *7 (S.D.N.Y. Mar. 5, 2018) (imposing Rule 37 sanctions for protective order violation); *Jay v. Spectrum Brands Holdings, Inc.*, 2015 WL 6437581, at *5 (S.D.N.Y. Oct. 20, 2015) (same); *Schiller v. City of New York*, 2007 WL 1623108, at *3 (S.D.N.Y. June 5, 2007) (same).

303.    Rule 37(b) sanctions are properly used to "ensure that a party will not benefit from its own failure to comply" with a court order, "to obtain compliance with the particular order issued," and "to serve a general deterrent effect on the case at hand and on other litigation, provided that the party against whom they are imposed was in some sense at fault." *Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988). "Severe sanctions" are "justified . . . when the failure to comply with a court order is due to willfulness or bad faith, or is otherwise culpable." *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1367 (2d Cir. 1991). The court's discretion in selecting a sanction should be guided by factors including: "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser

88

sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant

party had been warned of the consequences of his noncompliance." *Nieves v. City of New York*,

208 F.R.D. 531, 535 (S.D.N.Y. 2002).

304.    Rule 37(e) of the Federal Rules of Civil Procedure further authorizes this Court to

impose sanctions "[i]f electronically stored information that should have been preserved in the

anticipation or conduct of litigation is lost because a party fail[s] to take reasonable steps to

preserve it, and it cannot be restored or replaced through additional discovery."  Fed. R. Civ. P.

37(e)(1).  Like the Court's authority under Rule 37(b), its authority under Rule 37(e) may be

used to impose sanctions on lawyers and law firms as well as parties.  *See Fashion Exch. LLC v.*

*Hybrid Promotions, LLC*, 2021 WL 1172265, at *5 (S.D.N.Y. Mar. 29, 2021) (observing that

"courts in this district have sanctioned attorneys under" Rule 37(e)(1)); *Karsch v. Blink Health*

*Ltd.*, 2019 WL 2708125, at *1 (S.D.N.Y. June 20, 2019) (imposing such sanctions).

## 2.    The Court has inherent power to sanction bad-faith misconduct

305.    This Court can impose sanctions for litigation misconduct by attorneys and law

firms before it under its inherent powers.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-46

(1991) (discussing the scope of a court's inherent powers).  Inherent-power sanctions can be

imposed for "willful disobedience of a court order," *id.* at 45 (citation omitted), including a

protective order.  *See City of Almaty*, 2018 WL 1229730, at *6 n.1; *Schiller*, 2007 WL 1623108,

at *3.  Inherent-power sanctions are also appropriate for "the making of false and misleading

statements to the Court."  *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I, LLC*, 924 F.

Supp. 2d 505, 507 (S.D.N.Y. 2013).

306.    Where "bad-faith conduct in the course of litigation . . . c[an] be adequately

sanctioned under the [Federal] Rules, [a] court ordinarily should rely on the Rules rather than the

inherent power."  *Chambers*, 501 U.S. at 50.  But the existence of "a statute or rule which

FILED UNDER SEAL – SUBJECT TO CONFIDENTIALITY REVIEW

provides a mechanism for imposing sanctions of a particular variety for a specific type of abuse does not limit a court's inherent power to fashion sanctions." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 136 (2d Cir. 1998).  In an appropriate case, courts can impose sanctions for conduct under a specific rule and also invoke its inherent powers as an alternative legal basis for the same sanctions.  *See City of Almaty*, 2018 WL 1229730, at *6 n.1; *Schiller*, 2007 WL 1623108, at *3.  That approach is appropriate here to ensure that the Court invokes authority of sufficient breadth to answer the wide-ranging misconduct before it.

307.    Sanctions under the Court's inherent powers require a finding of bad faith.  Bad faith is action for an improper purpose such as (a) harassment or (b) delay, *see Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir. 1986); (c) "'hampering enforcement of a court order,'" *Chambers*, 501 U.S. at 46 (quoting *Hutto v. Finney*, 437 U.S. 678, 689 n.14 (1978)); or (d) perpetrating a "fraud" on the court, *see Beverly Hills Teddy Bear Co. v. Best Brands Consumer Prods., Inc.*, 2020 WL 7342724, at *16-17 (S.D.N.Y. Dec. 11, 2020).[2]

> ### E.     The Court Should Impose Appropriate Remedies To Enforce Its Orders and Ensure Future Respect for Its Authority
>
> #### 1.     The Court should remove all Kreindler & Kreindler attorneys from the Plaintiffs' Executive Committee for Personal Injury Claims and terminate their access to confidential information in the MDL

308.    The Court should remove all Kreindler & Kreindler attorneys from the Plaintiffs' Executive Committee for Personal Injury Claims, as a "just order[ ]" under Rule 37(b)(2)(A) and in the exercise of its inherent powers.  No lesser remedy against Kreindler & Kreindler will adequately redress its misconduct, ensure that it respects the Court's orders in the future, or send

---

[2] The Court also can and should further confirm the conclusion that Fawcett and Kreindler & Kreindler acted in bad faith by drawing an adverse inference under Rule 37(e) based on Fawcett's purposeful destruction of evidence.  *See infra* ¶ 326.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

In re:

     **TERRORIST ATTACKS ON**
     **SEPTEMBER 11, 2001**

-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___9/21/2022___

**03-MD-01570 (GBD)(SN)**

<u>**OPINION & ORDER**</u>

**SARAH NETBURN, United States Magistrate Judge:**

     In federal multidistrict litigation, district courts regularly appoint attorneys to manage the litigation and coordinate pretrial proceedings. These executive committees centralize the leadership and daily management of litigation in a single body. They provide a forum to share resources, resolve or limit internal disputes, and put forward a unified litigation position. Leadership in such a committee is thus a role of immense responsibility and trust. The benefits of centralized leadership evaporate when the court cannot depend on a committee member's professionalism, ethics, and honesty.

     In this sprawling litigation, the Court established two Plaintiffs' Executive Committees ("PECs") in 2004 and named lawyers from the law firm of Kreindler & Kreindler to leadership positions. Kreindler & Kreindler plays a major role in advocating for the 9/11 families. In addition to representing its clients in court, it lobbies Congress and the Executive branch and aggressively promotes its litigation narrative in the press. All of this is permissible so long as the firm complies with judicial orders and, when called upon, speaks with candor to the Court.

     On July 15, 2021, reporter Michael Isikoff of Yahoo! News published an article about the deposition of Musaed Al Jarrah, a non-party in this case.[1] The article claimed that Yahoo! News

---

[1] Counsel for Saudi Arabia also represents nonparty Al Jarrah. ECF No. 7066.

had successfully obtained a copy of the deposition transcript (the "Al Jarrah Transcript"). That transcript, however, was protected by two protective orders (the "Protective Orders").

Faced with a flagrant breach of its orders, the Court initiated an investigation. Most firms willingly aided the effort. Kreindler & Kreindler did not. Instead, it dragged its feet, submitted incomplete responses to the Court's inquiries, and obstructed the investigation. Eventually, the reason for its reticence became apparent. One of its consultants, John Fawcett, confessed to deliberately leaking the transcript.

The Court ordered further discovery to determine the extent of this breach. After conducting an investigation, which included a two-day evidentiary hearing, it became apparent that Fawcett leaked the transcript as part of Kreindler & Kreindler's long-standing litigation strategy to pressure the Kingdom of Saudi Arabia into a settlement, and that he did so with the knowledge or at least tacit consent of lead attorney James Kreindler. Other attorneys at the firm were, at best, willfully blind to the leak as evidenced by their paltry investigation and knowingly misleading statements to the Court.

Kreindler & Kreindler served on the PECs for nearly two decades. Given its willful breach of the Protective Orders and its conduct during the investigation, the Court has lost faith in the firm's ability to comply with court orders or appear before the Court on behalf of all the September 11 victims. Kreindler & Kreindler is therefore removed from the PECs effective immediately. Fawcett is stripped of his access to any documents designated as confidential and barred from any further participation in the case.

## DISCUSSION

The background to this Opinion and Order is bound up with the facts of the breach and the parties' conduct during the Court's investigation. The Court therefore discusses this history

as part of its Findings of Fact. It assumes familiarity with the broader background of this

multidistrict litigation ("MDL"), which arises from the terrorist attacks on September 11, 2001.

## I.    Findings of Fact

The Court makes these findings based on the evidentiary hearing held on November 1

and 2, 2021 ("Hearing Tr."),[2] the parties' submissions at ECF Nos. 7386 (Kreindler &

Kreindler), 7387 (Fawcett), 7389 (Saudi Arabia), and the supporting exhibits provided by

Kreindler & Kreindler ("K&K"), Fawcett, and Saudi Arabia ("KSAX").[3] It also takes judicial

notice of its own orders and records. Rosado-Acha v. Red Bull Gmbh, No. 15-cv-7620 (KPF),

2016 WL 3636672, at *7 (S.D.N.Y. June 29, 2016) (a court may "take judicial notice of its own

orders and its own records") (cleaned up) (internal citations omitted).

### A.  The Protective Orders

Since 2006, discovery materials in this MDL have been protected by one or more

protective orders designed to facilitate the unique discovery challenges of this case. The first of

these (the "General Protective Order") was entered on October 3, 2006, under Rule 26(c) of the

Federal Rules of Civil Procedure. KSAX-0002, ECF No. 1900. In entering the General

Protective Order, Judge Casey recognized that the defendants in this MDL "are accused of either

committing the terrorist acts of September 11, 2001 or providing material support to those who

did." These "defendants will be asked to turn over a vast array of private and confidential

information during discovery, much of which will have little or no bearing on the resolution of

---

[2] The transcripts for November 1 and 2 are located at ECF Nos. 7347 and 7349 respectively.

[3] The exhibits presented by the parties are largely duplicative. Many are also contained on the main MDL docket, No. 03-md-1570. In the interest of balancing simplicity, transparency, and accessibility, the Court has used Saudi Arabia's exhibits for citations where possible as its filings were the most voluminous. Where the filing corresponds to a document on ECF, the Court has included that document in the first instance. Unless otherwise noted, all ECF citations are to the main MDL docket.

these actions but will be subject to widespread public scrutiny with prejudicial effects in the absence of a protective order." <u>Id.</u> at 5.

Accordingly, the General Protective Order creates a set of safeguards for confidential discovery material. It defines "Confidential Information or Material" and "Protected Material" as any disclosure or discovery material designated as confidential by a party under its terms. <u>Id.</u> at 7. Materials so designated may be used only in the defense or prosecution of this MDL. <u>Id.</u> at 8. The General Protective Order also covers deposition transcripts involving confidential information. These transcripts are treated as confidential for 30 days from when a party receives them from the court reporter. <u>Id.</u> at 10–11.

This Order also limits who can access protected material (primarily attorneys in this litigation and their staff) and requires that it be stored securely. <u>Id.</u> at 11–12. Violations of the Order are "punishable by money damages caused by the violation, including, but not limited to, all attorneys' fees, court costs, exhibit costs, expert witness fees, travel expenses, all related litigation costs, and actual damages incurred by the other Party, equitable relief, injunctive relief, sanctions or any other remedy as the Court deems appropriate." <u>Id.</u> at 15.

On November 14, 2018, a second order (the "FBI Protective Order") was entered specifically covering the use of information produced by the FBI. KSAX-0015, ECF No. 4255. Like the General Protective Order, the FBI Protective Order limits the use of protected material produced by the FBI to prosecuting or defending this matter and prohibits its dissemination to the public. <u>Id.</u> at 2, 5. It also limits the disclosure of protected FBI materials to select parties including attorneys and their staff. <u>Id.</u> at 2–3. If a transcript involves material subject to the FBI Protective Order, the whole transcript is treated as confidential for 30 days. <u>Id.</u> at 5.

These orders have been the target of frequent public attack by Kreindler & Kreindler attorneys. James Kreindler ("Kreindler"), the attorney supervising the firm's work on this case, Hearing Tr. at 22:3–15, has been particularly vociferous. He has publicly described the Protective Orders as "gag orders," "disgusting," the "hated protective order," "these disgusting protective orders imposed upon us by the Department of Justice with the blessing of the court," and "a damn gag order imposed on us by the Saudis, our Department of Justice, and the court." Id. at 29:1–25. He has also stated publicly that he is "angered and disgusted with the protective orders that the FBI and Saudi Arabia have insisted on." Id. at 29:18–21. Other Kreindler & Kreindler attorneys agree. Andrew Maloney, a Kreindler & Kreindler partner, stated that the entire Kreindler & Kreindler team hates the Protective Orders. Id. at 210:7–14.

**B.  Kreindler & Kreindler's 2017 Breach of the Protective Orders**

The firm's attorneys have not merely criticized the Protective Orders—in 2017 they breached them. KSAX-0010 at 9:6–7, ECF No. 3619. The incident stemmed from a Politico Magazine article describing a confidential discovery document. Hearing Tr. at 37:6–38:8; KSAX-0011 at 7–8 (article). Both Fawcett and Kreindler were involved in this breach. Fawcett described to a reporter how Kreindler & Kreindler used that document and a phone number in it to advance its investigation. KSAX-0010 at 4:2–5:1. He and Kreindler were the only ones to talk to the reporter for that article. Hearing Tr. at 38:3–8.

This specific description of a confidential document breached the General Protective Order. KSAX-0010 at 9:6–7. The Court did not order sanctions but used the breach as an opportunity to issue a "first warning" against further such conduct. Id. at 10:2. It also urged Kreindler to "be more careful as you continue to litigate this case, including given that you are an executive member of the plaintiffs' executive committee . . . ." Id. at 13:12–15. While Fawcett and Kreindler discussed the breach, no disciplinary action was taken against Fawcett and his

access to confidential materials was not limited. Hearing Tr. at 38:12–24.[4] Fawcett was not

restricted from speaking to the press going forward either. Id. at 40:19–24.

### C. Fawcett Leaks the Al Jarrah Transcript to Isikoff

In July 2021, Fawcett leaked the Al Jarrah Transcript to Isikoff, a reporter for Yahoo!

News. Isikoff has a symbiotic relationship with Kreindler on issues related to the September 11

Attacks. Hearing Tr. at 50:15–19. Kreindler & Kreindler, under Kreindler's leadership, has made

press appeals and outreach to reporters like Isikoff a central part of its litigation strategy against

Saudi Arabia. Fawcett has been instrumental in those efforts in the years leading up to the

breach.

#### 1. Fawcett, Kreindler, and Isikoff

Kreindler talks to the press because he believes this will "pressure" Saudi Arabia into

resolving this case. Id. at 25:3–5, 25:21–24. The firm operates on a contingency basis and

Kreindler expects that the firm will reap a substantial recovery if it prevails. Id. at 23:1–24:2.

Maloney has spoken to the press as well. Id. at 208:20–22.

Fawcett helped execute this press strategy. He also talked to the press on the firm's

behalf. Id. at 40:22–24, 41:12–18. At the request of Kreindler or other attorneys, he provided

---

[4] Saudi Arabia suggests that Kreindler's July 10, 2021, appearance on Isikoff's podcast, *Conspiracyland*, is further breach of the Protective Orders. ECF No. 7389 at ¶¶ 39–41. On that show, Kreindler made several generic assertions about the depositions. For example, he suggested that Congress might declare war if it knew everything he knew about the Saudi role in the September 11 Attacks, KSAX-0039 at 6, and that the depositions "have exposed all kinds of lies." Id. at 11. This is not relevant here, and the Court has not considered it in formulating this Opinion and Order. The statements made by Kreindler in 2017 disclosed specific information about a document. His *Conspiracyland* statements were generic. He did not even identify which deponents he had in mind. Such remarks lack the specificity necessary to breach the Protective Orders. Similarly, Saudi Arabia suggests that Kreindler breached the Protective Orders in a 2019 speech at Dartmouth. ECF No. 7389 at ¶¶ 37–38. The FBI also asserted in a letter that this speech violated the FBI Protective Order. KSAX-0020 at 3. Following that speech, the Court directed the parties to "be operating, at counsels' table, with heightened sensitivity." ECF No. 5334 at 36:6–7. The Court did not, however, specifically target that critique at Kreindler, Kreindler & Kreindler, or anyone else associated with the firm. Thus, as with the *Conspiracyland* podcast, the Court does not find it appropriate to consider this speech in its evaluation of this breach or the appropriate response.

documents to reporters. Id. at 41:19–24, 208:23–25. For example, in June 2021, he provided

materials and a briefing to a reporter for National Public Radio. Id. at 42:12–43:12. He gave her

further materials in September 2021. Id. at 43:18–44:7, KSAX-0012 at 4. Before doing so,

however, he sought approval from a Kreindler & Kreindler partner. Hearing Tr. at 44:8–18. This

was standard procedure: Fawcett sought approval from senior Kreindler & Kreindler personnel

before providing materials to reporters. Id. at 209:3–5.

Fawcett's press work for Kreindler & Kreindler included contacts with Isikoff. Kreindler

had spoken to Isikoff about this case sporadically over the years, id. at 50:20–25, including in an

interview that Isikoff discussed in a March 1, 2021 article. KSAX-0079 at 2. On July 1, 2021,

Kreindler had an interview with Isikoff on Isikoff's podcast, which aired on July 10. Fawcett was

in contact with Isikoff during this period. Hearing Tr. at 427:10–21.

Fawcett's role went beyond press management. For more than 20 years, he supported all

aspects of the firm's work on this case as a researcher and investigator. Id. at 312:1–3, 416:3–5.

In particular, he was responsible for managing discovery materials and other documents for the

firm. Id. at 40:5–9, 416:12–18. He had a Kreindler & Kreindler email address, phone, and office

and the same email and login privileges as any employee. Id. at 148:14–149:6. He also had

access to Kreindler & Kreindler's proprietary internal server. Id. at 148:8–10. His work for the

firm accounted for 80 to 90 percent of his income. Id. at 416:9–11.

Given this record, it is perhaps unsurprising that there is substantial loyalty between

Fawcett, Kreindler, and the rest of the firm. Fawcett was loyal to Kreindler considering their long

work together. Id. at 417:15–18. Kreindler reciprocated the feeling. Even after Fawcett admitted

to the leak, Kreindler described Fawcett as "one of the most committed . . . and honest and

trustworthy people I ever met." Id. at 128:14–15. Continuing, Kreindler said that he had never

met "a more honest and noble person . . . ." Id. at 128:25. Indeed, in a tearful moment at the evidentiary hearing, Kreindler said that only his own father could surpass Fawcett for honestly and nobility. Id. at 128:24–129:1.

Other Kreindler & Kreindler attorneys held Fawcett in similar regard and testified to their respect for him at the evidentiary hearing. Steven Pounian described Fawcett as "a colleague and a peer," id. at 411:23–412:2, who had never been the subject of a single complaint. Id. at 413:9–15. Maloney considered Fawcett an essential part of the litigation team. Id. at 215:12–16. Megan Benett, another Kreindler & Kreindler partner, called him a "tireless advocate for the family members" victimized by the September 11 Attacks. Id. at 366:8–9. Indeed, despite Fawcett's admitted violation of the Protective Orders, the firm apparently paid for his defense counsel for these proceedings. Id. at 415:21–416:2.

**2. The Leak**

Benett deposed Al Jarrah on Thursday and Friday, June 17 and 18, 2021. Id. at 310: 5–7. Table 1 shows that the next business day after that deposition, Kreindler communicated with Isikoff and Fawcett several times.

| Table 1: Post-Deposition Communications June 21–28 | | | | |
|---|---|---|---|---|
| **Date** | **Sender** | **Recipient** | **Communication** | **Duration** |
| Mon., June 21, 10:41 a.m. | Isikoff | Kreindler | Phone Call | 18 Minutes |
| Fri., June 25, 10:53 a.m. | Isikoff | Kreindler | Phone Call | 10 Minutes |
| Mon., June 28, 11:36 a.m. | Isikoff | Kreindler | Phone Call | 7 Minutes |
| Mon., June 28, 12:22 p.m. | Fawcett | Kreindler | Phone Call | 1 Minute |
| Mon., June 28, 12:23 p.m. | Fawcett | Kreindler | Phone Call | 1 Minute |
| See KSAX-0142 (Kreindler-Isikoff)[5]; KSAX-0134 (Kreindler-Fawcett). | | | | |

---

[5] The phone number interacting with Kreindler on this call log corresponds to Isikoff's cellphone number. KSAX-0041A at 10.

Kreindler testified that on June 28 he spoke with Isikoff about the Al Jarrah deposition. He testified that he told Isikoff that he would ask the team if any portion of the transcript could be disclosed. Then, the same day, he allegedly asked Fawcett if any part of the Al Jarrah deposition transcript could be provided to Isikoff and was told no. Hearing Tr. at 61:19–62:9. The Court does not find this testimony credible. It is not reasonable that Kreindler would suspect that any portion of the deposition of a Saudi official would not be under seal just ten days after the deposition. This would be even more obvious given that it involved sensitive interactions with the FBI. As noted, both Protective Orders require that deposition transcripts containing Confidential Information be kept confidential for at least 30 days. KSAX-0002 at 10–11; KSAX-0015 at 5.

There are other reasons to doubt this testimony. Given the extreme reciprocal loyalty between Fawcett and Kreindler, Hearing Tr. at 128:11–129:16, 417:15–18, the Court does not believe that Fawcett would betray his friend and long-time employer by leaking the transcript to Isikoff a little more than a week after a call where he and Kreindler allegedly agreed that the transcript could not be sent to Isikoff.

Five days after the June 28 call between Fawcett and Kreindler, there was a burst of communication between Fawcett and Isikoff, which ended July 5. Table 2. This was their only apparent communication in the months around the Al Jarrah deposition and leak.

| Table 2: Fawcett-Isikoff Communications | | | | |
|---|---|---|---|---|
| **Date** | **Sender** | **Recipient** | **Communication** | **Duration** |
| Sat., July 3, 1:53 p.m. | Fawcett | Isikoff | Phone Call | 22 Minutes |
| Sat., July 3, 2:13 p.m. | Isikoff | Fawcett | Phone Call | 1 Minute |
| Sat., July 3, 2:15 p.m. | Isikoff | Fawcett | Phone Call | 3 Minutes |
| Sat., July 3, 2:35 p.m. | Fawcett | Isikoff | Phone Call | 1 Minute |
| Sat., July 3, 7:14 p.m. | Isikoff | Fawcett | Signal Message | 1 Message |
| Sat., July 3, 7:15 p.m. | Fawcett | Isikoff | Signal Call | Unknown |
| Sat., July 3, 7:16 p.m. | Fawcett | Isikoff | Signal Call | Unknown |
| Sat., July 3, 7:17 p.m. | Isikoff | Fawcett | Signal Message | 1 Message |
| Sat., July 3, 7:18 p.m. | Fawcett | Isikoff | Signal Call | Unknown |
| Sat., July 3, 7:19 p.m. | Fawcett | Isikoff | Signal Call | Unknown |
| Sat., July 3, 7:19 p.m. | Fawcett | Isikoff | Signal Call | Unknown |
| Sat., July 3, 7:19 p.m. | Isikoff | Fawcett | Signal Call | Unknown (Missed) |
| Sat., July 3, 7:19 p.m. | Fawcett | Isikoff | Signal Message | 1 Message |
| Sat., July 3, 7:21 p.m. | Fawcett | Isikoff | Signal Call | Unknown |
| Sat., July 3, 7:23 p.m. | Fawcett | Isikoff | Signal Call | Unknown |
| Mon., July 5, 1:46 p.m. | Isikoff | Fawcett | Signal Call | Unknown |
| Mon., July 5, 4:22 p.m. | Isikoff | Fawcett | Signal Message | 1 Message |
| See KSAX-0082 at 1–3 (Signal); KSAX-0134 (Phone). | | | | |

The first phone call between Fawcett and Isikoff is the afternoon of July 3. It lasts 22 minutes. Those calls are followed by a few short calls. Then, later that day at 7:14 p.m., Isikoff writes to Fawcett using the messaging app Signal: "Try calling me – it's not going through on signal." KSAX-0082 at 1. That message is followed by a series of calls on Signal. In the last communication on July 5, Isikoff asked Fawcett on Signal whether another witness who had been deposed "also invoke[d] the Vienna convention?" Id. at 3; Hearing Tr. at 435:19–24. The specificity of that question suggests that by July 5, Isikoff had the transcript in hand. Fawcett did not recall the exact date he sent the transcript to Isikoff but suggested that it would have been around July 5, 2021. Hearing Tr. at 436:3–5. None of these communications was located during Kreindler & Kreindler's internal investigation of the leak. They were uncovered only when the firm retained outside counsel following Fawcett's confession.

10

**A24**

Both Kreindler and Fawcett continued to communicate with Isikoff after July 5 and before the July 15 publication. On July 12, 2021, Fawcett emailed Isikoff a copy of the FBI privilege log listing documents that had been withheld by DOJ on privilege grounds, with nothing in the body of the email. KSAX-0056F at 13–23. [6] On July 13, Kreindler and Isikoff exchanged multiple emails regarding Plaintiffs' "request to DOJ to lift the state secrets privilege and gag order." Id. at 24–27. Kreindler testified that he knew that Fawcett sent Isikoff the privilege log and that Fawcett "[p]robably did so at his direction." Hearing Tr. at 66:3-21. Benett testified that on September 27, 2021, Kreindler had told her that he was "not aware that Fawcett had sent the privilege log back in July." Id. at 387:3–6.

Isikoff published his article, "FBI Tried to Flip Saudi Official in 9/11 Investigation," on Yahoo! News on July 15, 2021. KSAX-0040. The article stated that "a copy of the [Al Jarrah] deposition – with some redactions for law-enforcement sensitive material – was obtained exclusively by Yahoo News." Id. at 1. Before the article was published, on July 5, Isikoff emailed Michael Kellogg, counsel for Saudi Arabia, to ask if he wanted to give any "comments . . . in response to what Jim Kreindler had to say about where things stand – and how the depositions went." KSAX-0041A at 10, ECF No. 6981-4.

**D. Kreindler & Kreindler's Investigation**

While Kreindler & Kreindler purported to conduct an internal investigation after Isikoff's article was published, that investigation suffered from numerous deficiencies. These inadequacies were particularly noticeable where Fawcett was concerned.

---

[6] The exhibits identified with the prefix "KSAX-0056" are at ECF No. 7147. Additionally, KSAX-0056J, KSAX-0062A, and ECF No. 7147-11, and ECF No. 7166-1 all reference the same document: Fawcett's original September 27 declaration admitting to his role in the breach. The Court cites this document as KSAX-0062A.

11

The initial investigation was headed by Maloney, a former federal prosecutor from the Southern District of New York with experience conducting such investigations. Hearing Tr. at 212:25–213:6, 219:20–25. It supposedly ran from July 15, id. at 69:24–70:13, when the Yahoo! News article was published until about July 29, when the firm's LAN Administrator John Hartney was instructed to conduct several follow-up searches. Id. at 172:14–24.

Maloney began the investigation confident that Kreindler & Kreindler was not the source of the leak, id. at 212:3–5, and his inquiries were neither professional nor comprehensive. He began by informally asking a group of people associated with the case collectively if they knew who leaked the transcript. He did not ask anyone whether they had any contact with Isikoff. Id. at 215:17–25. Later, he spoke to some people one-on-one; he spoke with Kreindler only by phone. Id. at 216:2–23. Maloney did not work from a set of prepared questions to ensure a comprehensive inquiry. There was no witness list or systematic effort to determine who had access to the transcript and who should be interviewed.

Maloney did not probe Kreindler's interactions with Isikoff during these initial conversations, only sometime in the following two weeks. Id. at 204:12–205:6. Catherine Hunt, a Kreindler & Kreindler consultant who both participated in the Al Jarrah deposition, id. at 198:25–199:6; KSAX-0032 at 6, and appeared on the July 10 podcast with Isikoff and Kreindler, Hearing Tr. at 205:14–206:5, was never interviewed. Id. at 206:3–16. Indeed, Maloney was still unaware that Hunt was on the podcast when he testified at the Court's investigation in November. Id. at 206:6–12.

Fawcett was never meaningfully investigated despite his central role managing documents and his involvement in the prior breach. While Pounian, id. at 407:6–21, and

Maloney, id. at 216:24–217:6, testified that they questioned Fawcett directly about the breach,

Fawcett does not recall being questioned by anyone:

> Q. But my question is does [Kreindler] come to you and say, ask
> you the question, did you disclose this transcript?
> A. I don't remember that, no.
> Q. Did Megan Benett come to you and say, did you disclose this
> transcript?
> A. No, I don't recall that.
> Q. Did Andrew Maloney come to you and say, did you disclose
> the transcript?
> A. I don't recall that.
> Q. Did Steven Pounian come to you and say, did you disclose
> the transcript?
> A. No, I don't recall that.

Id. at 439:1–12.

The Court credits Fawcett's testimony over the testimony of Pounian and Maloney. First,

given Fawcett's guilt, it makes sense that he would recall whether he was ever asked if he was

the culprit. Whereas Maloney and Pounian both approached the investigation confident that their

firm was not the source. Second, Pounian did not object when Fawcett removed from a draft

declaration language that would have stated that he "told Kreindler & Kreindler that [he] did not

know how Michael Isikoff had obtained the transcript." KSAX-0121 at 1. Although Fawcett has

admitted to violating the Protective Orders, he was apparently unwilling to sign a perjurious

declaration.

Other members of the firm operated with a similar blind spot where Fawcett was

concerned. Kreindler testified that he never asked Fawcett if he leaked the transcript even though

he testified that he asked Fawcett about the transcript and Isikoff's interest in it. He testified, "I

spoke to John. I didn't do it. I know you didn't do it. I have no idea who could have done it." Id.

at 78:7–9. The following colloquy ensured:

Q:      At any point in time, did you ever ask John Fawcett, in words or
        substance, John, did you provide the Al Jarrah transcript to Mr.
        Isikoff?

A.      No.

Q.      Did you direct anyone else to ask Mr. Fawcett that question?

A.      No.

Id. at 78:22–79:3. Kreindler described Fawcett as being "at the heart of the documents" in the

firm's case management. Id. at 39:3. It is telling that despite this, no one in the firm ever

seriously investigated him in connection with the document leak.

The firm failed to investigate Fawcett in other ways as well. Even though he stored

protected materials on the Dropbox cloud storage system, KSAX-0067 at 1, there is no indication

that Maloney's investigation sought to assess what role such storage systems might have played

in the breach. Hartney did not investigate Dropbox, even though he knew Fawcett maintained a

Dropbox account. Hearing Tr. at 150:8–14.

Fawcett also used his personal devices to save and send information when he breached

the Protective Orders. See KSAX-0059 at ¶ 7, ECF No. 7162-2 (describing how Fawcett used his

laptop and personal thumb drive during the breach). Maloney did not review personal devices of

Kreindler & Kreindler staff, Hearing Tr. at 157:18–20; 222:8–25, or firm phone records, id. at

157:23–158:17, which he insisted would have been an unreasonable investigative step. Id. at

233:22–25. The firm eventually reviewed Fawcett's phone records after Fawcett admitted to the

breach and the firm retained outside counsel. Hearing Tr. at 158:2–17. Those records revealed

his July 3-5 communications with Isikoff and other suspicious communications.

The investigation had numerous deficiencies beyond its inexplicably cursory review of

the firm's key document manager. Firm staff saved material covered by the Protective Orders in

at least three locations: (1) an internal proprietary server called "Case Media," Id. at 136:25–

137:2, 137:23–138:7, 140:11–17; (2) a cloud-based system called Citrix ShareFile, id. at 137:3–

14

**A28**

5, 147:21–22; and (3) the Kreindler & Kreindler email system. Id. at 137:6–9. Maloney's investigation did virtually nothing to account for or investigate people's ability to access the Al Jarrah Transcript using these systems.

Case Media stored protected material, including the Al Jarrah Transcript. Id. at 138:6–7, 140:11–17. Before September 27, 2021, anyone who worked at Kreindler & Kreindler could access this system. Id. at 138:18–139:8. Even though anyone with access to the Kreindler & Kreindler system could access Case Media, Maloney did not take any steps to account for this broad access. Hartney was never instructed to carry out a forensic investigation of who accessed the Al Jarrah Transcript in Kreindler & Kreindler's systems. Id. at 175:4–21. This may be because the firm had no ability to track who accessed material saved in Case Media. Id. at 139:25–140:17. Despite this, the firm stated to the Court that it had reviewed its systems and affirmed that no one had sent the transcript to Isikoff based on that review. See, e.g., KSAX-0048A at ¶¶ 8–9, ECF No. 7016 ("[O]ur firm conducted a review of the handling of the Jarrah deposition transcript . . . including searches performed by the firm's information technology director of all outgoing email. Based on that review . . . no one with the firm . . . shared the Jarrah deposition transcript").[7]

The email searches that Maloney directed to investigate the leak were also deficient. Initially, he ordered just two searches of Kreindler & Kreindler's email system: one for outgoing emails from eight individuals that could have contained the Al Jarrah Transcript, and one for emails to Isikoff. Hearing Tr. at 221:1–222:17, 223:10–17; KSAX-0084 at 1. While the search revealed communications between Isikoff and Kreindler in June that implied the existence of earlier communications, Maloney did not expand his search to determine if any such

---

[7] KSAX-0048 includes four further separate exhibits, KSAX-0048A–D, which are included as a single document at ECF No. 7016.

communications existed. Hearing Tr. at 235:17–236:17. Similarly, the search revealed communications between Fawcett and Isikoff that suggested that there might be earlier emails not found in the initial search. Id. at 237:3–238:11. Despite this, Maloney did not have Hartney expand the search for these additional communications either. Id. at 162:12–163:6.

Other investigative steps were delayed. The firm was aware of the breach by July 15 but Hartney was not instructed to review ShareFile until July 29. Id. at 149:21–150:3. This was two days after Kreindler & Kreindler reported to the Court that its investigation was complete. Id. at 172:14–24; KSAX-043 at 2, ECF No. 6988.

Finally, Maloney never directed Fawcett, Kreindler, or anyone else at the firm to retain documents relevant to the breach. Retention orders were sent out in early October 2021 and only after Kreindler & Kreindler's outside counsel for the investigation noticed an appearance. Hearing Tr. at 244:14–245:2. In short, the firm failed to take basic investigative steps in an investigation that conspicuously failed to consider Fawcett in any meaningful way.

**E. Saudi Arabia's Investigation Request and the July 22 Calls**

On July 21, 2021, six days after the article was published, Saudi Arabia sent an email to the PECs, including Kreindler & Kreindler, stating that it would ask the Court to investigate the breach. KSAX-0042 at 3–4. The email was sent at 9:14 p.m. Fawcett was not copied on this communication. See generally KSAX-0042. Starting early the next morning, Fawcett had a series of suspicious communications. None of these communications was uncovered as part of the firm's internal investigation. See Table 3.

| Table 3: Fawcett July 22 Communications | | | | |
|---|---|---|---|---|
| **Date** | **Sender** | **Recipient** | **Communication** | **Duration** |
| July 22, 8:18 a.m. | John Fawcett | Liz Crotty | Text Message | 1 Message |
| July 22, 9:17 a.m. | John Fawcett | Jim Kreindler | Phone Call | 46 Minutes |
| July 22, 10:41 a.m. | John Fawcett | Liz Crotty | Phone Call | 22 Minutes |
| July 22, 12:07 p.m. | John Fawcett | Liz Crotty | Email | Unknown |
| July 22, 12:56 p.m. | John Fawcett | Jim Kreindler | Phone Call | 5 Minutes |
| <u>See</u> KSAX-0135 at 3; KSAX-0151 at 1, ECF No. 7327-3. | | | | |

First, at 8:18 a.m., Fawcett sent a text message to Elizabeth Crotty requesting legal advice. KSAX-0151 at 1. Elizabeth Crotty is a former Kreindler & Kreindler attorney who currently works as a criminal defense lawyer. Hearing Tr. at 84:20–24, 447:5–8. Then, at 9:17 a.m., Fawcett had a 46-minute phone call with Kreindler. KSAX-0135 at 3.

Fawcett and Kreindler insist they cannot recall the purpose of the 9:17 a.m. call except to assert with absolute confidence that it was not about the leak. Hearing Tr. at 84:3–19 (Kreindler), 445:25–446:2 (Fawcett).[8] Fawcett suggested that it may have been a work-related conference call. <u>Id.</u> at 445:18–447:1. But his phone log indicates that the call was with "Jim Kreindler." Unlike numerous other entries in his phone log, this call was not labeled "ATTORNEY WORK PRODUCT – KREINDLER," undermining the suggestion that this was a work-related call. <u>See generally</u> KSAX-0135.

---

[8] After the hearing, Pounian submitted a declaration stating that that call and another call made that day were not about Fawcett's leak of the deposition, ECF No. 7359-1 at ¶ 5, but did include a discussion of coordinating the firm's response to an email sent the prior evening by Saudi Arabian counsel Gregory Rapawy. <u>Id.</u> at ¶ 4. While Pounian was questioned at the hearing, his testimony did not touch on these calls. <u>See generally</u> Hearing Tr. at 404–414. His declaration also offers little clarity. Rapawy's email was about Saudi Arabia's intent to move the Court to investigate the breach of the Protective Orders. KSAX-0042 at 3–4. Thus, Pounian's statement would seem to undercut Kreindler's testimony that the leak was not discussed on the call, Hearing Tr. at 84:11–12, even if it also confirms Fawcett's statement that the call might have been a conference call. Thus, this declaration does little to illuminate what was discussed in the 9:17 a.m. call. It is also inadmissible hearsay since it is proffered for the truth. Fed. R. Evid. 801(c), 802. Given its marginal value and inadmissible nature, the Court has not relied on this declaration in rendering its Opinion and Order.

**A31**

Fawcett next had a 22-minute call with Crotty beginning at 10:41 a.m. Id. at 3. After the call, Fawcett sent an email to Crotty requesting legal advice at 12:07 p.m. KSAX-0151 at 1. That email was followed by a five-minute call with Kreindler at 12:56 p.m. KSAX-0135 at 3.[9] These communications with Crotty were Fawcett's only apparent communication to her for legal advice in July. The next legal communication between them does not occur until September 24, the day after the Court issued an order directing further disclosures in its investigation of the breach. KSAX-0151 at 1.

During discovery, Fawcett asserted the attorney-client privilege over his July 22 communications with Crotty. Hearing Tr. at 449:5–11. Initially, at the hearing, however, he stated that the call was only about Crotty's recent run for district attorney. Id. at 449:16–20. He was then challenged about asserting privilege over a personal call. Id. at 449:21–451:4. After the conclusion of cross-examination and a recess, Fawcett asked to correct his testimony. He said that he talked to Crotty because he "saw the court order," id. at 480:16, and wanted to get legal advice because of the position he was in after leaking the transcript. Id. at 481:6–9. This cannot be true: the Court had not issued any order relating to the breach as of July 22. Indeed, Saudi Arabia would not even move for discovery until July 23. KSAX-0041, ECF No. 6981. The only activity related to the breach was Saudi Arabia's non-public 9:14 p.m. email. KSAX-0042. Fawcett was not included on that communication although Kreindler, Pounian, Benett, and Maloney were. Thus, sometime between this 9:14 p.m. email and Fawcett's text message to Liz Crotty at 8:18 a.m. the next day, someone informed Fawcett that an investigation was likely enough that he decided to seek legal counsel.

---

[9] Pounian's declaration, discussed in note 8, says that this call was similarly not about the transcript leak. ECF No. 7359-1 at ¶¶ 3–4. For the reasons discussed in note 8, the Court declines to rely on this declaration.

This also makes it even less credible that Fawcett and Kreindler's 9:17 a.m. call was a work-related conference call. Fawcett's 8:18 a.m. text and subsequent call to Crotty were explicitly for legal advice relating to the breach. Hearing Tr. at 480:5–481:9. To find Fawcett and Kreindler's testimony about these July 22 calls credible would require the Court to accept that, despite his long friendship with Kreindler, Fawcett reached out to a defense attorney about betraying Kreindler, had a normal, extended call with Kreindler, switched back to talking to his attorney about betraying Kreindler, and then talked to Kreindler again, all apparently without revealing a hint of his guilt. Having witnessed Fawcett on the stand, heard tributes to his loyalty, and knowing that he confessed instantly when forced to sign a sworn statement, the Court does not find it credible that Fawcett could manage this kind of duplicity. It is all the more unlikely given Fawcett and Kreindler's prior breach of the Protective Orders in 2017.

**F.  The Court's Initial Investigation: July 23 to August 16**

On July 23, 2021, Saudi Arabia moved for discovery into the breach of the Protective Orders. KSAX-0041. It suggested that the Court investigate by ordering declarations from every party who had access to the Al Jarrah Transcript as a precursor to implementing sanctions under Rule 37 and the Court's inherent powers. Id. at 4. It also supplied 27 declarations from its attorneys and staff. KSAX-0041A. Each of these stated that the declarant had not disclosed the Al Jarrah Transcript, did not know who did, and either had no interactions with Isikoff or had been contacted by him for a comment but had not communicated with him. Id.

On July 27, the PECs opposed Saudi Arabia's motion in a letter signed by PECs representatives from Kreindler & Kreindler, Cozen O'Connor, and Motley Rice LLC. KSAX-043 at 2. The letter stated that "each of the lead PEC firms had already conducted internal investigations into the handling of the Jarrah transcript and communications with Mr. Isikoff . . . ." It further stated that "as a result of those investigations, each of the lead PEC firms [is]

19

**A33**

confident that it was not the source of the leak to Mr. Isikoff." Id. Hartney would later agree that by July 27, he "could not have concluded that no one at the Kreindler firm was the source of the leak." Hearing Tr. at 174:25–175:3.

Despite this letter, Cozen O'Connor and Motley Rice voluntarily submitted declarations distancing themselves from the breach two days later. KSAX-0044, ECF No. 6991 (Cozen O'Connor); KSAX-0045, ECF No. 6992 (Motley Rice). Cozen O'Conner submitted five declarations. Two of these came from senior attorneys stating that they had neither shared the transcript with Isikoff, not communicated with him since at least June 2021. KSAX-0044 at 3–10. Two came from paralegals who also denied sharing the transcript. Id. at 14–17. The final declaration came from the firm's "Director of User Support." That declaration described the investigative steps that the firm took to assess how it received the Al Jarrah Transcript, what databases it stored that transcript on, and who accessed those databases. It also described a review of the firm's email system taken as part of that investigation. Id. at 11–13. Based on that, Cozen O'Conner confirmed that access to the transcript was limited exclusively to the employees who had signed declarations stating that they did not leak the transcript and that the firm email had not been used to leak the transcript. Id. at 1.

Motley Rice submitted seven similarly thorough declarations. KSAX-0045. That submission included declarations from four lawyers, id. at 3–17, and two paralegals, id. at 18–21. All of these declarations stated that the declarant had not communicated with Isikoff and did not know anyone at the firm who had. Motley Rice also submitted a declaration from a "Compliance and Security Specialist" stating that no firm emails had been sent to any known emails for Isikoff and that there had been no unusual traffic to the secure storage site for the transcript. Id. at 22–24.

With those submissions in hand, the Court turned to Kreindler & Kreindler. Even at this early stage, several circumstantial factors suggested that it might be the source of the leak. These included Kreindler's known relationship with Isikoff, Isikoff's outreach to Kellogg noting Kreindler's cooperation, and the firm's prior breach of the Protective Orders. Despite this, Maloney stated that it was a "consensus decision" by Kreindler & Kreindler not to file anything until directed by the Court. Hearing Tr. at 262:6–15.

On August 12, 2021, the Court directed Kreindler & Kreindler "to follow the lead of Cozen O'Conner and Motely Rice and to file declarations, under penalty of perjury, as to whether anyone with the firm or anyone acting on its direction shared the Al Jarrah deposition transcript with anyone unauthorized by the Protective Order and the FBI Protective Order." ECF No. 7011 at 2. While the Court did not specify who had to file declarations, it required, "[a]t a minimum," that Kreindler, Pounian, Maloney, and Benett submit one. Those declarations were due August 16. Id.

In the intervening period, a third major PECs firm, Anderson Kill, voluntarily filed five declarations. KSAX-0047, ECF No. 7013. This submission included declarations from three attorneys, ECF Nos. 7013-1, 7013-2, 7013-3, and one paralegal. ECF No. 7013-4. All of these attested that no one at the firm had shared the Al Jarrah Transcript with Isikoff or indeed, communicated with him in any way. Anderson Kill also included a declaration from the director of its IT department. ECF No. 7013-5. That declaration stated that no one at the firm had accessed the secure folder in which the Al Jarrah Transcript was stored, id. at ¶ 8, and that no emails had been sent to Isikoff from the Anderson Kill email system. Id. at ¶ 10. That submission left Kreindler & Kreindler as the only major PECs firm not to have made a voluntary submission.

**A35**

Pursuant to the Court's order, Kreindler & Kreindler submitted its first set of declarations on August 16 (the "August 16 Declarations"). This submission consisted of declarations from only the four attorneys identified as the minimum by the Court. KSAX-0048. The firm did not ask Fawcett to submit a declaration or include a declaration from IT or other legal support staff. Although Maloney testified at the evidentiary hearing that he headed the initial internal investigation, Maloney did not mention any such efforts in this declaration. KSAX-0048C at 7–8. His declaration was a near verbatim copy of the Kreindler and Pounian declarations, each of which stated generically that they received the transcript, did not share it with anyone unauthorized to see it, and did not direct anyone to share it.

These declarations were also substantially vaguer and less comprehensive than the declarations submitted by the other PEC firms. The most prominent difference was that the Kreindler & Kreindler declarants did not state that they did not communicate with Isikoff, only that neither the declarant nor, to their knowledge, anyone in the firm had shared the transcript "with anyone unauthorized to see it." See, e.g., KSAX-0048A at ¶ 6. The declarations also provided virtually no detail about the investigation conducted to reach these conclusions. Only Benett—who testified that she was not involved in the initial investigation, Hearing Tr. at 335:23–336:10—stated that the "firm conducted a review of the handling of the Jarrah deposition transcript" and mentioned that the firm's information technology director searched "all outgoing email." KSAX-0048A at ¶ 8.

### G. The Court's August 30 Order and the Oath Intervention

The deficiencies in the August 16 Declarations led the Court to issue a second order two weeks later (the "August 30 Order"). KSAX-0049, ECF No. 7082. That Order had two components. First, the Court ordered additional submissions from Kreindler & Kreindler. The

22

**A36**

four attorneys who submitted the initial declarations were required to identify their communications with Isikoff and identify everyone with whom they shared the transcript, or who had access to the transcript that had not already supplied a declaration. Id. at 1. One of those declarations also had to describe the investigative steps the firm took in response to the breach of the Protective Orders. As part of this, the firm was required to submit any written communications with Isikoff between June 1 and August 1, 2021, to the Court. Id. Additionally, any person named in the four attorneys' supplemental declarations had to submit declarations themselves stating whether they had shared the Al Jarrah Transcript or otherwise communicated with Isikoff. Finally, the head of Kreindler & Kreindler's IT group or a comparable figure was required to submit a declaration demonstrating that a "forensic analysis" had been completed to determine who had access to the Al Jarrah Transcript. Id. at 2.

Second, the Court required declarations from the court reporter service that took the Al Jarrah deposition, as well as other law firms who attended. These declarations required these firms to state whether they shared the declaration transcript with Isikoff or otherwise communicated with him. All declarations were due by September 10, 2021. Id. at 2–3.

Before these could be filed though, Oath, Inc., which offers Yahoo! News, intervened to request that the August 30 Order be modified on First Amendment grounds. ECF Nos. 7094–95. The Court stayed the August 30 Order to permit briefing on this motion. ECF No. 7098. Kreindler & Kreindler, unique among the PEC firms, filed a brief supporting Oath's position. KSAX-0051, ECF No. 7103.

On September 23, the Court held that Oath's motion was without merit. KSAX-0055, ECF No. 7134. It ordered the declarations required by the August 30 Order to be filed by September 27, 2021. Id. at 24.

23

**A37**

### H.  The Remaining Attorneys File Declarations

While Oath's motion was pending, and notwithstanding that the August 30 Order had been stayed, the remaining plaintiffs' firms filed declarations distancing themselves from the breach. ECF No. 7106. Indeed, certain plaintiffs' counsel not covered by that Order joined in the submission voluntarily. Id. at 1. In all, nine additional attorneys from eight firms submitted declarations. All of these stated that they had not shared the Al Jarrah Transcript. On September 27, similar submissions were received from the defense-side firms and the court reporters for the Al Jarrah deposition. ECF No. 7145.

### I.  The Kreindler & Kreindler Declarations

While Oath's motion was pending, Kreindler & Kreindler obtained one exculpatory declaration from a consultant, who stated that he had not been in touch with Isikoff or shared the Al Jarrah Transcript with any unauthorized parties. That declaration is signed September 2, 2021, just days after the August 30 Order. KSAX-0062B, ECF No. 7166-2. Fawcett, however, testified that he was not even asked to prepare a declaration until September 23, 2021. Hearing Tr. at 454:9-455:20 ("[I]n the two-month period from July 15 until September 23 . . . no one from Kreindler & Kreindler insisted that I give a sworn declaration.")

Kreindler & Kreindler submitted its declarations on September 27 (the "September 27 Declarations"). These declarations contained numerous misleading or false statements. Benett was primarily responsible for creating these declarations, with assistance from Pounian. See K&K Ex. 51; K&K Ex. 52; K&K Ex. 62; Hearing Tr. at 368:14–17, 369:25–370:2.

### 1. The Hartney Declaration

Hartney's Declaration (the "Hartney Declaration"), KSAX-0056F, made several material misleading statements.[10] He states that a directory in Case Media "is for use only by individual Kreindler attorneys and staff involved in this litigation and one consultant to Kreindler, John Fawcett." Id. at ¶ 5. This implies that this directory is restricted to a limited set of people. That is false. Anyone employed by Kreindler & Kreindler could access this directory. Hearing Tr. at 138:18–25. Hartney raised this precise issue to Benett in an email on September 27:

> I have an issue with this statement "That share drive is for use only by Kreindler attorneys and staff involved in the litigation." I don't think it is truthful because it was saved in the case media share and not on the terror share (which is restricted) and everyone at Kreindler has access to everything in casemedia.

KSAX-0115.

Benett replied shortly after that this "language is drafted carefully, and it does not say that it was restricted, in fact I was careful NOT to say that." Id. As Hartney explained, Benett drafted the statement this way because she did not want to disclose to the Court that everyone at Kreindler & Kreindler could access materials on Case Media. Hearing Tr. at 143:4–13; 196:3–19.

Hartney also states that he "did not find any evidence that the Jarrah transcripts had been downloaded, printed, or emailed, by anyone else." KSAX-0056F at ¶ 5. This is misleading. It implies that Kreindler & Kreindler investigated if the Al Jarrah Transcript was downloaded and determined that it was not. But this was impossible because the firm could not track downloading or printing. Hearing Tr. at 145:14–22. Given this, it is questionable whether the firm would even

---

[10] The exhibits identified with the prefix "KSAX-0056" are at ECF No. 7147. Additionally, KSAX-0056J, KSAX-0062A, and ECF No. 7147-11, and ECF No. 7166-1 all reference the same document: Fawcett's original September 27 declaration admitting to his role in the breach. The Court cites this document as KSAX-0062A.

have been able to carry out the forensic analysis expected by the August 30 Order. KSAX-0049 at 2. Even if it would have been possible with the firm's technology, Hartney was never asked to do so. Hearing Tr. at 175:4–21.

### 2.  The Fawcett Declaration

Fawcett's declaration underwent substantial modification at the hands of Pounian and Benett before it was submitted to the Court. Fawcett purportedly told Kreindler & Kreindler attorneys for the first time that he leaked the transcript on the morning of September 27, sometime between 10:00 a.m. and 10:30 a.m. Hearing Tr. at 388:19–25. About two hours later, at 12:20 p.m., Fawcett emailed Pounian and Benett a statement that he had drafted himself. Id. at 456:7–15; KSAX-108. He wrote this in his own words and believed it was accurate. Hearing Tr. at 456:18–21.

The original declaration, KSAX-108A, differed substantially from the version that was filed with the Court. See KSAX-0062A. In this original declaration, Fawcett said was troubled by "evidence of Jarrah's use of child pornography." KSAX-108A at 1. He also said that "[t]he protective order should not be used to cover up evidence of a crime that is not being adjudicated." Id. He went on to state that "[i]f the Saudi government, the FBI, and the Federal Court of the Southern District of New York continue to protect Musaed Al Jarrah rather than prosecute him, then the public must at least be forewarned in order to have a chance to protect themselves." Id. He then asserted that "[t]he only venue for such a warning is the media." Id. As Benett acknowledged, this initial draft makes no mention of any personal familial motivation for the breach. Hearing Tr. at 348:21–25. Finally, Fawcett said that he "sent a redacted version of the transcript of the deposition of Musaed Al Jarrah to Michael Isikoff" and does not deny that he sent FBI protected material by sending that transcript. KSAX-108A at 1.

Both Pounian and Benett edited Fawcett's original statement. Hearing Tr. at 458:22–24. At 1:41 p.m., Pounian emailed a new draft to Benett. KSAX-0109; KSAX-0109A. This new draft differed from Fawcett's original declarations in two important ways. First, the declaration now stated that "the redacted portions of the deposition [Fawcett] sent to Michael Isikoff were limited to Jarrah's possession of child pornography." KSAX-0109A at 1. It also said that Fawcett "did not send any other portions of the deposition to Isikoff." Id. These statements give the impression that Fawcett sent only portions of the deposition transcript to Isikoff, when in fact, he sent the whole transcript. Second, this draft added that Fawcett had a "personal interest" in this issue because Al Jarrah worked in Morocco as a diplomat and Fawcett's children were from that country.[11]

At 1:47 p.m., Benett wrote back to Pounian that this draft was "good" but made one further addition. KSAX-0110. She added that Fawcett knew from his "background in global humanitarian work … that Morocco is a country with a history of child sex trafficking." KSAX-0110A at 1. While Benett stated at the hearing that she "formatted it" but did not "write the words," id. at 346:20–22, there was no evidence at the hearing or in Fawcett's phone records that he participated in these additions. Pounian and Benett circulated these drafts between 1:41 p.m. and 1:47 p.m. Fawcett's call log shows no evidence of calls to or from Pounian or Benett from 11:51 a.m., when he calls Pounian, until 3:11 p.m., when he calls Benett. KSAX-0136 at 2–3.

Pounian emailed Fawcett revised drafts at 6:53 p.m., KSAX-0118; KSAX-0118A, and 7:06 p.m. KSAX-0119. In that latter email exchange, Fawcett emails back edits. KSAX-0120; Hearing Tr. at 443:21–444:2. First, as noted above, he deleted "Until today, I had told Kreindler & Kreindler that I did not know how Michael Isikoff, had obtained the transcript" and replaced it

---

[11] This information is redacted in KSAX-0109A but is contained in substantially the same form in a sealed filing at ECF No. 7166-1.

with "No one from Kreindler & Kreindler even knew about what I had done, even while they were responding to the Court's Orders." KSAX-0121 at 1. Second, he changed the line "redacted portions of the deposition I sent to Michael Isikoff were *limited to* Musaed Al Jarrah's testimony about his possession of child pornography" to "were *focused on* Musaed Al Jarrah's testimony about his possession of child pornography . . . ." KSAX-0121 at 1 (emphases added). Regardless of the framing, the statement was misleading. Fawcett sent the whole deposition transcript, with certain redactions, to Isikoff. Hearing Tr. at 461:6–22.

Fawcett's alleged motive for disclosing the transcript—to protect the children of Morocco—was fabricated and intended to make Fawcett appear more sympathetic. There are also reasons to doubt its genuineness. The alleged conduct occurred 17 years ago, and Fawcett had learned about the information related to Al Jarrah, at least on an unconfirmed basis, about six to eight months before the deposition. Hearing Tr. at 468:8–24. The deposition did not appear to shed much new light on what happened: Isikoff describes the deposition as containing neither "smoking guns" nor "dramatic confessions"— the FBI tried to confront Al Jarrah, he rebuffed them, and that was the end of it. KSAX-0040 at 2. Despite his purported concerns, aside from leaking the transcript to a single reporter that is friendly to the firm, Fawcett did not alert anyone in the U.S. or Moroccan governments about his concerns. Hearing Tr. at 470:5–471:16. His "children" referenced in his declaration were at least 21 by the time of the leak. Id. at 489:11–14.

### 3.   The Maloney, Pounian, and Benett Declarations

The Maloney, Pounian, and Benett Declarations also contain misleading statements. The August 30 Order required Kreindler & Kreindler attorneys to "state every person they know had access to the deposition transcripts who has not already supplied a declaration in this investigation." KSAX-0049 at 1. Each of these lawyers reported in their declaration that no other individuals with access to the transcript had failed to submit declarations. KSAX-0056B at ¶ 9

(Maloney); KSAX-0056D at ¶ 4 (Pounian); KSAX-0056C at ¶ 5 (Benett). This was false. At least Benett, through her interaction with Hartney, KSAX-0115, and Maloney, Hearing Tr. at 245:15–247:11, were aware that anyone with a Kreindler & Kreindler employee login had "access" to Case Media and, by extension, the Al Jarrah Transcript.

### 4. The Kreindler Declaration

Kreindler's declaration understates his contacts with Isikoff and lacks supporting materials required by the August 30 Order. In his declaration, Kreindler recalled communicating with Isikoff and his producer "several times" including two phone calls and several emails. KSAX-0056A at ¶ 6. At the hearing, however, it was stipulated that Kreindler had three calls with Isikoff. Hearing Tr. at 54:17–25. He also had text message exchanges with Isikoff, id. at 55:2–56:12, which were not produced as part of the September 27 Declarations. Kreindler testified that his declaration was based "[s]olely on his recollection," id. at 52:23–25, and that he did not check any of his records before it was prepared. Id. at 51:15–52:11. Kreindler did not explain why he took so little effort to verify his sworn statements before filing them with a federal court investigating his firm for deliberate breaches of protective orders.

Kreindler, like others, reported that he knew of no one with access to the Al Jarrah Transcript who had not submitted a declaration. KSAX-0056A at ¶ 6. Again, this is misleading given the unrestricted access to the file.

### J. Fawcett Confesses

Kreindler & Kreindler filed the declarations required by the August 30 Order on September 27, 2021. KSAX-0056. In that filing, Fawcett provided a signed declaration admitting that he had deliberately leaked the Al Jarrah Transcript to Isikoff. KSAX-62A. Three days later, Kreindler & Kreindler submitted an additional update. KSAX-0057, ECF No. 7153. It reported that "it has moved all 9/11 case protected materials into a separate file on its computer system."

29

**A43**

Id. at 1. The firm was "also in the process of setting up a new system that will automatically track the viewing and download of all documents on the system . . . ." Id.

### K. The September 30 Fawcett Declaration

Three days later, Fawcett filed a second declaration. KSAX-0059, ECF No. 7162-2. It provided additional details about both Fawcett's communication with Isikoff, KSAX-0059 at ¶¶ 3, 8, 10, and more information about how he leaked the transcript. Id. at ¶ 7. The August 30 Order, however, required that copies of any communications with Isikoff discussed or identified in responsive declarations be provided as part of those declarations. KSAX-0049 at 2. Despite this, neither of Fawcett's declarations attached communications with Isikoff, though both disclosed that Fawcett had communicated with him. See, e.g., KSAX-0062A at ¶ 3; KSAX-0059 at ¶¶ 3, 8, 10. Indeed, beyond searching the Kreindler & Kreindler email system, no effort was made to locate or obtain copies of Fawcett's various communications with Isikoff until the Court ordered further discovery. Hearing Tr. at 177:21–178:6, 178:24–180:19.

### L. Evidentiary Hearing

Faced with the inadequacies of Kreindler & Kreindler's declarations and unconvinced that the breach was solely the responsibility of a rogue consultant, the Court ordered a hearing. ECF No. 7167. It informed the parties that "[t]he purpose of the hearing is to render findings of fact in connection with the breach and to determine the appropriate remedies." Id. at 1. It further informed the parties that potential remedies would include "removal from the Plaintiffs' Executive Committees, monetary sanctions, a referral for professional discipline to the Committee on Grievances for the Southern District of New York, and a criminal referral to the U.S. Attorney's Office for the Southern District of New York." Id. The Court designated six witnesses to participate in the hearing: Kreindler, Maloney, Benett, Pounian, Hartney, and Fawcett. Id. at 1–2. Counsel for Saudi Arabia was directed to perform the cross-examination.

The hearing took place November 1 and 2, 2021. On several occasions, it devolved into contentious exchanges between counsel for Saudi Arabia and either counsel for Kreindler & Kreindler or Kreindler & Kreindler witnesses. See, e.g., Hearing Tr. at 53:2–54:16, 240:18–241:5, 248:1–25, 268:19–269:2, 475:2–21.

Kreindler & Kreindler attorneys also used the hearing to continue their efforts to inject embarrassing and irrelevant information targeting Saudi Arabia into this proceeding. Benett, in particular, went out of her way in her testimony to discuss how Fawcett's reaction "was very much informed by his strong feelings about somebody that he believed was not only trafficking in sexual images of minors but was deliberately living in a place where he would have easy access to minor children for sexual purposes." Id. at 393:1–5. This extension of Fawcett's motivation and additional gratuitous attack on Al Jarrah was nowhere in the original declaration Fawcett drafted, KSAX-0108A, the declaration prepared after Benett and Pounian's tinkering, KSAX-0062A, or the follow-up declaration Fawcett provided. KSAX-0059. No such charge can be inferred from Isikoff's article either. KSAX-0040.

## M. Further Breaches of the Protective Order

The evidentiary hearing revealed two further breaches of the Protective Orders by Kreindler & Kreindler, one related to their treatment of protected material, and one related to unauthorized participation in depositions.[12]

### 1. Kreindler & Kreindler's Protection of Protected Material

The Protective Orders require that protected material be stored "in a secure manner that ensures that access is limited to the persons authorized" to see the material. KSAX-0002 at 11. Kreindler & Kreindler's data systems do not satisfy this criteria. Even though Case Media stored

---

[12] Saudi Arabia made three post-hearing motions. ECF Nos. 7322, 7327, 7328. The Court addressed these in a single omnibus order. ECF No. 7369.

protected materials like the Al Jarrah Transcript, Hearing Tr. at 138:6–7, 140:15–17, anyone who worked at Kreindler & Kreindler could access these files regardless of whether they were assigned to the case. Id. at 138:18–139:8. These system did not track who accessed protected materials, id. at 139:25–140:14, and did not warn people that they were about to access confidential data restricted to specific personnel. Id. at 249: 6–10. While the firm considered migrating the Case Media files to a new system before the breach, it determined that this move would be too disruptive. Id. at 373:1–16.

### 2.   Unauthorized Deposition Participation by Brian Weidener

The evidentiary hearing and subsequent submissions revealed that certain Kreindler & Kreindler personnel had improperly participated in the Al Jarrah deposition. Depositions are governed by a protocol proposed by the parties, ECF No. 6002–04, and adopted by the Court. ECF No. 6204 (the "Deposition Protocol"). Under the Deposition Protocol, "depositions may be attended (either in person or remotely) only by the witness, counsel for the witness, attorneys of record in the MDL Proceeding and their staff, court reporters, videographers, translators, and the Parties' in-house counsel." ECF No. 6002-1 at ¶ 31. "All persons in attendance (either in person or remotely) must be noted on the deposition record." Id.

Benett's testimony suggested that a firm consultant had participated in the deposition without being noted on the record. Hearing Tr. at 328:6–330:1. To investigate this, Kreindler & Kreindler was ordered to produce a declaration from this party describing his role and participation in the Al Jarrah deposition as well as evidence that this individual had agreed to be bound by the Protective Orders. ECF No. 7369 at 3.

Kreindler & Kreindler initially produced that declaration on November 22, 2021. ECF No. 7379. It revealed that a retired FBI special agent, Brian Weidener, had participated without declaring himself on the record. He "entered a conference room where [he] saw portions of the

Jarrah deposition." ECF No. 7384-1 at ¶ 4. Weidener "did not watch the deposition in its entirety, and [he] was not in the conference room at the beginning of it." Id. When Benett, who was conducting the deposition, took a break, he provided her with additional information about Al Jarrah's meeting with two FBI special agents. Id. at ¶ 5. In violation of the deposition protocol, he was not listed on the appearance sheet for the deposition. Hearing Tr. at 329:25–330:1.

Weidener also stated that he "understood his obligations under the MDL and FBI protective orders . . . [and] have abided by them since reviewing them and signing the FBI acknowledgment page over a year ago . . . ." ECF No. 7384-1 at ¶ 5. He also provided an acknowledgement, dated November 13, 2020, agreeing to be bound the FBI Protective Order. Id. at 6. The declaration does not include any similar records demonstrating that Weidener agreed to be bound by the General Protective Order, which requires that an attorney who permits someone to access the confidential material "create and retain records indicating that the person receiving Confidential Information or material agreed to be bound by the terms and restrictions of this Order." KSAX-0002 at 12–13.

Beyond responding to the Court's order, Kreindler & Kreindler tried to use this declaration to inject "gratuitous and irrelevant information about Al Jarrah's interactions with the FBI" into the proceedings. ECF No. 7381 at 1. Accordingly, it was sealed on the Court's motion. Kreindler & Kreindler then produced a version with the offending material redacted. ECF No. 7384.

**N. The MPS Violation**

While the resolution of the breach investigation was pending, Kreindler & Kreindler violated the General Protective Order in a separate incident (the "MPS Violation"). By the end of March 2022, the firm had received a substantial volume of discovery material from the United

33

**A47**

Kingdom's Metropolitan Police Service (the "MPS Materials"). This was subject to the General Protective Order because it was produced pursuant to this Court's discovery powers, specifically a letters rogatory request. ECF No. 8066 at 5. The General Protective Order requires that such materials be used only for the defense or prosecution of this case. KSAX-0002 at 8.

Kreindler & Kreindler posted the entire cache of MPS Materials on a publicly accessible website. As they acknowledge, at least one of their reasons for doing so was not the defense or prosecution of this case but public outreach. ECF No. 7996-1 at ¶ 25. They also issued a press release about the material and CBS ran a news story about it. ECF No. 7952-4 at 6. Divulging an entire tranche of discovery materials violated the General Protective Order. ECF No. 8066 at 9. The parties were ordered not to republish the MPS Material and to determine if any of it was confidential and subject to further protections under the terms of the General Protective Order.

Because this investigation was still pending when the Court addressed the MPS Violation, and because iterative sanctions would have been inefficient, the Court reserved future action on this for the resolution of the present investigation. Kreindler & Kreindler's objections to this order are pending. ECF No. 8114.

## II.    Conclusions of Law

Kreindler, Fawcett and Kreindler & Kreindler violated the Protective Orders. The appropriate remedy under Rule 37(b) is to remove Kreindler & Kreindler from the PECs, to require it to pay the attorneys' fees and costs expended by Saudi Arabia in response to this breach, and to bar Fawcett from further participation in this case.

### A.  Notice

In a footnote, Kreindler & Kreindler's counsel has questioned the adequacy of the notice the firm received in this proceeding before the imposition of sanctions. ECF No. 7386 at 41 n.6 ("Any other issues raised by the Kingdom are those for which Kreindler & Kreindler has not

34

**A48**

been provided with proper notice and are therefore not addressed here.") It is unclear about what issues counsel believes the firm received inadequate notice, but the Court is satisfied that Kreindler & Kreindler had full notice of the scope of the investigation, the Court's authorities to impose sanctions, and the possible penalties it faces. See ECF No. 7167 at 1 ("The Court will conduct a hearing regarding the breach of the protective orders by Kreindler & Kreindler." Later, "remedies may include, among other possible remedies, removal from the Plaintiffs' Executive Committees, monetary sanctions, a referral for professional discipline to the Committee on Grievances for the Southern District of New York, and a criminal referral to the U.S. Attorney's Office for the Southern District of New York.")

"Due process requires that courts provide notice and opportunity to be heard before imposing any kind of sanctions." In re 60 E. 80th St. Equities, Inc., 218 F.3d 109, 117 (2d Cir. 2000) (quoting Ted Lapidus, S.A. v. Vann, 112 F.3d 91, 96 (2d Cir. 1997)) (cleaned up). To the extent the firm is referring to non-leak breaches of the Protective Orders, Kreindler & Kreindler was plainly on notice that those issues had been raised by Saudi Arabia in its initial letters and follow-up requests for further investigation. See, e.g., Margo v. Weiss, 213 F.3d 55, 64 (2d Cir. 2000) ("[T]he district court was not required to give appellants notice of grounds for sanctions that were clearly expressed in defendants' Rule 11 motion papers."); Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc., 38 F.3d 1279, 1286 (2d Cir. 1994) ("Appellants thus had notice from [the opponent's] motion, and an opportunity to be heard by opposing the motion . . . .")

Finally, Kreindler & Kreindler may file Rule 72(a) objections to this Opinion and Order, which will cure any possible notice issues.[13] See, e.g., Thomas E. Hoar, Inc. v. Sara Lee Corp.,

---

[13] No sanction under this Opinion and Order is dispositive. See, e.g., Cunningham v. Hamilton Cty., Ohio, 527 U.S. 198, 209 (1999) (an attorney disqualification sanction is not a final dispositive order); Errant Gene Therapeutics, LLC v. Sloan-Kettering Inst. for Cancer Rsch., 768 F. App'x 141, 142 (2d Cir. 2019) (order imposing Rule 37 monetary sanctions in the form of attorneys' fees is not dispositive). Discovery

900 F.2d 522, 527 (2d Cir. 1990) (finding a due process objection to sanctions based on a lack of

notice meritless, where, among other things, a magistrate judge issues a report and

recommendation to which a party makes objections, followed by a final review by the district

judge).

**B.  Sanctions Against Kreindler & Kreindler Under Rule 37(b) Are Appropriate**

Kreindler & Kreindler, through Fawcett and Kreindler, breached the Protective Orders by

carrying out a deliberate scheme to leak the Al Jarrah Transcript to Isikoff. Under Federal Rule

of Civil Procedure 37(b)(2) "[i]f a party or a party's officer . . . fails to obey an order to provide

or permit discovery . . . the court where the action is pending may issue further just orders."[14]

Thus, "[t]he failure to abide by a protective order is sanctionable under Rule 37." <u>City of</u>

<u>Almaty, Kazakhstan v. Ablyazov</u>, No. 15-cv-05345 (AJN)(KHP), 2018 WL 1229730, at *4

(S.D.N.Y. Mar. 5, 2018). For a court to issue sanctions under this Rule, "there must be a valid

court order in force . . . ." <u>Id.</u> Where such an order exists and is violated, "[d]istrict courts have

wide discretion in selecting appropriate sanctions." <u>Id.</u>[15]

---

sanctions under Rule 37 moreover, fall within the broad authority granted to magistrate judges to manage discovery. <u>See, e.g.,</u> <u>Kiobel v. Millson,</u> 592 F.3d 78, 88 (2d Cir. 2010) (Cabranes, J., conc.) ("[I]t is the broad scope of a magistrate judge's authority over discovery disputes that provides the source of his authority to impose sanctions for the violation of discovery orders.") Accordingly, an Opinion and Order, and not a Report and Recommendation, is appropriate.

[14] While the language of Rule 37(b) refers to a "party's" failure to obey an order, this includes misconduct by the party's attorney. For example, in <u>Fonar Corp. v. Magnetic Resonance Plus, Inc.,</u> the Court of Appeals upheld a contempt sanction and fine imposed on an attorney pursuant to the Rule 37(b) for that attorney's specific role in violating a court order separate from that of the client. 128 F.3d 99, 102–03 (2d Cir. 1997); <u>see also</u> <u>Markus v. Rozhkov,</u> 615 B.R. 679, 701 (S.D.N.Y. 2020) (affirming sanctions against an attorney for discovery misconduct pursuant to Rule 37(b)). Other circuits have similarly found that "[p]ursuant to Rule 37(b), the court is authorized to impose sanctions against parties or counsel . . . ." <u>Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.,</u> 685 F.3d 486, 490 (5th Cir. 2012).

[15] The Court declines to invoke its inherent powers to address this breach. "Inherent power sanctions are . . . not a primary mechanism by which a party can obtain relief for a discovery abuse: They should serve only as a useful backstop against discovery abuses that do not clearly violate Rule[] . . . 37." <u>Yukos Cap. S.A.R.L. v. Feldman,</u> 977 F.3d 216, 236 (2d Cir. 2020). Moreover, "imposing sanctions under a court's

**A50**

There is no dispute that at the time of the deposition leak, two valid court orders were in effect, and the leak of the transcript violated those orders. The only question is who is culpable. The clear answer is Kreindler & Kreindler, through the actions of at least Fawcett and Kreindler. Although some of the evidence of this coordinated campaign is circumstantial, it is compelling. Circumstantial evidence is not a bar to finding that they breached the order. Even in the criminal context, where the standard of proof is "beyond a reasonable doubt," "[t]he existence of—and a particular defendant's participation in—a conspiracy may be established entirely by circumstantial evidence." United States v. Desimone, 119 F.3d 217, 223 (2d Cir. 1997). "Moreover, the conspiratorial agreement itself may be established by proof of a tacit understanding among the participants, rather than by proof of an explicit agreement . . . ." Id.

Fawcett, Kreindler, and Kreindler & Kreindler have amply demonstrated their motive for the leak. The firm's litigation strategy is to use press attention to force Saudi Arabia into a settlement. Hearing Tr. at 25:3–5, 21–24. If this strategy is successful the firm will reap a substantial benefit. Id. at 23:24–24:2. Firm personnel, and Kreindler in particular, have also repeatedly criticized the Protective Orders in vitriolic terms. Id. at 29:1–25, 210: 7–14.

Kreindler & Kreindler rely on the coordinated efforts of Kreindler and Fawcett to implement this press strategy. Kreindler or another attorney works with journalists to lay the groundwork for stories that will put pressure on Saudi Arabia. Fawcett follows up with supporting documents. Id. at 24:3–25:9, 41:12–24, 208:20–209:2. It is this tag-team between

---

inherent power can be 'needless and confusing [] when a particular rule directly applies to the specific problem confronting the district court.'" Automated Mgmt. Sys., Inc. v. Rappaport Hertz Cherson Rosenthal, P.C., No. 16-cv-04762 (LTS)(KNF), 2021 WL 2983240, at *9 (S.D.N.Y. July 14, 2021) (quoting S. New England Tel. Co. v. Glob. NAPs Inc., 624 F.3d 123, 144 n.7 (2d Cir. 2010) (alterations in original).

Kreindler and Fawcett that resulted in the 2017 breach. Hearing Tr. at 38:3–8; KSAX-0010 at 4:20–5:1.

Kreindler and Fawcett also had a series of suspicious communications with Isikoff for which they have provided no credible explanation. The weeks after the Al Jarrah deposition saw a flurry of communications, first between Kreindler and Isikoff, KSAX-0142, then between Kreindler and Fawcett, KSAX-0134 at 1–2, and, at last, between Fawcett and Isikoff. KSAX-0082 at 1–2; KSAX-0134 at 1; Hearing Tr. at 428:1–25, 433:10–24. Only in early July, after these exchanges of communications between Kreindler, Isikoff, and Fawcett, did Fawcett leak the transcript. Hearing Tr. at 436:3–5

Kreindler testified that when he spoke with Fawcett in the days before the leak, he was not directing Fawcett to leak the transcript but asking whether it could be provided to Isikoff. Id. at 61:19–62:9. The Court does not credit this testimony: it would require Kreindler to be completely ignorant of the requirements of the Protective Orders and for Fawcett to be willing to betray his friend and employer by leaking the transcript just a week after allegedly telling Kreindler that it could not be shared. As discussed, Fawcett's alleged motivation appears to have been fabricated by firm attorneys as a way to open another front in their campaign against Al Jarrah and Saudi Arabia.

Similarly, Saudi Arabia's July 21 email informing the PECs of its intention to alert the Court of the breach triggered a burst of communications between Fawcett, Kreindler, and Crotty. First, there was a text between Fawcett and Crotty at 8:18 a.m, hours after the Kingdom's email. KSAX-0151 at 1. Then, Fawcett and Kreindler had a 9:17 a.m. call. KSAX-0135 at 3. This was followed by a call between Fawcett and Crotty at 10:41 a.m. Id. Finally, Fawcett and Kreindler had a call at 12:56 p.m. Id. Their explanations for these calls are not credible. They have not

explained why they had a 9:17 a.m. conference call purportedly about the MDL that they did not assert privilege over, as was their practice with other work product calls. Moreover, having witnessed Fawcett on the stand, the Court does not find it credible that Fawcett would have a 46-minute call with Kreindler while simultaneously seeking legal advice about a blatant breach of his duty and loyalty.

Fawcett's explanation for what triggered these communications to Crotty is also suspect. He states that he reached out to her on July 22 because he "saw the court order," Hearing Tr. at 480:16, and wanted to get legal advice about his exposure due to the breach. Id. at 481:6–9. But no order existed as of July 22. Saudi Arabia's late-night July 21 email to Kreindler & Kreindler and the rest of the PECs (but not including Fawcett) was the only activity related to the breach during this period. Kreindler & Kreindler attorneys were on that email. Fawcett was not. KSAX-0042. Yet inexplicably, 11 hours after Saudi Arabia's email, Fawcett sought legal advice about the breach. Putting these pieces together, the reasonable inference is that the calls between Kreindler, Fawcett, and Isikoff were discussions about how to get the Al Jarrah Transcript into Isikoff's hands in violation of the Protective Orders. When Saudi Arabia decided to press the issue, someone inside the firm alerted Fawcett to the impending threat.

After the breach, the conduct of the firm lawyers reflects, at best, efforts to remain willfully unaware of what Kreindler and Fawcett did, and at worst, active collusion in a cover-up. Maloney conducted a facially deficient investigation with a clear blind spot for Fawcett. He prejudged the inquiry's outcome and was confident that his firm was not the source. Id. at 212:3–5. He did not direct anyone to retain documents. Id. at 244:14–245:2. There was no systematic interview process. Some people were interviewed in person, others over the phone. Id. at 216:2–23. Some, like Hunt, were not interviewed at all despite participating in both the deposition and

interviews with Isikoff. Id. at 198:25–199:6, 205:14–206:16; KSAX-0032 at 6 (deposition appearance sheet listing Hunt).

The investigation did nothing to account for the fact that all Kreindler & Kreindler staff could access the transcript through Case Media, did not examine firm phone records or personal devices and did not explore non-firm cloud-based systems like Dropbox even though Hartney knew Fawcett used them. Hearing Tr. at 150:8–18, 157:18–158:17, 222:8–223:2. Hartney was never instructed to carry out any kind of forensic investigation. Rather, by July 27, when Kreindler & Kreindler was reporting to the Court that its investigation was complete, electronic search efforts amounted to just a few searches for messages on the firm's email system and confirmation of where the Al Jarrah Transcript was stored. Id. at 173:21–176:18.

But the most telling flaw in this investigation was how completely it passed over Fawcett. Fawcett, in Kreindler's words, was "at the heart of the documents" in this case, id. at 39:3, and was involved in the prior breach. Despite this, Fawcett reports that he was not directly questioned about his role in the breach until September 27, long after the firm had reported its investigation was complete. Id. at 436:11–439:12. The Court does not credit contrary testimony by Pounian and Maloney, particularly since in Fawcett's declaration, he removed language that would have explicitly stated that he had told Kreindler & Kreindler that he did not know how Isikoff obtained the transcript. KSAX-0121. Despite the firm obtaining an exculpatory declaration from another consultant days after the Court's August 30 Order, Fawcett was not asked to sign a declaration until the absolute deadline, and he confessed immediately.

This investigation was then presented to the Court in misleading terms. On July 27, the PECs reported to the Court that "each of the lead PEC firms [*i.e.*, Kreindler & Kreindler among others] had already conducted internal investigations into the handling of the Jarrah transcript

and communications with Mr. Isikoff, and that as a result of those investigations, each of the lead

PEC firms was confident that it was not the source of the leak to Mr. Isikoff." KSAX-0043 at 2.

But, by that point, Kreindler & Kreindler had not even investigated ShareFile and had done

nothing with Case Media but confirm that the Al Jarrah Transcript was stored there. It would not

seriously investigate these systems for another two days. Hearing Tr. at 149:21–150:3, 172:25–

174:4. Thus, Kreindler & Kreindler had not even completed its paltry investigative efforts by the

time it was confidently reporting that it was not the source of the breach.

Then, when the Court's investigation began, Kreindler & Kreindler sought to frustrate it.

It was the only major plaintiffs' firm that refused to submit voluntary declarations. Two of its

peers submitted comprehensive declarations almost immediately. KSAX-0044; KSAX-0045.

After the Court ordered declarations from Kreindler & Kreindler, Anderson Kill, another leading

firm, followed suit voluntarily. KSAX-0047. Later, despite the stay of the August 30 Order,

other plaintiffs' firms, including ones not necessarily covered by that Order, filed their own

declarations. KSAX-0053.[16]

Kreindler & Kreindler failed to participate voluntarily in any aspect of the investigation.

It provided its first round of declarations only under court order. ECF No. 7011. The firm's

declarations were less comprehensive and vaguer than the ones provided by its peers, and they

failed to include any information about whether it had truly investigated its information

technology systems. The Court thus was forced to enter a second order to supplement these

declarations. KSAX-0049. When the Court stayed that order because of Oath's intervention,

Kreindler & Kreindler was the only firm to support this meritless effort to derail the

---

[16] While Anderson Kill and these firms did not submit declarations immediately, no credible comparison
can be drawn between these firms and Kreindler & Kreindler. These firms had limited involvement with
the Al Jarrah deposition. None had interacted with Isikoff or previously violated the Protective Orders.

investigation. KSAX-0051. Other firms volunteered their declarations despite the stay. KSAX-0053. Kreindler & Kreindler resisted until it had no option but to comply.

The resulting September 27 Declarations were misleading. Two misrepresentations are particularly noteworthy. First, Kreindler & Kreindler fabricated Fawcett's motive. The motive Fawcett proffered in his filed declaration was a desire to protect children from Al Jarrah. KSAX-0062A at ¶ 4. Fawcett's declaration suggested that he had personal motivations since his children were from Morocco. Id. This narrative has been revealed to be primarily an invention of Pounian and Benett. They added the personal elements as part of their revisions to Fawcett's original declaration. KSAX-0109; KSAX-0109A; KSAX-0110; KSAX-0110A. Fawcett's original declaration did not offer any familial motivation. KSAX-0108A.

Second, Benett deliberately structured Hartney's declaration to convey the impression that access to Case Media was far more limited than it was, even after Hartney alerted Benett that the language was not "truthful." KSAX-0115. The resulting declaration was explicitly designed to avoid alerting the Court to Kreindler & Kreindler's deficient protection of confidential materials. Hearing Tr. at 143:4–13, 196:3–19. These are not the only misleading statements in the September 27 Declarations, merely the most glaring. See Section I.I.

The firm also tried to use the Court's investigation as a forum to compound the damage caused by the breach. During the evidentiary hearing, Hearing Tr. at 393:1–15, and in the Weidener Declaration, ECF Nos. 7379, 7381 at 1, Kreindler & Kreindler introduced gratuitous and irrelevant material to disparage Saudi Arabian personnel. In short, Kreindler & Kreindler repeatedly sought to foil the investigation and engage in the very type of disclosures created by the breach in the first place.

The Court does not credit Kreindler & Kreindler's attempts to write this off as the actions of a rogue employee. For almost two decades, Fawcett has loyally supported Kreindler & Kreindler's efforts in this case. Hearing Tr. at 416:3–5. He professed loyalty to Kreindler, id. at 417:15–18, and Kreindler, despite Fawcett's admitted betrayal, offered emotional testimony lauding Fawcett's character. Id. at 128:13–129:1. Other attorneys were similarly complimentary. Id. at 366:4–13, 411:23–412:2. Moreover, Fawcett consistently sought approval from Kreindler & Kreindler attorneys before sharing documents, particularly after the 2017 breach. Id. at 44:16–23, 209: 3–5. The only time he was involved with the breach of a protective order was when he and Kreindler collaborated on placing stories with a reporter.

Similarly, the Court does not credit the firm's attempt to explain Fawcett's actions as those of a man with such a blinding hatred for child pornography that he would betray his long-time employer and friends by disclosing confidential material they had a duty to protect. By his own admission, he had already heard unconfirmed reports about Al Jarrah's FBI interaction for at least six months. During this time he took no action beyond attempting to confirm what he had heard. Id. at 468:21–24, 469:8–16. Yet, though the deposition produced "no smoking guns or dramatic confessions," KSAX-0040 at 2, he claims he was suddenly compelled to act.

But even that asserted motivation does not square with what Fawcett did with the deposition transcript. He never alerted anyone in the United States or Moroccan governments to register or publicize his concern. Hearing Tr. at 470:5–471:16. Despite a background in humanitarian work, KSAX-0062A at ¶ 4, he did not provide the information to a non-governmental group that might have been able to aid Moroccan children. All he did was covertly leak the entire deposition transcript to a single friendly journalist who had recently hosted Kreindler to discuss this case. He also turned to Crotty, a former Kreindler & Kreindler attorney,

for legal advice on the breach. This is consistent with the motivation of a person supporting the firm's press strategy, not one embarked on a crusade against child pornography.

The Court is left with two possible conclusions. The first is that, after twenty years of unwavering service, Fawcett decided to betray his firm and friends over an unproven 17-year-old allegation of possession of child pornography.

The second is that Kreindler & Kreindler has decided to litigate this case in the press. Part of that press strategy involves repeatedly distributing disparaging information about people connected to Saudi Arabia to pressure it into a resolution. Like in the 2017 breach, Fawcett takes his direction from Kreindler and leaks confidential material to a friendly journalist. The firm then demonstrates its reciprocal loyalty to Fawcett by resisting the Court's investigation of the breach through misleading declarations and a lackadaisical internal investigation. The evidence overwhelmingly proves this latter conclusion.

Fawcett and Kreindler's conduct in this breach is thus properly imputed to Kreindler & Kreindler. When an entity, even a non-party, acts on behalf of an organization, the actions of that entity may be imputed to the organization as part of the Rule 37(b) analysis. S. New England Tel. Co. v. Glob. NAPs Inc., is instructive. 624 F.3d 123 (2d Cir. 2010). There, the Court of Appeals considered sanctions imposed on a company in part based on the actions of that entity's bookkeeper. The bookkeeper, who had previously worked for the sanctioned company, used a computer application to destroy relevant files. In imposing a default judgment sanction, the district court found this (along with other behavior) to be a willful violation of its discovery orders. Id. at 142–43. The company appealed, arguing that the "district court erred in imposing sanctions . . . based on the actions of . . . [the bookkeeper], a non-party." Id. at 146. The Court of

Appeals dismissed this argument, noting that "the evidence supported a conclusion that [the bookkeeper] acted on the defendants' behalf." Id. at 148 n.10.

The problem, moreover, goes beyond Kreindler and Fawcett. While they were the key players, several other firm attorneys were, at best, willfully blind to their scheme and willing to obstruct the Court's efforts to uncover it. Maloney, a former federal prosecutor for this District, ran an investigation almost designed to avoid implicating Fawcett. Pounian and Benett then drafted a series of declarations intended to conceal the firm's failings and distance it from the breach. Later, Benett sought to further the very litigation strategy that drove the breach by injecting further gratuitously irrelevant information into the record. The breach is not the result of a rogue attorney or consultant. It is the result of the firm's litigation strategy and a culture that is determined to resist and evade the Protective Orders to further its goal.

### C.  The Appropriate Sanctions As to Kreindler & Kreindler Are Removal From the PECs and Payment of Attorneys' Fees and Costs Related to the Breach

The appropriate sanction for the breach of the Protective Orders is for Kreindler & Kreindler to be removed from the PECs and to pay Saudi Arabia attorneys' fees and costs related to the breach. Sanctions under Rule 37(b) "must be 'just'; and . . . must relate to the particular claim to which the discovery order was addressed." Daval Steel Prod., a Div. of Francosteel Corp. v. M/V Fakredine, 951 F.2d 1357, 1366 (2d Cir. 1991). Four factors guide the Court's determination of proper sanctions: "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of . . . noncompliance. "World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp., 694 F.3d 155, 159 (2d Cir. 2012) (quoting Agiwal v. Mid Island Mortg. Corp., 555 F.3d 298, 302 (2d Cir.2009)) (alterations in original).

"Because the text of the rule requires only that the district court's orders be 'just,' however, and because the district court has 'wide discretion in imposing sanctions under Rule 37,' these factors are not exclusive, and they need not each be resolved against the party" facing sanction. S. New England Tel. Co., 624 F.3d at 144 (quoting Shcherbakovskiy v. Da Capo Al Fine, Ltd., 490 F.3d 130, 135 (2d Cir. 2007)). Finally, "[t]he district court is free to consider 'the full record in the case in order to select the appropriate sanction.'" S. New England Tel. Co., 624 F.3d at 144 (quoting Nieves v. City of New York, 208 F.R.D. 531, 535 (S.D.N.Y.2002)).

Thus, willfulness is important to the determination of *what* sanction is appropriate, but not to *whether* sanctions may be employed. "For purposes of subdivision (b)(2) of Rule 37 . . . a party 'refuses to obey' simply by failing to comply with an order." Societe Internationale Pour Participations Industrielles et Commerciales, S. A. v. Rogers, 357 U.S. 197, 208 (1958). "[T]he willfulness or good faith of [party targeted for sanctions], can hardly affect the fact of noncompliance and are relevant only to the path which the District Court might follow in dealing with petitioner's failure to comply." Id. Based on these factors, Kreindler & Kreindler is removed from the PECs and will be required to pay attorneys' fees and costs sought by Saudi Arabia in connection with the breach.

### 1. Kreindler & Kreindler's Breach Was Willful and Committed to Obtain Litigation Advantage

Kreindler & Kreindler's breach was willful. The leak of the Al Jarrah Transcript did not occur by accident or negligence. It was the result of deliberate coordination between Fawcett and Kreindler. Once the breach occurred, the rest of the firm was, at best, willfully blind to this strategy. This coordinated plan was executed as part of the firm's longstanding effort to extract a favorable settlement from Saudi Arabia by placing damaging stories about it in the public eye, a

46

strategy the firm continued to pursue in the evidentiary hearing, through the Weidener

Declaration, and in the mass dissemination of the MPS materials.

The problem is not that Kreindler & Kreindler has chosen to make an aggressive press

campaign part of its litigation strategy. The Court has repeatedly affirmed that the parties may

talk to the press. See, e.g., KSAX-0010 at 9:10–11 ("I'm certainly not going to prohibit anyone

from speaking to the press . . . ."); KSAX-0055 at 16 ("[T]he Court has affirmed that parties may

talk to Isikoff or any other member of the press so long as they do not violate the Protective

Orders."); ECF No. 8066 at 8 ("The Court has repeatedly confirmed that parties may talk to the

press about this case . . . It does so again here."). Where Kreindler & Kreindler's press activities

do not run afoul of these limits, the Court has not responded with sanctions, even where the FBI

has urged the Court to act. Supra n. 4, see also KSAX-0020 at 3–5. The problem is that Kreindler

& Kreindler is apparently unwilling to execute this strategy without doing the one thing it may

not do: leak information subject to the Protective Orders.

Having held an evidentiary hearing and determined that Kreindler & Kreindler's breach

was willful, the Court may factor that willfulness into its determination of sanctions. Jay v.

Spectrum Brands Holdings, Inc., No. 13-cv-8137 (LTS)(DF), 2015 WL 6437581, at *6

(S.D.N.Y. Oct. 20, 2015) ("Only where the court imposes sanctions that require a finding of

willfulness is an evidentiary hearing required.")

### 2. Lesser Sanctions Would Be Ineffective

Lesser sanctions will be ineffective at curbing Kreindler & Kreindler's discovery abuses.

Expulsion from the PECs is a severe, but not the most severe, sanction that can be imposed.

More severe measures would likely require dispositive sanctions and would unfairly penalize

Kreindler & Kreindler's blameless clients. See, e.g., Fed. R. Civ. P. 37(b)(2)(v), (vi) (authorizing

dispositive sanctions).

Removing Kreindler & Kreindler from the PECs is a severe sanction. The Manual for Complex Litigation notes that removing an attorney from a leadership role "may disrupt the litigation, may cause significant harm to the client's case and the reputation of the attorney or law firm, and can conflict with a party's right to counsel of its choosing." § 10.154 (4th ed. 2004). Lesser sanctions, however, are not viable. As the 2017 breach demonstrates, admonishment has not deterred Kreindler & Kreindler from abusing the Protective Orders.

Direct financial penalties, another alternative, are frequently ineffective in cases involving protective order breaches. See, e.g., Ablyazov, 2018 WL 1229730, at *7 (finding, where material was leaked in violation of a protective order, that a financial sanction "would be insufficient punishment for the breach because it would enable the [party at fault] to simply pay for breaches of court orders and transform compliance with them into a mere financial calculation.") This is particularly true where the potential awards are vast. For example, on June 10, 2022, a partial default judgment for only compensatory and solatium damages was entered for just 78 plaintiffs in this case. ECF No. 7580. The value of the award for this tiny slice of the MDL was $512,500,000. Id. Six days earlier, another partial final default judgment was granted for 40 plaintiffs, again limited to solatium, economic, and compensatory damages. ECF No. 7523. The total award was $290,207,405. Id. Thus, this is a case where even "small" partial judgments yield nine-figure awards. If Kreindler & Kreindler prevails against Saudi Arabia, the resulting award will likely be worth billions of dollars. Financial sanctions alone are simply not viable where this much money is at stake.

Prohibiting the use of the Al Jarrah Transcript is also not sufficient. While that sanction has been deployed in cases where a protective order was breached, see, e.g., Ablyazov, 2018 WL 1229730, at *7 (precluding the use of a leaked transcript), it will not work here for three reasons.

First, such a sanction would unfairly harm Kreindler & Kreindler's clients. See, e.g., Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp., 602 F.2d 1062, 1069 (2d Cir. 1979) (Oakes, J. conc.) ("It would be with the greatest reluctance . . . that I would visit upon the client the sins of counsel, absent client's knowledge, condonation, compliance, or causation.") Second, it is not clear that the transcript is important enough to make its preclusion meaningful. Kreindler & Kreindler has accreted more than four years of discovery materials in the case against Saudi Arabia. It is unlikely that the loss of a single transcript will be so relevant that it will be a sanction commensurate with a willful breach of the Court's orders. Indeed, Isikoff's article does not suggest that the deposition was particularly revelatory. KSAX-0040 at 2. Third, this sanction, like a financial sanction, could play into Kreindler & Kreindler's litigation strategy. Materials that are not helpful to the case, but are nonetheless useful for press purposes could be leaked and sacrificed while still advancing the overall litigation strategy.

In considering the viability of lesser sanctions, the Court has also considered that removing Kreindler & Kreindler from the PECs will impact the many plaintiffs who have chosen Kreindler & Kreindler as their counsel. In contexts like attorney disqualification, a court "must be solicitous of a client's right freely to choose his counsel" while recognizing that this "right . . . must be balanced against the need to maintain the highest standards of the profession." Gov't of India v. Cook Indus., Inc., 569 F.2d 737, 739 (2d Cir. 1978).

While the Court is sensitive to these concerns, they are less salient here. Kreindler & Kreindler is not being barred entirely from the MDL, only from the PECs. This will dramatically reduce its role in the MDL but it may continue to represent its clients if they chose to remain with the firm. If clients chose new counsel, there are numerous sophisticated firms in this MDL who are familiar with the case and fully able to continue to litigate their clients. The danger that

a plaintiff will be prejudiced by the diminution of Kreindler & Kreindler's role is thus much mitigated.

More importantly, the Court cannot permit Kreindler & Kreindler to hide behind its clients to evade the consequences of its actions. Beyond removal there is no lesser sanction that can address the firm's repeated flouting of the Protective Orders and lack of candor before the Court. Ultimately, even the client's right to choose their counsel must yield where the integrity of the adversarial process is at stake. See, e.g., Evans v. Artek Sys. Corp., 715 F.2d 788, 791 (2d Cir. 1983) ("The objective of the disqualification rule is to 'preserve the integrity of the adversary process . . . . .'") (quoting Board of Education of the City of New York v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979)).

Further demonstrating the need for strong sanctions, Kreindler & Kreindler's conduct in the Court's investigation shows that it will fight tooth and nail to avoid accountability for discovery violations, consuming both the Court and all parties' resources in the process. It took months to overcome Kreindler & Kreindler's obstruction. It will doubtless take months more to address objections. Another draining debacle is out of the question. Accordingly, having considered the full spectrum of sanctions available to it, the Court determines that removing Kreindler & Kreindler from the PECs is the least disruptive and least severe sanction that can credibly address the breach of the Protective Orders.

### 3. The Breach of the Protective Orders Is Permanent

In terms of the duration of noncompliance, the breach of the Protective Orders is effectively permanent. This situation is similar to that of Ablyazov, where, in violation of a protective order, confidential material was uploaded to a file-sharing website and then later discussed on a Russian news website. 2018 WL 1229730, at *3. As Ablyazov acknowledged in assessing the duration of non-compliance, "disclosures on the internet are potentially permanent,

as any number of people could have downloaded the Transcript and now have the ability to share it at any time in the future." Id. at *6.

That is the case here too. While the full transcript is not public, the article discussing its contents is. That article is readily found on the internet and will likely remain there forever. The breach of confidentiality is thus permanent. A "protective order issued under Rule 26(c)" plays a "vital function" in civil litigation "by encouraging full disclosure of all evidence that might conceivably be relevant." Martindell v. Int'l Tel. & Tel. Corp., 594 F.2d 291, 295 (2d Cir. 1979). "Unless a valid Rule 26(c) protective order is to be fully and fairly enforceable, witnesses relying upon such orders will be inhibited from giving essential testimony in civil litigation, thus undermining a procedural system that has been successfully developed over the years for disposition of civil differences." Id.

These concerns are heightened because the subjects of discovery include material related to some of America's most sensitive national security investigations and foreign nations' diplomatic affairs. While the Court has sought to mitigate the damage caused by this breach through a rigorous investigation of its source, Isikoff's article has permanently damaged the credibility of the Protective Orders as a tool for encouraging fulsome disclosure.

### 4.  Kreindler & Kreindler Has Been Warned About Violating the Protective Orders

The General Protective Order includes specific language warning about the consequences of violating it. It notes that "any violation of this Order is punishable by money damages caused by the violation, including, but not limited to, all attorneys' fees, court costs, exhibit costs, expert witness fees, travel expenses, all related litigation costs, and actual damages incurred by the other Party, equitable relief, injunctive relief, sanctions or any other remedy as the Court deems appropriate." KSAX-0002 at 15.

Moreover, Kreindler and his firm have been warned about violating the Protective Orders by disclosing confidential information to the press. In 2017, after the firm's first violation, the Court gave Kreindler a "first warning." KSAX-0010 at 10:2, and directed him to "be more careful as you continue to litigate this case, including given that you are an executive member of the plaintiffs' executive committee . . . ." Id. at 13:12–15. As present circumstances reflect, that warning was not effective.

**5.    Further Considerations**

Beyond these four considerations, this investigation has revealed an almost complete lack of respect for the Court and its orders. The MPS Violation also shows that the firm will continue to violate the Protective Orders to advance its "press-first" litigation strategy even while an investigation against it is pending. Indeed, Kreindler & Kreindler is now accumulating violations of the Protective Orders at an increasing rate. The Court considers Kreindler & Kreindler's overall conduct given that "sanctions must be weighed in light of the full record in the case . . . ." Cine Forty-Second St. Theatre Corp., 602 F.2d at 1068.

The first indication of Kreindler & Kreindler's lack of respect for the Court is the sheer number of misrepresentations the firm made during the Court's investigation. These misstatements were made, moreover, in a clear effort to hinder the Court's investigation of the breach and cover-up other issues with the firm's adherence to the Protective Orders. "[T]he effect of and number of misrepresentations that a party makes are perfectly acceptable data points for a court to consider in determining whether – and, perhaps more importantly, what – sanctions are warranted." Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd., 991 F.3d 361, 369 (2d Cir. 2021).

The investigation has also revealed numerous issues with Kreindler & Kreindler's conduct beyond the initial breach. The General Protective Order requires that confidential material like the Al Jarrah Transcript be stored "in a secure manner that ensures that access is limited to the persons authorized" to see that material. KSAX-0002 at 11. Kreindler & Kreindler stored it on a system that anyone at their firm could access. That system does not track users' access or even alert them that they are about to review protected material. Hearing Tr. at 138:18–140:14, 249: 6–10. The Deposition Protocol provides that "depositions may be attended (either in person or remotely) only by designated personnel and "all persons in attendance (either in person or remotely) must be noted on the deposition record." ECF No. 6002-1 at ¶ 31. Weidener attended parts of the Al Jarrah deposition, ECF No. 7384-1 at ¶ 4, and was not noted on the record. Hearing Tr. at 329:25–330:1. This violated the Deposition Protocol.[17]

The issues are not the violations themselves. This Court, like others to confront *de minimis* or technical violations of discovery orders, recognizes that, on occasion, there will not be strict adherence to the terms of complex orders. So long as the issue is addressed quickly, and the harm is minimal, judicial action is not necessary. See, e.g., In re Hornbeam Corp., No. 14-mc-424, 2022 WL 60313, at *5 (S.D.N.Y. Jan. 6, 2022) (declining to impose Rule 37 sanctions where "to the extent any violations did occur, they appear to be bare, technical violations that were remedied in due course and caused no harm.") Rather, each new issue is troubling because it reveals how little respect the firm has for the Court's efforts to manage this litigation. The firm has already made numerous comments disparaging the Protective Orders. These incidents further

---

[17] It is no defense, as Kreindler & Kreindler suggests, that *other* parties also violated this particular aspect of the Deposition Protocol. See ECF No. 7386 at 40 (suggesting that other parties' declarations reveal comparable violations of this aspect of the protocol). While this may speak to the severity of the breach and the appropriate remedy, that one party breached an order does not suddenly make it permissible for another party to breach it.

confirm its contempt for the Court's authority to manage this case.

The Court also considers that, given the MPS Violation, Kreindler & Kreindler is now accumulating violations of the Protective Orders at an increasing rate. As the Court noted at the time, the MPS Violation, standing alone, might well have been treated as a "minor incident." ECF No. 8066 at 7. As with Weidner's participation and the storage issues, there will be missteps in a long-running and heavily litigated case like this one. The issue is:

> the increasing rate at which violations of the protective orders are accruing. From 2006 to 2017, this was not a major issue. Beginning in 2017, with Kreindler's violation, however, conflicts have becoming increasingly common. The Court warned parties to be sensitive about their public commentary on this case again in 2019, after the Government raised concerns about speeches made by plaintiffs. ECF No. 5334 at 35:4–8. Then in 2021, protected material was deliberately leaked to a journalist. The parties are not quite halfway through 2022, and the present violation has already accrued.

Id. at 8.

The MPS Violation is also remarkable because it occurred while Kreindler & Kreindler was under investigation for the leak of the Al Jarrah Transcript. This was an incident where, even taking the facts in the light most favorable to them, one of their most trusted consultants deliberately violated the Protective Orders and the firm's security measures were inadequate to the detect the deceit. One might reasonably expect a firm to treat discovery materials more cautiously while it is actively being investigated for flaws in their document security. The MPS Violation is further evidence that Kreindler & Kreindler does not take its discovery obligations seriously and that, without serious sanctions, it will continue to accumulate discovery violations, prejudice defendants, and waste judicial resources.

### 6.   Removal from the PECs

Given these factors, removal from the PECs is the appropriate sanction. In a less

complicated matter, the combination of a financial sanction and the loss of access to confidential

material might be a sufficient remedy. As noted though, a financial penalty alone will not be

effective. Other common responses to breaches of protective orders include preventing the party

from using disclosed material, see, e.g., Ablyazov, 2018 WL 1229730, at *7, or ending their

access to confidential material entirely. See, e.g., CMC Telecom, Inc. v. Michigan Bell Tel. Co.,

No. 07-cv-319, 2012 WL 13185452, at *6 (W.D. Mich. June 29, 2012) (ordering a party that

violated a protective order to "return all Confidential Information received . . . during the course

of this lawsuit."); Grant Heilman Photography, Inc. v. Pearson Educ., Inc., No. 11-cv-4649, 2018

WL 2414984, at *4 (E.D. Pa. May 29, 2018) (directing a party to return or destroy confidential

information following their breach of a protective order).

The former solution would be ineffective for the reasons discussed. The latter solution

would seriously harm Kreindler & Kreindler's clients. While the Court has lost faith in the firm's

ability to conduct this litigation responsibly and report honestly as a representative of all

plaintiffs, hundreds of plaintiffs may continue to trust the firm to advocate for their claims. The

firm will not be able to do so if it cannot use any of the confidential materials obtained in

discovery. Some imposition on these clients is unavoidable given the scale of the firm's

wrongdoing, but the Court will not void their right to select counsel by rendering Kreindler &

Kreindler unable to represent them effectively. The Court is thus left to fashion a sanction under

circumstances in which the traditional remedies for breaches of a protective order are unusable.

Because the normal remedies are not viable, the Court orders that Kreindler & Kreindler

be removed from the PECs. This will have a corollary financial effect on their ability to seek

compensation for work done as part of that body that is appropriately part of this sanction. The

Manual for Complex Litigation notes that demotion or removal of counsel is an appropriate sanction "for egregious circumstances." § 10.154. Thus, the Court of Appeals in Plaintiffs' Baycol Steering Comm. v. Bayer Corp. upheld an order removing an attorney from an MDL executive committee where the attorney "exhibited poor judgment and a profound lack of the appropriate forthrightness and candor necessary from a member of the [executive committee] . . . deliberately tried to cover-up his actions and mislead the Court and the parties . . . [and] failed to exercise due care regarding the handling of confidential documents." 419 F.3d 794, 807 (8th Cir. 2005).

Other courts, acting under different rubrics, have also removed attorneys or a law firm from a leadership position in a multidistrict litigation once the court determined that counsel could no longer effectively fill the role. For example, the law firm of Milberg Weiss Bershad & Schulman, LLP held or was seeking leadership roles in various cases across the country when it was indicted in a kickback scheme. As a result, various courts removed it from leadership positions in consolidated cases. See, e.g., In re New Motor Vehicles Canadian Exp. Antitrust Litig., 466 F. Supp. 2d 364, 371 (D. Me. 2006); In re Medtronic, Inc. Implantable Defibrillator Prod. Liab. Litig., 434 F. Supp. 2d 729, 732 (D. Minn. 2006).

The removal of Kreindler & Kreindler from the PECs is thus the kind of "just" order Rule 37(b)(2)(A) permits a court to impose. When "acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses . . . ." Reilly v. Natwest Markets Grp. Inc., 181 F.3d 253, 267 (2d Cir. 1999). The fact that several courts have demoted counsel from an executive committee when they lost faith in a firm's ability to perform the role, along with the Manual for Complex Litigation's approval of demotion as a sanction, confirms the propriety of removal as a remedy for this breach.

Appointment to the PECs places a law firm in a particular position of trust and responsibility. The Court must be confident that a firm has the expertise to manage and safeguard the immense volume of sensitive discovery material produced in this case. It also needs to know that the representations made by the PECs are candid. The PECs cannot efficiently perform their functions if the Court cannot trust their statements. With this episode, the Court has lost faith in Kreindler & Kreindler. It has demonstrated, not once, but twice, that it will leak confidential information to reporters as part of its litigation strategy. This time, when the Court was forced to investigate the breach, Kreindler & Kreindler made numerous misleading statements and dragged its heels in identifying the source—which, of course, proved to be its consultant.

This problem, moreover, is systemic. Numerous attorneys at the firm facilitated the obstruction of the Court's efforts to repair the breach so sanctioning a single attorney will not fix the problem. At this point, the firm's removal from the PECs is not only an appropriate sanction, but a necessary step to ensure that body's continuing efficacy and credibility.

As a consequence, in any future application to a common benefit fund or any similar fee sharing structure designed to compensate the PECs lawyers for work done on this case, Kreindler & Kreindler shall not be permitted to apply for compensation for work done after the date of the breach, *i.e.*, July 5, 2021. "[T]he reasonableness of a common fund fee award is governed by the [six] so-called Goldberger factors . . . ." Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423, 436 (2d Cir. 2007) (citing Goldberger v. Integrated Res., Inc., 209 F.3d 43, 121 (2d Cir. 2000). "Quality of representation" is one such factor, Goldberger, 209 F.3d at 50, and can "justify a decrease as well as an increase" in an award. In re Agent Orange Prod. Liab. Litig., 611 F. Supp. 1296, 1314 (E.D.N.Y. 1985), aff'd in part, rev'd in part on other grounds, 818 F.2d 226 (2d Cir. 1987).

In Fears v. Wilhelmina Model Agency, for example, the court awarded a substantial, but less than sought fee where it was concerned that counsel had not displayed adequate diligence in representing a class and had forced the court to take a more hands-on role in settlement negotiations. No. 02-cv-4911 (HB), 2009 WL 2958396, at *7 (S.D.N.Y. Sept. 16, 2009). It is undoubtably rare for the "quality of representation" factor to merit a downward departure. "Oftentimes, the quality of representation prong of the Goldberger test is utilized to praise plaintiffs' counsel, their administration of the case, their willingness to work with their adversary, and ability to recover a settlement on behalf of the plaintiffs." Fears v. Wilhelmina Model Agency, Inc., No. 02-cv-4911(HB), 2005 WL 1041134, at *8 (S.D.N.Y. May 5, 2005) aff'd in part, vacated in part, remanded sub nom. Masters, 473 F.3d 423, and aff'd in part, vacated in part, remanded sub nom. Fears v. Wilhelmina Model Agency, Inc., 315 F. App'x 333 (2d Cir. 2009). The scale of Kreindler & Kreindler's misconduct calls for a downward modification.

From July 5 onward, Kreindler & Kreindler impeded the efficacy of the PECs. Their actions diverted focus from their clients' case, injected false information into the PECs' communication with the Court, and forced other firms to spend time and resources on an investigation irrelevant to their clients' claims. While the Court offers no opinion on the quality of the Kreindler & Kreindler's representation before July 5, from that day forward, they cost the PECs more than they contributed. Accordingly, while Kreindler & Kreindler may seek an award from any common fund, the deficient quality of their representation after July 5 merits barring them from seeking an award for work done on the PECs after that date.

Accordingly, Kreindler & Kreindler is removed from the PECs. To the extent a common benefit fund is later established and members of the PECs seek an award for their service,

Kreindler & Kreindler is precluded from seeking any contribution for work performed from July 5, 2021, when it undermined the PECs by leaking the transcript.

### 7. Attorneys' Fees and Costs

Kreindler & Kreindler shall also pay attorneys' fees incurred due to its willful breach of the Protective Orders and its obstructionist conduct during the investigation, which unnecessarily increased its expense. Rule 37(b)(2)(C) provides that when a party fails to obey a discovery order "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." There is no justification, much less substantial justification, for a willful and premediated breach of the Protective Orders or for the firm's conduct thereafter. Accordingly, Kreindler & Kreindler shall pay Saudi Arabia reasonable attorneys' fees and costs associated with investigating and addressing the breach of the Protective Orders.

### D. Sanctions May Be Levied Against Fawcett Under Rule 37(b)

Fawcett is barred from further participation in this case. He has confessed to deliberately leaking the Al Jarrah Transcript in violation of the Protective Orders so even assuming the Court accepted his and Kreindler's statements at face value there is no question that he is a proper target for sanction. The only question is the proper authority. As a non-attorney agent, Fawcett is in a somewhat unusual position but ultimately, Rule 37(b) provides the proper framework for sanctions against him as well.

The principles behind Rule 37(b) support its application against the agents of parties and attorneys who violate protective orders. "Rule 37(b) provides comprehensively for sanctions for failure to obey discovery orders." 8B C. Wright, A. Miller, & R. Marcus, Federal Practice and Procedure § 2289, p. 531 (3d ed). The purpose of discovery sanctions under this comprehensive

regime is " (1) to ensure that a party will not benefit from its failure to comply; (2) to obtain compliance with the court's orders; and (3) to deter noncompliance, both in the particular case and in litigation in general." <u>Anhui Konka Green Lighting Co. v. Green Logic Led Elec. Supply, Inc.</u>, No. 18-cv-12255 (MKV)(KHP), 2020 WL 5743518, at *4 (S.D.N.Y. Sept. 25, 2020); <u>see also</u> <u>Cine Forty-Second St. Theatre Corp.</u>, 602 F.2d at 1066 (2d Cir. 1979).

Accordingly, parties, attorneys, firms, and their agents have been sanctioned under Rule 37(b). Court have a levied sanctions against entire law firms, <u>see, e.g.,</u> <u>Thomas E. Hoar, Inc.</u>, 900 F.2d at 528 (upholding Rule 37 sanctions on a firm), and individual attorneys. <u>See, e.g.,</u> <u>Dino Antolini v. Amy McCloskey</u>, No. 19-cv-09038 (GBD)(SDA), 2021 WL 5411176, at *12 (S.D.N.Y. Nov. 19, 2021) (sanctioning an individual attorney). Courts have also levied sanctions jointly and severally against a party, a firm, and some of the firm's attorneys. <u>See, e.g.,</u> <u>Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC</u>, No. 16-cv-1318 (GBD)(BCM), 2017 WL 3671036, at *34 (S.D.N.Y. July 18, 2017), <u>report and recommendation adopted</u>, No. 16-cv-1318 (GBD)(BCM), 2017 WL 4712639 (S.D.N.Y. Sept. 28, 2017) (holding a plaintiff, a specific attorney, and that attorney's law firm jointly and severally liable for Rule 37 sanctions).

Most relevantly, courts in this District have barred experts employed by attorneys when those experts become a vehicle for attorneys' violations of protective orders. In <u>Matter of Bouchard Transportation Co., Inc.</u>, No. 14-cv-0617 (PAC), 2018 WL 1581992, at *1 (S.D.N.Y. Mar. 28, 2018), attorneys disclosed "attorneys eyes only" material to an expert in violation of a protective order. The court responded by "striking the [expert's] report and disqualifying [the expert] from further involvement in this matter" as "an appropriate remedy under Federal Rule of Civil Procedure 37." <u>Id.</u> In support, the court drew on other cases precluding the participation of experts where attorneys had disclosed information to them in violation of a court order. <u>Id.</u>

60

**A74**

(citing <u>Allergan, Inc. v. Sandoz Inc.</u>, No. 09-cv-182, 2011 WL 2563238, at *2–3 (E.D. Tex. June 28, 2011)). Given that Rule 37(b) has been used to sanction parties, law firms, and attorneys, and to preclude experts who will be a conduit for discovery abuse, it would be odd if a non-expert agent who aided a discovery abuse was unaccountably insulated from the otherwise comprehensive Rule 37(b) regime.

The suitability of Rule 37(b) is thrown into even sharper relief by cumbersome, restrictive, and heavy-handed tools to which a court would otherwise have to resort for conduct like Fawcett's. Civil or criminal contempt proceedings restrict the court's means of addressing a breach to fines or imprisonment. <u>See</u> 18 U.S.C. § 401 ("A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion . . . contempt of its authority . . . ."), <u>see also</u> <u>Phelan v. People of Territory of Guam</u>, 394 F.2d 293, 297 (9th Cir. 1968) ("[T]he only power of the court in contempt proceedings is to punish by fine or imprisonment.") Where a matter is proceeding before a magistrate judge these tools also delay and compound the costs of the breach since a magistrate judge may only certify the necessary facts to a district judge who must then hold further proceedings. 28 U.S.C. § 636(e)(6)(B) (discussing the certification process). Courts are thus encouraged to use tools besides contempt to address failures to comply with the litigation process. <u>See, e.g.</u>, <u>Int'l Union, United Mine Workers of Am. v. Bagwell</u>, 512 U.S. 821, 833 (1994) (citing Rule 37 and noting that "[c]ourts traditionally have broad authority through means other than contempt—such as by striking pleadings, assessing costs, excluding evidence, and entering default judgment—to penalize a party's failure to comply with the rules of conduct governing the litigation process.")

The use of a court's inherent powers is equally problematic. While courts possess inherent powers to enforce protective orders issued under Rule 26, <u>Hunt v. Enzo Biochem, Inc.</u>,

61

**A75**

904 F. Supp. 2d 337, 344 (S.D.N.Y. 2012), "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991). Conversely, "Rule 37 is flexible. The court is directed to make such orders as are 'just' and is not limited in any case of disregard of the discovery rules or court orders under them to a stereotyped response." 8B C. Wright, A. Miller, & R. Marcus, Federal Practice and Procedure § 2284, p. 436 (3d ed). Because "a court should always seek to impose the least harsh sanction that will remedy the discovery violation and deter such conduct in the future," Duncan v. Sullivan Cty., No. 18-cv-9269 (PMH)(PED), 2021 WL 6884505, at *18 (S.D.N.Y. Dec. 29, 2021) (quoting Silva v. Cofresi, No. 13-cv-3200 (CM)(JCF), 2014 WL 3809095, at *3 (S.D.N.Y. Aug. 1, 2014))(internal quotations omitted), this flexible sanction regime is a more appropriate way to respond to misconduct by attorney agents then resort to the Court's inherent power.

Undoubtably, sanctions against agents will rarely be merited because New York requires lawyers to supervise nonlawyers and renders lawyers responsible for the nonlawyers' conduct in appropriate circumstances. N.Y. Rule of Professional Conduct 5.3. Thus, sanctions targeting attorneys, their firm, or their clients will generally be adequate to ensure that neither client nor counsel will benefit from sanctionable conduct.

This case presents the rare circumstance where such sanctions are insufficient. This multidistrict litigation consists of thousands of clients employing dozens of lawyers. Sanctioning Kreindler & Kreindler alone or barring only their clients from employing Fawcett will be insufficient. Fawcett could easily offer his services to any of the other clients and firms in this case. Given his substantial knowledge of this case's subject matter, there would be considerable temptation for a party to avail themselves of his services. Moreover, this case is likely to continue for many years, providing numerous opportunities for Fawcett to return. Targeting

Kreindler & Kreindler thus does not guarantee that Fawcett will not eventually reemerge into this case. Considering the severity of his misconduct, that is unacceptable.

Barring Fawcett is necessary to ensure that he does not continue to serve as a means for further violations of the Protective Orders and that no party in this matter is able to benefit by employing an agent with a demonstrated willingness to deliberately violate court orders for litigation advantage. Thus, the Court finds that Fawcett may be properly subjected to sanctions under Rule 37.

Accordingly, as a "just order" under Rule 37(b)(2), Fawcett is barred from participating further in this multidistrict litigation or in any of its member cases in any capacity. He has confessed to deliberately violating the Protective Orders. KSAX-0062A at ¶ 2. Indeed, he agrees that barring his further participation in the MDL is an appropriate Rule 37(b) sanction, ECF No. 7387 at 41, and the Court does not find that any further or alternative sanctions would be appropriate. More importantly, while Fawcett carried out the leak, he was ultimately just a cats' paw for Kreindler & Kreindler. He is culpable, but his culpability is adequately addressed by barring his further participation from this case. One year after the entry of this Order, the PECs shall submit a letter to the Court certifying that they have conferred with plaintiffs' counsel and confirmed that Fawcett has not worked on this case for any plaintiff in the preceding year. The Court will determine if ongoing certification is necessary at that time.

### E. Implementation of This Opinion and Order

This Opinion and Order will be implemented as follows. Kreindler & Kreindler is removed from the PECs. Within two weeks of the entry of this Opinion and Order, the remaining members of the PECs shall file a letter with the Court confirming that the firm is no longer involved in any of that body's operations. If the PECs believe additional court action or

modification to the structure of the PECs is necessary as a result, they may raise those issues as part of this letter.

Within two weeks of the entry of this Opinion and Order, Kreindler & Kreindler shall file a letter with the Court confirming that Fawcett has been removed from any work on this MDL and describing the steps taken to ensure that he does not have access to MDL-related material in the firm's possession.

Kreindler & Kreindler and Saudi Arabia are ordered to meet and confer and reach agreement on a reasonable fee award. If the parties cannot reach agreement, any motion for attorneys' fees shall be filed within two weeks of the filing of this Order.

The Court does not find oral argument necessary to resolve this motion. It therefore denies Kreindler's & Kreindler's request for oral argument. ECF No. 7418. Because the firm is no longer part of the PECs, its request to add members to the Plaintiffs' Executive Committees at ECF No. 7153 is denied.

The Court recognizes that some material in this Opinion and Order may touch on sealed material. Out of an abundance of caution, the Court will permit the parties to make requests to redact material in this Opinion and Order by September 28, 2022. Given the importance of this decision to the MDL, however, the Court does not expect to accept any redaction requests that are not absolutely crucial. Accordingly, this Opinion and Order is sealed, with access restricted to the Plaintiffs' Executive Committees, Saudi Arabia, and the FBI. If Saudi Arabia believes Al Jarrah requires access, they may petition the Court accordingly.

## CONCLUSION

Kreindler & Kreindler and John Fawcett willfully breached the Court's protective orders to embarrass Saudi Arabia and gain an advantage in this case. When the Court tried to

investigate this breach, Kreindler & Kreindler engaged in a sustained campaign of delay and obstruction. Given this conduct, sanctions under Rule 37(b) are appropriate for both the firm and Fawcett. Fawcett is barred from further participating in this case in any capacity. Kreindler & Kreindler will be removed immediately from the Plaintiffs' Executive Committees and required to pay the attorneys' fees and costs for Saudi Arabia associated with this breach. One year after the entry of this Order, the PECs shall submit a letter to the Court certifying that they have checked with plaintiffs' counsel and confirmed that Fawcett has not worked on this case for any party in the preceding year. Kreindler & Kreindler's request to add members to the Plaintiffs' Executive Committees at ECF No. 7153 is denied.

The Court respectfully directs the Clerk of the Court to deny the motion for oral argument at ECF No. 7418. This Opinion and Order shall be SEALED with access restricted to the Plaintiffs' Executive Committees, Saudi Arabia, and the FBI. The parties shall make any requests to redact material in this Opinion and Order by September 28, 2022.

Dated: September 21, 2022
       New York, New York

SARAH NETBURN
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | No. 03-MDL-01570 (GBD) <br><br> This document relates to: *All Actions* |

**[PROPOSED] ORDER TO SHOW CAUSE TO STAY**
**ORDER PENDING RESOLUTION OF RULE 72(a) OBJECTIONS**

Upon the Declaration of Andrew Maloney, dated October 4, 2022, and the memorandum of law of Kreindler & Kreindler LLP ("K&K") in support of their motion by order to show cause for a stay pending resolution of objections pursuant to Federal Rule of Civil Procedure 72(a):

IT IS HEREBY ORDERED that Defendant Kingdom of Saudi Arabia show cause before this Court on October ___, 2022 at _____ __.m. before the Honorable George B. Daniels, United States District Court Judge, why an order should not be entered (a) granting a stay of the nonmonetary sanctions entered against K&K in Magistrate Judge Sarah Netburn's Opinion & Order dated September 21, 2022, Dkt. No. 8544 at 65 (the "Order")—namely, the "immediat[e]" removal of K&K from the Plaintiffs' Executive Committee after over two decades leading this multi-district litigation—pending resolution of K&K's Rule 72(a) objections due October 21, 2022.

IT IS FURTHER ORDERED that service via email and ECF of a copy of this order and annexed papers upon Defendant on or before _____ __.m on October ___, 2022, shall be deemed good and sufficient service thereof.

**A80**

IT IS FURTHER ORDERED that Defendant's opposing papers, if any, in response to this order to show cause, shall be served upon counsel for K&K on an expedited basis no later than October ___, 2022 at _____ ___.m.

IT IS FURTHER ORDERED that K&K's reply papers, if any, shall be served upon counsel for Defendant on an expedited basis no later than October ___, 2022 at _____ ___.m.

IT IS FURTHER ORDERED that all aspects of the non-monetary sanctions against K&K in the Order are stayed pending this Court's resolution of K&K's present motion by order to show cause for a stay pending resolution of Rule 72(a) objections.


SO ORDERED.


Dated: October ___, 2022
        New York, NY


_____
Hon. George B. Daniels
United States District Judge

2

**A81**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE TERRORIST ATTACKS ON
SEPTEMBER 11, 2001

No. 03-MDL-01570 (GBD) (SN)

This document relates to: *All Actions*

ORAL ARGUMENT REQUESTED

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION BY PROPOSED ORDER TO SHOW CAUSE FOR STAY**
**PENDING RESOLUTION OF RULE 72(a) OBJECTIONS**

Emily Kirsch
Paul Niehaus
KIRSCH & NIEHAUS PLLC
950 Third Avenue, 19th floor
New York, NY 10022
(212) 832-0170
emily.kirsch@kirschniehaus.com

Edward M. Spiro
MORVILLO ABRAMOWITZ GRAND
 IASON & ANELLO P.C.
565 Fifth Avenue
New York, NY 10017
(212) 856-9600
espiro@maglaw.com

*Counsel for Movant Kreindler & Kreindler LLP*

**A82**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT .............................................................................................. 1

BACKGROUND ........................................................................................................................ 3

      A.      K&K has played the central leadership role for two decades in representing thousands of victims and families of the 9/11 terrorist attacks .............................. 3

      B.      John Fawcett, a researcher for K&K, confessed to leaking the deposition transcript of Musaed al Jarrah, in violation of the protective orders, and took extraordinary steps to hide and lie about his actions. ............................................ 5

      C.      K&K submits declarations as directed by the Magistrate Judge as part of her investigation. ....................................................................................................... 7

      D.      Fawcett confesses to K&K who immediately advises the Magistrate Judge of the leak and how it occurred. ............................................................................... 7

      E.      The Magistrate Judge holds an evidentiary hearing on November 1 and  2, 2021 ............................................................................................................. 8

      F.      The Magistrate Judge issues an Opinion & Order on September 21, 2022, "immediately" removing K&K from the PEC. .................................................... 10

ARGUMENT .......................................................................................................................... 11

I.      The Court should stay the Magistrate Judge's Order "immediately" removing K&K from the Plaintiffs' Executive Committee, until K&K's Rule 72 objections are resolved .......................................................................................................... 11

      A.      Rule 37(b) does not authorize sanctions against a law firm. ................................ 13

      B.      The immediate nonmonetary sanction has upended a decades-long status quo, threatening irreparable harm to plaintiffs, before K&K's objections are resolved. ............................................................................................................. 20

CONCLUSION ....................................................................................................................... 22

i

**A83**

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alvarez v. Larose,*
    2020 WL 5632659 (S.D. Cal. Sept. 21, 2020) ..................................................................... 11

*Apex Oil Co. v. Belcher Co. of New York,*
    855 F.2d 1009 (2d Cir. 1988) .................................................................................... 13, 14

*Bloom v. Azar,*
    976 F.3d 157 (2d Cir. 2020) ...................................................................................... 16

*Bus. Guides, Inc. v. Chromatic Commc'ns Enterprises, Inc.,*
    498 U.S. 533 (1991) ................................................................................................ 12

*Fonar Corp. v. Magnetic Resonance Plus, Inc.,*
    128 F.3d 99 (2d Cir. 1997) ...................................................................................... 17

*Hassoun v. Searls,*
    968 F.3d 190 (2d Cir. 2020) .................................................................................... 12

*In re NTL Inc. Sec. Litig.,*
    2006 WL 1167848 (S.D.N.Y. May 3, 2006) ........................................................... 11

*In re World Trade Ctr. Disaster Site Litig.,*
    503 F.3d 167 (2d Cir. 2007) .................................................................................... 12

*Kidder, Peabody & Co. v. Maxus Energy Corp.,*
    925 F.2d 556 (2d Cir. 1991) ................................................................................ 12, 23

*LEG Q LLC v. RSR Corp.,*
    2017 WL 4222690 (N.D. Tex. Sept. 22, 2017) ...................................................... 11

*Markus v. Rozhkov,*
    615 B.R. 679 (S.D.N.Y. 2020) ................................................................................ 17

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................................................ 12, 20, 23

*NPF Franchising, LLC v. SY Dawgs, LLC,*
    37 F.4th 369 (6th Cir. 2022) .................................................................................. 16

*Pablovich v. Rooms to Go Louisiana Corp.,*
    2021 WL 928030 (E.D. La. Mar. 11, 2021) ........................................................... 11

*Pavelic & LeFlore v. Marvel Ent. Grp.*,
    493 U.S. 120 (1989) .................................................................................................. 17

*Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*,
    685 F.3d 486 (5th Cir. 2012) ................................................................................... 17

*S. New England Tele. Co. v. Global NAPs Inc.*,
    624 F.3d 123 (2d Cir. 2010) .................................................................................... 17

*United States v. Zapatero*,
    961 F.3d 123 (2d Cir. 2020) .................................................................................... 12

*Williams v. Beemiller, Inc.*,
    527 F.3d 259 (2d Cir. 2008) .................................................................................... 12

*Wolters Kluwer Fin. Servs., Inc. v. Scivantage*,
    564 F.3d 110 (2d Cir. 2009) .................................................................................... 18

*Yukos Cap. S.A.R.L. v. Feldman*,
    977 F.3d 216 (2d Cir. 2020) .............................................................................. 17, 18

## Rules

Fed. R. Civ. P. 11(c) ................................................................................................. 13, 15

Fed. R. Civ. P. 37(a) ....................................................................................................... 15

Fed. R. Civ. P. 37(b) ................................................................................................ *passim*

Fed. R. Civ. P. 37(c) ................................................................................................. 13, 14

Fed. R. Civ. P. 37(d) ................................................................................................ 15, 16

Fed. R. Civ. P. 72(a) ................................................................................................ *passim*

## Other Authorities

Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment ................................ 16

Fed. R. Civ. P. 37 advisory committee's note to 1993 amendment ................................ 16

Manual for Complex Litigation § 10.154 (4th ed. 2004) ............................................... 22

Michael Isikoff, *FBI tried to flip Saudi official in 9/11 investigation*, Yahoo! News (July 15, 2021), https://news.yahoo.com/fbi-tried-to-flip-saudi-official-in-911-investigation-090041290.html ................................................................................................................................. 5

Wright & Miller, Federal Practice and Procedure § 2290 (3d ed.) ............................................. 14

**PRELIMINARY STATEMENT**

Kreindler & Kreindler LLP ("K&K") moves this Court to stay that portion of the Opinion & Order of Magistrate Judge Sarah Netburn, dated September 21, 2022 (the "Order"), which removes K&K from Plaintiffs' Executive Committee for Death and Injury Claims ("PEC" or "Committee"), so that this Court may properly hear and resolve K&K's Rule 72(a) legal and factual objections to the Magistrate Judge's Order without seriously upsetting the existing status quo in this litigation and threatening immediate and irreparable injury, loss, or damage to the 9/11 death and injury plaintiffs.

On July 15, 2021, a reporter for Yahoo! News published an article about the deposition of Musaed al Jarrah, a non-party in this case.  Following news of the article, it was K&K that discovered who breached this Court's protective orders by disclosing Jarrah's deposition transcript, and it was K&K who disclosed its finding the same day that the culprit was identified, September 27, 2021.  A consultant hired by K&K, John Fawcett, admitted in declarations and subsequent hearing testimony that he acted alone, that he betrayed his duties to K&K and this Court by leaking the deposition transcript to the reporter, and that he actively took steps to hide his misconduct from K&K for over two months.  Four K&K attorneys – James Kreindler, Andrew J. Maloney, III, Steven Pounian, and Megan Benett – each testified under oath that no attorney or staff member at K&K had any knowledge of or anything to do with Fawcett's decision to leak the transcript.  The documents and testimony at the extraordinary two-day hearing in November 2021 – during which K&K attorneys were sequestered; subjected to cross-examination by attorneys for Defendant Kingdom of Saudi Arabia ("Saudi Arabia" or "Kingdom"); and denied the opportunity to review Saudi Arabia's proposed exhibits before being confronted with them on the stand – revealed no involvement by K&K's attorneys in Fawcett's wrongful acts.

1

**A87**

Over ten months later, the Magistrate Judge erroneously invoked Rule 37(b)(2)(A) as the legal basis for removing K&K from the PEC.  But that rule only imposes sanctions based on the conduct of "*a party*" and does not authorize sanctions – let alone such a sweeping nonmonetary sanction – against a *law firm*.  The Magistrate Judge expressly declined to invoke her inherent power to impose the nonmonetary sanction of removing the K&K firm from the PEC.  Use of inherent powers would have required specific findings of bad faith by clear and convincing evidence and other heightened standard requirements not met – or even discussed – in the Order.

As detailed in the accompanying declaration of Mr. Maloney, K&K's attorneys have played the lead role on the PEC in prosecuting the claims of the death and injury plaintiffs in the litigation against Saudi Arabia and handled nearly every aspect of this complex case over the past five years.  It is K&K attorneys that hired and, over the past five years, built trusted relationships with the former Federal Bureau of Investigation agents who have located and interviewed key witnesses who have revealed Saudi complicity in the attacks.  It is K&K attorneys who prepared and argued the critical legal and discovery motions in the case against Saudi Arabia.  It is K&K attorneys that located key non-party witnesses and obtained their statements and testimony.  It is K&K attorneys who deposed all fact and expert witnesses in the case against Saudi Arabia.  It is K&K attorneys that worked diligently for nearly a year to obtain crucial discovery from the United Kingdom's Metropolitan Police Service.  And it is K&K attorneys that, over the past two years, identified potential experts, hired them, and obtained six out of the seven expert reports, preparing those experts for depositions and defending their depositions.  It is also K&K attorneys who deposed the three experts retained by Saudi Arabia.  No other law firm meaningfully participated in that work, which remains active and ongoing.  Immediate removal of K&K from the PEC will

2

**A88**

only serve to harm 9/11 death and injury plaintiffs before K&K's (likely successful) objections are resolved.

This Court should order a stay to preserve K&K's key role and the existing status quo on the PEC until this Court has had a proper opportunity to review K&K's pending Rule 72(a) objections to the Magistrate Judge's Order.  Counsel at Motley Rice LLP and Cozen O'Connor took no position as to this motion for a stay, while counsel for Defendant Kingdom of Saudi Arabia opposes it.

## BACKGROUND

A.     **K&K has played the central leadership role for two decades in representing thousands of victims and families of the 9/11 terrorist attacks.**

As detailed in the accompanying declaration of Andrew Maloney ("Maloney Decl."), K&K along with its co-counsel represents more than 830 of the estates of those killed on September 11, 2001, as well as over 2,000 immediate family members of those victims and more than 10,000 personal injury clients.  Maloney Decl. ¶ 2.  K&K has been working on behalf of the 9/11 victims for two decades.  In 2004, Judge Casey appointed Mr. Maloney to the PEC and appointed James Kreindler as co-chair of the death and injury PEC alongside Ron Motley.  *Id.* ¶ 5  & Ex 1.[1]

The case against Saudi Arabia began in earnest after Congress passed the Justice Against Sponsors of Terrorism Act in September 2016.  *Id.* ¶ 9.  Plaintiffs alleging death or injury as a result of the 9/11 attacks filed their claims in essentially two groups: plaintiffs represented by K&K are under the umbrella of the *Ashton* Complaint, while plaintiffs represented by Motley Rice are under the Consolidated Amended Complaint that they filed with the Federal Insurance Plaintiffs. *Id.* ¶ 9.  Notwithstanding the essentially bifurcated pleadings, the K&K attorneys have performed

---

[1] For clarity, "PEC" or "Committee" refers only to the Plaintiffs' Executive Committee for Death and Injury Claims, not the Plaintiffs' Executive Committee for Commercial Claims.

3

nearly all of the substantial work on behalf of all death and injury plaintiffs.  *Id.* ¶¶ 3, 10-18.  For example, in January 2018, Mr. Pounian handled the briefing and argued the opposition to Saudi Arabia's motion to dismiss on behalf of not just the *Ashton* plaintiffs, but all death and injury plaintiffs.  No other attorney argued that motion on behalf of the death and injury plaintiffs.  *Id.* ¶ 11.

With respect to discovery, K&K has almost singlehandedly advanced the factual investigation and development.  K&K has hired former FBI and Joint Terrorism Task Force agents to investigate the support network established by Saudi government officials for the 9/11 hijackers, locate key witnesses, collect information, and identify evidence held by other parties, including the FBI and Saudi Arabia.  *Id.* ¶ 12.  Declarations from agents retained by K&K were submitted before the Court to obtain further discovery.  *Id.* ¶ 12.

Mr. Pounian, Ms. Benett and Mr. Maloney handled over 30 fact depositions.  *Id.* ¶ 15. During the first six months of 2021, Mr. Pounian and Ms. Benett were lead plaintiffs' counsel for all of the liability depositions of all Saudi government personnel.  *Id.* ¶ 15.  The K&K attorneys also were responsible for locating non-party witnesses, obtaining their statements, and handling their depositions in the case.  *Id.* ¶ 15.  K&K conducted a search for, retained, and obtained reports from six highly qualified experts to offer opinions in the case.  *Id.* ¶ 17.

K&K then defended the depositions of those experts.  *Id.* ¶ 17.  The Motley Rice firm obtained the report of only one expert, and no other firm was involved in the aforementioned investigatory and expert work. K&K has been carrying out this work for over five years.  *Id.* ¶ 18.

K&K developed relationships of trust with the investigators and experts, gained detailed knowledge of their efforts and the facts, and incurred all the expenses for this work.  *Id.* ¶ 18.  No other firm, including Motley Rice, was involved in this work or paid any portion of the expenses

4

for this work.  *Id.* ¶ 9.

>    **B.**   **John Fawcett, a researcher for K&K, confessed to leaking the deposition
>           transcript of Musaed al Jarrah, in violation of the protective orders, and took
>           extraordinary steps to hide and lie about his actions.**

On June 17 and 18, 2021, Ms. Benett took the deposition of Saudi official Musaed al-

Jarrah.  The transcript of Jarrah's deposition (the "Jarrah Transcript") was designated confidential

by Saudi Arabia pursuant to the October 3, 2006 protective order entered by Judge Casey in this

matter (the "MDL Protective Order").  ECF 1900.  The Jarrah Transcript was also presumptively

confidential for 30 days from the date of the deposition pursuant to the November 14, 2018 Privacy

Act Order and Protective Order for FBI Documents ("FBI Protective Order," and together with the

MDL Protective Order, the "Protective Orders").  ECF 4255.

But on July 15, 2021, journalist Michael Isikoff published an article in Yahoo! News

entitled "FBI Tried to Flip Saudi Official in 9/11 Investigation."[2]  The article states that "[a] copy

of the [Jarrah] deposition – with some redactions for law-enforcement sensitive material – was

obtained exclusively by Yahoo! News."  If true, it was immediately apparent that Yahoo! News

could only have obtained even a redacted copy of the Jarrah Transcript through a leak, in violation

of the Protective Orders.

Immediately that same day, K&K initiated an internal investigation to determine whether

the firm was the source of the leak.   Mr. Maloney convened a conference call with the K&K team

working on the 9/11 case (the "K&K 9/11 Team") to discuss this serious leak.  *Id.* ¶ 4; Ex. 2

---

[2] Michael Isikoff, *FBI tried to flip Saudi official in 9/11 investigation*, YAHOO! NEWS (July 15,
2021), https://news.yahoo.com/fbi-tried-to-flip-saudi-official-in-911-investigation-
090041290.html.

(Maloney, Tr. 278:7-16).[3]   On that July 15 call, the K&K 9/11 team – including Fawcett – all discussed "whether anyone knew how Isikoff had obtained the transcript, whether anybody at K&K had sent the transcript to him or told Mr. Isikoff anything about the Jarrah deposition, the substance of the Jarrah deposition."  Ex. 2 (Maloney, Tr. 278:18-21).  The K&K lawyers testified that the takeaway from that K&K 9/11 Team call was that "no one had sent the transcript and no one knew how [Isikoff] got it" – including Fawcett.  Ex. 2 (Maloney, Tr. 216:5-11; 278:22-2; Kreindler, 123:18-21).

K&K nevertheless undertook an internal investigation to further confirm that it was not the source of the leak, beginning with searches of email and documents servers to track any movement of the Jarrah transcript.  Ex. 2 (Maloney, Tr. 278:25-13; Hartney, 185:2-186:10).  On multiple occasions between July 15 and September 27, K&K lawyers asked Fawcett whether he was the source of the leak, or whether he knew anything at all about how the leak could have happened. Mr. Pounian testified that he asked Fawcett if he knew anything about how Mr. Isikoff got the transcript and that he was told no.  He further testified when the Kingdom's counsel followed up:

Q:     [Fawcett] told you to your face he knew nothing about it?
A:     That is correct.
Q:     That was a lie, correct?
A:     That is correct.

Ex. 2 (Pounian, Tr. 407:8-408:4).  Similarly, Mr. Maloney testified that he asked Fawcett about the leak on several occasions.  For example:

Q:     Now, your testimony is that you actually specifically sat down with Mr. Fawcett, looked him in the eye, and he told you that he didn't send the transcript to Mr. Isikoff, is that right?
A:     I don't think I sat down, but I was in his office and I asked him.
Q:     And he lied to you, is that your testimony?
A:     We covered this yesterday.

---

[3] References to the transcript of the November 1-2, 2021 hearing are referred to by witness's name and page and line. The transcripts of the hearing are attached as Exhibit 2 to the accompanying Declaration of Andrew Maloney.

Q:      He lied to you?

A:      He did not tell me the truth.

Ex. 2 (Maloney, Tr. 252:2-10).  Fawcett himself testified that during the investigation period, he

"prevaricated," "dissembled," and "was not being honest with [the K&K lawyers]" when they

asked him in substance whether he was the source of the leak, or whether he knew anything about

it.  Ex. 2 (Fawcett, Tr. 486:21-487:7; 488:12).

### C.      K&K submits declarations as directed by the Magistrate Judge as part of her investigation.

On August 12, the Magistrate Judge issued an order requiring K&K to submit declarations

confirming certain facts regarding the leak.  ECF 7011.  On August 16, K&K timely submitted

declarations from the four lawyers required by the order, testifying in good faith to the facts requested

and that they believed that K&K was not the source of the leak.  ECF 7016.  The Magistrate Judge

ordered supplemental declarations from K&K and from other parties that would ultimately be due

on September 27.  ECF 7082, 7134.

### D.      Fawcett confesses to K&K who immediately advises the Magistrate Judge of the leak and how it occurred.

It was then not until September 27 – the day Fawcett was to provide his signature on the

draft declaration claiming innocence he had in his possession for days – that Fawcett confessed.

He admitted for the first time to K&K that, despite his earlier denials, he was the source of the leak

of the Jarrah Transcript to Mr. Isikoff.  His contemporaneous declarations confess that he is

responsible, admitting his liability and exculpating the lawyers.  *See* Ex. 5 (Tr. 11).  Fawcett's

September 27 declaration states, among other things, "that no-one from Kreindler & Kreindler

even knew about what I had done, even as they were responding to the Court's Orders."  Ex. 8

(Order at 28 (citing Fawcett's declaration – KSAX 62A – which was entered into evidence by

Saudi Arabia at the November 2021 hearing)).[4]  In a later declaration sworn to on September 30, 2021, Fawcett provided additional detail about the specific steps he took to hide the leak from any one at K&K.  *See* Ex. 8 (Order at 30 (citing Fawcett's second declaration – KSAX 59 – which was entered into evidence by Saudi Arabia)).

Fawcett's September 27, 2021 declaration was attached to a three-page letter to the Magistrate Judge explaining how the K&K lawyers learned that day that Fawcett was the source of the leak, and that they were "immediately taking steps to preventing this happening again and [have] denied access to all confidential documents on our system to [Fawcett]."  ECF 7147.  K&K submitted 11 supporting declarations that day, including from each of the lawyers previously identified by the Court, who all specifically testified:  "For the first time today I learned the information set forth in the declaration of John Fawcett."  ECF 7147.

### E.     The Magistrate Judge holds an evidentiary hearing on November 1 and 2, 2021

On October 4, the Magistrate Judge issued an order that she would conduct a "hearing regarding the breach of the protective orders by Kreindler & Kreindler."  Ex. 3; *see also* ECF 7167. More specifically, the Magistrate Judge wrote on October 21, that "Kreindler & Kreindler investigator John Fawcett admitted that he is responsible for the breach and claimed that he acted on his own for certain reasons unrelated to the September 11 attacks.  Other Kreindler lawyers swore they learned of his actions only on September 27.  The Court has scheduled a hearing to determine whether anyone other Fawcett participated in the breach (including by directing it or helping to cover it up), how the breach was carried out, and whether any party submitted to the Court false or knowingly misleading statements as part of its inquiry.   The Court intends to issue findings of fact and *recommend remedies to District Judge Daniels*."  Ex. 4 at 1 (ECF 7277)

---

[4] Because the Fawcett declaration is not publicly available on the Court's docket, out of an abundance of caution, K&K references only those portions of the declaration discussed publicly.

(emphasis added).

The Magistrate Judge ordered six witnesses to appear, including four K&K attorneys. She deemed the declarations that she had ordered admitted "as their direct testimony." Ex. 3 at 2 (ECF 7167). But she also ordered that "[l]awyers for the Kingdom of Saudi Arabia will be permitted to cross-examine the witnesses but shall not be limited in scope by their direct testimony." *Id.* Fawcett sought to assert his Fifth Amendment right against self-incrimination at the Hearing, but his application was denied first by the Magistrate Judge and also by this Court as of October 29, 2021. Ex. 5 (Tr. 48).

The Magistrate Judge denied, without explanation, K&K's request for the parties to exchange proposed exhibits on the Friday prior to the Monday hearing, even though the Magistrate Judge required that the parties provide exhibits to the Court. Ex. 7 at 3 (ECF 7310). The Magistrate further ordered that witnesses be sequestered throughout the hearing so that none could hear the testimony of others, ostensibly to avoid coordination of testimony. *Id.*

At no time prior to the September 21, 2022 Order did the Magistrate Judge suggest that this highly unusual hearing purported to be held under the auspices of Federal Rule of Civil Procedure 37 or any other federal rule. To the contrary, the Magistrate Judge referred to it as the "the contempt hearing." *Id.*

The Hearing proceeded for two full days in accordance with these *sui generis* and prejudicial procedures, over K&K's objections.[5] Nevertheless, the Hearing revealed no new material evidence and revealed no evidence at all that K&K knew of, participated in, suggested, encouraged, condoned, ratified, or covered up any aspect of the leak of the Jarrah Transcript by Fawcett. The

---

[5] K&K's forthcoming Rule 72(a) objections will detail the ways in which procedures at the Hearing were unfairly prejudicial to K&K.

evidence was all to the contrary. *See, e.g.*, Ex. 2 (Kreindler, Tr. 129:19-130:5; Maloney, Tr. 304:18-305:4; Benett, Tr. 358:13-124; 402:5-8; Pounian, Tr. 413:24-414:6; Fawcett, Tr. 485:17-486:25). Nor did any evidence adduced at the Hearing indicate that K&K – or any of its attorneys – had any reason to suspect that Fawcett had anything to do with the leak prior to September 27, 2021. The evidence was all to the contrary. *See, e.g.*, Ex. 2 (Kreindler, Tr. 129:19-130:5; Maloney, Tr. 304:18-305:4; Benett, Tr. 340:11-342:9; 358:13-124; 402:5-8; Pounian, Tr. 413:24-414:6). Fawcett reaffirmed his declaration testimony that until September 27, 2021, no one other than Mr. Isikoff and Fawcett knew that it was Fawcett who was the source of the leak, and that he was very clear with Ms. Benett and Mr. Pounian in preparing his September 27 declaration "that the first time [any of the K&K lawyers] had heard about it was the day he signed the declaration." Ex. 2 (Fawcett, Tr. 444:13-15). On cross-examination Fawcett testified that prior to September 27 he did not "communicate to any human being . . . that [he] had sent the redacted transcript to Michael Isikoff, attorneys included." Ex. 2 (Fawcett, Tr. 465:11-17).[6]

   F.   **The Magistrate Judge issues an Opinion & Order on September 21, 2022, "immediately" removing K&K from the PEC.**

   On September 21, 2022 the Magistrate Judge issued her Order. The Magistrate Judge found that "it became apparent that Fawcett leaked the transcript as part of Kreindler & Kreindler's long-standing litigation strategy to pressure the Kingdom of Saudi Arabia into a settlement, and that he did so with the knowledge or at least tacit consent of lead attorney James Kreindler. Other attorneys at the firm were, at best, willfully blind to the leak as evidenced by their paltry investigation and knowingly misleading statements to the Court." Ex. 8 (Order at 2). The Magistrate Judge concluded that K&K, as a firm, had "willfully breached the Protective Orders"

---

[6] In addition to a lack of evidence that any K&K attorney knew of or participated in the leak, all affirmative evidence corroborates those facts. K&K will detail this evidence in its forthcoming Rule 72(a) objections.

in the case and as a result, she has "lost faith in the firm's ability to comply with court orders or

appear before the Court on behalf of all the September 11 victims."  *Id.* at 2.

Having conducted her investigation pursuant to her inherent powers, never invoking or

referring to Rule 37 in any pre-Hearing order or statement, and referring to the evidentiary hearing

as a contempt hearing, the Magistrate Judge suddenly pivoted in the Order to conclude that:

> [Jim] Kreindler, Fawcett and Kreindler & Kreindler violated the Protective
> Orders. The appropriate remedy under Rule 37(b) is to remove Kreindler &
> Kreindler from the PECs, to require it to pay the attorneys' fees and costs
> expended by Saudi Arabia in response to this breach, and to bar Fawcett from
> further participation in this case.

*Id.* at 34.

## ARGUMENT

**I.     The Court should stay the Magistrate Judge's Order "immediately" removing K&K
from the Plaintiffs' Executive Committee, until K&K's Rule 72 objections are
resolved.**

The Magistrate Judge's order removing the K&K firm from the PEC was not authorized

by Federal Rule of Civil Procedure 37 and immediately upturned a nearly twenty-year status quo

of K&K attorneys leading this multidistrict litigation on behalf of the 9/11 families as critical

members of the PEC.  This Court should stay the Magistrate Judge's order – preserving the status

quo – until K&K's Rule 72 objections are resolved.

To stay a magistrate judge's order pending Rule 72 objections, courts apply the four-factor

test used for a stay pending appeal.  *See, e.g.*, *Pablovich v. Rooms to Go Louisiana Corp.*, 2021

WL 928030, at *2 (E.D. La. Mar. 11, 2021); *Alvarez v. Larose*, 2020 WL 5632659, at *2 (S.D.

Cal. Sept. 21, 2020); *LEG Q LLC v. RSR Corp.*, 2017 WL 4222690, at *2 (N.D. Tex. Sept. 22,

2017); *accord In re NTL Inc. Sec. Litig.*, 2006 WL 1167848, at *2 (S.D.N.Y. May 3, 2006).

The four factors are:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 434 (2009); *Hassoun v. Searls*, 968 F.3d 190, 195 (2d Cir. 2020) (applying the *Nken* factors).

The first and second factors – likelihood of success on the merits and irreparable injury absent a stay – are "the most critical." *Nken*, 556 U.S. at 434. But "the degree to which a factor must be present varies with the strength of the other factors." *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007). In other words, "more of one factor excuses less of the other." *Id.* (alteration adopted; quotation marks omitted). A court ultimately should issue a stay "when it is necessary to preserve the status quo pending the appeal." *Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 565 (2d Cir. 1991).[7]

Interpretations of the Federal Rules of Civil Procedure are reviewed de novo. *Williams v. Beemiller, Inc.*, 527 F.3d 259, 264 (2d Cir. 2008). Where, as here, the text of a federal rule is clear and unambiguous, the analysis begins and ends with the plain text. *Bus. Guides, Inc. v. Chromatic Commc'ns Enterprises, Inc.*, 498 U.S. 533, 540-41 (1991); *United States v. Zapatero*, 961 F.3d 123, 127 (2d Cir. 2020).

---

[7] Factors three and four – whether a stay will substantially injure other parties and where the public interest lies – heavily favor K&K. Given K&K's central role on the PEC for nearly two decades, maintaining the status quo until K&K's Rule 72 objections are resolved will serve the public interest by promoting a more efficient resolution of this matter through avoiding significant disruptions to the internal structure of the PEC. As detailed in section A above and section I.B below, the only remaining members of the PEC do not have the necessary depth of knowledge and experience with the facts and experts on their own. No party will be "substantially injured" by maintaining a decades-long status quo until K&K's Rule 72 objections are resolved. *See Nken*, 556 U.S. at 434.

### A.    Rule 37(b) does not authorize sanctions against a law firm.

Despite every indication that the Magistrate Judge scheduled an "evidentiary hearing" pursuant to the court's inherent powers, the Magistrate Judge without notice issued the sanctions order pursuant to Rule 37(b), "immediately" stripping K&K of its leadership position on the PEC after nearly 20 years.  Ex. 8 (Order at 36 n.15 & 64).  The Magistrate Judge expressly declined to invoke the Court's inherent powers as the basis to impose sanctions, relying on Rule 37(b) as the sole legal basis for the sanctions imposed against K&K.  *Id.* (Order at 36 n.15).

Rule 37(b), however, does not authorize a court to issue sanctions against a law firm.  As the text of the rule makes clear, only the misconduct of "a party" or "a party's" corporate official is sanctionable under the provision.  Fed. R. Civ. P. 37(b)(2)(A).  This matter does not involve any alleged misconduct by a party or its corporate officials.  Neither the text of Rule 37(b) – nor any other provision of the rule – even mentions a law firm.  The exclusion of law-firm sanctions under Rule 37(b) stands in stark contrast to Rule 11(c), which expressly authorizes sanctions against "any attorney, law firm, or party" for impermissible documents submitted to the court.  Both longstanding Supreme Court and Second Circuit precedent, and recent caselaw of other federal courts of appeals, reinforce this conclusion.  In sanctioning K&K under Rule 37(b), the Magistrate Judge overstepped the court's authority under the Federal Rules of Civil Procedure and issued an order "contrary to law."  *See* Fed. R. Civ. P. 72(a).

Although the Second Circuit has yet to address whether a court may sanction a law firm under Rule 37(b), the Court decision in *Apex Oil Co. v. Belcher Co. of New York*, 855 F.2d 1009 (2d Cir. 1988), is instructive.  There, the Court was asked to resolve whether then Rule 37(c), which provided sanctions for impermissibly failing to admit the truth of matters contained in a request for admission, authorized such sanctions against a party's attorney.  Rejecting the suggestion that the Court should "construe Rule 37(c) broadly in order to fill a so-called 'gap' in

13

**A99**

the federal rules," the Court found that by its express terms, Rule 37(c) only applies to "a party" – not a party's attorney.  *Id.* at 1013-14.[8]  The Court, moreover, concluded that it "must infer from the other subsections of Rule 37," which "expressly provid[ed] for the imposition of sanctions against a party's attorney," "that the drafters intended to omit attorneys from the coverage of subsection (c)."  *Id.* at 1014.  The Court therefore held that then Rule 37(c) did not authorize sanctions against a party's attorney.  *Id.* at 1013-14.

So too here.  The express terms of Rule 37(b) simply do not authorize nonmonetary sanctions against a law firm where the firm is the purported offender.  The text of the rule is clear:

> If a *party* or a *party's* officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders.

Fed. R. Civ. P. 37(b)(2)(A) (emphasis added).  In other words, a court may issue sanctions under Rule 37(b) only where a party (*i.e.*, a plaintiff or defendant) or a party's corporate official violates a discovery order.  *Cf.* Wright & Miller, Fed. Prac. & Proc. Civ. § 2290 (3d ed.) ("Since [Rule 37(c)] specifically authorizes an award only against the party, it does not permit sanctions against the party's attorney.").

No such violation occurred here.  In this action, neither a plaintiff nor a plaintiff's corporate official has violated a discovery order.  The allegations are quite the opposite.  According to the

---

[8] The text of then Rule 37(c) provided in relevant part:

> If *a party* fails to admit the genuineness of any document or the truth of any matter as requested under Rule 36, and if the party requesting the admissions thereafter proves the genuineness of the document or the truth of the matter, the requesting party may apply to the court for an order requiring *the other party* to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees.

Fed. R. Civ. P. 37(c) (1988) (emphasis added).

14

**A100**

Magistrate Judge,  K&K and one of its consultants breached protective orders to purportedly "embarrass Saudi Arabia and gain an advantage in this case."  Ex. 8 (Order at 64).  Based on the evidence presented at the hearing, that finding was wrong for a myriad of reasons, which K&K will detail in its forthcoming objections.  But even assuming a law firm breached the terms of a discovery order, a law firm's conduct does not violate the express terms of Rule 37(b) unless the law firm is "a party" to the action.

The conclusion that a law firm's conduct does not fall within Rule 37(b) and that, accordingly, Rule 37(b) does not authorize broad sanctions against a law firm is only reinforced by other provisions of Rule 37, which authorize *monetary* sanctions against *individual* attorneys advising the disobedient *party*.  If a court finds that a party or its corporate official violated a discovery order under Rule 37(b)(2)(A), Rule 37(b)(2)(C) authorizes the court to impose monetary sanctions on "the *disobedient party*, the *attorney* advising that party, or both" by requiring payment of reasonable expenses caused by the party's failure to obey a discovery order.  Fed. R. Civ. P. 37(b)(2)(C) (emphasis added).  Likewise, Rule 37(d)(3) authorizes the court to require "the *party failing to act*, the *attorney* advising that party, or both to pay the reasonable expenses" caused by the party's failure to engage in discovery.  Fed. R. Civ. P. 37(d)(3) (emphasis added).  And, if opposing counsel successfully moves to compel discovery, Rule 37(a)(5)(A) authorizes a court to "require the *party* or *deponent* whose conduct necessitated the motion, the *party* or *attorney* advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion."  Fed. R. Civ. P. 37(a)(5)(A) (emphasis added).  Accordingly, it is clear that Rule 37 authorizes – at most – *monetary* sanctions against the *individual* attorney advising the disobedient *party*.  And even the monetary sanction against an individual is only derivative of the wrongdoing of a party.

15

**A101**

The drafter's decision to limit Rule 37's scope to the conduct of a party was intentional, as other Federal Rules of Civil Procedure clearly authorize sanctions against law firms.  An earlier version of Rule 11, which concerned representations to a court by "the person who signed" an offending document submitted to the court, similarly made no mention of a party's law firm.  In 1993, however, Rule 11 was amended to expressly allow sanctions against law firms:

> [T]he court may impose an appropriate sanction on any *attorney*, *law firm*, or *party* that violated the rule or is responsible for the violation.  Absent exceptional circumstances, a *law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.*

Fed. R. Civ. P. 11(c)(1); *see also* Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment. That same year, the drafters amended Rule 37 but did not similarly authorize sanctions against a law firm.  *See generally* Fed. R. Civ. P. 37 advisory committee's note to 1993 amendment.  Then and now, Rule 37 makes no mention of sanctions against a law firm, let alone sanctions against a law firm based on the actions of an individual attorney or employee.  *Cf. Bloom v. Azar*, 976 F.3d 157, 161 (2d Cir. 2020) ("the interpretive canon, expressio unius est exclusio alterius, expressing one item of an associated group or series excludes another left unmentioned," applies when "it is fair to suppose that [drafters] considered the unnamed possibility and meant to say no to it." (quotation marks omitted; alteration adopted)).

The Sixth Circuit reached this very conclusion when faced with an identical issue of statutory interpretation of Rule 37.  In *NPF Franchising, LLC v. SY Dawgs, LLC*, 37 F.4th 369, 373 (6th Cir. 2022), the lower court sanctioned a law firm pursuant to Rule 37(d) for its failure to produce documents, among other discovery abuses. On appeal, the Sixth Circuit reversed.  In a decision in lockstep with the above analysis, the Sixth Circuit gave dispositive weight to the fact that "Rule 37 makes no mention of a party's law firm but explicitly lists a party and a party's attorney."  *Id.* at 383.  It therefore concluded that Rule 37(d) simply "does not allow for sanctions

16

**A102**

against a law firm, unless it is a party." *Id.*; *see also Pavelic & LeFlore v. Marvel Ent. Grp.*, 493 U.S. 120, 122 (1989) (holding that an earlier version of Rule 11, which only authorized sanctions against "the person who signed" an offending document, did not permit sanctions against an attorney's law firm).

The Magistrate Judge's sanctions Order cites no caselaw to the contrary. *See* Ex. 8 (Order at 36 & n.14, 44). In *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 128 F.3d 99, 101 (2d Cir. 1997), the court upheld a small *monetary sanction* entered against an *individual attorney* for "his role in [the company president's] failure to appear for deposition." *Cf.* Fed. R. Civ. P. 37(b)(2)(C) (authorizing monetary sanctions against "the attorney advising" the disobedient party). In *Southern New England Telephone Co. v. Global NAPs Inc.*, 624 F.3d 123, 147-48 & n.10 (2d Cir. 2010), the court imposed sanctions on *a party* for the actions of one of its bookkeepers. And in *Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 490 (5th Cir. 2012), the court imposed *monetary* sanctions pursuant to the expenses provision of Rule 37(b)(2)(C) against an attorney and a law firm (which the firm failed to contest); *see also Markus v. Rozhkov*, 615 B.R. 679, 701 (S.D.N.Y. 2020) (imposing monetary sanction against an individual attorney). Nowhere do these cases discuss – let alone authorize – *non-monetary* sanctions against an entire *law firm*.

In cases such as this one, the Second Circuit has been clear that, when alleged discovery abuses "do not clearly violate" Rule 37, a court should issue any sanctions under its inherent authority. *See Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 236 (2d Cir. 2020). Indeed, Saudi Arabia itself argued to the Magistrate Judge she should invoke "authority of sufficient breadth" – *i.e.*, the court's inherent powers – to impose wide-ranging sanctions. *See* Saudi Arabia's Proposed Findings of Fact and Conclusions of Law at 90, ECF 7389.

The Magistrate Judge's decision to proceed under Rule 37 is no trivial matter; it directly affects K&K's due process rights. To award sanctions under the court's inherent powers, the court must find "*clear and convincing* evidence of *bad faith*" by the offender. *Yukos*, 977 F.3d at 235 (emphasis added). That heightened standard is significant here, as only a few examples show. As an initial matter, the Magistrate Judge's Order imposed sweeping sanctions against the entire K&K law firm, barring all K&K attorneys from positions on the PEC, without finding any clear and convincing evidence that each attorney operated in bad faith. In fact, the Order itself does not use the phrases "clear and convincing" or "bad faith" once. *Cf. Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009) ("Imposition of sanctions under a court's inherent powers requires a specific finding that *an attorney* acted in bad faith. . . . A finding of bad faith . . . must be supported by *a high degree of specificity* in the factual findings." (emphasis added)). And as a practical matter, the Order overlooks the fact that, in the Court's order establishing the PEC, former Judge Richard C. Casey appointed individual attorneys – not law firms – to the Committee. *See* Ex. 1 ¶¶ 4-7 (ECF 248). By erroneously invoking Rule 37(b)(2)(A), the Magistrate Judge did not make the heightened – and specific – finding required as to each K&K attorney.

Separate from the unwarranted breadth of the sanctions, the Order fails to engage with evidence this Court has suggested is significant to imposing any sanctions against K&K attorneys at all. In particular, the Magistrate Judge disregarded Fawcett's confessions that he acted on his own in sending the transcript to a reporter and then took precautions and lied to K&K to hide his act. At the hearing, Fawcett testified that he "certainly prevaricated and dissembled and avoided letting [the K&K attorneys] know" and that "I was not being honest with [the K&K attorneys]." Ex. 2 (Fawcett, Tr. 486:24-25; 488:12) Despite the significance of this testimony, the Magistrate

Judge's Order does not credit – or even discuss – Fawcett's confessions.  The Magistrate Judge, moreover, disregarded proof of Fawcett's personal motives for the leak.  Fawcett averred in his September 27 and September 30, 2021 declarations that he decided to leak the testimony because of the revelations at Jarrah's deposition that "he was a child pornographer," along with the facts that Jarrah was living in Morocco, Fawcett had knowledge about child abuse in Morocco stemming from his prior international aid work, and Fawcett adopted his two children in Morocco.  Ex. 8 (Order at 28).  The Magistrate Judge had no contradictory testimony to disregard this declaration testimony and she even found that "Fawcett was unwilling to sign a perjurious declaration," which only bolsters his credibility.  *Id.* (Order at 13).  The Magistrate Judge also found without any basis that K&K attorneys "fabricated" Fawcett's motive and that Fawcett's declaration was the "invention" of two K&K lawyers.  *Id.* (Order at 42).  The Magistrate Judge disregarded Fawcett's testimony that the words in his declaration about his motives for releasing the transcript were his own and that he approved them.  *See* Ex. 2 (Fawcett, Tr. 467).

This Court, by contrast, previously expressed the view that Fawcett's confession merited not insignificant weight.  At a hearing addressing Fawcett's right to invoke his Fifth Amendment privilege, the Court made clear that Fawcett "handled [the violation of the protective order] as if this was the most serious conduct that he had ever engaged in in his life in terms of hiding it from the law firm, in terms of hiding it from the Court, in terms of how he destroyed the evidence."  Ex. 5 (Tr. ¶ 9).  The Court further stated that "it would be quite awkward for Magistrate Judge Netburn to say I'm going to disregard the declarations so therefore there is no evidence in this case whatsoever that supports the lawyers' assertions that they didn't know."  *Id.*(Tr. ¶ 23).

19

**A105**

In short, as even this one example shows, the due process rights of K&K are heavily implicated by the Magistrate Judge's decision to impose sanctions under Rule 37(b), rather than address the heightened finding required under a court's inherent powers.

*   *   *

At bottom, the Magistrate Judge issued sanctions against the entire K&K firm without authority under Rule 37(b)(2)(A).  Because the Order was accordingly "contrary to law," Fed. R. Civ. P. 72(a), K&K is likely to succeed on the merits of its Rule 72(a) objection, *Nken*, 556 U.S. at 434.

**B.**   **The immediate nonmonetary sanction has upended a decades-long status quo, threatening irreparable harm to plaintiffs, before K&K's objections are resolved.**

By "immediately" removing K&K from the PEC after nearly two decades at the helm, the Magistrate Judge upended a longstanding status quo in this massive and complex multidistrict litigation arising from the terrorist attacks on September 11, 2001.  *See* Ex. 8 (Order at 65).  This sweeping reformulation of the PEC—before the resolution of K&K's pending Rule 72(a) objections—threatens immediate and irreparable injury to the 9/11 death and injury plaintiffs.

K&K (along with co-counsel in some cases) represents more than 830 of the estates of those killed on September 11, 2001, as well as over 2,000 of their immediate surviving family members and more than 10,000 victims who suffered personal injury.  *See* Maloney Decl. ¶ 2. Since this Court's creation of the PEC in June 2004, James Kreindler of K&K and Ronald Motley (and after Mr. Motley's death, other partners of Motley Rice LLC) have served as the PEC's Co-Chairs.  *Id.* ¶ 6; ECF No. 248-2.  Despite turnover in the membership of the PEC over the years, which has included various K&K attorneys, *see* ECF No. 248-2, the shared leadership structure between K&K and Motely Rice has remained unchanged.  Maloney Decl. ¶ 7.

20

**A106**

K&K's already outsized role on the PEC has expanded sharply over the past six years. After Congress passed the Justice Against Sponsors of Terrorism Act ("JASTA") in September 2016 and litigation commenced against Defendant Kingdom of Saudi Arabia, K&K effectively led all aspects of the litigation against Saudi Arabia on its own, despite the PEC's shared leadership structure remaining nominally in place.  *See id.* ¶¶ 3, 10-18.

K&K's attorneys have handled *nearly every* aspect of this complex case, including dispositive motions, investigation, discovery motions, depositions, witness interviews and statements, and experts.  *Id.* ¶ 3.  These attorneys work on the case against Saudi Arabia for death and injury plaintiffs on a daily, full-time basis.  *Id.*

As the leader of the litigation against Saudi Arabia, the disproportionate workload undertaken by K&K has been significant.  In addition to the multitude of daily tasks required to prosecute such a far-reaching and complex case against a foreign sovereign, K&K attorneys have:

- directed a wide-ranging investigation in the United States and around the world (carried out by former FBI and Joint Terrorism Task Force agents) that located and helped obtain key evidence and witness testimony, both domestically and internationally;

- identified key non-party witnesses and secured their necessary testimony;

- argued *all* of the substantive and discovery motions before this Court and the Magistrate Judge;

- conducted *all* of the non-party witness depositions;

- handled *all* of the depositions of Saudi government witnesses over a six-month period;

- located, hired, and obtained reports from six key experts with relevant experience in national security, terrorism, and other matters, and defended their depositions;

- deposed each of the three experts hired by Saudi Arabia.

*Id.* ¶¶ 10-18.  The work of K&K is continuing at this time.  *Id.* ¶ 3.  The wealth of knowledge and experience assembled by K&K over the past five years of litigation alone – along with its ready

21

**A107**

access to the key experts, investigators, and proof – is indispensable to the proper representation of the death and injury plaintiffs.  With the except of the retention of a single expert by Motley Rice, *no other firm* representing death and injury plaintiffs was involved in the aforementioned investigatory and expert work, and motion practice.  *Id.* ¶¶ 17-18.

Nor is there any reason that K&K's removal from the PEC must occur "immediately."  The leak forming the primary basis for the Magistrate Judge's Order occurred more than fifteen months ago, and Fawcett was outed as the perpetrator more than a year ago.  Throughout that time, K&K attorneys have continued to diligently prosecute this case, expending thousands of hours, and achieving significant milestones, including the completion of the expert reports noted above.  The Order identifies no harm that would come from K&K continuing to serve on the PEC pending its Rule 72(a) objections.  To the contrary, the only harm that would occur is to the plaintiff victims in this matter, who would be deprived of the vigorous leadership and tireless effects K&K has exhibited on their behalf.

The Magistrate Judge's Order unnecessarily undermines the status quo and immediately threatens the ability of K&K and its attorneys to prosecute this case on behalf of death and injury plaintiffs—not to mention causes immediate significant harm to the reputation of K&K and its attorneys.  *See* Manual for Complex Litigation § 10.154 (4th ed. 2004) ("[Removal from a leadership position] may disrupt the litigation, may cause *significant harm to the client's case and the reputation of the attorney or law firm*, and can conflict with a party's right to counsel of its choosing." (emphasis added)).  And, adding insult to injury, such harm was not authorized by Rule 37(b).

**CONCLUSION**

Because the Magistrate Judge was not authorized under Rule 37(b) to impose nonmonetary sanctions against a law firm, K&K is likely to succeed on the merits of its pending Rule 72(a) objections.  *Nken*, 556 U.S. at 434.  Because the Magistrate Judge "immediately" imposed such sanctions, failure "to preserve the status quo pending" resolution of K&K Rule 72(a) objections will needlessly risk irreparable harm to the prosecution of Saudi Arabia and K&K's reputation.  *Kidder*, 925 F.2d at 565.  This Court should issue a stay the removal of K&K from the PEC until it has had an opportunity to review and resolve K&K's pending Rule 72 objections due October 21, 2022.

Dated:  October 4, 2022
      New York, NY

                                    Respectfully submitted,

                                    */s/ Edward M. Spiro*

Emily Kirsch                         Edward M. Spiro
Paul Niehaus                      MORVILLO ABRAMOWITZ GRAN
KIRSCH & NIEHAUS PLLC           IASON & ANELLO P.C.
950 Third Avenue, 19th floor     565 Fifth Avenue
New York, NY 10022         New York, NY 10017
(212) 832-0170                (212) 856-9600
emily.kirsch@kirschniehaus.com   espiro@maglaw.com

23

**A109**

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO*
KATHLEEN E. CASSIDY
BENJAMIN S. FISCHER
CATHERINE M. FOTI
CHRISTOPHER B. HARWOOD
LAWRENCE IASON
BRIAN A. JACOBS
TELEMACHUS P. KASULIS
KAREN R. KING
ROBERT M. RADICK*
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
RICHARD D. WEINBERG

565 FIFTH AVENUE
NEW YORK, NEW YORK 10017
(212) 856-9600
FAX: (212) 856-9494

www.maglaw.com

WRITER'S CONTACT INFORMATION

espiro@maglaw.com
212.880.9460

SENIOR COUNSEL
PAUL R. GRAND

COUNSEL
JASMINE JUTEAU

ROBERT G. MORVILLO
1938-2011
MICHAEL C. SILBERBERG
1940-2002
JOHN J. TIGUE, JR.
1939-2009

*ALSO ADMITTED IN WASHINGTON, D.C.
**ALSO ADMITTED IN CONNECTICUT

October 4, 2022

**Via ECF**

Hon. George B. Daniels
United States District Judge
Southern District of New York
500 Pearl Street, Room 1310
New York, NY 10007

      Re:    Request for Oral Argument on Motion for a Stay of Nonmonetary Sanctions; *In re Terrorist Attacks on September 11, 2001*, No. 03-MDL-01570 (GBD) (SN)

Dear Judge Daniels:

      I, together with Kirsch & Niehaus PLLC, represent the law firm Kreindler & Kreindler LLP ("K&K") in connection with the sanctions entered against K&K by Magistrate Judge Sarah Netburn on September 21, 2022, pursuant to Federal Rule of Civil Procedure 37(b)(2)(A).  *See* Opinion & Order, Dkt. No. 8544.  The monetary and nonmonetary sanctions entered against the law firm—including the removal of K&K from the Plaintiffs' Executive Committee after more than two decades at the helm of this multidistrict litigation—are effective "immediately."  *Id.* at 65.

      Earlier today, we filed a motion by order to show cause for a stay of the nonmonetary sanctions entered against K&K, pending resolution of its Rule 72(a) objections due October 21, 2022.

      Pursuant to Section IV.D of your Honor's Individual Rules and Practices, I respectfully request oral argument on K&K's motion for a stay.

                                    Respectfully submitted,

                                       */s/  Edward M. Spiro*

                                      Edward M. Spiro

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE TERRORIST ATTACKS ON
SEPTEMBER 11, 2001

No. 03-MDL-01570 (GBD) (SN)

This document relates to: *All Actions*

## CORRECTED DECLARATION OF ANDREW MALONEY

I, Andrew J. Maloney, III, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of
perjury the following:

1.      I submit this declaration in support of the motion of Kreindler & Kreindler LLP
("Kreindler" or "Kreindler firm") for a stay of the Order of Magistrate Judge Sarah Netburn,
dated September 21, 2022, because of the immediate and irreparable injury, loss, or damage that
will result to the 9/11 death and injury plaintiffs by the removal of the Kreindler firm from the
Plaintiffs' Executive Committee for Death and Injury Claims ("PEC" or "Committee").[1]

2.      Kreindler (along with co-counsel in some cases) represents more than 830 of the
estates of those killed on September 11, 2001, as well as over 2,000 of their immediate surviving
family members and more than 10,000 victims who suffered personal injury.

3.      As addressed below and demonstrated in the prior proceedings before this Court,
the Kreindler firm has played the lead role in prosecuting the claims of the death and injury
plaintiffs in the litigation against Defendant Kingdom of Saudi Arabia.[2]  Kreindler's attorneys
have handled nearly every aspect of this complex case, including dispositive motions,

---

[1] For clarity, "PEC" or "Committee" refers only to the Plaintiffs' Executive Committee for Death and Injury Claims,
not the Plaintiffs' Executive Committee for Commercial Claims.

[2] Other members of the PEC have worked on prosecuting charities and banks.

1

**A111**

investigation, discovery motions, depositions, witness interviews and statements, and experts.
Kreindler firm attorneys are working on the case against Saudi Arabia on a daily, full-time basis.
The investigation remains active and ongoing with several investigators working for Kreindler in
the field as of today. The continued leadership role of the Kreindler firm is essential to the proper
handling and resolution of the case.  The removal of Kreindler attorneys will upset the balance of
the Committee and prejudice all the death and injury plaintiffs.

4.      I know from my own personal knowledge, and my close work interactions with
my colleagues at the Kreindler firm – Jim Kreindler, Steve Pounian, and Megan Benett – that
none of us knew that our consultant John Fawcett had leaked the transcript to a reporter until the
morning of September 27, 2021, when Mr. Fawcett confessed to Ms. Benett.  Mr. Fawcett
worked alongside my Kreindler colleagues and me for nearly two decades on this case.  Mr.
Fawcett betrayed our trust through his intentional and wrongful act, and by actively deceiving us
for over two months to hide his involvement.  The same day that we first learned what Mr.
Fawcett had done, we filed our declarations and immediately informed the Magistrate Judge and
the parties of what had happened.  We explained that we had, that day, discovered that "our prior
statements to the Court were wrong" and stated that we were "very sorry and [we] apologize[d]
to the Court and counsel for this error."  ECF 7147.  We also explained that we were responding
in real-time to our learning on September 27, 2021 that Mr. Fawcett was the source of the
breach, that we "need[ed] time to further assess the situation," and that we would shortly provide
a further update to the Court – which we did on September 30, 2021.

5.      Kreindler is preparing and will file Rule 72(a) Objections to the Magistrate
Judge's Order regarding these events.  Our papers will detail the mistakes of law and fact in the

2

**A112**

Magistrate Judge's Order that need to be corrected.  It is critical that the PEC structure remain in place while this Court is conducting its review.

6.       I have served as a member of the relevant PEC since the June 16, 2004 Order of Judge Richard Conway Casey established the PEC.  A true and correct copy of that Order, filed on the docket in this case as ECF 248, is attached hereto as Exhibit 1.  In that Order, Judge Casey appointed individual attorneys from various firms (and did not appoint law firms) to positions on the PEC.  Ronald Motley of Motley Rice LLC and James Kreindler of the Kreindler firm were appointed as the PEC's Co-Chairs.

7.       Over the years, there have been many *de facto* changes to the PEC's composition because of changes in the circumstances of the attorneys named by Judge Casey, including deaths, resignations, and reassignments.  Most if not all those changes were made by the PEC members informally without obtaining court orders.  Despite the changes in the PEC, however, the essential shared leadership structure of the PEC remained the same, with individual attorneys from the Motley Rice firm and the Kreindler firm sharing co-lead responsibilities.

8.       By 2005, I assumed the role of the PEC Co-Liaison Counsel.  Robert Haefele of the Motley Rice firm served as the other PEC Co-Liaison Counsel.

9.       Litigation against Defendant Kingdom of Saudi Arabia began in earnest after Congress passed the Justice Against Sponsors of Terrorism Act ("JASTA") in September 2016.  The death and injury plaintiffs filed their claims in essentially two groups, with the plaintiffs represented by the Kreindler firm in the *Ashton* complaint, and the plaintiffs represented by Motley Rice in the Consolidated Amended Complaint, which was prepared and filed by Motley Rice together with counsel for the commercial plaintiffs, the Cozen & O'Connor firm.

3

**A113**

10.     Once JASTA was enacted, the Kreindler firm assembled a dedicated team of attorneys to work on the liability case against Saudi Arabia. The attorney team included me, together with Mr. Kreindler, Mr. Pounian, Ms. Benett, and Gavin Simpson.

11.     In January 2018, Mr. Pounian handled the briefing and argued the opposition to Saudi Arabia's Motion to Dismiss on behalf of the death and injury plaintiffs. No other attorney argued that motion on behalf of the death and injury plaintiffs.

12.     The Kreindler firm hired former Federal Bureau of Investigation (FBI) and Joint Terrorism Task Force agents to investigate the support network established by Saudi government officials for the 9/11 hijackers, locate key witnesses, collect information, and identify evidence held by other parties, including the FBI and Saudi Arabia. Declarations from agents retained by Kreindler were submitted before the Court to obtain further discovery. For example, it was only after we presented a declaration from a former FBI agent who located witness Akram Alzamari that the Department of Justice produced Mr. Alzamari's prior interview reports. There are numerous examples like this where our investigators uncovered witnesses and information that prompted the FBI to produce more documents in a slow rolling process. Prior to starting its production, the Department of Justice counsel for the FBI told the Court that the FBI expected to produce three tranches of documents in total, but to date the FBI has produced 32 tranches, in large part because of Kreindler's work to identify the proof.

13.     This investigation was key to obtaining the proper documents from the FBI starting with the first tranches in November and December 2018. The Kreindler investigation located and obtained the testimony of key witnesses, including Mohamed Johar, Mr. Alzamari, and Mohdar Abdullah, and led to the production of key documents. The Kreindler firm's attorneys travelled to Sweden and the United Kingdom and retained investigators and lawyers in

4

**A114**

the United Kingdom, Sweden, and Turkey to track down third party witnesses and evidence; obtained Letters of Request from this Court; and worked with foreign governments to assist in their compliance with those Letters of Request, including the production of thousands of pages of relevant materials from the Metropolitan Police Service in England.  Kreindler's work for its clients collected key evidence that materially advanced the case against Saudi Arabia.

14.     Mr. Pounian led the discovery work and argued the motions involving Saudi Arabia and third parties, including the FBI.  Those motions included efforts to compel the production of documents and the testimony of various Saudi government witnesses, which were ordered by the Magistrate Judge.  Motley Rice did not play a similar leadership role on the discovery effort against Saudi Arabia or the FBI.

15.     Mr. Pounian, Ms. Benett and I handled over 30 depositions in the case against the Kingdom.  During the first six months of 2021, Mr. Pounian and Ms. Benett were lead plaintiffs' counsel for all the liability depositions of all the Saudi government personnel.  We also were responsible for locating non-party witnesses, obtaining their statements, and handling their depositions in the case.

16.     Although the FBI and DOJ asserted the state secrets doctrine to withhold key evidence in the case, Kreindler's investigation and efforts, together with sustained campaigns by the 9/11 Families, led in September 2019 to the limited release by then President Trump of previously classified information from FBI reports, and in September 2021 to the issuance by President Biden of Executive Order 14040 that released thousands of pages of previously classified FBI and Central Intelligence Agency (CIA) documents, many of which had been previously withheld by the government as state secrets.  These documents confirmed that a group

5

**A115**

of Saudi government officials established a support network used to aid the 9/11 hijackers upon their arrival in California.

17.    Kreindler conducted an extensive search, retained, and obtained reports from six highly qualified experts to offer opinions in the case, including a former member of the National Security Council under President Clinton; a former Senior Intelligence Service officer in the Directorate of Intelligence at the CIA and the founding Director and Senior Analyst of the CIA's Political Islam Strategic Analysis Program; a former FBI Unit Chief and terrorism investigator; a former State Department Assistant Chief of Protocol for Diplomatic and Consular Liaison; a Kings College London professor with unique knowledge of al Qaeda terrorist Anwar al Awlaki; and a highly decorated former airline captain.  The Kreindler firm then defended the depositions of those experts.  The Motley Rice firm obtained the report of one expert and defended his deposition.  Kreindler attorneys deposed the three experts retained by Saudi Arabia.  Motley Rice attorneys asked some follow-up questions.

18.    No other firm, including Motley Rice, was involved in the aforementioned investigatory and expert work (except as described above).  Kreindler has been carrying out this work for over five years.  We have developed relationships of trust with our investigators and experts and gained detailed knowledge of their efforts and the facts.  We worked alongside them regularly, meeting both in person and remotely over the course of the past five years.  Kreindler incurred all the expenses for this work.  No other firm, including Motley Rice, was involved in this work or paid any portion of the expenses for this work.

19.    Because of the important work of Mr. Pounian and Ms. Benett on the 9/11 litigation, a request was made to officially name them to the PEC in lieu of two other Kreindler members on the Committee, Justin Green and Marc Moller.  No party or lawyer opposed this

request, and other firms previously substituted counsel on the Committee without filing a motion with the Court.

20.     The removal of Kreindler attorneys from the Committee will leave only attorneys from the Motley Rice firm in a leadership role on the PEC. The work that Kreindler has accomplished to date is critical for the continued success of the case. The Motley Rice firm did not participate in that work. There should not be a wholesale change in the PEC and the status quo until this Court has had an opportunity to properly review the Magistrate Judge's Order. Moreover, there is no unfair prejudice to any party for this Court to stay changes to the longstanding make-up of the PEC until the objections to the Magistrate Judge's Order are fully reviewed by this Court.

21.     A true and correct copy of the transcripts of the November 1-2, 2021 Hearing are attached hereto as Exhibit 2.

22.     A true and correct copy of Magistrate Judge Netburn's October 4, 2021 Order (ECF 7167) regarding the Hearing is attached hereto as Exhibit 3.

23.     A true and correct copy of Magistrate Judge Netburn's October 21, 2021 Order (ECF 7277) regarding the Hearing is attached hereto as Exhibit 4.

24.     A true and correct copy of the October 29, 2021 transcript of the hearing before this Court denying Fawcett's application to assert the Fifth Amendment at the Hearing is attached hereto as Exhibit 5.

25.     A true and correct copy of Magistrate Judge Netburn's November 1, 2021 Order (ECF 7311) regarding the Hearing is attached hereto as Exhibit 6.

26.     A true and correct copy of Magistrate Judge Netburn's November 1, 2021 Order (ECF 7310) regarding the Hearing is attached hereto as Exhibit 7.

27.     A true and correct copy of Magistrate Judge Netburn's September 21, 2022 Order (ECF 8544) is attached hereto as Exhibit 8.

28.     A true and correct copy of a redline comparison against the original Declaration of Andrew Maloney (ECF 8610) is attached hereto as Exhibit 9.

29.     No prior application has been made for the relief requested herein.


Dated: New York, New York
       October 5, 2022

Respectfully submitted,

Andrew J. Maloney, III

8

**A118**

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
———
(202) 326-7900

FACSIMILE:
(202) 326-7999

October 6, 2022

*Via ECF*

The Honorable George B. Daniels
Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, NY 10007-1312

The Honorable Sarah Netburn
Thurgood Marshall United States Courthouse
40 Foley Square, Room 430
New York, NY 10007

     Re:    *In re Terrorist Attacks on September 11, 2001*, 03-md-1570 (GBD) (SN)

Dear Judge Daniels and Judge Netburn:

     I write on behalf of Defendant Kingdom of Saudi Arabia ("Saudi Arabia") regarding the Motion by Proposed Order To Show Cause for Stay Pending Resolution of Rule 72(a) Objections filed by Kreindler & Kreindler LLP ("Kreindler & Kreindler") on October 4, 2022. *See* ECF No. 8607. On September 21, 2022, the Court entered an order sanctioning Kreindler & Kreindler for its willful violation of the Court's protective orders and, among other things, immediately removed the firm from the Plaintiffs' Executive Committees ("PECs"). *See* ECF No. 8544. Kreindler & Kreindler's motion by proposed order to show cause, which seeks a "stay" of its removal from the PECs, is procedurally improper and violates Local Rule 6.1(d). It should be denied without prejudice as procedurally improper, refiled as a notice of motion, and referred to Judge Netburn. Saudi Arabia should be given 14 days to respond, the ordinary time under this Court's Rules.

     **1.**    Local Rule 6.1(b) requires that, with the exception of certain discovery motions, "all civil motions, petitions, and applications" be brought by a notice of motion and provides that an opposition may be filed within 14 days. SDNY Local Rule 6.1(b). "No *ex parte* order, or order to show cause to bring on a motion, will be granted except upon a clear and specific showing by affidavit of good and sufficient reasons why a procedure other than by notice of motion is necessary." SDNY Local Rule 6.1(d). This rule ensures that the non-movant is provided "a proper opportunity to respond" to the motion and that the Court can give "careful consideration" to the parties' filings. *Chevron Corp. v. Donziger*, 37 F. Supp. 3d 650, 652 (S.D.N.Y. 2014).

**A119**

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable George B. Daniels
The Honorable Sarah Netburn
October 6, 2022
Page 2

Instead of proceeding by notice of motion, Kreindler & Kreindler filed a "Proposed Order To Show Cause With Emergency Relief" that seeks an order requiring Saudi Arabia to "show cause" why this Court should not stay the sanctions order against Kreindler & Kreindler and requests an emergency stay pending the Court's disposition of the motion. *See* ECF No. 8607. It does not ask for a specific briefing schedule. Kreindler & Kreindler has failed to provide any "clear and specific showing" of "good and sufficient reasons" for a procedure requiring Saudi Arabia to defend the Court's ruling on an expedited basis. SDNY Local Rule 6.1(d). The accompanying corrected declaration of Andrew Maloney avers that removal of Kreindler & Kreindler will cause "immediate and irreparable injury" to Plaintiffs. ECF No. 8613, ¶ 1. But it makes no attempt to explain why "emergency relief" in the form of an "order to show cause" against Saudi Arabia (as opposed to normal motions practice) is necessary to avoid that purported harm.

There is no exigency here. The September 21, 2022 order removed Kreindler & Kreindler from the PECs "immediately." ECF No. 8544, at 65. The remaining PECs members have confirmed that the firm is "no longer involved in any of the PEC's operations." ECF No. 8603, at 1. Thus, although styled as a request for a stay, Kreindler & Kreindler's motion by order to show cause is really a request for reinstatement to the PECs. That Kreindler & Kreindler waited a full two weeks after it was removed from the PECs to file the present motion belies any claimed urgency. *See Donziger*, 37 F. Supp. 3d at 652 (denying emergency motion to stay court's order because party waited two weeks to file the motion and there was no "showing of likely irreparable injury in the period between the making of the motion and its disposition on a schedule consistent with the rules"). Fact and expert discovery was completed at the end of June 2022. All that remains is the briefing of *Daubert* motions and a renewed motion to dismiss. When a schedule for that briefing is set, the remaining members of the PECs are more than capable of handling that briefing. They have represented to the Court that they stand ready to "conduct[ ] all pre-trial proceedings involving common legal and factual issues, whether relating to liability or damages, on behalf of all Plaintiffs," and that no "structural changes to the PECs" are necessary following Kreindler & Kreindler's removal. ECF No. 8603, at 1.

2. The Court should further direct that, if Kreindler & Kreindler chooses to refile its motion in compliance with the ordinary notice-of-motion procedure under Local Rule 6.1(b), the motion should be addressed to Judge Netburn in the first instance. Any motion to "stay" the Court's sanction order is a non-dispositive motion, which has been referred to Judge Netburn under the Court's June 6, 2018 referral order. *See* ECF No. 4018 (referring to Judge Netburn all "General Pretrial" matters, including "scheduling" and "non-dispositive pretrial motions," in the litigation against Saudi Arabia). Courts in this District consider stay requests to be non-dispositive motions that should be resolved by the magistrate judge where such a referral order is in place. *See Crane v. Poetic Prods. Ltd.*, 549 F. Supp. 2d 566, 568 (S.D.N.Y. 2008) ("PPL's motion to stay is nondispositive and therefore within the scope of Judge Jones's general pretrial referral to me."); *In re Pidwell for an Order Seeking Discovery from Centerbridge Partners L.P.*,

**A120**

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable George B. Daniels
The Honorable Sarah Netburn
October 6, 2022
Page 3

2022 WL 443632, at *1 n.1 (S.D.N.Y. Feb. 14, 2022) (same); *Hansel 'N Gretel Brand, Inc. v. Savitsky*, 1997 WL 698179, at *2 (S.D.N.Y. Nov. 10, 1997) (magistrate judge issuing stay of his order pending Rule 72(a) objections); *see also CFTC v. Standard Forex, Inc.*, 882 F. Supp. 40, 41 (E.D.N.Y. 1995) (seeking stay of magistrate judge's order from the magistrate judge and then seeking a stay from the district judge).

        Judge Netburn is also best suited to resolve this motion in the first instance.  She has overseen discovery in this matter for the last four years, is familiar with the efforts of the various firms serving on the PECs, and can assess the contention that a refusal to stay the sanctions order will irreparably injure Plaintiffs.  *See Donziger*, 37 F. Supp. 3d at 651 (explaining that a request for a stay pending appeal should first be sought in district court because that "'court . . . is best and most conveniently able to exercise the nice discretion needed to determine th[e] balance of convenience'") (quoting *Cumberland Tel. & Tel. Co. v. Louisiana Pub. Serv. Comm'n*, 260 U.S. 212, 219 (1922)) (alteration in *Donziger*); *In re BGI, Inc.*, 504 B.R. 754, 765-66 (S.D.N.Y. 2014) (denying stay request that was not first presented to the bankruptcy judge so that the district court would have "the benefit of the views of the Judge who is familiar with the issues pertaining to any purported emergency").

                                    * * *

        For the reasons set forth above, Saudi Arabia respectfully requests that the Court deny Kreindler & Kreindler's motion by order to show cause without prejudice as procedurally improper and direct that, if the firm chooses to refile, it do so as an ordinary motion under Local Rule 6.1(b) to which Saudi Arabia shall have 14 days to respond.  The Court should further confirm that, under its general pretrial referral order already in place, any such motion will be referred to Judge Netburn in the first instance.

                                    Respectfully submitted,

                                    /s/ *Michael K. Kellogg*

                                    Michael K. Kellogg
                                    *Counsel for the Kingdom of Saudi Arabia*

cc:    All MDL Counsel of Record (via ECF)

**A121**

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO*
KATHLEEN E. CASSIDY
BENJAMIN S. FISCHER
CATHERINE M. FOTI
CHRISTOPHER B. HARWOOD
LAWRENCE IASON
BRIAN A. JACOBS
TELEMACHUS P. KASULIS
KAREN R. KING
ROBERT M. RADICK*
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
RICHARD D. WEINBERG

565 FIFTH AVENUE
NEW YORK, NEW YORK 10017
(212) 856-9600
FAX: (212) 856-9494

www.maglaw.com

WRITER'S CONTACT INFORMATION

espiro@maglaw.com
212.880.9460

SENIOR COUNSEL
PAUL R. GRAND

COUNSEL
JASMINE JUTEAU

ROBERT G. MORVILLO
1938-2011
MICHAEL C. SILBERBERG
1940-2002
JOHN J. TIGUE, JR.
1939-2009

*ALSO ADMITTED IN WASHINGTON, D.C.
**ALSO ADMITTED IN CONNECTICUT

October 7, 2022

**Via ECF**

The Honorable George B. Daniels
United States District Judge
Southern District of New York
500 Pearl Street, Room 1310
New York, NY 10007

 Re: *In re Terrorist Attacks on September 11, 2001*, No. 03-md-01570 (GBD) (SN)

Dear Judge Daniels:

  I, together with Kirsch & Niehaus PLLC, write on behalf of Kreindler & Kreindler LLP ("K&K") regarding Defendant Kingdom of Saudi Arabia's letter to the Court yesterday evening. *See* ECF No. 8616 ("Def. Letter").

  On October 4, 2022, K&K moved this Court for a stay of Magistrate Judge Sarah Netburn's recent Order "immediately" removing K&K from its decades-long leadership position on the Plaintiffs' Executive Committee for Death and Injury Claims ("PEC") in this multidistrict litigation. *See* ECF No. 8607-8610, 8613.  K&K seeks a short-term stay until this Court can review and resolve K&K's Rule 72(a) objections.  On October 5, 2022, the Clerk's Office notified the Court that K&K's request "was reviewed and approved as to form."  *See* ECF Docket Entry (dated Oct. 5, 2022).

  Defendant nevertheless argues that K&K's request (i) does not meet the requirements of Local Rule 6.1(d) and (ii) should have been filed with Magistrate Judge Netburn in the first instance.  *See* Def. Letter 1-3.  Defendant is doubly wrong.

  1. To grant an "order to show cause to bring on a motion," Local Rule 6.1(d) requires "a clear and specific showing by affidavit of good and sufficient reasons why a procedure other than by notice of motion is necessary, and stating whether a previous application for similar relief has been made."  Although Defendant argues, in conclusory fashion, that K&K "makes no attempt" to explain why an order to show cause is "necessary to avoid" irreparable injury, *see* Def.

**A122**

Morvillo Abramowitz Grand Iason & Anello P.C.

The Honorable George B. Daniels
October 6, 2022
Page 2

Letter 2, the Corrected Declaration of Andrew Maloney does just that, *see* ECF No. 8610 ("Decl.").[1]

"Plaintiffs need only show 'a *threat* of irreparable harm, not that irreparable harm already ha[s] occurred.'" *Make the Rd. New York v. Cuccinelli*, 419 F. Supp. 3d 647, 665 (S.D.N.Y. 2019) (Daniels, J.) (quoting *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010)). In his declaration, Mr. Maloney details K&K's "lead role" handling "nearly every aspect" of this complex litigation against a foreign sovereign on behalf of thousands of 9/11 victims and their families ("Plaintiffs"), including "dispositive motions, investigation, discovery motions, depositions, witness interviews and statements, and experts." *See* Decl. ¶¶ 2-3, 10-19. He catalogues the specifics of such work, which K&K continues to handle on a "daily, full-time basis" and to which "[n]o other law firm" contributed, save two limited exceptions. *Id.* ¶¶ 3, 18-19.

K&K, for example, "obtained reports from six highly qualified experts" for Plaintiffs and "defended the depositions of those experts," while another member of the PEC obtained "the report of one expert and defended his deposition." *Id.* ¶ 17. K&K also "deposed the three experts retained by Saudi Arabia." *Id.* Briefing of *Daubert* motions remains outstanding and, based on K&K's knowledge and experience described in the Maloney declaration, K&K stands as the only PEC member properly positioned to handle the motions on behalf of Plaintiffs.

Defendant is simply wrong that "[a]ll that remains is the briefing of *Daubert* motions and a renewed motion to dismiss." Def. Letter 2. There are Plaintiffs' pending Rule 54 motions, *see* ECF Nos. 7431 & 7481, including a pending motion for additional discovery concerning various Saudi government officials based on newly discovered evidence, *see* ECF No. 7481; *cf.* Decl. ¶ 3 ("The investigation remains active and ongoing with several investigators working for [K&K] in the field as of today."). Magistrate Judge Netburn ruled that Plaintiffs' motions must be decided before setting a briefing schedule on Defendant's renewed motion to dismiss. *See* ECF No. 8542. Without detailing Plaintiffs' litigation strategy, Defendant cannot presume to know the importance of the work now being conducted by K&K (including investigation based on the new evidence recently produced by the FBI and the Metropolitan Police, *see* ECF Nos. 7743 & 7831), or the further motions that will need to be filed on behalf of Plaintiffs. Seeking delay, Defendant's procedural objections are no more than a collateral attack on the merits of K&K's stay motion, surreptitiously addressing the likelihood of irreparable injury while avoiding entirely the strong likelihood that the sanction was issued "contrary to law." *Nken v. v. Holder*, 556 U.S. 418, 434 (2009); Fed. R. Civ. P. 72(a).[2]

---

[1] Defendant does not dispute that K&K satisfied the latter requirement of the rule. *See* Decl. ¶ 29.

[2] Cited by Defendant (Def. Letter 2), *Chevron Corp. v. Donziger* actually *supports* K&K's motion. *See* 37 F. Supp. 3d 650, 651-52 (S.D.N.Y. 2014) ("In appropriate circumstances of urgency, a movant may seek an order to show cause to bring on a motion on shorter notice and interim relief pending the hearing of the motion."). A stay was denied there because, unlike here, the motion was "unsupported by any affidavit or other evidence." *Id.* at 651.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

The Honorable George B. Daniels
October 6, 2022
Page 3

      2.      Given the threat of irreparable harm to 9/11 Plaintiffs as K&K awaits a resolution of its Rule 72(a) objections, it is proper for this Court to address the emergency stay motion in the first instance. Unlike other federal district courts throughout the country, the Southern District of New York does not require litigants to seek a stay of an order with the issuing magistrate judge in the first instance. *Compare, e.g.*, D. Colo. Local Rule 30.2(b) ("A stay of the [Rule 72(a)] order shall be obtained by motion filed with the magistrate judge, and if denied, then with the assigned district judge."). Where, as here, there is no local rule that governs, district courts in this Circuit and other circuits have long reviewed emergency stay motions in the first instance. *See, e.g.*, *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 124 F.R.D. 75, 77 (S.D.N.Y. 1989); *Am. Rock Salt Co., LLC v. Norfolk S. Corp.*, 371 F. Supp. 2d 358, 360 (W.D.N.Y. 2005); *Pablovich v. Rooms to Go Louisiana Corp.*, 2021 WL 928030, at *2 (E.D. La. Mar. 11, 2021). Because the Magistrate Judge's Order "immediately" removed K&K from the PEC before this Court has had an opportunity to review K&K's pending Rule 72(a) objections, an application to this Court in the first instance is appropriate.

      Finally, K&K disagrees that Magistrate Judge Netburn is "best suited to resolve [K&K's stay] motion in the first instance." Def. Letter 3. The motion involves a pure question of law—namely, whether Rule 37(b) authorizes sanctions against a law firm—and district courts regularly make irreparable harm determinations in the first instance. *See, e.g.*, *Make the Rd. New York*, 419 F. Supp. 3d at 665. In any event, by imposing sanctions effective "immediately," the Magistrate Judge decided against any form of a stay. No further delay to a briefing schedule is warranted.

*   *   *

      K&K seeks a short-term stay to preserve a decades-long status quo until this Court has had an opportunity to review K&K's pending Rule 72(a) objections, due October 21, 2022. Given K&K's long-running leadership of the PEC and its ongoing investigation and prosecution of a complex case against a foreign sovereign for 9/11 Plaintiffs, a stay should be granted "to preserve the status quo pending the appeal" of the removal sanction. *Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 565 (2d Cir. 1991). For the reasons set forth above, the Court should (i) set a hearing and briefing schedule for K&K's motion by order to show cause and (ii) stay the removal of K&K from the PEC pending resolution of the instant motion. *See* ECF No. 8607.

                              Respectfully submitted,

                               */s/ Edward M. Spiro*

                              Edward M. Spiro
                              *Counsel for Kreindler & Kreindler LLP*

Cc:    All MDL Counsel of Record (via ECF)

**A124**

**MDL 1570 PLAINTIFFS' Executive COMMITTEES**
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y.)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley (1944-2013)<br>Jodi Westbrook Flowers, *Co-Chair*<br>Donald A. Migliori, *Co-Chair*<br>Robert T. Haefele, *Liaison Counsel*<br>Motley Rice LLC | Sean Carter, *Co-Chair*<br>Stephen A. Cozen, *Co-Chair*<br>J. Scott Tarbutton, *Liaison Counsel*<br>Cozen O'Connor |

**VIA ECF**

October 11, 2022

The Honorable George B. Daniels
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street New York, NY 10007

The Honorable Sarah Netburn, U.S. Magistrate Judge
Thurgood Marshall U.S. Courthouse, Room 430
40 Foley Square
New York, NY 10007

     Re:    *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD) (SN)

Dear Judge Daniels and Judge Netburn:

     The leadership of the PECs write briefly in response to Motion to Stay and Declaration in support found at ECF #8608 and ECF #8610 filed by the Kreindler firm. We will not respond to all of the inaccuracies set forth in these latest submissions, but we are compelled to inform the Court we dispute the veracity of the facts and characterizations as recited in Mr. Maloney's declaration. Should the Court wish to hear anything further from the PECs on these submissions, we stand willing to do so, but we do not believe it is necessary or productive to engage in any further distractions created by the Kreindler firm.

     We remind the Court, the parties, and our clients that the undersigned spearheaded this case and this MDL since its formation in 2003, and that Motley Rice has continuously led on behalf of the personal injury and wrongful death clients since the original *Burnett v. Al Baraka* filing in August of 2002. We reaffirm our commitment to leading this complex consolidation on behalf of *all* Plaintiffs, as stated in our filing of October 4, 2022, ECF #8603.

Respectfully submitted,

MOTLEY RICE LLC               COZEN O'CONNOR

By: /s/ Jodi Westbrook Flowers    By: /s/ Sean P. Carter
JODI WESTBROOK FLOWERS      SEAN P. CARTER
DONALD A. MIGLIORI           STEPHEN A. COZEN
ROBERT T. HAEFELE            J. SCOTT TARBUTTON
MOTLEY RICE LLC              COZEN O'CONNOR

**A125**

The Honorable George B. Daniels
The Honorable Sarah Netburn
October 11, 2022
Page 2

---

28 Bridgeside Boulevard
Mount Pleasant, SC 29464
Tel.: (843) 216-9163
Email: jflowers@motleyrice.com
Email: dmigliori@motleyrice.com
Email: rhaefele@motleyrice.com
For Personal Injury and Death Claims PEC
For Plaintiffs' Executive Committees

One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Tel.: (215) 665-2105
Email: scarter@cozen.com
Email: scozen@cozen.com
Email: starbutton@cozen.com
For Commercial Claims PEC
For Plaintiffs' Executive Committees


cc:        All Counsel of Record via ECF


**A126**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| IN RE: : | MEMORANDUM DECISION |
| : | AND ORDER |
| TERRORIST ATTACKS ON : | 03 MDL 1570 (GBD) (SN) |
| SEPTEMBER 11, 2001 : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE B. DANIELS, United States District Judge:

In response to Magistrate Judge Sarah Netburn's Opinion & Order dated September 21, 2022, (Opinion and Order, ECF No. 8544), Kreindler & Kreindler LLP filed a motion by proposed order to show cause for a stay pending resolution of objections pursuant to Federal Rule of Civil Procedure 72(a), (Proposed Order to Show Cause with Emergency Relief, ECF No. 8607). Kreindler & Kreindler has also requested, and has been granted, an extension until October 21, 2022 to file objections to Magistrate Judge Netburn's Opinion and Order. (*See* Memo Endorsement, ECF No. 8553.)

Kreindler & Kreindler's motion by proposed order to show cause is procedurally improper under Local Rule 6.1. Except for some discovery motions, Local Rule 6.1 requires that a moving party bring "all civil motions, petitions, and applications" by a notice of motion, allowing for opposition filings within 14 days of service of the moving papers. *See* Local Rule 6.1(b). Local Rule 6.1 also provides:

> No *ex parte* order, or order to show cause to bring on a motion, will be granted except upon a clear and specific showing by affidavit of good and sufficient reasons why a procedure other than by notice of motion is necessary, and stating whether a previous application for similar relief has been made.

Local Rule 6.1(d). Kreindler & Kreindler has failed to provide any "clear and specific showing" of "good and sufficient reasons" for a procedure requiring the consideration of the

1

**A127**

Magistrate Judge's ruling on such an expedited basis. *Cf. id.* Kreindler & Kreindler's Memorandum of Law and the Declaration of Andrew Maloney cite "immediate and irreparable injury" in a conclusory manner, (*see* Brief on Proposed Order, ECF No. 8608, at 1; and Declaration of Maloney, ECF No. 8610, at ¶1), but they fail to demonstrate any exigency as to "why a procedure other than by notice of motion is necessary," *see* Local Rule 6.1(d). Defendant is "entitled to a proper opportunity to respond," and both parties "are entitled to the Court's careful consideration, particularly where . . . familiarity with the enormous record in this case may prove quite important." *See Chevron Corp. v. Donziger*, 37 F. Supp. 3d 650, 652 (S.D.N.Y. 2014). Here, Kreindler & Kreindler has failed to provide "a sufficient showing of likely irreparable injury in the period between the making of the motion [by proposed order to show cause] and its disposition on a schedule consistent with the rules." *Id.* (emphasis omitted).

Therefore, Kreindler & Kreindler's motion by proposed order to show cause for a stay is DENIED without prejudice.

Regarding the forthcoming Rule 72(a) objections to Judge Netburn's Opinion and Order, upon full briefing and submission, this Court is prepared to hear oral argument on December 8, 2022 at 10:00 a.m.

The Clerk of the Court is directed to close the open letter motion at ECF No. 8609.


Dated: October 17, 2022
       New York, New York

                                        SO ORDERED.

                                        *George B. Daniels*
                                        GEORGE B. DANIELS
                                        United States District Judge

2

**A128**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE TERRORIST ATTACKS ON
SEPTEMBER 11, 2001

No. 03-MD-01570 (GBD) (SN)

This document relates to: *All Actions*

ORAL ARGUMENT SCHEDULED
DECEMBER 8, 2022  @ 10:00 AM

**RULE 72 OBJECTIONS TO MAGISTRATE JUDGE SARAH NETBURN'S**
**ORDER IMPOSING SANCTIONS ON KREINDLER & KREINDLER LLP**

Emily Kirsch
Paul Niehaus
KIRSCH & NIEHAUS PLLC
950 Third Avenue, 19th floor
New York, NY 10022
(212) 832-0170
emily.kirsch@kirschniehaus.com

Edward M. Spiro
MORVILLO ABRAMOWITZ GRAND
  IASON & ANELLO P.C.
565 Fifth Avenue
New York, NY 10017
(212) 856-9600
espiro@maglaw.com

*Counsel for Non-Party Kreindler & Kreindler LLP*

**A129**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ iii

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ......................................................................................................... 3

    A.    Fawcett Was a Longtime, Trusted Consultant for K&K ..................................... 3

    B.    Fawcett Secretly Leaks the Transcript, Evading K&K Security Measures and Lying to K&K Attorneys ......................................................................................... 4

    C.    K&K Investigates the Leak Independently and in Accordance with the Magistrate Judge's Orders to the Parties .................................................................. 6

    D.    Fawcett Admits to Being the Source of the Leak ................................................ 10

    E.    The Magistrate Judge Permits Discovery of K&K by Saudi Arabia and Holds an Evidentiary Hearing on November 1 and 2, 2021............................................ 12

    F.    The Magistrate Judge's September 21, 2022 Opinion and Order........................ 14

STANDARD OF REVIEW .......................................................................................... 15

ARGUMENT ............................................................................................................... 15

I.    The Magistrate Judge's Rule 37(b) Order Sanctioning K&K is "Contrary to Law"........ 15

    A.    Rule 37(b) Did Not Authorize Sanctions Against K&K ..................................... 16

    B.    The Magistrate Judge Applied the Wrong Evidentiary Standard ........................ 19

II.    The Magistrate Judge's Finding that K&K "Willfully Breached" the Protective Orders, in Light of the Full Record, Cannot be Sustained as a Matter of Law. ............................ 21

    A.    Direct Evidence Confirms the Truth of Fawcett's Confession ............................ 22

    B.    No Circumstantial Evidence Supports the Finding that K&K Willfully Breached the Protective Order ........................................................................................ 26

        1.    K&K's "Litigation Strategy" .................................................................... 27

        2.    K&K's Post-Leak Investigation.................................................................. 28

        3.    K&K's Responses to the Magistrate Judge's Orders................................. 30

i

**A130**

        4.      The Timing of Phone Calls ........................................................................ 32

III.    The Sanctions Imposed on K&K Are Neither Just Nor Commensurate with Fawcett's Breach. ................................................................................................................. 35

CONCLUSION................................................................................................................. 40

ii

**A131**

## TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Abbott Laboratories v. Adelphia Supply USA*,
  2017 WL 1732454 (E.D.N.Y. May 2, 2017) .......................................................................... 38

*Apex Oil Co. v. Belcher Co. of New York*,
  855 F.2d 1009 (2d Cir. 1988).............................................................................................. 18

*Bloom v. Azar*,
  976 F.3d 157 (2d Cir. 2020)................................................................................................ 18

*Bus. Guides, Inc. v. Chromatic Commc'ns Enterprises, Inc.*,
  498 U.S. 533 (1991).............................................................................................................. 16

*Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*,
  602 F.2d 1062 (2d Cir. 1979)......................................................................................... 22, 36

*City of Almaty v. Ablyazov*,
  2018 WL 1229730 (S.D.N.Y. Mar. 5, 2018) .......................................................................... 36

*Daval Steel Prod. v. M/V Fakredine*,
  951 F.2d 1357 (2d Cir. 1991)....................................................................................... 36, 38

*Denis v. County of Nassau*,
  2019 WL 7372957 (E.D.N.Y. Dec. 31, 2019) ........................................................................ 38

*Fonar Corp. v. Magnetic Resonance Plus, Inc.*,
  128 F.3d 99 (2d Cir. 1997)................................................................................................... 19

*International Union v. Bagwell*,
  512 U.S. 821 (1994)............................................................................................................. 21

*Jay v. Spectrum Brands Holdings, Inc*,
  2015 WL 6437581 (S.D.N.Y. Oct. 20, 2015) .................................................................. 36, 38

*Koch v. Greenberg*,
  2011 WL 4485975 (S.D.N.Y. Sept. 28, 2011)....................................................................... 41

*Mackler Prods., Inc. v. Cohen*,
  146 F.3d 126 (2d Cir. 1998)................................................................................................. 21

*Markus v. Rozhkov*,
  615 B.R. 679 (S.D.N.Y. 2020).............................................................................................. 19

**A132**

*Nationwide Mut. Ins. Co. v. Mortensen*,
    2009 WL 2710264 (D. Conn. Aug. 24, 2009) ...................................................... 28

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) .................................................................................. 29

*NPF Franchising, LLC v. SY Dawgs, LLC*,
    37 F.4th 369 (6th Cir. 2022) ................................................................................. 19

*Oliveri v. Thompson*,
    803 F.2d 1265 (2d Cir. 1986) ................................................................................ 20

*Pavelic & LeFlore v. Marvel Entertainment Group*,
    493 U.S. 120 (1989) ............................................................................................... 18

*Ramgoolie v. Ramgoolie*,
    333 F.R.D. 30 (S.D.N.Y. 2019) ............................................................................. 22

*Shcherbakovskiy v. Da Capo Al Fine, Ltd.*,
    490 F.3d 130 (2d Cir. 2007) .................................................................................. 36

*Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*,
    685 F.3d 486 (5th Cir. 2012) ................................................................................ 19

*S. New England Tele. Co. v. Global NAPs Inc.*,
    624 F.3d 123 (2d Cir. 2010) .................................................................................. 19

*Thompson v. Jam. Hosp. Med. Ctr.*,
    2015 WL 7430806 (S.D.N.Y. Nov. 20, 2015) ........................................... 22, 29, 30

*U.S. ex rel. Eisenstein v. City of New York*,
    556 U.S. 928 (2009) ............................................................................................... 16

*United States v. Pauling*,
    924 F.3d 649 (2d Cir. 2019) ..................................................... 22, 27, 32, 35

*United States v. Zapatero*,
    961 F.3d 123 (2d Cir. 2020) .................................................................................. 16

*Update Art, Inc. v. Modiin Publ'g, Ltd.*,
    843 F.2d 67 (2d Cir. 1988) .................................................................................... 40

*Williams v. Beemiller, Inc.*,
    527 F.3d 259 (2d Cir. 2008) .................................................................................. 15

iv

**A133**

*Wolters Kluwer Fin. Servs., Inc. v. Scivantage*,
   564 F.3d 110 (2d Cir. 2009) ............................................................................... 20

*Yukos Cap. S.A.R.L. v. Feldman*,
   977 F.3d 216 (2d Cir. 2020) ............................................................................... 20

**Statutes**

18 U.S.C. § 1621 .................................................................................................... 25

28 U.S.C. § 636(b) ............................................................................................. 15, 34

28 U.S.C. § 1746 .................................................................................................... 25

**Rules**

Fed. R. Civ. P. 11(c) .......................................................................................... 17, 18

Fed. R. Civ. P. 37(a) .......................................................................................... 16, 17

Fed. R. Civ. P. 37(b) ........................................................................................... *passim*

Fed. R. Civ. P. 37(c) (1987) ............................................................................... 18, 19

Fed. R. Civ. P. 37(d) .......................................................................................... 17, 19

Fed. R. Civ. P. 72(a) ........................................................................................... *passim*

**A134**

## PRELIMINARY STATEMENT

On September 27, 2021, Kreindler & Kreindler LLP ("K&K") discovered that a longtime and trusted consultant, John Fawcett, had violated the two protective orders of this Court (the "Protective Orders") by leaking a deposition transcript to a Yahoo! News reporter in July 2021. That morning, after months of prevarication, Fawcett confessed the truth to K&K attorneys. That same day, K&K reported what Fawcett had done to Magistrate Judge Sarah Netburn (hereinafter, the "Magistrate Judge" or "the court") and apologized to this Court, the Magistrate Judge, and the parties for Fawcett's misconduct.

Fawcett admitted, under penalty of perjury, that:

- he leaked the transcript to the reporter;

- he copied the transcript from K&K's computer storage system onto a thumb drive, a method that circumvented any means for K&K to discover his misconduct; sent the transcript via an encrypted email service; and deleted all evidence of his actions;

- no one other than the reporter was aware of what he had done until the morning of September 27, 2021;

- he leaked the transcript because he believed that media attention was the only means to protect the public from a deposition witness who collected pornography involving minor children;

- he was questioned by K&K attorneys shortly after the Yahoo! News article was published on July 15, 2021, and denied that he knew anything about the leak; and

- for over two months, he prevaricated, dissembled, and misled K&K attorneys to cover up what he had done.

K&K attorneys met immediately after the Yahoo! News article was published and started an investigation the following day, in order to find out whether the firm was the source of the leak. K&K's investigation was substantially similar to the investigations of other plaintiffs' and defendants' law firms. After the Magistrate Judge issued Orders directing K&K and other entities to submit declarations from its attorneys and staff, K&K faithfully and timely complied with those

1

**A135**

Orders.  K&K was unable to uncover the leak until the day Fawcett confessed because Fawcett repeatedly lied to K&K to hide what he had done, and because Fawcett leaked the transcript in a way that left no trace.  K&K thereafter produced internal communications and other discovery to counsel for Defendant Kingdom of Saudi Arabia ("Saudi Arabia").

At a two-day hearing before the Magistrate Judge, all direct and indirect evidence corroborated Fawcett's sworn confession that he wrongfully leaked the transcript on his own, without permission or ratification, for personal reasons, and that K&K's attorneys were entirely unaware of what he had done until the day he confessed.

The Magistrate Judge's ruling is clearly erroneous and contrary to law and should be set aside.  The ruling is clearly erroneous because it overlooks the evidence and is based on speculation.  While the ruling finds that Fawcett would not submit perjurious testimony, it fails to address the undisputed facts in Fawcett's declarations and testimony that he acted alone to leak the transcript.  Despite being lied to and misled, K&K ultimately discovered who leaked the transcript, and K&K immediately reported the facts to the Court.

The ruling is contrary to law because it relies solely on Federal Rule of Civil Procedure 37(b) to impose sanctions on K&K.  But Rule 37(b)'s plain text only allows sanctions based on the misconduct of "a party," which is absent here, and does not authorize sanctions against K&K. The ruling is also contrary to law because it did not consider or apply the requisite evidentiary standards.  Under Second Circuit caselaw, no sanction could be imposed on K&K or its attorneys without findings of bad faith based on specific facts and clear-and-convincing evidence.  No such findings were made, or could be made, based on the evidence.  In addition, the Magistrate Judge made additional errors of law by excluding and not considering key evidence.

Finally, the immediate removal of K&K from the Plaintiffs' Executive Committee for Death and Injury Claims ("PEC"), after nearly 20 years at the helm, was not only unauthorized as a matter of law but was not commensurate with the leak itself. Given K&K's lead role in prosecuting the case of 9/11 death and injury plaintiffs ("Plaintiffs") against Saudi Arabia, the removal sanction highly prejudices Plaintiffs and was wholly out of proportion to K&K's responsibility for a breach that Fawcett perpetrated alone and in secret.

### BACKGROUND

### A.  Fawcett Was a Longtime, Trusted Consultant for K&K

In 2002, Fawcett started working for K&K as a researcher and consultant. *See* Transcript of Nov. 1-2, 2021 Hearing ("Tr.") 365:11-13; KSAX-62A (ECF 7166-1). Before joining the firm, in addition to spending ten years in Turkey, Fawcett worked for a humanitarian aid organization in Iraq, the former Yugoslavia, Afghanistan, and Pakistan, among other countries. Tr. 483:13-17. Through his human rights work, Fawcett became aware of the "dreadful history of child sex trafficking" in Morocco. KSAX-62A. With such knowledge, Fawcett adopted two children from Morocco. *Id.*; Tr. 489:11-16.

Until late September 2021, Fawcett primarily managed and analyzed the 9/11 discovery materials for K&K. Tr. 40:5-9, 483:22-24. This work represented 80-90% of his income. Tr. 416:9-11. Over two decades, Fawcett spent significant time engaging with 9/11 families, including participating in weekly calls with the families and educating them about the progress of the case. Tr. 366:6-13, 483:24-484:1. He worked with Jim Kreindler and Andrew Maloney for 20 years, and with Steven Pounian and Megan Benett for at least four years. *See* Tr. 21:9-10, 398:8-9, 410:25-411:2. Since the commencement of this action in 2016 against Saudi Arabia, as a core team member, Fawcett interacted on an almost "daily basis" with K&K attorneys. Tr. 275:9-14, 411:3-7. After decades together, K&K attorneys viewed Fawcett as an "key member" of the team,

3

**A137**

Tr. 215:12-16 (Maloney), a "tireless advocate" for 9/11 families, Tr. 366:6-13 (Benett), and as a "colleague and a peer" about whom they "never" received a complaint, Tr. 412:1-2, 413:9-12 (Pounian).  As a result, K&K attorneys trusted Fawcett deeply.  *See, e.g.*, Tr. 128:14-15 (Kreindler: "[O]ne of the most . . . honest and trustworthy people I ever met."); Tr. 411:25-412:1 (Pounian: "[S]omeone that we trusted as a professional."); Tr. 279:5-6 (Maloney: "You come to know people after 20 years of working with them [and], you know, their integrity . . . .").

### B.    Fawcett Secretly Leaks the Transcript, Evading K&K Security Measures and Lying to K&K Attorneys

In mid-June 2021, Benett deposed Musaed al Jarrah, who had served as an official at the Saudi Embassy in Washington, D.C.  The deposition transcript (the "Transcript") was designated confidential under the governing Protective Orders, *see* ECF 1900 (MDL protective order), and was presumptively confidential for 30 days after the deposition, *see id.*; ECF 4255 (FBI protective order) .  Although Fawcett had heard a "rumor" of Jarrah's activities involving child pornography in the months preceding his deposition, the deposition confirmed the rumor and, on the day of the deposition, Fawcett and Benett received "disturbing" descriptions of the images.  Tr. 468:21-470:4 (Fawcett); Tr. 327:3-25, 393:10-15 (Benett).

In his own words, Fawcett decided to leak the Transcript "[a]fter the revelations at the deposition that [Jarrah] was a child pornographer" because the public "must be forewarned in order to have some chance to protect themselves" and "the only venue for such warning is the media." KSAX-108A.  Fawcett wrote that the Saudi and U.S. governments "continue to protect [Jarrah] rather than prosecute him . . . ."  *Id.*  According to Fawcett, his knowledge that Jarrah worked as a Saudi diplomat in Morocco for years and continued to live there, and of Morocco's history of child sex trafficking, further informed his decision to leak the Transcript.  ECF 7166-1 at ¶ 4.  He stated

that "I sent the Jarrah transcripts to Isikoff because I wanted someone to do something to stop Jarrah." ECF 7162-2 at ¶ 6.

In early July 2021, Fawcett contacted Michael Isikoff of Yahoo! News about the Jarrah deposition and sent him the Transcript on or about July 5, 2021. Tr. 430:11-431:14, 432:10-25, 436:1-5. To avoid detection, Fawcett said that he took "several steps" to send the Transcript "without anyone at Kreindler knowing": he "saved [the Transcript] onto a thumb drive" from an office computer; "took the thumb drive home"; and "used a personal email account [he] established on ProtonMail," an encrypted end-to-end email service, "to send the transcript [to Isikoff]." ECF 7162-2 ¶¶ 7-9. To further avoid detection, Fawcett used a self-destruct feature to erase any trace of the email after seven days and later wiped and destroyed the thumb drive. *Id.* According to Fawcett, he took steps to hide his misconduct because he knew that "[the K&K lawyers] would tell me not to do it" and would not "condone" it. Tr. 485:17-21.

During this same period, Isikoff's staff also communicated with Jim Kreindler about joining Isikoff's podcast *Conspiracyland*, with Kreindler attending on July 1, 2021 and it ultimately airing on July 10, 2021. *See, e.g.*, Tr. 59:18-24; ECF 7147-6 at 6. Kreindler discussed on the podcast where things stood with the case against Saudi Arabia, including general discussion of the depositions of Omar al Bayoumi, Fahad al Thumairy, and Jarrah. ECF 8000 at 2.[1] Fawcett and Kreindler, who worked with each other "every day," also communicated over the phone throughout this period, as "probably not a day [went] by" where they were not talking. Tr. 59:22-23, 86:10-12 (Kreindler). Given the timing, Fawcett said he called Isikoff to convey that he was "worried" that Kreindler might get blamed for the leak because of his participation in the podcast with Isikoff even though Kreindler had no knowledge about the leak. ECF 7162-2 at ¶ 8.

---

[1] *See generally* Apple Podcasts, *Conspiracyland*, Bonus Episode 2: "Khashoggi and the 9/11 lawsuit" (July 10, 2021), https://tinyurl.com/4u6ze9rx.

5

**A139**

On July 5, 2021, Isikoff emailed counsel for Saudi Arabia, stated that he was "doing a story on the state of the 9/11 lawsuit," and asked whether he wanted to comment "in response to what Jim Kreindler had to say about where things stand – and how the [three] depositions went."  ECF 6981-4 at 10.[2]

On July 15, 2021, Isikoff published an article based on the Transcript that he obtained from Fawcett, in which he reported that the FBI had confronted Jarrah with child pornography found on his laptop in an effort to get Jarrah to cooperate with their 9/11 investigation.  KSAX40.

### C.    K&K Investigates the Leak Independently and in Accordance with the Magistrate Judge's Orders to the Parties

Recognizing "immediately that [this] was a serious issue," K&K attorneys held a conference call the day of the leak, which Fawcett attended, and discussed "whether anyone knew how Isikoff had obtained the transcript, whether anybody at Kreindler had sent the transcript to him or told Mr. Isikoff anything about the Jarrah deposition."  Tr. 277:9-13, 278:17-21 (Maloney). Despite this discussion, Fawcett did not admit his misconduct to his colleagues and Maloney and other K&K lawyers finished the call initially "confident" that "no one," including Fawcett, "had sent the transcript" to Isikoff or "knew how he got it."  Tr. 212:3-5, 216:5-11, 278:22-24 (Maloney); Tr. 123:18-21 (Kreindler).  Despite having "trust" in his colleagues, Maloney sought to "verify" that K&K was not the source of the leak, working with John Hartney, the firm's head of information technology.  Tr. 279:3-10.  Pounian did his own internal checks with K&K personnel because he similarly was "very concerned about nailing down exactly what had

---

[2] In his email, Isikoff included the following quote from Kreindler's podcast that had been taped but not yet broadcast: "If I could tell you now everything we knew about the Saudi role, you could see a resolution in Congress to declare war. I mean, it is so dramatic… 'We are thrilled with how the depositions went,. I can say that we've exposed all kinds of lies. You know, one witness will contradict another.  Each person wants to minimize their own role and point fingers at each other."  ECF 6981-4 (errors in original).

happened with the transcript" and "wanted to determine if the transcript had left the law firm in any way, shape or form." Tr. 406:2-3, 406:23-24, 407:1-5 (Pounian).

Seeking to determine whether anyone shared the Transcript, the internal investigation searched the firm's email and document servers to track any movement of the Transcript, and reviewed the Citrix cloud-based system. Tr. 185:2-186:10; KK-14 (Citrix access report). The initial email server searches revealed only two instances of the Transcript leaving the firm; it was sent by a K&K paralegal to an authorized co-counsel at Baumeister & Samuels P.C. and by Fawcett to an authorized consultant living abroad. Tr. 290:14-291:2; Tr. 407:23-408:1. Maloney spoke to the consultant and verified that the consultant had not sent the Transcript to Isikoff. Tr. 291:24-292:7. Maloney and Hartney performed additional searches too, including broad searches, refined searches, and searches targeted to Isikoff and Yahoo! News. Tr. 183:22-183:20; KK-4. The searches of the K&K systems, among other things, revealed a brief email exchange between Isikoff's staff and Kreindler regarding his upcoming appearance on the *Conspiracyland* podcast, an inquiry from Isikoff about motions in the litigation, and an email from Fawcett to Isikoff regarding the publicly filed FBI list of documents being withheld. ECF 7147-6 at 6-27; Tr. 160:7-24. Hartney confirmed that while K&K consultants and experts had access to the Transcript on K&K's cloud-based storage system, none of them had downloaded the Transcript from that system before Isikoff's story was published. ECF 7147-6 at ¶ 6.

On multiple occasions shortly after the Yahoo! News article was published, K&K attorneys directly asked Fawcett whether he was the source of the leak, or whether he knew anything about how the leak could have happened. Maloney, for example, asked Fawcett "face-to-face" whether he "sent this transcript to Mr. Isikoff or if he knew anything about it," and Fawcett said he "did not." Tr. 279:11-20. Fawcett also told Pounian "to [his] face" that "he knew nothing

about" the leak.  Tr. 407:8-408:4.

On July 21, 2021, six days after the article was published, Saudi Arabia emailed the PECs at 9:14 p.m., stating it would ask the court to order discovery into the leak.  KSAX-42 at 3-4.  The following morning, Fawcett sent a text message to a criminal defense attorney, requesting legal advice.  KSAX-151 at 1.  Later that morning, at 9:17 a.m., Fawcett joined a conference call with Pounian and Kreindler to discuss various case issues, including that Pounian would coordinate with the other PEC firms concerning the response to Saudi Arabia's email.  ECF 7359-1 ¶ 4.[3]

K&K has led the fact discovery efforts against Saudi Arabia, including investigating and locating witnesses abroad.  Tr. 370:25-371:8 (Benett).  At the time of the publication, K&K attorneys had "genuine concerns" about revealing K&K's own sensitive, confidential work product information to Saudi Arabia, including the identity of its consultants who had access to protected information.  Tr. 370:9-17, 371:13-18 (Benett).  None of the other plaintiffs' firms had the same work product concerns as they had not provided access to the deposition transcripts to consultants or anyone else outside of their firms.  *See* ECF 6991; ECF 6992; Tr. 372:4-10 (Benett). K&K was particularly "worried" about protecting the identity of one consultant who was living abroad,  especially given the circumstances of the murder of Jamal Khashoggi, who had been interviewed by a K&K representative.  Tr. 372:4-10 (Benett); KK-52 (Pounian: "I'm also concerned about sharing [] name with [Saudi Arabia] since he is living abroad.").  K&K attorneys thought Saudi Arabia might use the leak as a tactical opportunity to access the firm's work product. Tr. 336:17-19; Tr. 370:3-372:20 (discussing safety and work product concerns).  K&K therefore decided "to wait for the court to issue an order to guide the process."  Tr. 336:14-21 (Benett); Tr. 262:9-10 (Maloney: "[T]he consensus was we would wait to see what the court asked us to do.").

---

[3] As discussed in Section II.B.4 *infra*, the Magistrate Judge improperly refused to admit this evidence regarding the conference call.

On July 23, 2021, Saudi Arabia filed a motion for discovery into the handling of the Transcript, as well as the transcripts of the depositions of Bayoumi and Thumairy.  KSAX-41.  Saudi Arabia filed its motion without seeking to meet and confer with the plaintiffs, as required by Judge Netburn's rules.  *See* Individual Rules and Practice § II(C) (June 28, 2021).  On July 27, 2021, the PEC firms—Cozen O'Connor, Motley Rice LLC, and K&K—responded to the motion and asked the Magistrate Judge to direct the parties to meet and confer to prepare a joint plan to investigate the Transcript leak that included adequate protections for Plaintiffs' work product.  ECF 6988 at 1-3.[4]

The letter also stated that, based on their investigations, each of the lead PEC firms is "confident that it was not the source of the leak."  *Id.* at 2.  The described staff meetings and the firm's investigations to date gave K&K such confidence.  Cozen O'Connor and Motley Rice submitted declarations to the court a few days later, including descriptions of their firm's investigations concerning the leak.  ECF 6991; ECF 6992.  The declarations confirmed that those firms did not have the same work product concerns as K&K as neither firm had shared the relevant transcripts with consultants or experts.  ECF 6991; ECF 6992.

On August 12, 2021, the Magistrate Judge granted Saudi Arabia's motion, denied the PECs' request for the parties to agree on an investigation plan, and issued an order requiring Maloney, Pounian, Benett, and Kreindler to file, "*on* August 16, 2021," "declarations, under penalty of perjury, as to whether anyone with the firm or anyone acting on its direction shared the Al Jarrah deposition transcript with anyone unauthorized by" the Protective Orders.  ECF 7011 at

---

[4] The letter explained K&K's concerns that Saudi Arabia's demands "would require Plaintiffs to reveal to Saudi Arabia any unidentified consultant or expert" that had access to any of the three depositions identified by Saudi Arabia.  ECF 6988 at 1-3.  The firms' letter supported a thorough investigation of the leak, with the caveat that "it must do so in a manner that protects Rule 26 work product and prevents the unnecessary identification of . . . consultants and experts."  *Id.*

9

**A143**

2 (emphasis added).  As directed, on August 16, 2021, each K&K attorney declared, under penalty of perjury, that they did not individually "share the Jarrah deposition transcript or videos with anyone unauthorized," did not "direct anyone to share the Jarrah deposition transcript or videos with anyone unauthorized," and to their knowledge, "no one with [K&K] or anyone acting on its direction shared the Jarrah deposition transcript with anyone unauthorized."  *See* ECF 7016.

On August 30, 2021, the Magistrate Judge ordered supplemental declarations from additional personnel at K&K, in addition to declarations from the deposition transcription services company and from other plaintiff and defendant law firms.  ECF 7082.  After Oath Inc., which offers the Yahoo! News Service, moved to intervene in this matter, the Magistrate Judge extended the deadline until September 27.  ECF 7134 at 24.

### D.      Fawcett Admits to Being the Source of the Leak

Following the Magistrate Judge's Order, Benett prepared K&K's draft supplemental declarations, spoke to each of the declarants about the contents of the declaration, and explained to the non-lawyers, such as Fawcett, what it meant to sign a declaration under penalty of perjury. Tr. 368:6-369:7.  Before September 27, 2021, Benett emailed Fawcett the Order and prepared and sent a draft declaration to Fawcett based on his previous statements to Maloney and Pounian that he had no knowledge of how Isikoff received the Transcript.  Tr. 339:12-340:3.  On the morning of the court's September 27 deadline, Fawcett confessed to Benett that he leaked the Transcript to Isikoff; Benett then broke the news to the K&K partnership.  Tr. 388:19-389:18.  About two hours later, at 12:20 p.m., Fawcett emailed Benett and Pounian a statement, KSAX-108 (the "Statement"), which "he had drafted himself."  Order at 26; *see also* Tr. 456:7-15 (Fawcett).  The Statement read, in predominate part:

> I sent a redacted version of the transcript of the deposition of Musaed al Jarrah to
> Michael Isikoff in early July, 2021.  The redacted portions related to the sections of
> the deposition which were taken subject to the FBI protective order and irrelevant

to the issue at hand, evidence of Jarrah's use of child pornography. . . .  No one at [K&K] instructed me to send the transcript to Michael Isikoff nor did anyone at [K&K] have any knowledge of my sending it to Mr. Isikoff. . . .  Until today, no one aside from myself and Michael Isikoff, was aware that I sent the Jarrah transcript to him.  I sent the transcript to Mr. Isikoff via a non-[K&K] email address.  I did so to prevent the partners and staff of [K&K] from knowing about my intended action and to prevent them from stopping me, should they wish to do so. . . .  Neither [the FBI nor Saudi Arabia] has brought legal action despite clear evidence a crime has been committed and there is no evidence to demonstrate that Jarrah has ceased his criminal activity.  The protective order should not be used to cover up evidence of a crime that is not being adjudicated.  If the Saudi [and U.S. governments] continue to protect Musaed al Jarrah rather than prosecute him, then the public at least must be forewarned in order to have some chance to protect themselves.  The only venue for such warning is the media.  After the revelations at the deposition that he was a child pornographer, I could not allow Musaed al Jarrah's criminal acts to remain a secret, when I had the opportunity to do something about it. . . .  I accept all responsibility for my actions.

*See* Statement (errors in original).  Pounian also spoke with Fawcett after receiving the news of his confession from Benett; Pounian and Benett worked that day with Fawcett to prepare his declaration for submission to the court based on the Statement.  Tr. 352:19-353:19, 392:2-15 (Benett); Tr. 466:22-467:2 (Fawcett).  In addition to the facts in his Statement, in his September 27 Declaration, Fawcett added, under penalty of perjury, that "I had a personal interest because [Jarrah] worked for Saudi Arabia as a diplomat in Morocco for many years and still lives there, . . . and I know from my prior international humanitarian and human rights work that Morocco has a dreadful history of child sex trafficking."  KSAX-0121 ¶¶ 3-4.  Fawcett later testified that his September 27 Declaration to the court was his own.  Tr. 467:12-19.

K&K submitted that declaration, and ten other declarations from K&K attorneys and staff, as required by the deadline set under the court's August 30 order.  *See* ECF 7147 et seq.  Maloney, Pounian, Benett, and Kreindler each declared, under penalty of perjury, that: "For the first time today I learned the information set forth in the declaration of John Fawcett."  *See* ECF 7147-1 to 7147-4.  Three days later, on September 30, Fawcett submitted a second declaration to the court,

detailing the substantial steps he took to hide his misconduct through the use of a thumb drive, the use of an encrypted email service, and the destruction of evidence.  ECF 7162-2 at ¶¶ 7-9.

Fawcett later testified that, although he could not recall the specific words used by K&K attorneys when questioning him about the leak during the firm's investigation, he "prevaricated," "dissembled" and "was not being honest with" the K&K attorneys when they asked him "in substance" whether he was the source of the leak, or whether he knew anything about it.  Tr. 436:12-17, 486:21-487:7, 488:12 (Fawcett).

> ### E.   The Magistrate Judge Permits Discovery of K&K by Saudi Arabia and Holds an Evidentiary Hearing on November 1 and 2, 2021

On September 29, 2021, Saudi Arabia requested that the Magistrate Judge continue investigating K&K in connection with the leak.  ECF 7157.  On October 4, 2021, the Magistrate Judge scheduled a hearing "to render findings of fact in connection with the breach and to determine the appropriate remedies."  ECF 7167 at 1.  The court ordered Fawcett, Maloney, Benett, Pounian, Kreindler, and Hartney to appear as witnesses at the hearing and forbade them from discussing the matter amongst themselves in the month prior to or during the hearing.  *Id.* at 1-2.

By joint letter submitted October 8, 2021 with Saudi Arabia, K&K consented to pre-hearing discovery into the firm.  ECF 7251.  On October 21, 2021, the Magistrate Judge ordered further pre-hearing discovery, and stated that the court "intends *to issue findings of fact and to recommend remedies* to District Judge Daniels."  ECF 7277 at 1 (emphasis added).  K&K thereafter conducted a forensic search and produced over 1,500 pages of internal documents, including, as K&K had anticipated, attorney work product.  *See, e.g.*, ECF 7251; ECF 7215-1; ECF 7277.  K&K also imaged the personal devices of Maloney, Benett, Pounian, and Kreindler and produced to Saudi Arabia further documents found in personal emails, messaging applications, and phone history.  *See* ECF 7251 at 6; ECF 7277 at 5; ECF 7359 at 4.

**A146**

On October 29, 2021, this Court heard argument on Fawcett's attempt to assert his Fifth Amendment privilege against self-incrimination. This Court denied Fawcett's request, noting that Fawcett "handled [the leak] as if this was the most serious conduct that he had ever engaged in his life in terms of hiding it from the law firm, in terms of hiding it from the Court, in terms of how he destroyed the evidence." 10/29/22 Tr. 9:7-11. This Court further stated that "it would be quite awkward for Magistrate Judge Netburn to say I'm going to disregard the declarations so therefore there is no evidence in this case whatsoever that supports the lawyers' assertions that they didn't know." 10/29/22 Tr. 23:23-24:1.

Two days before the hearing, the Magistrate Judge issued several additional procedural orders. First, without explanation, the court denied K&K's request for the parties to exchange exhibits before the hearing. ECF 7337. Second, the day before the hearing, the court referred to the forthcoming proceeding as a "contempt hearing" and ordered that the "witnesses" were in fact "subjects" and "will be sequestered in the jury deliberation room until they testify and then will be required to remain in the courtroom after their testimony." ECF 7310 at 3.[5]

Over November 1 and 2, 2021, Kreindler, Hartney, Maloney, Benett, Pounian, and Fawcett testified, in listed order. The court admitted their "previously filed declarations as their direct testimony," permitted lawyers for Saudi Arabia to "cross-examine the witnesses" without limitation "in scope by their direct testimony," and permitted K&K to "conduct a re-direct examination following the cross-examination." ECF 7167 at 2.

Following the hearing, Saudi Arabia sought to obtain additional discovery from K&K and to admit additional documents into evidence that were not admitted during the hearing. ECF 7322,

---

[5] Although K&K "participated in good faith with the [c]ourt's inquiry into the breach of its Protective Orders," K&K's "cooperation in this Hearing should not in any way be construed as consent to any of its procedural or substantive infirmities and all of [K&K]'s objections are hereby expressly preserved." ECF 7386 at 56.

7330, 7336; ECF 7327, 7337, 7356; ECF 7328, 7359, 7365.  Over K&K's objection, the court

admitted all but one of Saudi Arabia's documents into evidence.  ECF 7369.  Based on hearing

testimony, the court also ordered Brian Weidner—a former FBI agent who on the day of the

deposition described in detail to Fawcett and Benett the child pornography that the FBI found in

Jarrah's possession—to submit a declaration regarding whether he attended part of the Jarrah

deposition and failed to note his appearance.  ECF 7369 at 3; *see also* ECF 7379 (Weidner

declaration).

At no point before, during, or after the hearing did the court inform K&K that it might

consider issuing sanctions under Federal Rule of Civil Procedure 37.

**F.  The Magistrate Judge's September 21, 2022 Opinion and Order**

On September 21, 2022 the Magistrate Judge issued her Opinion and Order, concluding

that K&K had "willfully breached" the Protective Orders and finding that:

> Fawcett leaked the transcript as part of [K&K]'s long-standing litigation strategy
> to pressure the Kingdom of Saudi Arabia into a settlement, and that he did so with
> the knowledge or at least tacit consent of lead attorney James Kreindler.  Other
> attorneys at the firm were, at best, willfully blind to the leak . . . .

Order at 2.

Failing to engage with the direct evidence of Fawcett's admission that he acted alone and

his exoneration of K&K attorneys, the court concluded that "circumstantial evidence" of K&K's

"coordinated campaign" to leak the Transcript supported finding K&K "willfully breached" the

Protective Orders.  *Id.* at 37, 64.  In particular, the court found (i) that K&K had "amply

demonstrated their motive for the leak," namely, a "litigation strategy" of using "press attention to

force Saudi Arabia into a settlement"; (ii) that K&K attorneys investigating the leak were

"willfully blind" to the leak based on the scope of their post-leak investigation; (iii) that K&K

attempted to "frustrate" and "foil" the Magistrate Judge's investigation into the leak and engaged

14

**A148**

in "a sustained campaign of delay and obstruction"; and (iv) that "a series of suspicious communications" between Isikoff, Fawcett, and Kreindler around early July 2021 were in fact "discussions about how to get the Al Jarrah Transcript into Isikoff's hands in violation of the Protective Order." Order at 36-45, 65.

Rather than hold K&K attorneys in contempt or issue sanctions under the court's inherent powers, the court invoked the "just orders" provision of Federal Rule of Civil Procedure 37(b) and, "effective immediately," removed the entire K&K firm from the PEC after nearly 20 years at the helm and nearly a year after the hearing.  Order at 2.[6]  The court also required K&K to pay the reasonable attorneys' fees of counsel for Saudi Arabia; forbade K&K from seeking compensation from the common benefit fund after July 5, 2021; and barred Fawcett from any further participation in this case.  *Id.* at 57, 64-65

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 72(a) "requires a district court to consider a party's timely objections to a magistrate judge's order deciding a 'pretrial matter not dispositive of a party's claim or defense' and to 'modify or set aside any part of the order that is clearly erroneous or is contrary to law.'"  *Williams v. Beemiller, Inc.*, 527 F.3d 259, 264 (2d Cir. 2008) (quoting Fed. R. Civ. P. 72(a)); *see also* 28 U.S.C. § 636(b)(1)(A).  In determining whether a magistrate judge's order was issued "contrary to law" under Rule 72(a), this Court reviews *de novo* interpretations of the Federal Rules of Civil Procedure.  *Beemiller*, 527 F.3d at 264.

## ARGUMENT

I.   **The Magistrate Judge's Rule 37(b) Order Sanctioning K&K Is "Contrary to Law"**

The Magistrate Judge's factual findings were contrary to the record evidence and erroneous

---

[6] Two other K&K attorneys, Justin Green and Marc Moller, serve on the PEC as alternates.  ECF 248-2 at ¶¶ 5-6.

as a matter of law.  *See* Point II *infra*.  But the Order suffers from a threshold flaw: The court

exceeded its authority by removing the entire K&K firm from the PEC under Rule 37(b), upturning

the nearly twenty-year status quo of K&K's leading this multidistrict litigation on behalf of 9/11

victims and their families.

Rule 37(b) does not authorize sanctions against K&K.  The rule requires "party"

misconduct as the foundation for any sanctions, including sanctions against an attorney.  Fed. R.

Civ. P. 37(b)(2)(A).  But there is no allegation of such misconduct there.  The Magistrate Judge

expressly rejected issuing sanctions against K&K under the court's inherent powers, which would

have required findings of clear-and-convincing evidence of bad faith by each attorney.  Because

the court issued sanctions without authority, applied the wrong legal standard, and otherwise did

not (and could not) identify evidence rising to the level of clear-and-convincing bad faith, this

Court should "set aside" the sanctions imposed under the Order.  Fed. R. Civ. P. 72(a).

### A.        Rule 37(b) Did Not Authorize Sanctions Against K&K

When the text of a Federal Rule of Procedure is clear and unambiguous, the analysis begins

and ends with the plain text.  *Bus. Guides, Inc. v. Chromatic Commc'ns Enterprises, Inc.*, 498 U.S.

533, 540-41 (1991); *United States v. Zapatero*, 961 F.3d 123, 127 (2d Cir. 2020).

Rule 37(b) authorizes sanctions solely for the misconduct of "a party" or "a party's"

corporate official.  The text of the rule is clear:

> If *a party* or *a party's* officer, director, or managing agent—or a witness designated
> under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit
> discovery, including an order under Rule 26(f), 35, or 37(a), the court where the
> action is pending may issue further just orders.

Fed. R. Civ. P. 37(b)(2)(A) (emphasis added).  A court may issue sanctions under Rule 37(b) only

where a party (*i.e.*, a plaintiff or defendant) or a party's corporate official violates a discovery

order.  *See U.S. ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 933-34 (2009) ("A 'party' to

16

**A150**

litigation is one by or against whom a lawsuit is brought." (alteration adopted; quotation marks omitted)).  No such conduct occurred here.

Neither the text of Rule 37(b)(2)(A)—nor any other provision of Rule 37—mentions a law firm.  Rule 37 expressly authorizes, at most, monetary sanctions against individual attorneys advising a disobedient party.  For example, if a court finds that a party or its corporate official violated a discovery order, Rule 37(b) authorizes the court to impose monetary sanctions on "the disobedient party, the attorney advising that party, or both" by requiring payment of reasonable expenses caused by the party's violation.  Fed. R. Civ. P. 37(b)(2)(C).  Likewise, Rule 37(d) authorizes the court to require "the party failing to act, the attorney advising that party, or both" to pay the reasonable expenses caused by the party's failure to engage in discovery.  Fed. R. Civ. P. 37(d)(3).  And, if opposing counsel successfully moves to compel discovery under Rule 37(a), the rule authorizes a court to "require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both" to pay the movant's reasonable expenses incurred in making the motion. Fed. R. Civ. P. 37(a)(5)(A).  Accordingly, Rule 37 authorizes only monetary sanctions against the individual attorney advising the disobedient *party*—and such a sanction is only derivative of wrongdoing by *the party*.

Congress's decision to exclude law-firm conduct from Rule 37(b) was intentional, as Federal Rule of Civil Procedure 11 authorizes sanctions against "any attorney, law firm, or party" for impermissible documents submitted before the court.  *See* Fed. R. Civ. P. 11(c)(1).  An earlier version of Rule 11, which concerned representations to a court by "the person who signed" an offending document submitted to the court, did not include reference to a "law firm."  *See* Fed. R. Civ. P. 11(c)(1) (amended 1987).  In 1993, Congress amended Rule 11 to expand its reach to include law firms:

> [T]he court may impose an appropriate sanction on any *attorney*, *law firm, or party* that violated the rule or is responsible for the violation.   Absent exceptional circumstances, *a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.*

Fed. R. Civ. P. 11(c)(1) (emphasis added); *see also* Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment.   That same year, Congress amended Rule 37 but did not similarly authorize sanctions against law firms.   *See generally* Fed. R. Civ. P. 37 advisory committee's note to 1993 amendment.   Then and now, Rule 37 only authorized sanctions for "party" misconduct, not law-firm conduct.   Nor does Rule 37 authorize joint liability for a law firm based on the conduct of an individual lawyer or employee.   *Cf. Bloom v. Azar*, 976 F.3d 157, 161 (2d Cir. 2020) ("[T]he interpretive canon, *expressio unius est exclusio alterius*, expressing one item of an associated group or series excludes another left unmentioned," applies when "it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it." (alteration adopted; quotation marks omitted)).

U.S. Supreme Court, Second Circuit, and sister circuit caselaw confirm that Rule 37(b) does not sweep so broadly.   In *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120 (1989), the Supreme Court held that then-Rule 11, which only authorized sanctions against "the person who signed" an offending court submission, did not permit sanctions against the law firm of the signing-attorney.   *Id.* at 120, 123-24.   Likewise, in *Apex Oil Co. v. Belcher Co. of New York*, 855 F.2d 1009 (2d Cir. 1988), the Second Circuit held that then-Rule 37(c), which authorized sanctions for failing to admit the truth of matters contained in a request for admission, did not include sanctions against a party's law firm, Shea & Gould.   *Id.* at 1013-14.[7]   And earlier this year,

---

[7] The text of then Rule 37(c) provided in relevant part:

> If *a party* fails to admit the genuineness of any document or the truth of any matter as requested under Rule 36, and if the party requesting the admissions thereafter proves the genuineness of the

18

**A152**

in *NPF Franchising, LLC v. SY Dawgs, LLC*, 37 F.4th 369, 373 (6th Cir. 2022), the Sixth Circuit held that Rule 37(d), which authorizes sanctions for failure to produce documents, "does not allow for sanctions against a law firm, unless it is a party." *Id.* at 383.

The Magistrate Judge cites no caselaw to the contrary. *See* Order at 36 & n.14, 44.  In *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 128 F.3d 99, 101 (2d Cir. 1997), the court upheld a small *monetary* sanction entered against an *individual attorney* for "his role in [the company president's] failure to appear for deposition." *Cf.* Fed. R. Civ. P. 37(b)(2)(C) (authorizing monetary sanctions against "the attorney advising" the disobedient party).  In *Southern New England Telephone Co. v. Global NAPs Inc.*, 624 F.3d 123, 147-48 & n.10 (2d Cir. 2010), the court entered sanctions against *a party* for the actions of one of its bookkeepers.  And in *Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 490 (5th Cir. 2012), the court imposed *monetary* sanctions against an *individual attorney* and a law firm—which the firm did not contest; *see also Markus v. Rozhkov*, 615 B.R. 679, 701 (S.D.N.Y. 2020) (imposing monetary sanction against an individual attorney).[8]  Nowhere do these cases discuss—let alone authorize—sanctions against an entire law firm based on the conduct of a firm employee or even an individual attorney.

Accordingly, the Magistrate Judge's Order should be "set aside."  Fed. R. Civ. P. 72(a).

### B.     The Magistrate Judge Applied the Wrong Evidentiary Standard

In the Order, the Magistrate Judge expressly declined to invoke the court's inherent powers, relying on Rule 37(b) as the sole authority for the sanctions imposed against K&K, *see* Order at 36 n.15, despite stating prior to the hearing that she would only be "recommend[ing] remedies to

---

document or the truth of the matter, the requesting party may apply to the court for an order requiring *the other party* to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees.

Fed. R. Civ. P. 37(c) (amended 1987) (emphasis added).

[8] Cases cited elsewhere in the Order fit this same inapposite pattern.  *See* Order at 60.

[this Court]," which would have been done under contempt or inherent powers.  ECF 7277 at 1; *see also* Order at 36 n.15, 61 (concluding, without explanation, that "imposing sanctions under a court's inherent power" is "problematic" and can be "needless and confusing" (quotation marks omitted)).

Whatever the Magistrate Judge's rationale for declining to rely on inherent powers and basing the decision solely on Rule 37(b), the court circumvented the heightened "bad faith" standard mandated by Second Circuit caselaw under inherent powers.  Together, those cases require "clear and convincing evidence" of "bad faith" (*i.e.*, action that is "entirely without color"), which "must be supported by a high degree of specificity in the factual findings."  *See Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 235 (2d Cir. 2020); *Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009); *Oliveri v. Thompson*, 803 F.2d 1265, 1281 (2d Cir. 1986) (quotation marks omitted).  Bad faith is "personal" and "may not automatically" be "imputed" on others.  *Wolters Kluwer*, 564 F.3d 110 at 114 (quotation marks omitted).

There was no such evidence here.  Without even attempting to identify clear-and-convincing evidence of bad faith, the Magistrate Judge imposed sweeping sanctions against the entire K&K law firm, barring all K&K attorneys (including K&K attorneys uninvolved with the leak or investigation) from positions on the PEC.  In fact, the Order does not use the phrase "clear and convincing" or "bad faith" once.  Even more fundamentally, the Magistrate Judge "imputed" the conduct of Fawcett and Kreindler to the entire K&K firm, *see* Order at 44, a finding well short of what is required under inherent powers.  *Cf. Wolters Kluwer*, 564 F.3d at 114 (reversing sanctions where "the district court imputed Peters's bad faith to Dorsey" under its inherent powers, without "specific evidence of Dorsey's bad faith").  This heightened "bad faith" standard is particularly important where a court acts as the "accuser, fact finder and sentencing judge, not

20

**A154**

subject to restrictions of any procedural code and at times not limited by any rule of law governing the severity of sanctions that may be imposed." *Mackler Prods., Inc. v. Cohen*, 146 F.3d 126, 128 (2d Cir. 1998) (citing *International Union v. Bagwell*, 512 U.S. 821, 831 (1994)).

Because the Magistrate Judge's findings are facially deficient under the "bad faith" standard, the sanctions against K&K are unsupported as a matter of law.  This Court need go no further; it should "set aside" the sanctions against the firm as "contrary to law."  Fed. R. Civ. P. 72(a).

## II.     The Magistrate Judge's Finding that K&K "Willfully Breached" the Protective Orders, in Light of the Full Record, Cannot be Sustained as a Matter of Law

Under either evidentiary standard—whether clear-and-convincing evidence of bad faith or preponderance of evidence of willfulness—the finding that the entire K&K firm "willfully breached" the Protective Orders cannot stand as a matter of law.

The hearing evidence demonstrated that Fawcett acted on his own initiative, intentionally downloaded the Transcript onto a thumb drive, sent the Transcript to Isikoff via an end-to-end encrypted email service, utilized the service's self-destruction feature to delete any trace of the email, and wiped and destroyed the thumb drive to cover any trace of his misconduct.  ECF 1537-2 ¶¶ 7, 9.  Fawcett admitted that, when K&K attorneys questioned Fawcett about the leak, he "prevaricated and dissembled and avoided letting them know" about his misconduct and was "not being honest with them."  Tr. 486:21-25, 488:12 (Fawcett).  K&K provided broad and invasive discovery to counsel for Saudi Arabia, including the firm's internal documents, phone logs, text messages and cell phone data.  *See* ECF 7277.  And no evidence contradicted Fawcett's sworn declarations or his hearing testimony.

Based exclusively on strained inferences from "circumstantial evidence," the Magistrate Judge nevertheless concluded that, with the "knowledge or at least tacit consent" of James

Kreindler, Fawcett leaked the Transcript to further K&K's "litigation strategy" to pressure Saudi Arabia into a settlement and that other K&K attorneys were "willfully blind to the leak."  Order at 2.  Against the full record, the Magistrate Judge's finding is erroneous as a matter of law.

"Any decision under Rule 37 should be made in light of the full record in the case." *Ramgoolie v. Ramgoolie*, 333 F.R.D. 30, 35 (S.D.N.Y. 2019) (citing *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir. 1979)).  Although a fact finder is permitted to make inferences from the full record, the Court "may not credit inferences within the realm of possibility when those inferences are unreasonable."  *United States v. Pauling*, 924 F.3d 649, 657 (2d Cir. 2019) (quotation marks omitted).  The Court cannot find "willfulness" where breach of a discovery order was "due to factors beyond the party's control."  *See Thompson v. Jam. Hosp. Med. Ctr.*, 2015 WL 7430806, at *3 (S.D.N.Y. Nov. 20, 2015) (quotation marks omitted).  Here, the record evidence demonstrated that the breach of the Protective Order was due to factors beyond K&K's control.  *See id.*

### A.      Direct Evidence Confirms the Truth of Fawcett's Confession

The record demonstrates that Fawcett on his own initiative leaked the Transcript to Yahoo! News and, using his knowledge of K&K's security systems, took substantial steps to hide his misconduct from K&K.  On the morning of the September 27, 2021 deadline, Fawcett admitted "for the first time" that he leaked the Transcript to Isikoff and that, "[u]ntil today, no one other than" Isikoff knew.  *See* Statement.  He acted "to prevent the partners and staff of [K&K] from knowing about my intended action and to prevent them from stopping me."  *Id.*

In the Statement sent to Benett and Pounian, Fawcett explained that he leaked the Transcript because he did not believe that a protective order should "extend to cover evidence of a criminal act such as possessing and viewing child pornography."  *Id.*  Fawcett further stated that

"[a]fter the revelations at the deposition that [Jarrah] was a child pornographer, I could not allow [Jarrah]'s criminal acts to remain secret, when I had the opportunity to do something about it." *Id.* And that if the Saudi and U.S. government "continue to protect [Jarrah] rather than prosecute him, then the public at least must be forewarned in order to have some chance to protect themselves" and the "only venue for such warning is the media." *Id.*[9]   Later that day, Fawcett provided additional detail, under penalty of perjury, that "I had a personal interest because [Jarrah] worked for Saudi Arabia as a diplomat in Morocco for many years and still lives there, . . . and I know from my prior international humanitarian and human rights work that Morocco has a dreadful history of child sex trafficking." KSAX-0121 ¶¶ 3-4.  Three days later, Fawcett provided further detail, under penalty of perjury, regarding his use of a thumb drive, his use of an encrypted email service, and his destruction of the evidence of his misconduct.  ECF 1537 ¶¶ 7-9.  Fawcett's hearing testimony affirmed the truth of these statements.  *See, e.g.*, Tr. 444:13-15, 465:11-17, 485:3-19.

Following the leak, each of K&K's attorneys, including Benett, Maloney, Pounian and Kreindler, categorically denied having any knowledge about how Isikoff got the Transcript.  ECF 7016 (Aug. 16, 2021 declarations).  The same day that Fawcett confessed, each of the K&K attorneys submitted an additional declaration, under penalty of perjury, attesting that, "For the first time today, I learned the information set forth in the declaration of John Fawcett." ECF 7147.  The testimony evidence over two days reaffirmed each attorney's lack of knowledge or complicity.  *See, e.g.*, Tr. 129:19-130:5 (Kreindler); Tr. 304:18-305:4 (Maloney); Tr. 358:13-124, 402:5-8 (Benett); Tr. 413:24-414:6 (Pounian); Tr. 485:17-486:25 (Fawcett).  Nor did any evidence adduced

---

[9] Further demonstrating that these words and thoughts were Fawcett's alone, he had, three minutes before sending his declaration to Pounian and Benett, emailed it to himself from a personal email address to his K&K email address, from which he then emailed it to Pounian and Benett.  KSAX-107A.

at the hearing indicate that any K&K attorneys had any reason to suspect that Fawcett—a deeply trusted and respected consultant—had anything to do with the leak prior to September 27, 2021. *See, e.g.*, Tr. 129:19-130:5 (Kreindler); Tr. 304:18-305:4 (Maloney); Tr. 340:11-342:9, 358:13-124, 402:5-8 (Benett); Tr. 413:24-414:6 (Pounian).

No record evidence contradicted Fawcett's Statement, despite significant discovery produced by K&K, including the firm's internal documents, phone logs, text messages and cell phone data.  After a two-day hearing where counsel for Saudi Arabia was permitted unfettered cross-examination of K&K attorneys, where K&K attorneys were forbidden from communicating with one another about the facts for one month before and during the hearing, where K&K attorneys were denied the opportunity to see opposing counsel's exhibits before the hearing, and where K&K attorneys were sequestered, ECF 7167 at 1; ECF 7337; ECF 7310 at 3, no evidence was adduced that refuted Fawcett's confession.

That confession has particularly strong veracity here.  *See* Statement.  By leaking the Transcript and admitting to his misconduct, Fawcett exposed himself to potential criminal liability. *See* KSAX-151 at 1; 10/29/21 Transcript.  Fawcett also faced significant financial loss associated with his confession: he had worked as a consultant and researcher for K&K for more than twenty years, Tr. 312:1-3, 416:3-5, and this work accounted for 80 to 90 percent of his income.  Tr. 416:9-11.  The signing and submission of a declaration to the court, if false, also carried with it potential criminal prosecution, fines, and up to five years' imprisonment.  *See* 18 U.S.C. § 1621; 28 U.S.C. § 1746.  On a personal level, Fawcett's Statement required him to admit to individuals that he had worked with for years, individuals that deeply respected and trusted him, that he had utterly betrayed that trust, and harmed the firm.  *See* ECF 7167.  The timing of the confession—admitting to his misconduct on the morning of the Magistrate Judge's deadline for the submission of

24

**A158**

declarations after his leak had been public for weeks—shows that this was not an easy decision for Fawcett. Ultimately, he determined that while he could lie to his co-workers, he was unwilling, as even the Magistrate Judge found, to lie to the federal court and commit perjury. *See* Order at 13 ("[Fawcett] was apparently unwilling to sign a perjurious declaration.").[10]

The Magistrate Judge disregarded these facts in large part because she believed that Fawcett's motive for disclosing the Transcript—"to protect the children of Morocco"—was "fabricated" by two K&K attorneys, Pounian and Benett. Order at 28, 38. But the Magistrate Judge overlooked that Fawcett clearly rejected Saudi Arabia's characterization that he had "signed what Mr. Pounian and Ms. Benett wrote for you" and testified: "No, I signed what I believed to be a correct declaration at the time" and that "I felt that was my declaration." Tr. 467:12-19. Fawcett clearly stated his motive in his Statement which the Magistrate Judge found was "his own words." Order at 26. In the Statement Fawcett confessed that he leaked the Transcript because the Saudi and U.S. governments were protecting a "child pornographer" and therefore the public "must be forewarned in order to have some chance to protect themselves." *See* Statement. Fawcett's exposure to Morocco and its history of child sex trafficking through his prior human rights work, and his adopting two Moroccan children, informed the reason for his misconduct, was sworn to by Fawcett, and is true, Tr. 467:12-19 (Fawcett). The fact that Pounian and Benett included these words to the final declaration based on their discussions with and knowledge of their longtime colleague does not alter their truth. *Id.*; Tr. 352:19-353:19, 392:2-393:15 (Benett) (explaining that

---

[10] The Magistrate Judge's finding that Fawcett was "unwilling to sign a perjurious declaration" in executing the September 27, 2021 declaration cannot be reconciled with her other findings that ignore statements Fawcett made in that declaration: that he acted alone and no one except the reporter knew he leaked the Transcript; he took extraordinary steps "so that no one from Kreindler would know that I had done"; he decided to leak the information after the "revelations at the deposition" that Jarrah "was a child pornographer"; he knew Jarrah lives in Morocco, a place that "has a dreadful history of child sex trafficking" and that no one, including the Saudi and U.S. governments, "was taking action to protect the children at risk"; and that "the media was the only venue available to protect the public and children from [Jarrah] and his conduct." ECF 7166-1; Order at 28.

the additions to the declaration were based on the information from Fawcett, and that she believed this provided important context to understand what happened).[11]

While the Magistrate Judge criticized Fawcett for "not alert[ing] anyone in the U.S. or Moroccan governments about his concerns," Fawcett's Statement made clear his belief that the "only venue for such warning is the media" because those governments were "protecting" Jarrah. *See* Statement; ECF 7166-1, ¶ 4.   And although there might have been "unconfirmed" rumors about Jarrah's conduct before the deposition, Order 28 (citing Tr. 468:8-24), Fawcett's Statement made clear that Jarrah's conduct and his admission to possessing the child sexual images at the deposition was a "revelatio[n]" to him.  *See* Statement.[12]

### B.    No Circumstantial Evidence Supports the Finding that K&K Willfully Breached the Protective Order

The Magistrate Judge does not address the key evidence: Fawcett's direct confessions in his declarations and testimony that he acted alone in leaking the Transcript and repeatedly lied to K&K about doing so; and that the K&K attorneys discovered that Fawcett was the leaker and immediately notified the Court and all parties.   Instead, the Magistrate Judge concluded from circumstantial evidence that K&K, "through Fawcett and [Jim] Kreindler, breached the Protective Orders by carrying out a deliberate scheme to leak the Al Jarrah Transcript to Isikoff."  Order at

---

[11] While the Magistrate Judge found that "there was no evidence at the hearing or in Fawcett's phone records that he participated in these additions," Opinion at 27, this overlooks Fawcett's testimony at the hearing that the statements in his declaration were true and that he made them himself, Tr. 467:12-19 (Fawcett),  and that Fawcett had numerous phone calls with Pounian and Benett on the day his declaration was prepared and submitted to the court.  Tr. 466:22-25, 467:1-2 (Fawcett); KSAX-136 (showing eight phone calls with Fawcett and Benett or Pounian on September 27). Additionally, Fawcett had a decades-long relationship with the K&K attorneys, many of whom knew his personal and professional history well before the leak.

[12] The Magistrate Judge found changes made to the description of the leaked material in Fawcett's September 27 Declaration were "misleading."  Order at 27-28.  But any errors in Fawcett's declaration are attributable to Fawcett and not K&K; it was Fawcett who confessed on the morning of the court's September 27 deadline and K&K attorneys who attempted to learn the facts throughout a "very wild day" that ensued.  Tr. 343:9-18 (Benett); Tr. 459:15-21 (Fawcett: "I think in the pace of doing this, I've got a very poor sentence" that "doesn't make any sense").   In any event, because there is no dispute that Fawcett leaked the Transcript, it is not directly relevant whether the portions of the Transcript sent to Isikoff were "limited to" or "focused on" Jarrah's testimony about his possession of child pornography.

26

**A160**

36.   To reach that conclusion, the Magistrate Judge found four categories of circumstantial evidence to be "compelling," almost all of which relates to events either years before or months after the leak.  The Magistrate Judge's inferences from these circumstances were not reasonable. *See Pauling*, 924 F.3d at 657.

### 1.   K&K's "Litigation Strategy"

The Magistrate Judge first found that K&K had "amply demonstrated their motive for the leak," namely, a "litigation strategy" of using "press attention to force Saudi Arabia into a settlement."  Order 37.  But K&K's "litigation strategy" has never been to "force" Saudi Arabia into "a settlement" based on bad press, rather than increase general "pressure."  Tr. 24:3-25:5.  Nor would such a strategy make sense as a general matter: if the U.S. government cannot influence the Saudi government through international diplomacy to act, "press attention" created by a U.S. law firm certainly would not "force" Saudi Arabia into settlement.  Regardless of any "pressure" on Saudi Arabia, this case, like any other, will be determined by the strength of the evidence and the merits of the parties' arguments—whether by a determination through the courts or "what we traditionally think of as a settlement."  *See* Tr. 24:3-5, 25:3-5 (Kreindler).

In the nearly 20 years litigating this case, when Jim Kreindler speaks with the press, he has done so openly, with attribution, and using care not to divulge protected information.  *See* Tr. 25:7-20 (Kreindler).  This Court has repeatedly affirmed the parties' freedom to speak with the press.  *See* Order at 47 (collecting examples).  Fawcett's willful and secretive leak of information to the press, the first such incident in this nearly 20-year litigation, is inconsistent with the interactions of Kreindler—K&K's leading voice—with the press.  It would make no sense for the firm to break from its normal practice to suddenly leak a deposition transcript, particularly one that (according to the Magistrate Judge) was not clearly "important."  *See* Order at 49.

27

**A161**

To be sure, K&K attorneys have criticized the Protective Orders as overly broad. *See* Order 37; Tr. 29:18-30:4. But such criticism does not permit a reasonable inference that K&K attorneys would violate the Orders that they swore to obey and had painstakingly worked to follow on a nearly daily basis, including through their court filings and client discussions. Tr. 412:3-413:8.

The Magistrate Judge's finding regarding K&K's "litigation strategy," in addition to being inconsistent with K&K's historical press communications, are unsupported by the record, irrational as a general matter and particularly unfounded with regards to Fawcett's leak specifically. The Court should therefore reject this factual finding of "motive." *Cf. Nationwide Mut. Ins. Co. Mortensen*, 2009 WL 2710264 at *7 (D. Conn. Aug. 24, 2009) (granting summary judgment where the record evidence, including speculation of a "general plan" to harm the plaintiffs, could not support a reasonable inference of bad faith).

## 2. K&K's Post-Leak Investigation

The Magistrate Judge similarly erred in concluding that K&K attorneys investigating the leak were "willfully blind" to the leak based on the scope of their post-leak investigation. Order 2, 39, 45, 46. The record reflects that the K&K investigation was nearly identical to the investigation conducted by the other PECs and other plaintiff and defense firms in the case. *See* ECF 7385 ¶¶ 74-75. Indeed, upon learning of the leak, Andrew Maloney held a meeting with the entire team, including Fawcett, regarding "whether anyone knew how Isikoff had obtained the transcript, whether anybody at Kreindler had sent the transcript to him or told Mr. Isikoff anything about the Jarrah deposition, the substance of the Jarrah deposition." Tr. 278:18-21 (Maloney). Concurrently, Pounian checked to determine if the Transcript had "left the law firm in any way, shape or form." Tr. 405:12-407:5. The K&K team searched the email and document servers to track any movement of the Transcript and reviewed the firm's cloud-based system to see if anyone

28

had accessed, downloaded, or printed the Transcript.  Tr. 185:2-186:10 (Hartney); KKX-14.  These searches did not identify Fawcett, or anyone else at K&K, as the source of the leak.

The Magistrate Judge criticized various aspects of the investigation.  *See* Order 39-40.  But given the various steps Fawcett took to hide his misconduct, the heightened investigatory steps suggested by the Magistrate Judge would not have revealed Fawcett as the leaker and are not tantamount to willful blindness on the part of the investigators.[13]  *See* ECF 7162-2 ¶¶ 7, 9.  None of the Magistrate Judge's criticisms about the investigation, if performed differently, would have changed that.  *Cf. Thompson*, 2015 WL 7430806, at *3 (noncompliance with a court's order is not willful if it is "due to factors beyond the party's control" (quotation marks omitted)).  But most fundamentally, all contemporaneous emails produced in this matter show that Maloney, Hartney, and the investigative team were focused on trying to determine if anyone connected to K&K was the source of the leak.  *See, e.g.*, KSAX-84–87, KSAX-88–91, KSAX-93, KSAX-96–98.

To that end, this Court should reject the Magistrate Judge's conclusion that "Fawcett reports that he was not directly questioned about his role in the breach until September 27, long after the firm had reported its investigation was complete." Order at 40 (citing Tr. 436:11-439:12). The Order cites an exchange at the hearing in which counsel for Saudi Arabia asked Fawcett a narrow and specifically framed question, and demanded a yes/no answer: did specific K&K attorneys come to you and say, precisely, "did you disclose this transcript?"  Because Fawcett did not recall that precise wording, the Order wrongly concludes that Fawcett "does not recall being questioned by anyone."  *Id.*  This finding, without reason, ignores Fawcett's testimony, moments

---

[13] In a different context, the Second Circuit has held that it is inappropriate to hold a party to a standard based on "hindsight." *See, e.g.*, *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them" and "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim . . . ." (cleaned up)).

earlier, that he *was* asked in substance whether he had disclosed the Transcript, and that he lied and misled the K&K attorneys when he was asked about the leak:

> Q:   Did anyone from Kreindler & Kreindler, on July 15 or any time prior to September 27, in words or substance, John Fawcett, did you disclose the transcript to Michael Isikoff?
>
> A:   *I don't recall directly, but in substance, yes, they would have asked in substance.*

Tr. 436:12-23 (emphasis added); *see also* Tr. 486:21-24 (Fawcett: "I certainly prevaricated and dissembled and avoided letting them know [who leaked the Transcript]."); Tr. 488:4-12 (Fawcett: "I was not being honest with them."). That testimony is affirmed by the testimony of Pounian and Maloney—each of whom testified that they directly asked him about the leak. *See, e.g.*, Tr. 407:8-17 (Pounian); Tr. 252:1-10 (Maloney). Contrary to the Magistrate Judge's finding otherwise, *see* Order 40, Fawcett and K&K attorneys' testimony is fully consistent and affirming.

Given the degree to which Fawcett covered up his misconduct so that no investigation would have uncovered it, this Court should reject the finding that K&K investigation *after* the leak supports an inference of willful blindness *before* the leak was discovered. *Cf. Thompson*, 2015 WL 7430806, at *3.

### 3.   K&K's Responses to the Magistrate Judge's Orders

The Magistrate Judge further supported her finding of willfulness based on K&K supposed attempt to "frustrate" and "foil" the Magistrate Judge's investigation. *See* Order at 41-42   But from the outset, K&K supported a process for identifying the leaker. *See* KSAX-43 at 1-3 (K&K, among others, was "committed to a process to identify [the] source" of the violation of the Protective Orders). The conduct that the Magistrate Judge cites to support her opposite conclusion does not support an inference of an attempt to "frustrate" or "foil" the investigation. K&K

submitted its declarations to the Court by the required deadlines and in compliance with the Magistrate Judge's Orders.  *See* ECF 7011, 7147.

Given that K&K's conduct throughout the investigation complied with the Magistrate Judge's directives, it is unreasonable to conclude that K&K attempted to "obstruct" the investigation because there were instances of other firms filing declarations before the deadline or because several declarations may have provided more detail than requested by the Magistrate Judge's orders.  Order at 41-42.

K&K, as the lead firm prosecuting the case against Saudi Arabia, had unique and pressing work product concerns that had to be resolved at the outset. Tr. 370:3-372:20 (Benett).  Saudi Arabia's motion demanded information to obtain the names of K&K's consultants and experts who had reviewed not only Jarrah's deposition but also the depositions of the central discovery subjects, Bayoumi and Thumairy.  ECF 6981.  One of the consultants who received the Transcript was working overseas and faced serious personal security issues.  Tr. 372:4-10; KK-52.  No other law firm faced similar work product issues.[14]

Nor did K&K use the "investigation as a forum to compound the damage caused by the breach."  Order 42.  In its declarations and at the hearing, K&K attorneys repeated the truth: that Fawcett confessed that he leaked the Transcript because of Jarrah's illicit background.  There is no way to state that fact without some "disparagement [of] Saudi Arabian personnel."  Order at 42.

K&K complied with the Magistrate Judge's investigation and orders in a timely fashion. Because the Magistrate Judge held K&K to a standard *after* her investigation that she did not

---

[14] As reflected in the declarations submitted to the Court, other plaintiffs' firms did not share the Jarrah and other two Saudi employee transcripts with any outside consultants and therefore did not have the same work product concerns as K&K.  *See, e.g.,* ECF 6992, Haefele Decl. ¶¶ 6, 12 (Motley Rice attorney: "I did not provide access to those transcripts" and after the Transcript was filed onto the firm's system "it was not accessed").

require *during* her investigation, this Court should reject the inference that K&K willfully breached the Protective Order because it allegedly sought to "obstruct" the Magistrate Judge's investigation.

### 4.      The Timing of Phone Calls

The only remaining circumstantial evidence cited by the Magistrate Judge to support her finding that the law firm willfully breached the Protective Order is her finding that "a series of suspicious communications" between Fawcett, Jim Kreindler, and Isikoff were "discussions about how to get the Al Jarrah Transcript into Isikoff's hands in violation of the Protective Order." Order 38-39; *but see Pauling*, 924 F.3d at 649 ("[a]n inference is not a suspicion or a guess" (citations and internal quotations omitted)).

But rather than being suspicious, Kreindler's communications with Isikoff in the weeks leading up to early July 2021 are consistent with what no party disputes: Jim Kreindler was a guest on Isikoff's podcast on July 1, 2021.  In the lead up to his appearance, Kreindler was in communications with Isikoff and other Yahoo! News personnel regarding the podcast.  ECF 7147-6 at 6.  Kreindler also made clear that his communications with Fawcett were to inquire whether "any part of the Jarrah deposition not marked confidential" that could be shared with Isikoff under the Protective Orders.  Tr. 61:19-62:9.

In refusing to credit Kreindler's testimony, the court found that it is "not reasonable that Kreindler would suspect that any portion of the deposition of a Saudi official would not be under seal just ten days after the deposition," as the Protective Orders required "Confidential Information to be kept confidential for at least 30 days."  Order at 9.  But it is no secret that Kreindler operates at the strategy level in the 9/11 litigation, with other K&K lawyers handling the discovery, depositions, and motion practice through the case.  *See, e.g.*, Tr. 310:10-16 (Benett) (describing the distribution of discovery work); *see also* Maloney Decl. ¶¶ 8, 14.  Indeed, Kreindler confirmed that he asked K&K staff, including, Fawcett, to send him documents located on the firm's

computers.  *See* Tr. 74:16-19 (Kreindler: "I need to ask someone like John, can you send me a particular document."); *see also see also* Tr. 89:14-22 (Kreindler: "I don't [know the details of the leak investigation]. Duke and Steve were working on it.").  Nor is it surprising that Kreindler (or any individual in this matter) would not recall from memory the details of two Protective Orders and seek clarification.  Kreindler testified that he "didn't remember at the time whether there was something innocuous that wasn't confidential" but after checking confirmed that the entire deposition was confidential.  Tr. 27:18-28:23.  And the length of the two so-called "suspicious" phone calls (one minute each from 12:22 p.m. to 12:23 p.m.) is consistent with Kreindler's testimony about asking a quick question.  *See* Order at 8 (Table 1).

The Magistrate Judge's inference from a 46-minute call between Fawcett and Kreindler in late July 2021 after the Yahoo! News article, operates on similar unfounded suspicion.  The Magistrate Judge wrongfully infers from the fact that Fawcett texted a criminal defense attorney, Elizabeth Crotty, who was a friend and former K&K employee, an hour before the call, and then spoke to that attorney for 22 minutes after the call, that the 46-minute call with Jim Kreindler (and possibly others) must have been about the leak.  Order 16-19.  There is no direct evidence from the hearing about the substance of the call with K&K lawyers other than the log reflecting the call took place—and neither Fawcett nor Jim Kreindler, who spoke with each other frequently about the 9/11 litigation, could recall the contents of the call but testified that it was not about the leak. Tr. 84:3-8 (Kreindler); Tr. 446:10-447:4 (Fawcett).  Fawcett testified that the leak was not discussed during the 46-minute call and surmised that due to the length of the call, that it was probably a conference call with others, as those usually last longer.  Tr. 446:9-20.

After the hearing, when Pounian had learned what was discussed while he was sequestered, he submitted a declaration with his Verizon bill for his personal cell phone, showing that he

participated in that 46-minute call. Order 18 n.8. His declaration further stated what was in fact

discussed on the call, and he corroborated that the call did not contain any discussion of Fawcett's

leak. *Id.* The Magistrate Judge declined to rely on this declaration, finding that it was hearsay and

unhelpful. *Id.*[15] And yet, knowing that this contrary evidence existed, she still drew the

unsubstantiated inference that Kreindler and Fawcett had a private conversation about the leak,

and used this July 22 call as purported circumstantial evidence of Kreindler's complicity. Order

at 19. The Magistrate Judge's opinion does not seek to reconcile the phone records reflecting that

Pounian was also on this work conference call for its duration.[16] Nor does it explain reasons for

discrediting Pounian's testimony. It simply declines to engage with it. *Id.*[17]

Further, it ignores the record evidence demonstrating that calls between Fawcett and K&K

such as that 46-minute July 22 were routine, Fawcett phone records are replete with daily calls

between Fawcett, Kreindler and other K&K personnel from before the Jarrah deposition through

K&K's discovery of the breach. *See* KSAX-133–136.

Although a fact finder is permitted to make reasonable inference from known facts, the

Court "may not credit inferences within the realm of possibility when those inferences are

---

[15] Because no advance notice was given of the exhibits (the phone log to be used), and because witnesses were sequestered, Pounian could not been aware that this call would be the subject of speculation as to its contents, or what Kreindler's testimony about it was. *See generally* Tr. 404-409. Under these circumstances, the Magistrate Judge should have at a minimum allowed K&K the opportunity to address and overcome any possible hearsay issue before making her ruling.

[16] The Magistrate mistakenly determined that because the log of the 46-minute call was not specifically labeled on the exhibit as "work product," the call must not have been related to work and was therefore related to the leak. Opinion at 17. The court itself had previously ordered that all of Fawcett's phone records be produced with redactions permitted only for his personal communications. ECF 7277 at 6. The court expressly ruled that all of Fawcett's work communications with K&K be produced, *id.*, and it was later agreed that only the names of K&K's outside consultants and experts could be redacted as work product. Based on the court's order, the phone call exhibits (which Fawcett's counsel prepared) list all calls between Fawcett and Kreindler personnel, and do not redact or mark any of those calls as work product. See, e.g., KSAX-136 (showing calls of Fawcett with Kreindler, Pounian, Benett, Maloney, and a Kreindler paralegal). The only calls marked as work product were calls between Fawcett and K&K's consultants and consultants.

[17] For this reason and others discussed, K&K respectfully requests that if this Court reconsiders this matter anew, it admits this evidence into the record. *See* 28 U.S.C. § 636(b)(1)(A), (C).

unreasonable." *Pauling*, 924 F.3d at 657.  Because the Magistrate Judge's finding is based on a suspicion and not a reasoned inference, *id.*, this Court should reject her finding that the calls between Fawcett and Kreindler were discussions on how to leak the Transcript.  Order 39.

Based on the full record, there is no preponderance of evidence to support the finding of willfulness, and there certainly is no clear-and-convincing evidence to support it.

### III.    The Sanctions Imposed on K&K Are Neither Just Nor Commensurate with Fawcett's Breach

The Magistrate Judge's Order was erroneous for a third independent reason: the sanctions imposed on K&K were not commensurate with Fawcett's violation of the Protective Orders.  Based on Fawcett's breach, the Magistrate Judge, nearly a year after the hearing, (i) immediately removed K&K from its leadership position on the PEC after nearly two decades; (ii) barred K&K from seeking compensation from the common benefit fund after the date of the breach (*i.e.*, July 5, 2021), in effect a significant monetary fine; and (iii) required K&K to pay Saudi Arabia's attorneys' fees incurred to determine who leaked the Transcript, which Saudi Arabia claims total $1.39 million.  *See* Order at 45-63.  In light of the full record in this case, these sweeping sanctions are not proportional to the breach and should be set aside.  *See* Fed. R. Civ. P. 72(a).

Although a court has discretion in imposing sanctions, there are "two basic limitations upon a district court's discretion in imposing sanctions pursuant to Rule 37(b)(2)."  *Daval Steel Prod. v. M/V Fakredine*, 951 F.2d 1357, 1366 (2d Cir. 1991).  The sanctions (i) "must be 'just'" and (ii) "must relate to the particular claim to which the discovery order was addressed."  *Id.*  To be just, "the severity of sanction[s] must be commensurate with the non-compliance."  *Shcherbakovskiy v. Da Capo Al Fine, Ltd.,* 490 F.3d 130, 140 (2d Cir. 2007).  Any sanction "must be weighed in light of the full record in the case."  *Cine Forty-Second Street Theatre Corp.*, 602 F.2d at 1068.

In determining whether sanctions are commensurate, *Shcherbakovskiy*, 490 F.3d at 140, courts in this Circuit often consider the harm caused, or prejudice suffered, in fashioning appropriate sanctions.  In *City of Almaty v. Ablyazov*, for example, the court concluded that a party's requested sanction, appointment of a special master to oversee discovery, was "not an appropriate remedy for the leak" of a deposition transcript because the sanction was "not necessary to make [the requesting party] whole."  2018 WL 1229730, at *7 n.2 (S.D.N.Y. Mar. 5, 2018).  Similarly, in *Jay v. Spectrum Brands Holdings, Inc.*, the court held that payment of reasonable attorneys' fees for breach of a protective order was an appropriate sanction because the breach did not provide "litigation advantage" or result in "any actual prejudice" to the opposing party, "commercially or in the context of this action."  2015 WL 6437581 (S.D.N.Y. Oct. 20, 2015).

In removing K&K from the PEC, including barring the firm from seeking any compensation from the common benefit fund after July 5, 2021, the Magistrate Judge failed to weigh the harm that resulted from the leak.  *See generally* Order at 45-59.  The Magistrate Judge in fact identified no harm to Saudi Arabia.  Although repeatedly referring to K&K leaking the Transcript to "obtain a litigation advantage," *see* Order at 46, 52, 63, 64, the court does not identify what that advantage might be, *see id.* at 46-47.  There is no evidence, for example, that the Transcript contains "Confidential Information or Material" as defined in the Protective Orders, which might give rise to a "litigation advantage" if improperly released.  ECF 1900.  Indeed, the Magistrate Judge found that the Yahoo! News article itself "does not suggest that the deposition was particularly revelatory" and that the Transcript is not clearly "important enough" to preclude its use in the case.  Order at 49.  To the extent that the Magistrate Judge suggests that the leak could cause embarrassment to Saudi Arabia and force a settlement, *see* Order at 2, there is no evidence in the record (and the court identifies none) that the leak of one embassy official's

36

**A170**

deposition transcript would cause a foreign sovereign to agree to a potentially multi-billion-dollar settlement. And, of course, sixteen months after the leak, no such result has occurred. If anything, removal of K&K from the PEC after nearly 20 years and six years leading the case against Saudi Arabia will only provide a litigation advantage to Saudi Arabia.

By contrast, the harm caused to 9/11 Plaintiffs by removing K&K from the PEC after years of work is real, not theoretical. K&K (along with co-counsel in some cases) represents more than 830 of the estates of those killed on September 11, 2001, as well as over 2,000 of their immediate surviving family members and more than 10,000 victims who suffered personal injury. *See* Corrected Declaration of Andrew Maloney ¶ 2, ECF 8613. K&K's attorneys have taken the lead role and handled nearly every aspect of this complex case against Saudi Arabia, including dispositive motions, overseeing a world-wide investigation, discovery motions, depositions, witness interviews and statements, and experts. *Id.* ¶¶ 3, 10-18. The wealth of knowledge and experience assembled by K&K from its prosecution of the case against Saudi Arabia is indispensable to the proper representation of the 9/11 Plaintiffs. Save for the retention of a single expert by Motley Rice, no other firm representing Plaintiffs was involved in the aforementioned investigatory and expert work, and motion practice. *Id.* ¶¶ 17-18. Given that K&K handled nearly every aspect of the litigation against Saudi Arabia, the availability of other law firms, Order at 49-50, does not mitigate the unfair prejudice to Plaintiffs by removing K&K from the PEC.

Nor does removing K&K from the PEC relate to any "particular claim to which the [Protective Orders were] addressed," or even to the purpose of the Protective Orders as a whole. *See Daval,* 951 F.2d at 1366. No claim or defense has been affected by the leak of the Transcript, and thus no remedial measures are necessary to re-level the playing field. Removing K&K from

**A171**

the PEC simply disadvantages the 9/11 Plaintiffs and serves no purpose in either mitigating the harm (if any) that has been caused Saudi Arabia, or preventing a similar event in the future.

The Magistrate Judge's sanctions are also out of step with other cases in this Circuit for similar violations of protective orders.  In *Koch v. Greenberg*, for example, the court sanctioned a party for leaking confidential documents to the press by requiring the party to pay the attorneys' fees incurred in bringing the Rule 37 motion and by precluding the party from using documents at any hearing or trial; the latter of which was later vacated.  2011 WL 4485975, at *4 (S.D.N.Y. Sept. 28, 2011), modified, 2012 WL 13063624 (S.D.N.Y. Aug. 23, 2012).  Similarly, in *Denis v. County of Nassau*, the court sanctioned a party that was grossly negligent in maintaining security leading to the leak of confidential documents by requiring payment of attorneys' fees in bringing the Rule 37 motion.  2019 WL 7372957, at *9 (E.D.N.Y. Dec. 31, 2019); *Abbott Laboratories v. Adelphia Supply USA*, 2017 WL 1732454, at *2 (E.D.N.Y. May 2, 2017) (same).  And in *Jay*, the court sanctioned a party whose lawyer revealed highly confidential attorney's eyes-only material to the client by requiring the party to pay the reasonable fees and costs of the sanctions motion, while declining to disqualify the attorney or preclude evidence.  2015 WL 6437581, at *9 (S.D.N.Y. Oct. 20, 2015); *see also id.* at *6 n.3 (invoking, in part, the court's inherent powers).

The Magistrate Judge's reasoning for imposing such harsh sanctions, on its own terms, does not justify the broad sanctions imposed.  *See* Order at 46-59.  Given the extreme trust and respect K&K attorneys had for Fawcett, their accepting his denial of guilt in the early stages of K&K's investigation is understandable.  K&K's investigation, moreover, had difficulty detecting his leak of the Transcript, in light of Fawcett's lies and substantial efforts to cover up his misconduct.  This does not rise to the level of "willful" conduct by K&K or its attorneys.  Nor, as explained above, was there a litigation advantage to be had.  *Cf.* Order at 46-47.  Although the

38

**A172**

breach is permanent, Order at 50-51, there is no evidence of harm caused to Saudi Arabia.  Nor is there any potential for future harm as the Magistrate Judge found that the deposition was not "particularly revelatory," and not clearly "important" enough to strike.  *See* Order at 49.

The Magistrate Judge justified the sanctions against K&K in part because of other purported breaches of the Protective Order.  *See* Order at 52-54.  But in this decades-long litigation, K&K has never been accused of intentionally leaking a document or deposition designated as confidential until Fawcett's breach.  Each of the unrelated incidents cited by the Magistrate Judge did not rise to the level of an intentional breach.  For example, Brian Weidner, an authorized consultant of K&K who had investigated Jarrah previously and was entitled to review the Transcript under the Protective Orders, viewed a small portion of the Jarrah's deposition while visiting the K&K offices without being listed on the appearance sheet.  *See* ECF 7384-1; ECF 1900 at 12; ECF 4255 at 2.  The technical breach involving *Politico* likewise did not involve the leak of a confidential document.  That incident involved the disclosure of a phone number that was otherwise publicly available and listed on Saudi Embassy stationery; while correspondence, marked confidential, was written on that stationary, the confidential contents of the letter itself were not disclosed.    ECF 3619 at 4:2-5:1, 9:6-7.  The MPS materials provided by the United Kingdom, which stated the materials were no longer classified or protected as confidential (ECF 8114 at 3; ECF 7831-1 at ¶¶ 19-21) and which Saudi Arabia did not designate as "confidential" pursuant to the procedures set forth in the Protective Order (*see* ECF 1900 at 8-10) for a month after K&K provided express notice of its position that the materials were "not subject to any confidentiality or sealing orders" (ECF 8114 at 3), could be viewed as a "minor incident" standing alone (according to the Magistrate Judge), and occurred long after the hearing at issue in this matter.  ECF 8066 at 7.  It was improper for the Magistrate Judge to bolster her sanctions finding

based on these unrelated events, particularly when K&K's objections to her finding on the MPS materials remain unresolved, ECF 8113, 8195, when the Magistrate Judge previously viewed these as technical and not willful, ECF 3629 at 9:19-20, and when any issues with K&K's document security (which the court criticized) have been remedied through significant (and expensive) steps to solidify the firm's data infrastructure, *see* ECF 8614 at 1-2; ECF 8615.

The Magistrate Judge's decision against imposing lesser sanctions turned heavily on her belief that financial sanctions are not viable where there are large *potential* damages awards at stake. Order at 48. But that rationale assumes that K&K will in fact secure money damages against Saudi Arabia, and assumes further that K&K will then be able to collect on the judgment in the near future. The Magistrate Judge herself acknowledged, "this case is likely to continue for many years." Order at 62. Given the speculative nature of a monetary award, the Order does not explain why financial sanctions alone are insufficient. To the extent that deterrence is a relevant consideration, a reasonable monetary sanction would serve the purpose of specific and general deterrence in this case, while not punishing 9/11 victims and their families who are blameless. *See Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988).

The broad sanctions levied against K&K were not just and should be set aside.

## <u>CONCLUSION</u>

For the foregoing reason, this Court should set aside the Magistrate Judge's sanctions against K&K. Fed. R. Civ. P. 72(a).

Dated: October 25, 2022
      New York, New York

                                        Respectfully submitted,

                                     */s/ Edward M. Spiro*

| | |
|---|---|
| Emily Kirsch | Edward M. Spiro |
| Paul Niehaus | MORVILLO ABRAMOWITZ GRAND |
| KIRSCH & NIEHAUS PLLC |   IASON & ANELLO P.C. |
| 950 Third Avenue, 19th floor | 565 Fifth Avenue |
| New York, NY 10022 | New York, NY 10017 |
| (212) 832-0170 | (212) 856-9600 |
| emily.kirsch@kirschniehaus.com | espiro@maglaw.com |

**A175**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE TERRORIST ATTACKS ON
SEPTEMBER 11, 2001

No. 03-MD-01570 (GBD) (SN)

This document relates to: *All Actions*

ORAL ARGUMENT REQUESTED

---

### KREINDLER & KREINDLER LLP'S NOTICE OF MOTION TO STAY NONMONETARY SANCTIONS PENDING RESOLUTION OF RULE 72 OBJECTIONS

PLEASE TAKE NOTICE that, upon the corrected declaration of Andrew J. Maloney, III, dated October 5, 2022, *see* ECF No. 8613; the accompanying supplemental declaration of Andrew J. Maloney, III, dated November 3, 2022; the memorandum of law in support of Kreindler & Kreindler LLP's ("K&K") motion to stay sanctions pending resolution of Rule 72 objections, dated October 4, 2022, *see* ECF No. 8608; and K&K's Rule 72 objections, dated October 25, 2022, *see* ECF No. 8681, K&K will move this Court before the Honorable George B. Daniels, United States District Judge, at the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York 10007, on December 8, 2022 at 10:00 a.m., for an order pursuant to Rules 62 and 72(a) of the Federal Rules of Civil Procedure and/or the Court's inherent authority, granting a stay of the nonmonetary sanctions entered against K&K in Magistrate Judge Sarah Netburn's Opinion and Order dated September 21, 2022, *see* ECF No. 8544, pending resolution of K&K's Rule 72 objections, and awarding such other and further relief as the Court deems just and proper.[1]

---

[1] For the reasons set forth in K&K's Rule 72 objections, the Court should either modify or set aside all sanctions against K&K. *See* Fed. R. Civ. P. 72(a). While the instant motion requests a stay of the nonmonetary sanctions only, K&K has noted in its briefing regarding reasonable monetary sanctions that Magistrate Judge Netburn should stay consideration of such sanctions, pending resolution of K&K's Rule 72 objections, as a matter of judicial economy. *See* ECF No. 8685 at 5-6.

PLEASE TAKE FURTHER NOTICE that, pursuant to Local Civil Rule 6.1(b), answering papers shall be served by November 17, 2022.

Dated: November 3, 2022
     New York, New York

                                               _/s/ Edward M. Spiro_

Emily Kirsch                          Edward M. Spiro
Paul Niehaus                         MORVILLO ABRAMOWITZ GRAND
KIRSCH & NIEHAUS PLLC           IASON & ANELLO P.C.
950 Third Avenue, 19th Floor     565 Fifth Avenue
New York, NY 10022            New York, NY 10017
(212) 832-0170                  (212) 856-9600
emily.kirsch@kirschniehaus.com   espiro@maglaw.com

                  _Counsel for Kreindler & Kreindler LLP_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE TERRORIST ATTACKS ON
SEPTEMBER 11, 2001

No. 03-MD-01570 (GBD) (SN)

This document relates to: *All Actions*

## SUPPLEMENTAL DECLARATION OF ANDREW MALONEY
## IN SUPPORT OF KREINDLER & KREINDLER LLP'S MOTION TO STAY

I, Andrew J. Maloney, III, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of

perjury the following:

1.    I submit this declaration to supplement my October 5, 2022 corrected declaration,

ECF No. 8613, in support of the renewed motion of Kreindler & Kreindler LLP ("K&K") to stay

the Opinion and Order of Magistrate Judge Sarah Netburn, dated September 21, 2022 (the

"Order"), insofar as it ordered the immediate removal of K&K from the Plaintiffs' Executive

Committee for Death and Injury Claims ("PEC" or "Committee").[1]  ECF No. 8544.  In its

October 17, 2022 Memorandum Decision and Order, this Court denied "without prejudice"

K&K's motion by proposed order to show cause for a stay pending resolution of K&K's then-

anticipated Rule 72 objections, ECF No. 8607, and scheduled oral argument of those objections

for December 8, 2022.  ECF No. 8642.  On October 25, 2022, K&K filed its objections (the

"Objections").  ECF No. 8681.  K&K is filing the instant motion returnable on December 8,

2022, so that this Court can consider during oral argument of the Objections whether to stay that

---

[1] For clarity, "PEC" or "Committee" refers only to the Plaintiffs' Executive Committee for Death and Injury Claims,
not the Plaintiffs' Executive Committee for Commercial Claims, which is referenced herein as the "Commercial
Claims PEC."

**A178**

portion of the Order immediately removing K&K from the PEC pending the resolution of the Objections, because of the threat of irreparable harm to the 9/11 death and injury plaintiffs. Such removal, before resolution of the Objections, causes a drastic change in a nearly 20-year status quo.

2.      As stated in my corrected declaration dated October 5, 2022, K&K continues at this time to assemble the proof, actively investigate the facts, and develop evidence as part of the prosecution of the case against Defendant Kingdom of Saudi Arabia ("Saudi Arabia"). That work involves close and trusted relationships between K&K and investigators, consultants and experts who have worked solely with K&K during this litigation. The immediate removal of K&K from the PEC threatens harm to the development of K&K's investigatory and discovery work to the detriment of all 9/11 death and injury plaintiffs. While K&K can provide further details, it can do so at the present time only on an *ex parte* basis, to protect its work product.

3.      In addition, it is expected that the PEC will be required to address a series of key matters in the coming months. Pending before Magistrate Judge Netburn are motions under Federal Rule of Civil Procedure 54 to revise this Court's prior March 2018 order, and for further discovery. ECF Nos. 7431, 7481. Once these motions are decided, the PEC must immediately make strategic decisions and take the proper steps to move the litigation forward. Saudi Arabia has already made clear that it seeks to file a renewed motion to dismiss. *See* ECF No. 8542 (denying Saudi Arabia's motion for a schedule for its motion to dismiss "without prejudice to renew following the resolution of the Rule 54 motions"). If after the Magistrate Judge's rulings Saudi Arabia renews its motion to dismiss, the PEC must work promptly to assemble and prepare the vast factual record—including depositions, documents, witness statements, and expert reports. K&K's role in developing the factual record against Saudi Arabia has been unique and

2

**A179**

the knowledge, familiarity, and relationships that K&K has developed over the past five years cannot be readily replaced. The immediate removal of K&K from the PEC in connection with that briefing would thus irreparably harm all of the wrongful death and personal injury plaintiffs.

4. The immediate removal of K&K from the PEC has and will continue to negatively impact the proper functioning of this litigation and representation of all plaintiffs in other areas as well. The PEC structure encouraged the death and injury firms to work together (and join with the Commercial Claims PEC led by Cozen O'Connor P.C. on issues where our interests were aligned) to present a single submission to the Court on behalf of all plaintiffs. The PEC structure with K&K and Motley Rice LLC as co-lead counsel motivated counsel to resolve disagreements, incorporate different viewpoints, and keep separate pleadings to a minimum.

5. Without that structure, the PEC does not have the same incentive to work cooperatively and collaboratively. One example of the issues arising out of the new PEC structure occurred last week, when the newly reconstituted PEC, now absent K&K and led solely by Motley Rice, filed its response to Magistrate Judge Netburn's request for a proposal on how to proceed with pending motions for judgments against the Taliban in a way that permits plaintiffs to "proceed on equal footing with one another." ECF No. 8590. The response of the PEC (which filed its letter jointly with the Commercial Plaintiffs PEC) included only one proposal to the Magistrate Judge that did not include the alternate proposal of the *Ashton* Plaintiffs, who constitute approximately one-quarter of the wrongful death plaintiffs (and a vast majority of the injury plaintiffs). *See* ECF No. 8663. Writing on behalf of the *Ashton* Plaintiffs, Speiser Krause P.C. advised the Magistrate Judge that the PEC "denied [*Ashton's*] requests to include this proposal in their letter to the Court and failed to also inform the Court that the *Ashton* plaintiffs objected to the single proposal contained in that letter." ECF No. 8666. This

3

**A180**

example, among others, arises directly from an immediate and fundamental shift in the PEC's structure after a nearly 20-year status quo.

6.    As detailed in K&K's Rule 72 objections, (i) the Magistrate Judge issued sanctions against K&K under Rule 37(b) without authorization, (ii) the Magistrate Judge's finding that K&K "willfully breached" the governing protective orders cannot be sustained as a matter of law in light of the full record, and (iii) the sanctions imposed on K&K are neither just nor commensurate with the breach. ECF No. 8681. For these reasons and the reasons stated above, the pending risk of irreparable harm to 9/11 death and injury plaintiffs, coupled with the imposition of sanctions contrary to law, warrant the requested stay of K&K's immediate removal from the PEC, pending resolution of K&K's Objections.

Dated: New York, New York
      November 3, 2022

Andrew J. Maloney, III

**A181**

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

_____ )

IN RE:  TERRORIST ATTACKS ON )     Civil Action No. 03 MDL 1570 (GBD) (SN)
SEPTEMBER 11, 2001 )     ECF Case
_____ )

This document relates to:  *All Actions*

## SAUDI ARABIA'S OPPOSITION TO KREINDLER & KREINDLER'S
## RULE 72 OBJECTIONS TO THE SEPTEMBER 21, 2022 OPINION & ORDER

Michael K. Kellogg
Mark C. Hansen
Gregory G. Rapawy
Andrew C. Shen
Christopher M. Young
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036-3209
(202) 326-7900
(202) 326-7999 (fax)

*Attorneys for the Kingdom of Saudi Arabia*

**A182**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ...................................................................................................................... 1

FACTUAL BACKGROUND AND PROCEDURAL HISTORY ............................................... 2

    A.    Kreindler & Kreindler, Its Team, and Its Litigation Strategy .................................. 2

    B.    This Court's Protective Orders and Kreindler & Kreindler's
        Past Violations .......................................................................................................... 3

    C.    The Al Jarrah Deposition and Fawcett's Leak of the Transcript ............................ 4

    D.    Kreindler & Kreindler's Purported Investigation of the Leak ................................ 6

    E.    Saudi Arabia's Email and Kreindler's and Fawcett's Responses ........................... 8

    F.    Saudi Arabia's Motion, the August 12 Order, and Kreindler &
        Kreindler's Responses ............................................................................................ 10

    G.    The August 30 Order and Kreindler & Kreindler's Responses ............................ 12

    H.    The Evidentiary Hearing and the Attorneys' Testimony ..................................... 16

    I.    Kreindler & Kreindler's Additional Post-Hearing Violation ............................... 17

    J.    Judge Netburn's Opinion & Order ....................................................................... 17

STANDARD OF REVIEW ...................................................................................................... 19

ARGUMENT ............................................................................................................................ 20

I.    Judge Netburn's Order Was Not Contrary to Law Under Rule 37(b) .............................. 20

    A.    Kreindler & Kreindler Forfeited Any Argument That It Cannot Be
        Sanctioned Under Rule 37(b) ................................................................................. 20

    B.    Judge Netburn Had Authority To Sanction Kreindler & Kreindler
        Under Rule 37(b)(2)(A) ......................................................................................... 21

II.    The Evidence Supports Judge Netburn's Factual Findings ............................................. 27

    A.    Judge Netburn Reasonably Determined That Kreindler Knew of or
        at Least Tacitly Consented to Fawcett's Actions .................................................. 28

B.      Judge Netburn Reasonably Determined That Kreindler & Kreindler's
Breach of the Protective Orders Was Willful ................................................32

III.    Judge Netburn's Sanctions Against Kreindler & Kreindler Are Just
and Reasonable ..........................................................................................36

A.      Judge Netburn Considered the Appropriate Factors Under
Circuit Precedent.........................................................................................36

B.      Kreindler & Kreindler Fails To Show an Abuse of Discretion ............................37

CONCLUSION.............................................................................................................40

# TABLE OF AUTHORITIES

Page

**CASES**

*Abbott Labs. v. Adelphia Supply USA*, 2017 WL 1732454 (E.D.N.Y. May 2, 2017) ...........................................................................................................39

*Am. Cash Card Corp. v. AT&T Corp.*, 2000 WL 357670 (2d Cir. Apr. 6, 2000) ........................22

*AMR Servs. Corp. v. Int'l Bhd. of Teamsters*, 821 F.2d 162 (2d Cir. 1987)............................ 30-31

*Apex Oil Co. v. Belcher Co. of New York*, 855 F.2d 1009 (2d Cir. 1988) ....................................26

*Avago Techs., Inc. v. IPtronics Inc.*, 2015 WL 3640626 (N.D. Cal. June 11, 2015)....................25

*Blackrock Allocation Target Shares:  Series S. Portfolio v. Wells Fargo Bank, N.A.*, 2018 WL 3863447 (S.D.N.Y. Aug. 13, 2018)...........................................................19

*BS BIG V, LLC v. Philadelphia Indem. Ins. Co.*, 2022 WL 4181823 (S.D.N.Y. Sept. 13, 2022)...............................................................................................20

*CEATS, Inc. v. TicketNetwork, Inc.*, 2021 WL 3738847 (E.D. Tex. Aug. 24, 2021), *appeals pending*, Nos. 21-40705, 22-40028 (5th Cir.);...........................................25

*Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062 (2d Cir. 1979)...........................................................................................22

*City of Almaty, Kazakhstan v. Ablyazov*, 2018 WL 1229730 (S.D.N.Y. Mar. 5, 2018) ...................................................................................................................37, 38, 40

*Copeland v. Rosen*, 194 F.R.D. 127 (S.D.N.Y. 2000), *remanded*, 25 F. App'x 17 (2d Cir. 2001)...................................................................................................................22

*Daval Steel Prods., a Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357 (2d Cir. 1991)...................................................................................................................18

*Denis v. County of Nassau*, 2019 WL 7372957 (E.D.N.Y. Dec. 31, 2019) .................................39

*Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 128 F.3d 99 (2d Cir. 1997).........................23, 24

*Friends of Animals Inc. v. U.S. Surgical Corp.*, 131 F.3d 332 (2d Cir. 1997) ............................27

*Hyman v. Brown*, 927 F.3d 639 (2d Cir. 2019).............................................................................31

*Jay v. Spectrum Brands Holdings, Inc.*, 2015 WL 6437581 (S.D.N.Y. Oct. 20, 2015) ...................................................................................................................................38, 39

*Keurig Green Mountain Single-Serve Coffee Antitrust Litig., In re*, 336 F.R.D. 400 (S.D.N.Y. 2020) .......................................................................................21

**A185**

*Khaldei v. Kaspiev*, 961 F. Supp. 2d 572 (S.D.N.Y. 2013) ...........................................................19

*Koch v. Greenberg*, 2011 WL 4485975 (S.D.N.Y. Sept. 28, 2011), *modified*,
    2012 WL 13063624 (S.D.N.Y. Aug. 23, 2012)...................................................................39

*Leviton Mfg. Co. v. Greenberg Traurig LLP*, 2011 WL 2946380
    (S.D.N.Y. July 14, 2011) ....................................................................................................19

*Link v. Wabash R.R. Co.*, 370 U.S. 626 (1962)................................................................................22

*Lugosch v. Congel*, 443 F. Supp. 2d 254 (N.D.N.Y. 2006) ...........................................................19

*Mahboob v. Educ. Credit Mgmt. Corp.*, 2021 WL 7448532 (S.D. Cal. Mar. 31,
    2021) ................................................................................................................................24, 25

*Markus v. Rozhkov*, 615 B.R. 679 (S.D.N.Y. 2020) .....................................................................24

*Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291 (2d Cir. 1979) ..............................................37

*MASTR Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real Est. Sec. Inc.*,
    2013 WL 6840282 (S.D.N.Y. Dec. 27, 2013) ...................................................................19

*Novick v. AXA Network, LLC*, 2014 WL 12797254 (S.D.N.Y. Mar. 19, 2014) ...........................19

*NPF Franchising, LLC v. SY Dawgs, LLC*, 37 F.4th 369 (6th Cir. 2022) ...............................26, 27

*O'Connor v. Uber Techs., Inc.*, 2017 WL 3782101 (N.D. Cal. Aug. 31, 2017)......................24, 25

*Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S. 120 (1989) .................................................26

*Pereira v. Narragansett Fishing Corp.*, 135 F.R.D. 24 (D. Mass. 1991) .....................................24

*S. New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123 (2d Cir. 2010) .........................36, 37

*SEC v. McNulty*, 137 F.3d 732 (2d Cir. 1998)...............................................................................22

*Shipstad v. One Way or Another Prods., LLC*, 2017 WL 2462657
    (S.D.N.Y. June 6, 2017)......................................................................................................22

*Smith v. Bradley Pizza, Inc.*, 2019 WL 430851 (D. Minn. Feb. 4, 2019),
    *objections overruled*, 2019 WL 2448575 (D. Minn. June 12, 2019),
    *aff'd*, 821 F. App'x 656 (8th Cir. 2020) ......................................................................24, 25

*Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486 (5th Cir. 2012) .....................22

*Steward, In re*, 529 B.R. 903 (E.D. Mo. 2015), *aff'd*, 828 F.3d 672 (8th Cir. 2016)...................24

*United States v. Isiofia*, 370 F.3d 226 (2d Cir. 2004) ...................................................................28

**A186**

*Williams v. Beemiller, Inc.*, 527 F.3d 259 (2d Cir. 2008) .............................................................19

*Woodman v. WWOR-TV, Inc.*, 411 F.3d 69 (2d Cir. 2005) ........................................................30

*World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155
    (2d Cir. 2012).............................................................................................................36, 37

## CONSTITUTION, STATUTES, AND RULES

U.S. Const. amend. I ....................................................................................................................12

28 U.S.C. § 636(b)(1)(A).............................................................................................................19

Fed. R. Civ. P.:

    Rule 11 ...........................................................................................................................26

    Rule 11(c).......................................................................................................................26

    Rule 37 ................................................................................................................20, 24, 25

    Rule 37(b) ..............................................................................................1, 20, 21, 22, 23, 27

    Rule 37(b)(2)..............................................................................................18, 22, 25, 38

    Rule 37(b)(2)(A) ..............................................................18, 21, 22, 23, 24, 25, 26, 27

    Rule 37(b)(2)(A)(vii) ...................................................................................................24

    Rule 37(b)(2)(C) ...........................................................................................................24

    Rule 37(b)(2)(D) (1997) ...............................................................................................24

    Rule 37(c) (1987) ..........................................................................................................26

    Rule 37(d) ......................................................................................................................26

    Rule 37(d)(1)(A) ...........................................................................................................26

    Rule 37(d)(3).............................................................................................................26, 27

    Rule 72(a).............................................................................................................19, 20, 27

**A187**

# INTRODUCTION

Judge Netburn appropriately removed Kreindler & Kreindler LLP ("Kreindler & Kreindler") from the Plaintiffs' Executive Committees ("PECs") as a sanction for that firm's willful breach of this Court's orders by sending a confidential transcript to a journalist and for its failed attempts to conceal its misconduct from the Court.  ECF No. 8544 ("Op.").  After a two-day evidentiary hearing in which Kreindler & Kreindler attempted to pin blame solely on its researcher and investigator John Fawcett, Judge Netburn rejected its story.  She found instead that supervising attorney James Kreindler "deliberate[ly] coordinat[ed]" the breach with Fawcett, Op. 46, and that Fawcett acted with Kreindler's "knowledge or at least tacit consent," Op. 2.

Judge Netburn further found that others at the firm, "at best, [made] efforts to remain willfully unaware of what Kreindler and Fawcett did, and at worst, active[ly] collu[ded] in a cover-up."  Op. 39.  Attorneys Andrew Maloney, Megan Benett, and Steven Pounian "obstructed the investigation," Op. 2; made "knowingly misleading statements to the Court," *id.*; and tried "to use the Court's investigation as a forum" for "introduc[ing] gratuitous and irrelevant material to disparage Saudi Arabian personnel," Op. 42.  Having "lost faith in the firm's ability to comply with court orders or appear before the Court on behalf of all the September 11 victims," Op. 2, Judge Netburn removed Kreindler & Kreindler from the PECs, reduced its ability to lay claim to other firms' recoveries, and ordered it to pay attorneys' fees.

Kreindler & Kreindler now asks this Court to set aside Judge Netburn's decision.  It argues that the Court's sanctions authority under Federal Rule of Civil Procedure 37(b) does not extend to law firms that violate court orders; that Judge Netburn was required to believe the testimony of witnesses she found untruthful; and that she exceeded her broad discretion to select appropriate sanctions.  Those meritless arguments are foreclosed by the deferential standard of review that applies to her ruling.  Kreindler & Kreindler's objections should be overruled.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

A.      **Kreindler & Kreindler, Its Team, and Its Litigation Strategy**

Kreindler & Kreindler represents the plaintiffs in *Ashton v. al Qaeda Islamic Army*,

No. 1:02-cv-06977-GBD-SN, among other cases.  From 2004 until September 21, 2022,

Kreindler & Kreindler attorneys served on the PECs in this litigation.  The leader of the

Kreindler & Kreindler team is James Kreindler.  Op. 6.  Other relevant Kreindler & Kreindler

attorneys include partner Andrew Maloney, a former federal prosecutor; partner Megan Benett;

and counsel Steven Pounian.  The firm is working on a contingent-fee basis and expects a

substantial recovery if it prevails.  *Id.* (citing Tr. 23:1-24:2).[1]

Researcher and investigator John Fawcett was also part of the Kreindler & Kreindler

team.  For more than 20 years, Fawcett managed discovery materials and other documents for

this case.  Op. 7 (citing Tr. 40:5-9, 416:12-18); *see also* Op. 40 (quoting Kreindler's testimony

that Fawcett "was 'at the heart of the documents,' " Tr. 39:3).  The firm gave Fawcett a Kreindler

& Kreindler email address, phone, and office, and access to a proprietary internal computer

server.  Op. 7 (citing Tr. 148:8-10, 148:14-149:6).  His work for Kreindler & Kreindler generated

80 to 90 percent of his income.  *Id.* (citing Tr. 416:9-11).

Based on the testimony at the hearing, Judge Netburn found that Fawcett has "substantial

loyalty" to Kreindler & Kreindler and to James Kreindler personally, and that the firm is loyal to

Fawcett in return.  *Id.*  For example, "in a tearful moment at the evidentiary hearing, Kreindler

said that only his own father could surpass Fawcett for honest[y] and nobility."  Op. 7-8

(citing Tr. 128:24-129:1).  Maloney, Pounian, and Benett each also praised Fawcett.  Op. 8.

---

[1] References to "Tr." mean the transcript for the hearing held by Judge Netburn on
November 1 and 2, 2021, which is publicly docketed at ECF Nos. 8670-1 and 8670-2.

Kreindler & Kreindler "aggressively promotes its litigation narrative in the press," and doing so is a "central part" of the firm's litigation strategy – it talks to the press in an effort to "pressure" Saudi Arabia into settling.  Op. 1, 6, 37 (citing Tr. 25:3-5, 25:21-24).  Fawcett was "instrumental" in those efforts.  Op. 6.  He spoke to reporters directly and provided them with documents.  Op. 6-7.  His "standard procedure" was to "s[eek] approval from senior Kreindler & Kreindler personnel before providing materials to reporters."  Op. 7 (citing Tr. 209:3-5).

**B.      This Court's Protective Orders and Kreindler & Kreindler's Past Violations**

The sanctions Judge Netburn imposed were based on violations of two protective orders.  The first order (the "MDL Protective Order"), entered by Judge Casey in 2006, limits the use of discovery material, with special protections for information designated as confidential.  Op. 3-4 (citing ECF No. 1900 at 8).  The second order (the "FBI Protective Order"), entered by Judge Netburn in 2018, protects information the FBI has designated as confidential.  Op. 4 (citing ECF No. 4255).  Both orders prohibit disclosure of confidential information except to certain categories of individuals – mostly attorneys and their staff.  *Id.*  Both provide that depositions discussing confidential information shall remain wholly confidential for at least 30 days.  *Id.*

Because the protective orders limit what information Kreindler & Kreindler can disclose to the press, the entire Kreindler & Kreindler team "hates" the orders.  Op. 5 (citing Tr. 210:7-14).  Kreindler has been "particularly vociferous" in his public attacks on the protective orders.  *Id.*  He has expressed that he is "'angered and disgusted with the protective orders that the FBI and Saudi Arabia have insisted on.'"  *Id.* (quoting Tr. 29:18-21).  He has described the orders in "vitriolic terms" such as "'gag orders,'" "'disgusting,'" "'hated,'" and "'a damn gag order imposed on us by the Saudis, our Department of Justice, and the court.'"  Op. 5, 37 (quoting Tr. 29:1-25).

In 2017, Kreindler & Kreindler breached the MDL Protective Order.  Op. 5.  This breach occurred when Fawcett gave a reporter at *Politico* magazine a "specific description of a

confidential document" while explaining how Kreindler & Kreindler used that document to advance its investigation. *Id.* (citing KSAX-0010 at 4:2-5:1, 9:6-7).[2]  Kreindler was the only person from his firm other than Fawcett who spoke to that reporter. *Id.* (citing Tr. 38:3-8).  At that time, Judge Netburn issued a "'first warning,'" admonishing Kreindler to "'be more careful as you continue to litigate this case, including given that you are an executive member of the plaintiffs' executive committee.'"  *Id.* (quoting KSAX-0010 at 10:2, 13:12-15).  Kreindler & Kreindler took no action to prevent further protective order violations following this breach: no discipline of Fawcett, no limits on his access to confidential information, and no restrictions on his interactions with the press.  Op. 5-6 (citing Tr. 38:12-24, 40:19-24).

**C.**     **The Al Jarrah Deposition and Fawcett's Leak of the Transcript**

On June 17 and 18, 2021, Benett deposed Musaed Al Jarrah.  Op. 8.  Fawcett then violated the MDL and FBI Protective Orders by sending a copy of the Al Jarrah deposition transcript to journalist Michael Isikoff of *Yahoo! News*.  Although Kreindler and Fawcett testified that Fawcett acted alone, Judge Netburn did not believe them.  She weighed evidence including Kreindler & Kreindler's financial "motive for the leak," Op. 37; the "extreme reciprocal loyalty between Fawcett and Kreindler," Op. 9, 43; their past method of "tag-team[ing]" journalists with confidential documents, Op. 37-38; a series of "suspicious communications" between Kreindler, Fawcett, and Isikoff for which Kreindler and Fawcett had no "credible explanation," Op. 38; and Kreindler & Kreindler's efforts (discussed below) to "resist[ ] the Court's investigation of the breach," Op. 44.  Considering those facts, along with her first-hand observation of the witnesses' testimony and demeanor, she found that Fawcett sent

---

[2] References to "KSAX" and "K&K Ex." mean exhibits that were (1) admitted at the hearing; (2) admitted by post-hearing order, ECF No. 7369; or (3) as indicated by parentheticals accompanying the first citation, filed on ECF and therefore part of the record. *See* Op. 3 n.3.

the transcript "with [Kreindler's] knowledge or at least tacit consent," as part of a "coordinated campaign" in which Fawcett "t[ook] his direction from Kreindler."  Op. 2, 37, 44.

Kreindler's and Fawcett's communications with Isikoff began on June 21, 2021, shortly after the Al Jarrah deposition, and included phone calls from Isikoff to Kreindler and Fawcett to Kreindler on the morning of June 28.  Op. 8 (citing KSAX-0134; KSAX-0142).  On July 3, five days after Kreindler's calls, Fawcett and Isikoff exchanged a flurry of phone calls and electronic messages using the Signal application.  Op. 9-10 (citing KSAX-0082 at 1-3; KSAX-0134).  These exchanges started with a 22-minute phone call from Fawcett to Isikoff on the afternoon of July 3.  Op. 10.  A few phone calls later, Isikoff sent a Signal message saying, "'Try calling me – it's not going through on signal.'"  Id. (quoting KSAX-0082 at 1).  A series of Signal calls followed.  On July 5, Isikoff asked Fawcett via Signal whether another deponent "'also invoke[d] the Vienna convention,'" suggesting that Isikoff had read the Al Jarrah transcript by that time.  Id. (quoting KSAX-0082 at 3; citing Tr. 435:19-24) (alteration in original).

Judge Netburn found that "the calls between Kreindler, Fawcett, and Isikoff were discussions about how to get the Al Jarrah Transcript into Isikoff's hands in violation of the Protective Orders."  Op. 39.  She declined to credit Kreindler's contrary testimony that he told Isikoff that he would find out whether he could disclose part of the Al Jarrah transcript, that he asked Fawcett, and that Fawcett said no.  Op. 9 (citing Tr. 61:19-62:9).  Judge Netburn did not believe that explanation because it required her to accept that Kreindler was "completely ignorant of the requirements of the Protective Orders," which made the transcript confidential for at least 30 days; and that "Fawcett would betray his friend and long-time employer by leaking the transcript to Isikoff a little more than a week after a call where he and Kreindler allegedly agreed that the transcript could not be sent to Isikoff."  Op. 9, 38.

After Fawcett sent the transcript to Isikoff, Kreindler and Fawcett each continued to communicate with Isikoff.  Op. 11.  On July 10, 2021, Isikoff released an episode of his podcast *Conspiracyland* in which he and Kreindler discussed this litigation.  Op. 6 & n.4.  On July 12, Fawcett emailed Isikoff a copy of the FBI privilege log listing documents that the Department of Justice ("DOJ") had withheld.  Op. 11 (citing KSAX-0056F at 13-23).  Kreindler testified that he knew Fawcett gave the log to Isikoff and that Fawcett "'[p]robably did so at his direction.'"  *Id.* (quoting Tr. 66:3-21) (alteration in original).  Benett later testified that Kreindler told her in September 2021 that he was "'not aware that Fawcett had sent the privilege log back in July.'" *Id.* (quoting Tr. 387:3-6).  On July 13, Kreindler and Isikoff emailed about Plaintiffs' "'request to DOJ to lift the state secrets privilege and gag order.'"  *Id.* (quoting KSAX-0056F at 24-27).

On July 15, 2021, Isikoff published his article about Al Jarrah's deposition on *Yahoo! News*.  *Id.*  The article, titled "FBI Tried to Flip Saudi Official in 9/11 Investigation," stated that *Yahoo! News* had obtained a copy of the confidential Al Jarrah deposition transcript.  *Id.*

## D.     Kreindler & Kreindler's Purported Investigation of the Leak

The publication of Isikoff's article on July 15, 2021 purportedly set off an "internal investigation" at Kreindler & Kreindler.  Op. 11.  The first part ran from July 15 to July 29, 2021.  Op. 12 (citing Tr. 69:24-70:13, 172:14-24).  Judge Netburn found that "the firm failed to take basic investigative steps in an investigation that conspicuously failed to consider Fawcett in any meaningful way," Op. 16, and that the inquiries made by Maloney, who performed the investigation, were "neither professional nor comprehensive," Op. 12.  She found that the "conduct" of Maloney and his colleagues "reflect[ed], at best, efforts to remain willfully unaware of what Kreindler and Fawcett did, and at worst, active collusion in a cover-up."  Op. 39.

Maloney testified that he began his investigation "confident" that Kreindler & Kreindler "wasn't the source of the leak."  Tr. 212:3-5; *see* Op. 12, 39 (citing Tr. 212:3-5, 212:25-213:6,

219:20-25).  He made no lists of witnesses to interview or of questions to ask.  Op. 12, 39-40

(citing Tr. 215:17-25).  He did not ask anyone whether they had contacted Isikoff, and did not

even speak with a Kreindler & Kreindler consultant who attended the Al Jarrah deposition and

appeared on Isikoff's podcast.  *Id.* (citing Tr. 198:25-199:6, 205:14-206:16, 215:17-25).

Maloney directed Kreindler & Kreindler's Local Area Network administrator, John

Hartney, to conduct "a few searches for messages on the firm's email system."  Op. 40.  He

asked Hartney to search for emails to Isikoff and for outgoing emails from eight individuals that

might contain the transcript.  Op. 15 (citing Tr. 221:1-222:17, 223:10-17; KSAX-0084 at 1).

The searches turned up emails between Isikoff and Kreindler, and Isikoff and Fawcett, some of

which suggested earlier communications, but Maloney did not ask Hartney to look for those

earlier communications.  Op. 15-16 (citing Tr. 162:12-163:6, 235:17-236:17, 237:3-238:11).

Despite the MDL Protective Order's requirement that confidential material be stored "in

a secure manner," ECF No. 1900 at 11, anyone working at Kreindler & Kreindler had the ability

to access the transcript using the firm's proprietary internal server called "Case Media."  Op.

31-32.  Nevertheless, Maloney and Hartney made no efforts to find out who did so.  Op. 15, 40

(citing Tr. 138:18-139:8).  The transcript was also accessible to certain Kreindler & Kreindler

employees and consultants through a service called "Citrix ShareFile," but Maloney did not

direct Hartney to search that service until July 29, 2021.  Op. 14, 16 (citing Tr. 137:3-5, 147:21-

22, 149:21-150:03).  By that time, the firm had already told the Court that it had conducted an

internal investigation and was confident it was not the source of the leak.  *See infra* p. 11.

Judge Netburn found a particular "blind spot" in Kreindler & Kreindler's purported

investigation where Fawcett was concerned.  Op. 13.  Attorneys at the firm knew Fawcett

had communicated with Isikoff, but never checked whether Fawcett did so by means other

than his firm email account.  Op. 14.  Hartney knew Fawcett used a cloud-based storage system called Dropbox to store documents, but did not investigate that Dropbox account.  *Id.* (citing Tr. 150:8-14).  Maloney did not instruct anyone to search Fawcett's personal devices, testifying that he believed this would have been "unreasonable."  *Id.* (citing Tr. 233:22-25).

No one at Kreindler & Kreindler ever directly asked Fawcett whether he had leaked the transcript to Isikoff.  Fawcett testified that he did not recall being asked that question.  Op. 13 (citing Tr. 439:1-12).  Kreindler testified that he never asked Fawcett whether Fawcett had leaked the transcript, never directed anyone else to do so, and indeed told Fawcett:  "'I know you didn't do it.'"  Op. 13-14 (quoting Tr. 78:7-9; citing Tr. 78:22-79:3).  Although Maloney and Pounian each testified that they did ask Fawcett whether he leaked the transcript, Op. 12-13 (citing Tr. 216:24-217:6, 407:6-21), Judge Netburn did not believe them.  She reasoned that Fawcett, as the culprit, would likely recall being confronted, but Maloney and Pounian "approached the investigation confident that their firm was not the source."  Op. 13.  She also doubted Pounian's testimony because he did not object when Fawcett later removed from a draft declaration language that would have stated that Fawcett "'told Kreindler & Kreindler that [he] did not know how Michael Isikoff had obtained the transcript.'"  Op. 13, 40 (quoting KSAX-0121 at 1) (alteration in original); *see infra* p. 16.  In any event, all witnesses agreed that no one at Kreindler & Kreindler asked Fawcett to sign a sworn statement until the "absolute deadline" under the Court's orders, and then, when so asked, he "confessed immediately."  Op. 40.

**E.    Saudi Arabia's Email and Kreindler's and Fawcett's Responses**

On July 21, 2021, at 9:14 p.m., Saudi Arabia sent an email informing the PECs, including Kreindler & Kreindler, that it would ask the Court to investigate the leak of the Al Jarrah transcript.  Op. 16 (citing KSAX-0042 at 3-4).  Fawcett was not copied on this email.  Judge Netburn found that, starting early the next morning, Fawcett initiated a burst of "suspicious

**A195**

communications" that came to light only after he and Kreindler & Kreindler retained outside counsel in response to the court-ordered investigation, not as part of the firm's internal investigation. Op. 16-17 (citing KSAX-0135 at 3; KSAX-0151 at 1). She inferred that "someone inside the firm alerted Fawcett to the impending threat." Op. 18, 39.

On July 22, 2021, at 8:18 a.m., Fawcett texted Elizabeth Crotty, a criminal defense lawyer and former Kreindler & Kreindler attorney, seeking legal advice. Op. 17 (citing KSAX-0151 at 1). At 9:17 a.m., Fawcett had a 46-minute phone call with Kreindler. *Id.* (citing KSAX-0135 at 3). At 10:41 a.m., Fawcett called Crotty for 22 minutes. Op. 18 (citing KSAX-0135 at 3). At 12:07 p.m., he emailed Crotty, again seeking legal advice. *Id.* (citing KSAX-0151 at 1). At 12:56 p.m., he again called Kreindler. *Id.* (citing KSAX-0135 at 3). During discovery, Fawcett asserted attorney-client privilege over his July 22, 2021 communications with Crotty, *id.* (citing Tr. 449:5-11), but Kreindler & Kreindler did not assert work-product protection as to Fawcett's 46-minute call with Kreindler, Op. 17 (citing KSAX-0135).

At the hearing, Kreindler and Fawcett each testified that they could not remember the topic of their 46-minute phone call but were sure that they did not discuss the leak. *Id.* (citing Tr. 84:3-19, 445:25-446:2). Fawcett suggested that the call might have been work-related. *Id.* (citing Tr. 445:18-447:1). When asked about his 10:41 a.m. call with Crotty, Fawcett initially testified that it was not about the leak either; and that he and Crotty spoke about her recent run for district attorney, and nothing else. Op. 18 (citing Tr. 449:16-20). On cross-examination, counsel for Saudi Arabia pressed Fawcett as to why he asserted privilege over a personal phone call. *Id.* (citing Tr. 449:21-451:4). Fawcett stuck to his original answer. Then, after cross-examination and a recess, he corrected his testimony, stating that he spoke to Crotty because he "saw the court order" and needed legal advice because of his responsibility for the leak. *Id.* (citing Tr. 480:16, 481:6-9).

Judge Netburn declined to credit Fawcett's testimony that he called Crotty because he "saw the court order." *Id.* There was no court order about the breach as of July 22, 2021, the day Fawcett called Crotty. *Id.* There was only Saudi Arabia's July 21 email to the PECs – copying Kreindler, Pounian, Benett, and Maloney, but not Fawcett – stating that Saudi Arabia would request a court-ordered investigation. *Id.* Thus, one of these attorneys must have told Fawcett of the email before the July 22 calls to Crotty. Judge Netburn also declined to credit Fawcett's and Kreindler's testimony about their July 22 calls. Op. 17, 19. To start, she found that Fawcett's suggestion that his 9:17 a.m. call with Kreindler was a work-related conference call was belied by the fact that Kreindler & Kreindler asserted work-product protection over numerous other calls, but not that one. Op. 17 (citing KSAX-0135). She also did not believe that Fawcett could manage the "duplicity" that his and Kreindler's version of events implied. Op. 19. That is, crediting their testimonies would have required

> accept[ing] that, despite his long friendship with Kreindler, Fawcett reached out to a defense attorney about betraying Kreindler, had a normal, extended call with Kreindler, switched back to talking to his attorney about betraying Kreindler, and then talked to Kreindler again, all apparently without revealing a hint of his guilt.

*Id.* "Having witnessed Fawcett on the stand, heard tributes to his loyalty, and knowing that he confessed instantly when forced to sign a sworn statement," Judge Netburn found that such a maneuver would have exceeded his ability. *Id.* That finding further supported her inference that Kreindler knew of Fawcett's conduct and that his later denials of knowledge were false.

**F.    Saudi Arabia's Motion, the August 12 Order, and Kreindler & Kreindler's Responses**

On July 23, 2021, Saudi Arabia asked the Court to order discovery into the breach of the protective orders, suggesting as a first step that everyone with access to the Al Jarrah transcript submit declarations. Op. 19 (citing KSAX-0041 (ECF No. 6981)). The motion asked the Court to invoke its powers under Rule 37, as well as its inherent powers. *Id.* (citing KSAX-0041 at 4).

Saudi Arabia provided declarations from every attorney and staff member who had received or accessed the transcript, averring that:  (i) the declarant had not leaked the transcript; (ii) did not know who did; and (iii) either had no communications with Isikoff or had been contacted by him for comment but did not respond.  *Id.* (citing KSAX-0041A (ECF No. 6981-4)).

On July 27, 2021, the PECs, including Kreindler & Kreindler, opposed Saudi Arabia's motion.  *Id.* (citing KSAX-0043 at 2).  Their opposition letter stated that "'each of the lead PEC firms had already conducted internal investigations into the handling of the Jarrah transcript and communications with Mr. Isikoff'" and was "'confident that it was not the source of the leak to Mr. Isikoff.'"  Op. 19-20 (quoting KSAX-0043 at 2).  Judge Netburn found that Kreindler & Kreindler misled the Court by joining those statements.  Even aside from Kreindler's own personal knowledge, Hartney testified that, at the time this letter was filed, he "'could not have concluded that no one at the Kreindler firm was the source of the leak'" because his investigation was ongoing.  Op. 20 (quoting Tr. 174:25-175:3).  For example. Maloney did not direct Hartney to review the ShareFile system until two days later.  Op. 16 (citing Tr. 149:21-150:3, 172:14-24; KSAX-0043 at 2).

On July 29, 2021, two other PEC firms – Cozen O'Connor and Motley Rice – voluntarily submitted declarations from attorneys and firm staff, as well as their firms' IT specialists.  Op. 20 (citing KSAX-0044 (ECF No. 6991); KSAX-0045 (ECF No. 6992)).  Judge Netburn found their declarations were "thorough," confirming no communications with Isikoff (at all, or after the deposition) and describing investigative steps taken to determine that no one at the firm had given Isikoff the transcript.  *Id.* (citing KSAX-0044 at 3-10, 14-17; KSAX-0045 at 3-17, 18-21).  Later, Anderson Kill voluntarily submitted similar declarations.  Op. 21 (citing KSAX-0047 (ECF No. 7013)).  Kreindler & Kreindler made a "consensus decision" to file nothing until ordered to do so.  *Id.* (citing Tr. 262:6-15).

On August 12, 2021, Judge Netburn ordered Kreindler & Kreindler to file declarations addressing "'whether anyone with the firm or anyone acting on its direction shared the Al Jarrah deposition transcript with anyone unauthorized by the Protective Order and the FBI Protective Order,'" including, "'[a]t a minimum,'" declarations from Kreindler, Pounian, Maloney, and Benett. *Id.* (quoting ECF No. 7011 ("August 12 Order") at 2) (alteration in original).

On August 16, 2021, Kreindler & Kreindler filed declarations from those four attorneys alone. Op. 22 (citing KSAX-0048 (ECF No. 7016)). Judge Netburn found those declarations were "substantially vaguer and less comprehensive" than those of other PEC firms. *Id.* The declarants did not address communications with Isikoff and gave "virtually no detail" about their firm's purported investigation. *Id.* (citing, *e.g.*, KSAX-0048A (ECF No. 7016), ¶ 6). Maloney, who later testified that he conducted the investigation, did not mention it in his own declaration, leaving that to Benett. *Id.* (citing KSAX-0048A, ¶ 8; KSAX-0048C, ¶¶ 7-8).

## G.    The August 30 Order and Kreindler & Kreindler's Responses

On August 30, 2021, Judge Netburn found Kreindler & Kreindler's August 16 declarations "deficien[t]" and ordered the firm to supplement. Op. 22 (citing KSAX-0049 ("August 30 Order")). She directed each original declarant – Kreindler, Pounian, Maloney, and Benett – to disclose communications with Isikoff and identify others who had access to the transcript, and at least one to describe the firm's investigation and attach communications with Isikoff. Op. 23 (citing KSAX-0049 at 1). She also required declarations from others with access to the transcript and a declaration from the head of Kreindler & Kreindler's IT group attesting that the firm had performed a "forensic analysis" to investigate the leak. *Id.* (citing KSAX-0049 at 2).[3]

---

[3] On September 3, 2021, Oath, Inc., which offers *Yahoo! News*, moved to intervene to challenge the August 30 Order on First Amendment grounds. Op. 23 (citing ECF Nos. 7094-7095). Kreindler & Kreindler, alone among Plaintiffs' firms, supported Oath's position. *Id.* (citing KSAX-0051). Judge Netburn stayed the August 30 Order to consider Oath's motion,

On September 27, 2021, Kreindler & Kreindler submitted its supplemental declarations. Op. 24.  Benett was primarily responsible for creating them, with help from Pounian.  *Id.* (citing K&K Ex. 51; K&K Ex. 52; K&K Ex. 62; Tr. 368:14-17, 369:25-370:2).  Judge Netburn found that each declaration included "numerous misleading or false statements."  *Id.*

**Hartney's Declaration.**  Hartney's declaration, KSAX-0056F, made "several material misleading statements."  Op. 25.  Although everyone at Kreindler & Kreindler had access to the confidential deposition transcripts saved on Case Media, Hartney stated that Case Media "'is for use only by individual Kreindler attorneys and staff involved in this litigation and one consultant to Kreindler, John Fawcett.'"  *Id.* (quoting KSAX-0056F, ¶ 5; citing Tr. 138:18-25).  When the declaration was being prepared, Hartney had warned Benett that he "'d[id]n't think'" that statement was "'truthful,'" observing that the Al Jarrah transcript "'was saved in the case media share . . . and everyone at Kreindler has access to everything in casemedia.'"  *Id.* (quoting KSAX-0115).  She replied that this "'language is drafted carefully, and it does not say that it was restricted, in fact I was careful NOT to say that.'"  *Id.* (quoting KSAX-0115).  At the hearing, Hartney admitted that "Benett insist[ed] on not including that language in the declaration" and that "[s]he d[id]n't want to tell the court that everyone has access to everything."  Tr. 196:3-19; *see* Tr. 142:8-143:13.  Judge Netburn found that Benett intentionally hid from the Court that her entire firm could access the transcript.  Op. 25 (citing Tr. 143:4-13, 196:3-19).

Benett also included in Hartney's declaration, and Hartney signed, a statement that he "'did not find any evidence that the Jarrah transcripts had been downloaded, printed, or emailed, by anyone else.'"  *Id.* (quoting KSAX-0056F, ¶ 5).  Judge Netburn found that statement

---

then denied that motion as meritless.  *Id.* (citing KSAX-0055 (ECF No. 7134)).  During the stay, all remaining Plaintiffs' firms other than Kreindler & Kreindler voluntarily filed declarations denying involvement in the breach.  Op. 24 (citing ECF No. 7106).

13
**A200**

misleading as well, because it implies that Hartney looked for evidence of downloading or printing. *Id.* But it was "impossible" for Hartney to find such evidence because the firm's systems did not track those activities. *Id.* (citing Tr. 145:14-22).

   ***Maloney's, Benett's, and Pounian's Declarations.*** Maloney, Benett, and Pounian each declared that no one with access to the transcript failed to submit a declaration. Op. 28-29 (citing KSAX-0056B, ¶ 9; KSAX-0056C (ECF No. 7147-3), ¶ 5; KSAX-0056D (ECF No. 7147-4), ¶ 4). Judge Netburn found that was "false" because the entire firm had access through Case Media, as at least Maloney and Benett knew. Op. 29 (citing KSAX-0115; Tr. 245:15-247:11).

   ***Kreindler's Declaration.*** Like the other attorneys, Kreindler declared that he knew of no one with access to the transcript who had not submitted a declaration, even though everyone at his firm had access. Op. 29 (citing KSAX-0056A, ¶ 6). He "understate[d]" his interactions with Isikoff, omitting several text messages and a phone call, and violated the August 30 Order by failing to attach the messages. *Id.* (citing Tr. 54:17-25, 55:2-56:12). When asked about those omissions, Kreindler testified that he did not check any records to prepare his declaration and relied only on memory. *Id.* (citing Tr. 51:15-52:11, 52:23-25). Judge Netburn observed that he "did not explain why he took so little effort to verify his sworn statements before filing them with a federal court investigating his firm for deliberate breaches of protective orders." *Id.*

   ***Fawcett's Two Declarations.*** No one asked Fawcett to prepare a declaration until September 23, 2021. Op. 24 (citing Tr. 454:9-455:20). On the morning of September 27, he purportedly told Kreindler & Kreindler attorneys that he was responsible for the leak. Op. 26 (citing Tr. 388:19-25). He wrote a draft declaration confessing to the breach and sent it to Benett and Pounian. *Id.* (citing Tr. 456:7-15). In that draft, Fawcett claimed that Kreindler & Kreindler had no knowledge of his actions. He alleged that Al Jarrah's deposition transcript showed that Al Jarrah had "possess[ed] and view[ed] child pornography." KSAX-0108A at 1. He wrote that

14

**A201**

he sent Isikoff the transcript because "'the public must at least be forewarned'" about Al Jarrah's alleged conduct "'in order to have a chance to protect themselves.'" Op. 26 (quoting KSAX-0108A at 1). He did not mention any personal motivation. *Id.* (citing Tr. 348:21-25). He also stated that he had "'sent a redacted version of the transcript'" to Isikoff, but did not deny that it contained FBI protected material. *Id.* (quoting KSAX-0108A at 1).

Benett and Pounian edited the declaration. Op. 27-28. Pounian added statements that "'the redacted portions of the deposition [Fawcett] sent to Michael Isikoff were limited to Jarrah's possession of child pornography'" and that Fawcett "'did not send any other portions of the deposition to Isikoff.'" Op. 27 (quoting KSAX-0109A at 1) (alteration in original). Judge Netburn found that those statements "give the impression that Fawcett sent only portions of the deposition transcript to Isikoff, when in fact, he sent the whole transcript"; although Fawcett later changed "'limited'" to "'focused on,'" the statement remained "misleading." Op. 27-28.

Pounian also added language stating that Fawcett "had a 'personal interest' in this issue because Al Jarrah worked in Morocco as a diplomat and Fawcett's children were from that country." Op. 27. Benett further edited this language to state that Fawcett knew from his "'background in global humanitarian work . . . that Morocco is a country with a history of child sex trafficking.'" *Id.* (quoting KSAX-0110A at 1) (ellipsis in original). Judge Netburn found those statements were "fabricated and intended to make Fawcett appear more sympathetic." Op. 28, 38; *see also* Op. 42 (Fawcett's "personal motivation" was "primarily an invention of Pounian and Benett"). Although Benett testified that she did not come up with the added language, Judge Netburn did not credit that testimony, finding "no evidence at the hearing or in Fawcett's phone records that he participated the[] additions." Op. 27 (citing Tr. 346:20-22; KSAX-0136 at 2-3).[4]

---

[4] Judge Netburn also observed that Fawcett had known about the decades-old allegations related to Al Jarrah for at least six months before the deposition, that his own children were at

As noted above, *see supra* p. 8, Fawcett made one other important edit to his declaration before signing it.  He deleted:  "'Until today, I had told Kreindler & Kreindler that I did not know how Michael Isikoff, had obtained the transcript,'" and replaced it with:  "'No one from Kreindler & Kreindler even knew about what I had done, even while they were responding to the Court's Orders.'"  Op. 27-28 (quoting KSAX-0121 at 1).  Judge Netburn found it significant that Fawcett was "unwilling" to swear that he had lied to his firm.  Op. 13, 40.

Fawcett's second declaration, dated September 30, 2021, included more details about his communications with Isikoff and the leak.  Op. 30 (citing KSAX-0059, ¶¶ 3, 7, 8, 10).  Contrary to the August 30 Order, neither Fawcett's declaration nor his second one included copies of Fawcett's communications with Isikoff.  Kreindler & Kreindler did not produce those communications until Judge Netburn ordered further discovery, after he and Kreindler & Kreindler had retained outside counsel.  *Id.* (citing Tr. 177:21-178:6, 178:24-180:19).

## H.    The Evidentiary Hearing and the Attorneys' Testimony

On November 1 and 2, 2021, Judge Netburn held an evidentiary hearing.  Op. 30-31.  She admitted the declarations of Kreindler, Maloney, Benett, Pounian, Hartney, and Fawcett as their direct testimony, and counsel for Saudi Arabia cross-examined them.  *Id.* (citing ECF No. 7167 at 1-2).  Before the hearing, Judge Netburn issued an order stating that its purpose was to investigate "the breach of the protective orders by Kreindler & Kreindler" and that potential remedies would include "removal from the Plaintiffs' Executive Committees, monetary sanctions, a referral for professional discipline . . . , and a criminal referral."  ECF No. 7167 at 1.

At the hearing, Kreindler & Kreindler's attorneys claimed they had no knowledge of Fawcett's actions and defended the reasonableness of their investigation.  As set out above,

---

least 21 by the time of the leak, and that he never notified the U.S. or Moroccan governments about his concerns.  Op. 28 (citing Tr. 468:8-24, 470:5-471:16, 489:11-14; KSAX-0040 at 2).

Judge Netburn declined to credit much of their testimony.  Judge Netburn also found that Kreindler & Kreindler's attorneys "used the hearing to continue their efforts to inject embarrassing and irrelevant information targeting Saudi Arabia."  Op. 31; *see also* Op. 42 (describing Kreindler & Kreindler's attempt "to use the Court's investigation as a forum to compound the damage caused by the breach").  Most notably, Benett "went out of her way" to testify that Fawcett had " 'strong feelings about somebody that he believed was not only trafficking in sexual images of minors but was deliberately living in a place where he would have easy access to minor children for sexual purposes.' "  Op. 31 (quoting Tr. 393:1-5).  That "additional gratuitous attack on Al Jarrah," Judge Netburn observed, had no support in the record.  *Id.*[5]

Judge Netburn directed Kreindler & Kreindler, Fawcett, and Saudi Arabia to propose findings of fact and conclusions of law, which they did.

## I.      Kreindler & Kreindler's Additional Post-Hearing Violation

A few months after the hearing, Kreindler & Kreindler again violated the MDL Protective Order by publishing on a website a set of documents produced by the United Kingdom's Metropolitan Police Service.  Op. 33-34.  Under the MDL Protective Order, those documents should have been used only for the prosecution or defense of this case.  Op. 34 (citing ECF No. 8066 at 5; KSAX-0002 at 8).  Judge Netburn noted this conduct as evidence of Kreindler & Kreindler's "almost complete lack of respect for the Court and its orders."  Op. 52.

## J.      Judge Netburn's Opinion & Order

On September 21, 2021, Judge Netburn issued her Opinion & Order.  Based on detailed factual findings, she concluded that "Kreindler & Kreindler, through Fawcett and Kreindler,

---

[5] Benett's testimony at the hearing and later discovery also revealed that Kreindler & Kreindler had improperly permitted a consultant to attend the Al Jarrah deposition, did not notice his appearance on the record, and failed to obtain his written consent to abide by the MDL Protective Order.  Op. 32-33 (citing Tr. 328:6-330:1; KSAX-0002 at 12-13).

breached the Protective Orders by carrying out a deliberate scheme to leak the Al Jarrah Transcript to Isikoff." Op. 36. She invoked Rule 37(b)(2) to issue a "'just'" order that "'relate[d] to the particular claim to which the discovery order was addressed.'" Op. 45 (quoting *Daval Steel Prods., a Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357, 1366 (2d Cir. 1991), in turn quoting Fed. R. Civ. P. 37(b)(2)(A)). She found that the appropriate sanctions were to remove "Kreindler & Kreindler . . . from the PECs effective immediately," Op. 2, 45-46, to reduce the firm's ability to share in any future common fund, and to order it "to pay attorneys' fees and costs sought by Saudi Arabia in connection with the breach," Op. 46.

In determining the appropriate sanction, Judge Netburn concluded that Kreindler & Kreindler's violation was "willful" and "the result of deliberate coordination between Fawcett and Kreindler," while "the rest of the firm was, at best, willfully blind to this strategy." *Id.* She considered lesser remedies, such as "admonishment," "financial penalties," and "[p]rohibiting the use of the Al Jarrah Transcript," but found they had been or would be ineffective. Op. 47-49. She balanced any harm to Kreindler & Kreindler's clients against the need to address "the firm's repeated flouting of the Protective Orders and lack of candor before the Court." Op. 49-50. She also took into account the "effectively permanent" effects of "Kreindler & Kreindler's conduct," Op. 50; the "warn[ings]" she had previously given, Op. 51-52; and the firm's "complete lack of respect for the Court and its orders," as shown by "the sheer number of misrepresentations the firm made during the Court's investigation," and its "increasing rate" of "violations of the Protective Orders," Op. 52-54. Summarizing her reasoning, Judge Netburn explained that she had "lost faith in [Kreindler & Kreindler's] ability to comply with court orders or appear before the Court on behalf of all the September 11 victims." Op. 2, 55.

The present Rule 72(a) objections followed.

## STANDARD OF REVIEW

Parties objecting to a magistrate judge's non-dispositive order bear a "heavy burden." *Leviton Mfg. Co. v. Greenberg Traurig LLP*, 2011 WL 2946380, at *1 (S.D.N.Y. July 14, 2011). They must show that the order was "clearly erroneous" or "contrary to law." Fed. R. Civ. P. 72(a); *see* 28 U.S.C. § 636(b)(1)(A). "An order is clearly erroneous only when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed," while "[i]t is contrary to law if 'it fails to apply or misapplies relevant statutes, case law or rules of procedure.'" *Khaldei v. Kaspiev*, 961 F. Supp. 2d 572, 575 (S.D.N.Y. 2013) (citation omitted).

"[G]reater deference may be appropriate" for "a decision at least partially based on a credibility determination," as Judge Netburn's decision is here. *MASTR Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real Est. Sec. Inc.*, 2013 WL 6840282, at *1 (S.D.N.Y. Dec. 27, 2013). District courts "defer" to a magistrate judge's "decision as to the appropriate sanctions." *Novick v. AXA Network, LLC*, 2014 WL 12797254, at *3 (S.D.N.Y. Mar. 19, 2014). Further, this Court has given "particular deference" to Judge Netburn's rulings because she has been "'deeply involved in discovery matters in the case for years.'" ECF No. 6611 at 2 (quoting *Lugosch v. Congel*, 443 F. Supp. 2d 254, 276 (N.D.N.Y. 2006).

Kreindler & Kreindler erroneously argues (at 15) for *de novo* review of Judge Netburn's interpretation of the Federal Rules of Civil Procedure, citing *Williams v. Beemiller, Inc.*, 527 F.3d 259 (2d Cir. 2008). *Williams* involved appellate review of a district court's decision, not district court review of a magistrate judge's legal conclusions in a non-dispositive order. *See id.* at 264. The standard for the latter is "contrary to law." *See Blackrock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, N.A.*, 2018 WL 3863447, at *3 (S.D.N.Y. Aug. 13, 2018) (rejecting *de novo* review of "legal conclusions" in a non-dispositive order).

## ARGUMENT

### I.    Judge Netburn's Order Was Not Contrary to Law Under Rule 37(b)

Kreindler & Kreindler fails to show that Judge Netburn exceeded her authority under

Rule 37(b).  Its argument that the Rule does not authorize sanctions against a law firm for

violations of discovery orders was not preserved for review and in any event lacks merit.

#### A.    Kreindler & Kreindler Forfeited Any Argument That It Cannot Be
####        Sanctioned Under Rule 37(b)

On July 23, 2021, in its first letter about the breach of the MDL Protective Order, Saudi

Arabia made plain that it would ask the Court to invoke its "authority . . . under Federal Rule of

Civil Procedure 37(b)."  ECF No. 6981 at 3-4.  On October 4, in scheduling a hearing, Judge

Netburn explained that she would "render findings of fact" in connection with "the breach of the

protective orders by Kreindler & Kreindler" and "to determine the appropriate remedies," which

"may include . . . removal from the Plaintiffs' Executive Committees."  ECF No. 7167 at 1.

Accordingly, if Kreindler & Kreindler wanted to argue that Rule 37(b) did not authorize this

Court to remove it from the PECs, it had fair notice to do so.  Further, not only did Saudi Arabia

address Rule 37(b) in its November 15 proposed findings of fact and conclusions of law, *see*

ECF No. 7389, ¶¶ 301-303, 308, but so did Fawcett, *see* ECF No. 7387 at 32-36 – confirming

that the record made clear that Rule 37 sanctions were under consideration.

By contrast, Kreindler & Kreindler never cited Rule 37(b) – or any other provision of

Rule 37 – in its own proposed findings of fact and conclusions of law.  *See* ECF No. 7386.

Kreindler & Kreindler's failure to raise this issue before Judge Netburn, despite notice and

opportunity to do so, precludes the Court from considering it on a Rule 72(a) objection.  *See*,

*e.g.*, *BS BIG V, LLC v. Philadelphia Indem. Ins. Co.*, 2022 WL 4181823, at *5 (S.D.N.Y.

Sept. 13, 2022) (Daniels, J.) ("[I]t is established law that a district judge will not consider new

arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not."); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig*., 336 F.R.D. 400, 404 (S.D.N.Y. 2020) ("[n]ew arguments and factual assertions cannot properly be raised for the first time in objections" to a magistrate's discovery order, "and indeed may not be deemed objections at all") (brackets in original).

**B.  Judge Netburn Had Authority To Sanction Kreindler & Kreindler Under Rule 37(b)(2)(A)**

**1.**  Kreindler & Kreindler's interpretation of Rule 37(b) is also wrong as a matter of law.  Rule 37(b)(2)(A) authorizes sanctions "For Not Obeying a Discovery Order" and states: "If a party or a party's officer, director, or managing agent – or a witness designated under Rule 30(b)(6) or 31(a)(4) – fails to obey an order to provide or permit discovery, . . . the court where the action is pending may issue further just orders."  After that general authorizing language, Rule 37(b)(2)(A) gives a list of examples that just orders "may include," but does not limit the court's authority to those examples.  Accordingly, a sanctions order requires a finding that "a party or a party's officer, director, or managing agent," or a dedicated witness, failed to obey an order of the court.  After finding that such a failure has occurred, a district court can issue any "just order[]" as an appropriate sanction.  The language in Rule 37(b)(2)(A) requires only that the orders be "just" – it neither says nor implies that they may be directed only against a party.

This is a case in which a party failed to obey discovery orders.  Judge Netburn found that "Fawcett leaked the transcript" of the Musaed Al Jarrah deposition in violation of the Court's protective orders "as part of Kreindler & Kreindler's long-standing litigation strategy to pressure the Kingdom of Saudi Arabia into a settlement, and that he did so with the knowledge or at least tacit consent of lead attorney James Kreindler."  Op. 2.  It is settled law that "the conduct of an attorney is imputed to his client, for allowing a party to evade 'the consequences of the acts or

omissions of [ ]his freely selected agent' 'would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent.' " *SEC v. McNulty*, 137 F.3d 732, 739 (2d Cir. 1998) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633-34 (1962)) (brackets in *McNulty*).  Where – as here – an attorney violates a discovery order, that violation is deemed to have been committed by the "party" that the attorney represents, triggering sanctions under Rule 37(b).  *See Am. Cash Card Corp. v. AT&T Corp.*, 2000 WL 357670, at *5 (2d Cir. Apr. 6, 2000) (judgment noted at 210 F.3d 354 (table)) ("in reference to Rule 37(b) sanctions, '[a] litigant chooses counsel at his peril' ") (quoting *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir. 1979)) (brackets in *Am. Cash*).[6]  Thus, when Kreindler & Kreindler attorneys willfully violated the Court's protective orders and obstructed the Court's investigation of the violation to pursue a litigation strategy against Saudi Arabia, those actions were imputed to their clients – the *Ashton* Plaintiffs.

The application of those general principles to this case is confirmed by the language of the protective orders that Kreindler & Kreindler violated.  Those orders make clear that counsel for a party gains access to confidential material, and undertakes to protect that material, precisely because counsel is acting on behalf of a party.[7]  The MDL Protective Order governs the use and disclosure of confidential information by any "Party," which it defines to "mean any party to this MDL, including all of its officers, directors, employees, consultants, retained experts, and

---

[6] *See also Shipstad v. One Way or Another Prods., LLC*, 2017 WL 2462657, at *3, *5 (S.D.N.Y. June 6, 2017) (following *McNulty* and imputing attorney's violation of discovery order to a party under Rule 37(b)); *Copeland v. Rosen*, 194 F.R.D. 127, 133 (S.D.N.Y. 2000) (same), *remanded on other grounds*, 25 F. App'x 17 (2d Cir. 2001).

[7] *Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486 (5th Cir. 2012), *cited in* Op. 36 n.14, illustrates the point.  In *Smith*, the Fifth Circuit upheld Rule 37(b)(2) sanctions against both an attorney and that attorney's law firm for violation of a protective order.  *See id.* at 487, 490-91 (discussing Rule 37(b)(2)(A)).  The Fifth Circuit reasoned that courts are "authorized [under Rule 37(b)] to impose sanctions against parties or counsel."  *Id.* at 490.

*outside counsel (and their support staff)*." ECF No. 1900, ¶ II.B.1 (emphasis added). And it further defines the confidentiality obligations of a "Receiving Party," *see id.* ¶¶ II.B.4, II.H.1-5, which Kreindler & Kreindler has repeatedly violated.

Similarly, the Privacy Act Order and Protective Order for FBI Documents ("FBI Protective Order") governs the use of documents produced by the FBI to "Qualified Persons." The term "Qualified Persons" includes "Members of the Plaintiffs' Executive Committees ('PECs'), and any support staff of such PEC members . . . , as well as attorneys who are members of the same law firm as a member of the PEC." ECF No. 4255, ¶ 6(i). The FBI Protective Order further describes various actions that a "party" may or must take, such as challenging designations, *id.* ¶ 4; seeking consent to share protected information, *id.* ¶ 7; filing under seal, *id.* ¶ 11; and using protected information in court, *id.* ¶ 13. All of those actions can be taken only by the Qualified Persons representing a party rather than by the party personally, because only the Qualified Persons are authorized to have access to the protected information.

Accordingly, the textual predicate for Rule 37(b)(2)(A) sanctions – a violation of a discovery order by a "party" – is satisfied here. When Kreindler & Kreindler willfully violated the Court's orders, its breach was imputed to its clients (the *Ashton* Plaintiffs). Once that predicate is satisfied, the language of Rule 37(b)(2)(A) imposes no restrictions on who may be the subject of a "just order" that remedies the violation.

**2.**     Consistent with the language and structure of Rule 37(b), courts have imposed "just order" sanctions on both individual attorneys and law firms who violate discovery orders. *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 128 F.3d 99 (2d Cir. 1997) (per curiam), *cited in* Op. 36 n.14, is an example. In that case, the Second Circuit affirmed Rule 37(b) sanctions against a party's attorney for the attorney's role in the witness's failure to appear for deposition, explaining that the attorney's conduct "justifie[d] the district court's imposition of sanctions for

his contempt of court under Rule 37(b)." *Id.* at 103. Kreindler & Kreindler errs (at 19) in

attempting to distinguish *Fonar* as a "*monetary* sanction" against an "*individual* attorney," citing

to current Rule 37(b)(2)(C). *Fonar* did not rely on Rule 37(b)(2)(C), which did not exist in its

current form in 1997. *Fonar* relied on former Rule 37(b)(2)(D), *see* 128 F.3d at 102, which is

worded similarly to current Rule 37(b)(2)(A)(vii). Thus, *Fonar* supports Judge Netburn's

reasoning that current Rule 37(b)(2)(A) is not limited to sanctions against parties.[8]

   *Fonar* is far from the only example of a court directing a "just order" sanction to an

attorney – or a law firm – as a remedy for a violation of a discovery order. *See Mahboob v.*

*Educ. Credit Mgmt. Corp.*, 2021 WL 7448532, at *4 (S.D. Cal. Mar. 31, 2021) (adopting order

directing counsel to disclose names of improperly contacted individuals as Rule 37 sanction for

protective order violation); *Smith v. Bradley Pizza, Inc.*, 2019 WL 430851, at *1 (D. Minn. Feb.

4, 2019) (relying on Rule 37(b)(2)(A) to direct "defense counsel" to pay non-contempt monetary

sanction), *objections overruled*, 2019 WL 2448575 (D. Minn. June 12, 2019), *aff'd*, 821 F. App'x

656 (8th Cir. 2020) (per curiam); *O'Connor v. Uber Techs., Inc.*, 2017 WL 3782101, at *4, *9

(N.D. Cal. Aug. 31, 2017) (relying on Rule 37(b)(2)(A), among other authorities, to direct class

counsel to issue corrective notice after violating protective order); *In re Steward*, 529 B.R. 903,

913, 918 (E.D. Mo. 2015) (affirming bankruptcy court's imposition of monetary sanction on

attorney under Rule 37(b)(2)(A), in addition to fee award), *aff'd*, 828 F.3d 672 (8th Cir. 2016);

*see also Pereira v. Narragansett Fishing Corp.*, 135 F.R.D. 24, 26-27 (D. Mass. 1991) (relying

---

[8] *Markus v. Rozhkov*, 615 B.R. 679 (S.D.N.Y. 2020), *cited in* Op. 36 n.14, also supports
Judge Netburn's decision. That case determined that "Rule 37(b)(2)(A)(vii)," along with "Rule
37(d)," permits sanctions against a party's attorney. *Id.* at 700-01. Thus, *Markus* also refutes
Kreindler & Kreindler's position that Rule 37(b)(2)(A) authorizes sanctions only against parties.

on authority to issue "such orders in regard thereto as are just" in former Rule 37(b)(2) to order plaintiff's counsel to pay a non-contempt, non-compensatory fine).[9]

Courts have also directed Rule 37 "just orders" towards other non-parties, such as non-party corporate officers and retained experts. *See CEATS, Inc. v. TicketNetwork, Inc.*, 2021 WL 3738847, at *10-11 (E.D. Tex. Aug. 24, 2021) (relying on Rule 37(b)(2)(A) to impose bar on patent licensing by "individuals who violated [a] protective order," who included a party's CEO and two of its consulting experts), *appeals pending*, Nos. 21-40705, 22-40028 (5th Cir.); *Avago Techs., Inc. v. IPtronics Inc.*, 2015 WL 3640626, at *3, *5 (N.D. Cal. June 11, 2015) (relying on Rule 37(b)(2)(A) to direct expert who violated protective order to "return any . . . designated information" and "not [to] use that information for any purpose"). If Kreindler & Kreindler's interpretation of Rule 37(b)(2)(A) were correct, and only parties could be subjects of sanctions under that provision, then each of those orders would have been in error.

**3.** Kreindler & Kreindler's arguments confuse the difference between Rule 37(b)(2)(A)'s predicate for a sanctions order (which requires a violation by a "party") and the "just orders" that a district court may issue after finding that predicate (which may sanction the attorney or law firm through which the party violated the order). That confusion is best illustrated by Kreindler & Kreindler's attempts to compare Rule 37(b)(2)(A) to differently worded rules. Each of those rules contains specific language restricting a district court's remedial authority that Rule 37(b)(2)(A) does not contain.

---

[9] Although *Mahboob*, *Smith*, and *O'Connor* refer to the targets of sanctions using terms such as "Plaintiffs' counsel," "defense counsel," and "class counsel," context indicates that firms, not attorneys, were sanctioned. *See Mahboob*, 2021 WL 7448532, at *4 (referring to "Plaintiff's counsel" in the plural); *Smith*, 2019 WL 430851, at *1 (granting a sanctions motion against "Best & Flanagan LLP"); *O'Connor*, 2017 WL 3782101, at *5-6 (referring to "Class Counsel" as "it").

*First*, Kreindler & Kreindler errs in comparing (at 17-18) Rule 37(b)(2)(A) to Rule 11(c), which states that, if "the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." That is, Rule 11(c) contains language listing the entities "on" whom "the court may impose an appropriate sanction."[10] The "just orders" provision of Rule 37(b)(2)(A) does not contain any similar limit on the entities that may be the subject of a "just order[]." The appropriate inference is that Rule 37(b)(2)(A) does not impose any such limit.

*Second,* Kreindler & Kreindler errs in comparing (at 18) Rule 37(b)(2)(A) to former Rule 37(c), which the Second Circuit construed in *Apex Oil Co. v. Belcher Co. of New York*, 855 F.2d 1009, 1014 (2d Cir. 1988). Former Rule 37(c) authorized, where "'a party fail[ed] to admit the genuineness of any document or the truth of any matter,'" the relief of "'an order *requiring [that] party* to pay'" reasonable expenses and fees. *Id.* at 1013-14 (quoting Fed. R. Civ. P. 37(c) (1987)) (emphasis in *Apex Oil*). Thus, like Rule 11(c), but unlike current Rule 37(b)(2)(A), former Rule 37(c) did not contain a general authorization for "just orders," but a specific authorization for a fee order against the "party" that improperly failed to admit.

*Third*, Kreindler & Kreindler errs in comparing (at 17) Rule 37(b)(2)(A) to Rule 37(d)(3), which the Sixth Circuit construed in *NPF Franchising, LLC v. SY Dawgs, LLC*, 37 F.4th 369 (6th Cir. 2022). Rule 37(d) authorizes sanctions where a "party" or a "person designated" under certain rules "fails . . . to appear for [a] deposition" or to properly answer or object to "interrogatories" or a "request for inspection." Fed. R. Civ. P. 37(d)(1)(A). The resulting sanctions "may include

---

[10] In *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120 (1989), which Kreindler & Kreindler cites (at 18), the Supreme Court applied this rationale to hold that an earlier version of Rule 11 authorizing sanctions against "the person who signed" a violative "pleading, motion, or other paper" did not authorize sanctions against the person's law firm. *See Pavelic & LeFlore*, 493 U.S. at 123-25.

any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)" and also "must," with certain exceptions, include an order "requir[ing] the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure," with certain exceptions.  Fed. R. Civ. P. 37(d)(3).  Thus, Rule 37(d)(3) neither contains its own general authorization for "just orders" nor incorporates the authorization from the first paragraph of Rule 37(b)(2)(A).  And the Sixth Circuit reasoned not merely that Rule 37(d)(3) fails to "mention . . . law firms," but that it "confines liability to 'the party failing to act, the attorney advising the party, or both.'"  *NPF Franchising*, 37 F.4th at 383 (quoting Fed. R. Civ. P. 37(d)(3)). That reasoning does not help Kreindler & Kreindler.

Kreindler & Kreindler cites no case adopting its theory that district courts can issue Rule 37(b)(2)(A) "just orders" only against parties.  As set out above, *see supra* pp. 23-25, courts have issued such orders not only against parties to litigation, but also their attorneys, law firms, officers, and experts.  Those cases cohere with the Rule's text and the Second Circuit's teaching that "[a] district court has broad power to impose Rule 37(b) sanctions in response to abusive litigation practices."  *Friends of Animals Inc. v. U.S. Surgical Corp.*, 131 F.3d 332, 334 (2d Cir. 1997) (per curiam).  Judge Netburn did not act contrary to law in exercising that broad power.

## II.     The Evidence Supports Judge Netburn's Factual Findings

Kreindler & Kreindler also fails to show error, much less "clear[] error[]," Fed. R. Civ. P. 72(a), in Judge Netburn's careful review of the evidence.  Her findings rest on an extensive documentary record, observations of witness demeanor, and long familiarity with discovery in this litigation.  She determined that Kreindler, Maloney, Benett, Pounian, and Fawcett not only signed false and misleading declarations, *see* Op. 24-29, but also testified untruthfully in her

courtroom.[11]  Such credibility determinations receive "even greater deference," *United States v. Isiofia*, 370 F.3d 226, 232 (2d Cir. 2004), than do other findings of fact.

> **A.      Judge Netburn Reasonably Determined That Kreindler Knew of or at Least Tacitly Consented to Fawcett's Actions**

**1.**      Judge Netburn reasonably determined that Fawcett acted with Kreindler's "knowledge or at least tacit consent" and "t[ook] his direction from Kreindler [in] leak[ing] confidential material." Op. 2, 44.  Although Fawcett's September 29, 2021 declaration stated that, "[u]ntil today, no one other than Michael Isikoff and I knew that I sent the redacted transcript to Michael Isikoff" and that "[n]o one from Kreindler [& Kreindler] directed me to send the transcript to Michael Isikoff," KSAX-0056J, ¶ 3, Judge Neburn was not required to credit those statements.  Nor was she required to credit Kreindler's denials that he knew Fawcett had sent the transcript to Isikoff.  *E.g.*, Tr. 122:1-6.  Her contrary findings were supported by her observation of the witnesses and by four categories of evidence.

*First*, Judge Netburn found that Kreindler had an "amply demonstrated . . . motive for the leak." Op. 37.  That motive was his "litigation strategy" of "us[ing] press attention to force Saudi Arabia into a settlement," with an expectation of a "substantial benefit" – based on a "likely" award of "billions of dollars" – if that strategy succeeds.  Op. 37, 48.  Kreindler's "vitriolic" attacks on the Court's orders further demonstrate his heavy reliance on, and personal attachment to, his press-centered strategy.  Op. 37.  Fawcett also had a motive to leak the transcript in coordination with Kreindler, even though it put him at personal risk, because of the "extreme

---

[11] *See, e.g.*, Op. 9 ("The Court does not find this testimony [from Kreindler] credible."), 13 ("The Court credits Fawcett's testimony over the testimony of Pounian and Maloney."), 17-19, 38-39 (finding Kreindler's and Fawcett's "explanations" for their phone calls "not credible"), 27 (rejecting Benett's testimony that she "'formatted'" Fawcett's declaration but "did not 'write the words'"), 39 ("Fawcett's explanation for what triggered these communications to Crotty is also suspect.").

reciprocal loyalty" he shared with Kreindler.  Op. 9, 43.  By contrast, Judge Netburn reasonably rejected Kreindler & Kreindler's depiction of Fawcett as "a man with such a blinding hatred for child pornography that he would betray his long-time employer and friends by disclosing confidential material they had a duty to protect."  Op. 43.

*Second*, Judge Netburn found that Kreindler and Fawcett had an established method of "coordinated efforts" in contacting reporters, with Kreindler or another attorney "lay[ing] the groundwork" and Fawcett "follow[ing] up with supporting documents."  Op. 37-38.  This "tag team" approach "resulted in the 2017 breach," *id.*, and the hearing record contained other examples, *see* Tr. 41:12-18, 43:17-44-9 (Kreindler discussing Fawcett's contacts with reporters including Laura Sullivan of NPR News); Tr. 208:11-209:5 (Maloney stating that "from time to time [Fawcett] was asked to provide a nonconfidential document" for a reporter, and agreeing that "[b]efore" doing so Fawcett would "seek[ ] the approval of the attorneys at the firm").

*Third*, Judge Netburn found that Kreindler's and Fawcett's phone calls with Isikoff and with one another on June 28 were "suspicious," as were their phone calls with one another on July 22, interspersed with Fawcett's contacts with Crotty.  Op. 38-39.  She also rejected their explanations of those calls as not "credible" and "suspect."  *Id.*  Her reason was not merely that the calls were close in time.  It was that, for Kreindler's version of events to be true, Fawcett would have needed to be a skilled deceiver – switching back and forth between telling Kreindler that the documents could not be shared and then leaking them himself, *see* Op. 38, or alternating between calls with Kreindler about their work together and communications with defense counsel about his betrayal of Kreindler, *see* Op. 38-39.  "[H]aving witnessed Fawcett on the stand," she did not believe he had such skill.  Op. 39.  That credibility determination was further supported by Fawcett's inconsistent and false testimony about the calls with Crotty – first, that they had

not discussed the leak at all, and then that he contacted Crotty because he "saw the court order," even though on July 22 no investigative order had yet issued.  Op. 18, 39.

*Fourth*, Judge Netburn found that Kreindler & Kreindler's so-called internal investigation had a "clear blind spot" for Fawcett and "completely . . . passed over" him.  Op. 39-40.  That included never "directly question[ing]" Fawcett "about his role in the breach," Op. 40; never following up on Fawcett's known communications with Isikoff, Op. 13; and never asking Fawcett to sign a declaration until the "absolute deadline" set by court order, Op. 40.  If Kreindler and his colleagues had truly thought Fawcett was innocent, they would have had every reason to dispel the suspicion directed at their firm by questioning him and obtaining a declaration from him sooner, so that Kreindler & Kreindler could match the declarations submitted by Saudi Arabia's counsel and the non-Kreindler PEC firms.  *See supra* pp. 10-11.[12]  The Kreindler & Kreindler attorneys' avoidance of such measures is far better explained as a showing of "reciprocal loyalty" to Fawcett, Op. 44, protecting him as long as possible.

    **2.**       Kreindler & Kreindler's assertion (at 24) that "[n]o record evidence contradicted" Kreindler's and Fawcett's denials cannot withstand comparison to Judge Netburn's careful assembly of facts and weighing of inferences.  It does not matter that the denials were direct and the contrary proof was circumstantial.  *See, e.g.*, *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 83 (2d Cir. 2005) ("'Knowledge' is a fact often established – even in criminal cases where the prosecution's burden is beyond a reasonable doubt – simply through circumstantial evidence.").  Further, Kreindler & Kreindler's attempts (at 24-26) to marshal contrary evidence are misplaced under a clear-error standard of review.  *See AMR Servs. Corp. v. Int'l Bhd. of Teamsters*, 821

---

[12] Kreindler & Kreindler unpersuasively contends (at 8, 31) that its reluctance can be explained by a desire to protect a consultant's confidential identity.  The firm could have asked the Court to keep the consultant's name *ex parte* and under seal, as it ultimately did.  Judge Netburn granted that request.  *See* ECF No. 7165.

F.2d 162, 163 (2d Cir. 1987) (per curiam) ("[E]vidence from which a contrary inference could have been drawn" does "not entitle[]" the Court "to overturn the inference that was drawn.").

Thus, contrary to Kreindler & Kreindler's assertions (at 24-25 & n.10), Judge Netburn's finding that Fawcett was "unwilling" to "perjur[e]" himself about being asked directly about the Isikoff leak did not require her to believe everything else he said. *See Hyman v. Brown*, 927 F.3d 639, 661-62 (2d Cir. 2019) (explaining that "a factfinder [has] discretion to credit parts of a witness's testimony despite discrediting others"). Nor can Kreindler & Kreindler overcome her finding that Benett and Pounian fabricated Fawcett's supposed personal motive by pointing (at 25-26) to his reaffirmation of that motive on the stand. Given the evidence showing that the attorneys wrote the words for him, *see* Op. 27, as well as other instances at the hearing where Fawcett testified falsely, *see supra* pp. 9-10, 29-30, Judge Netburn could reasonably interpret his testimony as showing only that he remained willing to regurgitate the story he had been fed.[13]

**3.** Kreindler & Kreindler also fails to show (at 32-35) that the inferences that Judge Netburn drew from Kreindler's and Fawcett's phone calls were unreasonable. As to the June 28 phone calls, the firm asserts that it is not "surprising" that Kreindler would not recall the details of the protective orders and would need to ask Fawcett, but Kreindler testified under oath that he was "very familiar with the terms" of at least the FBI Protective Order. Tr. 18:17. Judge Netburn could reasonably credit that statement over his contrary (and self-exculpatory) claim that he had not recalled the 30-day period. Kreindler & Kreindler also fails to address Judge

---

[13] Kreindler & Kreindler remarkably contends (at 27-28) that it has no "litigation strategy" of attempting to "'force' Saudi Arabia into 'a settlement.'" The record supports Judge Netburn's contrary finding. *See* Tr. 24:3-25:5 ("Q. So, Mr. Kreindler, you have been making public statements about this case for years to put settlement pressure on the defendants, haven't you? . . . . A. I would say to put pressure on the defendant Saudi Arabia, yes. The form of a resolution may or may not be what we traditionally think of as a settlement.").

Netburn's reasoning that Fawcett's loyalty to Kreindler was not consistent with his affirming to Kreindler that a transcript was confidential and then secretly leaking it.

As to the July 22 phone calls, Kreindler & Kreindler asserts (at 33) that even though both Kreindler and Fawcett testified that they could not "recall the contents of the call," Judge Netburn was still required to accept the one fact that did they claim to be able to recall – that the call "was not about the leak."  It does not address her contrary reasoning that, based on her personal observation of Kreindler and Fawcett, Fawcett would not have been able to switch back and forth between his communications with Crotty and his calls with Kreindler, while concealing his guilt from Kreindler.[14]

### B.      Judge Netburn Reasonably Determined That Kreindler & Kreindler's Breach of the Protective Orders Was Willful

**1.**      Judge Netburn reasonably determined that Kreindler & Kreindler acted willfully in violating the MDL and FBI Protective Orders because the breach was "the result of deliberate coordination" between Kreindler and Fawcett and because "the rest of the firm was, at best, willfully blind to this strategy."  Op. 46.  Her finding of deliberate coordination was supported by the same evidence set forth above.  *See supra* pp. 28-30.  Her finding of willful blindness was based on the firm's "lackadaisical," "paltry," and "facially deficient" investigation and its attorneys' "knowingly misleading statements to the Court."  Op. 2, 39, 41, 44.

The investigation's defects included (1) "prejudg[ment]" and unjustified "confiden[ce]" that Kreindler & Kreindler was not the source of the leak"; (2) reliance on informal questioning

---

[14] Kreindler & Kreindler misplaces reliance (at 33-34) on a post-hearing declaration from Pounian, which Judge Netburn found to be inadmissible hearsay and declined to accept.  Op. 17 n.8.  The firm cites no authority to show that her evidentiary ruling was an abuse of discretion. Also, as Judge Netburn observed, Pounian's version of events "undercut Kreindler's testimony" because Pounian declared that the call was about a response to Saudi Arabia's July 21 email, contrary to Kreindler's protestations that it was not about the leak.  *Id.*

in a group setting; (3) disregard for document retention until outside counsel was retained;
(4) insufficient document searches and failure to follow up on them; (5) failure to account
for firm-wide "access" to the transcript through the "Case Media" system; (6) failure to check
firm phone records; (7) failure to search personal devices or outside cloud-based systems;
and (8) absence of any "forensic" efforts. Op. 12-16, 39-40; *see supra* pp. 6-8. Maloney, a
former federal prosecutor, knew how to conduct a professional investigation. *See* Tr. 225:7-12.
Judge Netburn reasonably inferred that he decided not to conduct one here because he wanted
to remain "willfully unaware" of what one would reveal – or, alternatively, was already aware
and "active[ly] collu[ding] in a cover-up." Op. 39.

      Kreindler & Kreindler's "sheer number of misrepresentations" to the Court, Op. 52,
also contributed to Judge Netburn's finding of willfulness. The most important were the false
or misleading statements to the Court that Kreindler & Kreindler was not responsible for the
breach, that no firm attorneys knew who was responsible for the breach until September 27, that
Fawcett acted alone, and that he had a personal motive for the breach. Op. 19-20, 22, 26-28, 31,
39, 42.[15]  In addition, firm attorneys also made or caused others to make false or misleading
statements that (i) the firm's investigation was "complete" by July 27, even though Hartney still
had searches to run; (ii) the September 27 declarations included all individuals with "access"
to the Al Jarrah transcript, even though the entire firm could access it; (iii)  Hartney "did not
find any evidence that the Jarrah transcripts had been downloaded[ or] printed," even though
Kreindler & Kreindler's systems did not permit him to look for such evidence; and (iv) Fawcett

---

[15] Those statements included the PEC's July 27 letter to the Court, in which Kreindler
& Kreindler joined, KSAX-0043; the Kreindler & Kreindler attorneys' August 16 declarations,
KSAX-0048A through 48D; the Kreindler & Kreindler attorneys' September 27 declarations,
KSAX-0056A through 56D; Fawcett's September 27 and 30 declarations, KSAX-0056J,
KSAX-0059; and hearing testimony from Kreindler and others.

had sent "portions" of the transcript to Isikoff that were "'focused on'" child pornography allegations, even though he had sent the entire transcript.  Op. 16, 19-20, 25-26, 27-28, 40.

In addition, Judge Netburn's finding of willfulness drew further support from Kreindler & Kreindler's attempts "to use the Court's investigation as a forum to compound the damage caused by the breach," Op. 42, pointing to "embarrassing and irrelevant information targeting Saudi Arabia" that Benett "went out of her way" to introduce, Op. 31 (discussing Tr. 393:1-15), and to "'gratuitous and irrelevant information about Al Jarrah's interactions with the FBI'" that Kreindler & Kreindler "tried" to "inject" into the record in a post-hearing declaration that Judge Netburn ordered sealed and refiled in redacted form, Op. 33 (quoting ECF No. 7381 at 1).

2.      Kreindler & Kreindler's criticisms of Judge Netburn's findings (at 28-32) fall short.  *First*, it takes issue (at 29-30) with Judge Netburn's finding that Fawcett was not directly questioned until September 27, pointing to purportedly contrary testimony from Fawcett, Tr. 436:12-23, and erroneously claiming that Judge Netburn "ignore[d]" it.  Judge Netburn cited the exact testimony that Kreindler & Kreindler highlights.  Op. 40.  Although Kreindler & Kreindler emphasizes Fawcett's statement that "they would have asked in substance," Tr. 436:16-17, Judge Netburn reasonably interpreted his entire testimony as meaning that he was never directly asked – especially the follow-on colloquy in which counsel asked him specifically about each Kreindler & Kreindler attorney and he answered that he did not recall being asked the question directly. *See* Tr. 439:1-3 (Kreindler), 439:4-6 (Benett), 439:7-9 (Maloney), 439:10-12 (Pounian).  As finder of fact watching Fawcett answer those questions, Judge Netburn could see him attempting to equivocate and ultimately failing.

*Second*, Kreindler & Kreindler erroneously asserts (at 29) that "the heightened investigatory steps suggested by [Judge Netburn] would not have revealed Fawcett as the leaker."  Maloney could have examined Fawcett's personal device and found Signal messages

showing that he and Isikoff were discussing the contents of confidential depositions by July 5, *see supra* p. 5, or a later exchange in which Fawcett warned Isikoff of a "witch hunt," KSAX-0150 at 2; *see* Tr. 232:22-234:2.  Maloney could have found the suspicious calls between and among Kreindler, Fawcett, and Isikoff on June 28, or between and among Kreindler, Fawcett, and Crotty on July 22.  *See supra* pp. 5-6, 9-10.  Before or after doing those things, Maloney could also have asked Fawcett directly about the leak or – most importantly – required him to sign a statement under oath for submission to the Court, as other firms did for their attorneys and employees.  *See supra* pp. 8, 10-11.  A requirement to sign such a declaration ultimately caused Fawcett to confess.  Kreindler & Kreindler's reluctance to impose such a requirement on Fawcett supports Judge Netburn's reasonable inference that Maloney and others either already knew or deliberately sought to avoid learning what Fawcett would say under oath.

     *Third*, Kreindler & Kreindler professes (at 30-32) that it "supported a process for identifying the leaker," that it "complied with [Judge Netburn's] directives," and that its refusal to come forward with information about how it had shared the Al Jarrah transcript reflected "unique and pressing work product concerns."  Its self-serving assertions cannot overcome Judge Netburn's meticulous catalogue of Kreindler & Kreindler's refusals to cooperate, misleading statements to the Court, and other misconduct, especially on deferential review.

     *Fourth*, Kreindler & Kreindler also unpersuasively responds to Judge Netburn's finding that it "tried to use the Court's investigation as a forum to compound the damage caused by the breach," Op. 42, by asserting (at 31) that its attorneys "repeated the truth" about Fawcett's motives.  It fails to address Judge Netburn's finding that Benett "went out of her way in her testimony" to make baseless allegations against Al Jarrah that were "nowhere in the original declaration Fawcett drafted, [in] the declaration prepared after Benett['s] and Pounian's tinkering, [in] the follow-up declaration Fawcett provided," or even in "Isikoff's article."

Op. 31 (citations omitted).  Judge Netburn could reasonably infer that Benett was again resorting

to "fabricat[ion]" and "invention," Op. 42, not testifying honestly about Fawcett's motives.

## III.     Judge Netburn's Sanctions Against Kreindler & Kreindler Are Just and Reasonable

### A.     Judge Netburn Considered the Appropriate Factors Under Circuit Precedent

Judge Netburn had "'wide discretion in imposing sanctions under Rule 37'" because

"'the text of [Rule 37(b)(2)(A)] requires only that the district court's orders be "just."'" *World*

*Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 159 (2d Cir. 2012)

(quoting *S. New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010)).

In fashioning sanctions, she considered four non-exclusive factors that the Second Circuit has

identified as relevant in guiding that exercise of discretion:

> (1) the willfulness of the non-compliant party or the reason for noncompliance;
> (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance;
> and (4) whether the non-compliant party had been warned of the consequences
> of . . . noncompliance.

*Id.* (internal quotation marks omitted; ellipsis in original); *see* Op. 45-52.  She also properly

considered Kreindler & Kreindler's "almost complete lack of respect for the Court and its

orders," Op. 52, including additional violations of those orders.

After examining those factors and additional considerations, Judge Netburn determined

that "removal from the PECs is the appropriate sanction," Op. 55, reasoning that "[b]eyond

removal there is no lesser sanction that can address the firm's repeated flouting of the Protective

Orders and lack of candor before the Court" and that other sanctions would "unfairly penalize"

or "unfairly harm" Kreindler & Kreindler's clients, Op. 47-50.  She noted that, "[w]ith this

episode, the Court has lost faith in Kreindler & Kreindler" and that "the firm's removal from the

PECs is not only an appropriate sanction, but a necessary step to ensure that body's continuing

efficacy and credibility."  Op. 57.  She also limited Kreindler & Kreindler's ability to recover

fees from any future common fund fee award, Op. 57-58, and ordered it to "pay Saudi Arabia reasonable attorneys' fees and costs associated with investigating and addressing the breach of the Protective Orders," Op. 59.  Those rulings were within her broad discretion.

### B.     Kreindler & Kreindler Fails To Show an Abuse of Discretion

**1.**     Kreindler & Kreindler errs in contending (at 36-37) both that Judge Netburn was required to consider "the harm that resulted from the leak" in fashioning appropriate sanctions and that she "failed" to do so.  Harm from a violation of a court order is not a separate factor under *Worldwide Polymers* or *Global NAPs*.  Judge Netburn did not err by framing her analysis using the factors set forth in the Second Circuit's precedent.

In any event, Judge Netburn noted several kinds of "damage caused by the breach." Op. 42.  Al Jarrah and Saudi Arabia were harmed by the release of "embarrassing and irrelevant information" and "gratuitous attack[s]" that will "permanent[ly]" remain public "on the internet." Op. 31, 50-51.  Kreindler & Kreindler's own clients were harmed because their attorneys "diverted focus from their clients' case."  Op. 58.  Other Plaintiffs were harmed because Kreindler & Kreindler "injected false information into the PECs' communication with the Court," damaging Plaintiffs' collective credibility.  *Id.*  "[O]ther firms" were "forced . . . to spend time and resources on an investigation irrelevant to their client's claims."  *Id.*  The Court's own time and resources have been (and are still being) consumed by what Judge Netburn described as a "draining debacle." Op. 50.  And "Isikoff's article has permanently damaged the credibility of the Protective Orders as a tool for encouraging fulsome disclosure," harming the important public interest in "'fully and fairly enforc[ing]'" such orders to "'encourag[e] full disclosure of . . . evidence.'"  Op. 51 (quoting *Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291, 295 (2d Cir. 1979)).

The cases that Kreindler & Kreindler cites (at 36) do not support its claims of error. *City of Almaty, Kazakhstan v. Ablyazov*, 2018 WL 1229730 (S.D.N.Y. Mar. 5, 2018), rejected

a proposed Rule 37(b)(2) sanction (appointment of a discovery master), observing that "it [wa]s not necessary to make Plaintiffs whole." *Id.* at \*7 n.2.  That footnoted observation did not detract from the thrust of the court's reasoning, which focused on the sufficiency of the sanction in deterring future breaches, *see id.* at \*7, as Judge Netburn did here, *see* Op. 50.  *Jay v. Spectrum Brands Holdings, Inc.*, 2015 WL 6437581 (S.D.N.Y. Oct. 20, 2015), noted a lack of prejudice from a protective order breach, and further reasoned that "the narrow parameters of the violation" ("a single incident" involving disclosure of "limited information") suggested "that a lesser sanction" than disqualification of the plaintiff's counsel "would be [ ]sufficient to address the situation presented and deter future misconduct." *Id.* at \*11.  Judge Netburn considered several alternative sanctions here, but reasonably concluded they were not sufficient.

     **2.**     Kreindler & Kreindler fails to show (at 37-38) that Plaintiffs have been harmed by Kreindler & Kreindler's removal from the PECs.  Both fact and expert discovery are complete. The next step will be the briefing of *Daubert* motions and a renewed motion to dismiss, but no schedule for this briefing is currently in place.  When a schedule is set, the remaining members of the PECs are capable of handling those filings.  They have informed the Court that they are ready to "conduct[ ] all pre-trial proceedings involving common legal and factual issues, whether relating to liability or damages, on behalf of all Plaintiffs" and that no "structural changes to the PECs are necessary" because of Kreindler & Kreindler's removal.  ECF No. 8603 at 1.  To the extent they need past work product generated by Kreindler & Kreindler, nothing in Judge Netburn's order prevents Kreindler & Kreindler from providing it.

     In addition, Judge Netburn observed that, because of Kreindler & Kreindler's willful and deliberate violations of the protective orders and attempts by the firm to mislead the Court and frustrate the Court's investigation, she "ha[d] lost faith in the firm's ability to conduct this litigation responsibly and report honestly as a representative of all plaintiffs."  Op. 55.

Even assuming for argument's sake that Plaintiffs have been harmed by the loss of Kreindler & Kreindler as a representative, that harm was caused by the firm's own conduct.  Judge Netburn merely recognized the loss of credibility that had already taken place.  *See* Op. 57 ("The PECs cannot efficiently perform their functions if the Court cannot trust their statements.").[16]

3.       Kreindler & Kreindler also fails to show (at 38) that Judge Netburn's sanctions are "out of step" with the case law.  *Koch v. Greenberg*, 2011 WL 4485975 (S.D.N.Y. Sept. 28, 2011), *modified*, 2012 WL 13063624 (S.D.N.Y. Aug. 23, 2012), involved an incident in which an attorney gave documents to one unauthorized recipient, who gave at least one document to a reporter.  *Id.* at *1.  That case featured no litigation strategy of disclosure, no previous violations, no obstruction of a court investigation, and no misrepresentations.  *Denis v. County of Nassau*, 2019 WL 7372957 (E.D.N.Y. Dec. 31, 2019), involved an unauthorized disclosure because of "gross negligence," not an intentional violation; the negligent attorney also "apologized" and "accepted responsibility."  *Id.* at *7, *9.  *Abbott Laboratories v. Adelphia Supply USA*, 2017 WL 1732454 (E.D.N.Y. May 2, 2017), involved a party who observed depositions without signing the appropriate form.  *Id.* at *1-2; *see also supra* p. 38 (discussing *Jay v. Spectrum Brands*).  The conduct here was far more serious than in any of those cases.

4.       Kreindler & Kreindler mischaracterizes (at 39-40) Judge Netburn's ruling as drawing support from what it calls "unrelated incidents" that it asserts were not "intentional breach[es]."  Other violations that supported Judge Netburn's ruling included Kreindler & Kreindler's 2017 violation of the MDL Protective Order by disclosing the contents of a

---

[16] This point is further confirmed by a recent exchange between Kreindler & Kreindler and the remaining PEC members in which, responding to a declaration by Maloney touting the importance of his firm's work, the remaining members "dispute[d] the veracity of the facts and characterizations as recited in [his] declaration" and expressed reluctance "to engage in any further distractions created by the Kreindler firm."  ECF No. 8620 at 1.

confidential document to a journalist, Op. 5; its failure to maintain the Al Jarrah transcript securely, Op. 25-26, 53; its violation during the Al Jarrah deposition of the Court's discovery protocol through an undisclosed attendee, Op. 32-33, 53; and its posting on a public website of an entire tranche of discovery materials from the London Metropolitan Police Service, Op. 33-34, 54. All of that conduct is relevant to the remedy for the current breach because it concerns Kreindler & Kreindler's consistent failure to comply with the Court's orders and, as Judge Netburn observed, shows "how little respect the firm has for the Court's efforts to manage this litigation." Op. 53.

**5.**       Finally, Kreindler & Kreindler cannot show error (at 40) in Judge Netburn's determination that financial sanctions alone will not sufficiently deter future misconduct. As she explained, "[d]irect financial penalties . . . are frequently ineffective in cases involving protective order breaches." Op. 48; *see City of Ablyazov*, 2018 WL 1229730, at *7 (noting that a sanction should not enable a party "to simply pay for breaches of court orders and transform compliance with them into a mere financial calculation"). That is all the more so in this case, given Kreindler & Kreindler's own claim that any award against Saudi Arabia "will likely be worth billions of dollars." Op. 48. Although Kreindler & Kreindler attempts (at 40) to frame any award as "speculative," Judge Netburn found that the potential for an award drives Kreindler & Kreindler's litigation strategy and actions in furtherance of that strategy. Op. 2, 6, 37, 44. That finding was supported by the record and by her long experience with the case. It supports her reasoning that "[f]inancial sanctions alone are simply not viable" as a deterrent. Op. 48.

## CONCLUSION

Kreindler & Kreindler's Rule 72 objections should be overruled.

Dated:  November 15, 2022                    Respectfully submitted,

                                             /s/ *Michael K. Kellogg*
                                             _____
                                             Michael K. Kellogg
                                             Mark C. Hansen
                                             Gregory G. Rapawy
                                             Andrew C. Shen
                                             Christopher M. Young
                                             KELLOGG, HANSEN, TODD, FIGEL
                                                & FREDERICK, P.L.L.C.
                                             Sumner Square
                                             1615 M Street, N.W., Suite 400
                                             Washington, D.C. 20036-3209
                                             (202) 326-7900
                                             (202) 326-7999 (fax)

                                             *Attorneys for the Kingdom of Saudi Arabia*

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 15, 2022, I caused a copy of the foregoing Opposition to Kreindler & Kreindler's Rule 72 Objections to the September 21, 2022 Opinion & Order filed by the Kingdom of Saudi Arabia to be served electronically pursuant to the Court's ECF system.

/s/ *Michael K. Kellogg*
_____
Michael K. Kellogg
*Attorney for the Kingdom of Saudi Arabia*

**A229**

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| _____ | ) | |
| IN RE:  TERRORIST ATTACKS ON | ) | Civil Action No. 03 MDL 1570 (GBD) (SN) |
| SEPTEMBER 11, 2001 | ) | ECF Case |
| _____ | ) | |

This document relates to:  *All Actions*

### SAUDI ARABIA'S OPPOSITION TO KREINDLER & KREINDLER'S
### MOTION TO STAY NON-MONETARY SANCTIONS
### <u>PENDING RESOLUTION OF RULE 72(a) OBJECTIONS</u>

Michael K. Kellogg
Mark C. Hansen
Gregory G. Rapawy
Andrew C. Shen
KELLOGG, HANSEN, TODD, FIGEL
   & FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036-3209
(202) 326-7900
(202) 326-7999 (fax)

*Attorneys for the Kingdom of Saudi Arabia*

November 17, 2022

**A230**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................................... ii

INTRODUCTION ....................................................................................................................... 1

BACKGROUND ......................................................................................................................... 2

STANDARD OF REVIEW ......................................................................................................... 5

ARGUMENT .............................................................................................................................. 5

    A.    Kreindler & Kreindler Cannot Show That It Will Likely Succeed
on the Merits ................................................................................................................. 5

    B.    Kreindler & Kreindler Cannot Show That Plaintiffs Will Be
Irreparably Injured Without a Stay .............................................................................. 7

    C.    A Stay Would Injure the Other Parties in This Proceeding and
Harm the Public Interest ............................................................................................ 10

CONCLUSION ......................................................................................................................... 10

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Page

**CASES**

*Aso, In re*, 2019 WL 2572491 (S.D.N.Y. June 21, 2019)................................................................5

*Google LLC v. United States*, 443 F. Supp. 3d 447 (S.D.N.Y. 2020) .............................................5

*Nken v. Holder*, 556 U.S. 418 (2009) .............................................................................................5

**RULES**

Fed. R. Civ. P.:

Rule 37(b) ..........................................................................................................1, 5, 6

Rule 37(b)(2)......................................................................................................................4

Rule 37(b)(2)(A) ...............................................................................................................6

Rule 72(a)...........................................................................................................1, 4, 5, 8

**INTRODUCTION**

The Court should not stay Judge Netburn's removal of Kreindler & Kreindler LLP ("Kreindler & Kreindler") from the Plaintiffs' Executive Committees ("PECs") as a sanction for Kreindler & Kreindler's willful breach of the Court's protective orders, obstruction of the Court's investigation of the breach, and misrepresentations to the Court. After a two-day evidentiary hearing, Judge Netburn carefully weighed the evidence and laid out Kreindler & Kreindler's disregard for Court orders and many untruthful and misleading statements to conceal its misconduct. That review led her to "los[e] faith in the firm's ability to conduct this litigation responsibly and report honestly as a representative of all plaintiffs." ECF No. 8544 ("Op."), at 55. Accordingly, she reasonably determined that "the firm's removal from the PECs is not only an appropriate sanction, but a necessary step to ensure that body's continuing efficacy and credibility." Op. 57. Her ruling went into effect nearly two months ago, on September 21, 2022, the day she issued the ruling.

Kreindler & Kreindler has presented no legitimate grounds for a stay. Its Rule 72(a) objections to the September 21 order have small chance of success on the merits. Kreindler & Kreindler cannot meet its heavy burden to show that Judge Netburn's factual findings were "clearly erroneous" or that the sanctions ordered were "contrary to law." Fed. R. Civ. P. 72(a). As demonstrated in Saudi Arabia's opposition to the Rule 72(a) objections, Kreindler & Kreindler's lead argument that Federal Rule of Civil Procedure 37(b) does not authorize sanctions against a law firm both was not raised before Judge Netburn and is wrong as a matter of law. Kreindler & Kreindler also cannot show irreparable harm. Judge Netburn has concluded that there are "numerous sophisticated firms in the MDL" that are "fully able to continue to litigate" Plaintiffs' claims, Op. 49, and the remaining PEC members have represented that they can do so ably without the involvement of Kreindler & Kreindler.

**BACKGROUND**

Shortly after the June 2021 deposition of non-party witness Musaed Al Jarrah, reporter Michael Isikoff published an article revealing that he had obtained the transcript of the deposition.  At the time Isikoff published his article, the entire transcript was confidential material under the MDL Protective Order, ECF No. 1900, and the FBI Protective Order, ECF No. 4255.  Saudi Arabia and Al Jarrah promptly asked the Court to investigate the serious breach of its orders, and the Court did so.  Saudi Arabia's counsel and every other PEC-member firm "willingly aided the effort," Op. 2, each providing thorough disclosures about the steps each firm had taken to ensure that it was not the source of the leak.  Kreindler & Kreindler, by contrast, "dragged its feet, submitted incomplete responses to the Court's inquiries, and obstructed the investigation."  *Id.*  After the Court's second order requiring it to provide declarations, Kreindler & Kreindler admitted that one of its researchers, John Fawcett, had "deliberately leak[ed]" the transcript, *id.*, but maintained that Fawcett had acted alone and based on personal motives.

Judge Netburn then held a two-day evidentiary hearing and heard testimony from witnesses, including Fawcett and four Kreindler & Kreindler attorneys:  supervising attorney and partner James Kreindler, partners Andrew Maloney and Megan Benett, and counsel Steven Pounian.  Op. 30-31.  Relying on both in-person observations of witnesses, Op. 19, 39, and on a mass of record evidence including phone records, text messages, emails, and draft documents, Op. 8-10, 16-18. 25, 26-28, 29, 38-39, 42, she repeatedly found the testimony of the Kreindler & Kreindler lawyers was not "credible," Op. 9, 13, 19, 38, 39, 40, 43, and declined to believe the firm's story about Fawcett.  Instead, she determined that Fawcett did not act alone or for personal reasons, concluding that "Kreindler & Kreindler, through Fawcett and Kreindler, breached the Protective Orders by carrying out a deliberate scheme to leak the Al Jarrah Transcript to Isikoff,"

as part of the "firm's litigation strategy . . . to use press attention to force Saudi Arabia into a settlement."  Op. 36-37.

Judge Netburn further found that "several other firm attorneys," including Maloney, Benett, and Pounian, "were, at best, willfully blind to the[ ] scheme and willing to obstruct the Court's efforts to uncover it."  Op. 45.  Their acts of obstruction included Maloney's "flaw[ed]" investigation of the breach that "completely . . . passed over Fawcett," and that Kreindler & Kreindler presented to the Court in "misleading terms," Op. 40; a "fabricated" motive for the leak that was "revealed to be primarily an invention of Pounian and Benett," Op. 42; a declaration from John Hartney (Kreindler & Kreindler's IT professional) that Benett "structured" and "explicitly designed to avoid alerting the Court to Kreindler & Kreindler's deficient protection of confidential materials," *id.*; and declarations submitted by the firm's attorneys that contained "numerous misleading or false statements," Op. 24, 28-29.  In addition, the Court found that the firm "tried to use the Court's investigation as a forum to compound the damage caused by the breach" by introducing "gratuitous and irrelevant material to disparage Saudi Arabian personnel."  Op. 42.

Judge Netburn also found that Kreindler & Kreindler committed other violations of the Court's orders.  Those violations included a 2017 episode in which Kreindler and Fawcett violated the MDL Protective Order by "tag-team[ing]" a journalist to provide information about a confidential document, Op. 5-6, 37-38, which led to Judge Netburn giving Kreindler a personal "'first warning' against further such conduct," Op. 5; the "stor[age]" of the Al Jarrah deposition transcript "on a system that anyone at their firm could access," which violated the MDL Protective Order, Op. 53; the undisclosed attendance of a Kreindler & Kreindler consultant at the Al Jarrah deposition, which violated the Court's Deposition Protocol (ECF No. 6002-1), Op. 32-33; and Kreindler & Kreindler's post-hearing violation of the MDL Protective Order by posting

discovery materials on a public website, Op. 33-34.  Judge Netburn determined that Kreindler & Kreindler's conduct taken as a whole "revealed an almost complete lack of respect for the Court and its orders."  Op. 52.

Having "lost faith in [Kreindler & Kreindler's] ability to conduct this litigation responsibly and report honestly as a representative of all plaintiffs," Judge Netburn imposed sanctions on Kreindler & Kreindler under Rule 37(b)(2).  Op. 55.  As relevant to the present motion, the firm was "removed immediately from the Plaintiffs' Executive Committees."  Op. 65.  Judge Netburn found this measure "not only an appropriate sanction, but a necessary step to ensure that body's continuing efficacy and credibility."  Op. 57.  She required the other PEC members to "confirm[]" within two weeks that Kreindler & Kreindler "is no longer involved in any of the [PECs'] operations" and to advise the Court "[i]f . . . additional court action or modification to the structure of the PECs is necessary."  Op. 63-64.

On October 4, 2022, the current members of the PECs filed a letter representing that "Kreindler & Kreindler is no longer involved in any of the PEC's operations."  ECF No. 8603, at 1.  Those PEC members have further asserted that they are fully capable of litigating this matter moving forward without Kreindler & Kreindler and that they "do not believe any structural changes to the PECs are necessary to do so."  *Id.*

Also on October 4, 2022, Kreindler & Kreindler filed a motion by proposed order to show cause to stay its removal from the PECs pending the resolution of its forthcoming Rule 72(a) objections, supported by a declaration from Maloney.  ECF Nos. 8608, 8610.  On October 17, the Court denied that motion without prejudice as procedurally improper.  ECF No. 8642.  On November 3, relying on the same memorandum of law submitted on October 4 and on a supplemental declaration from Maloney, Kreindler & Kreindler renewed its motion.  ECF Nos. 8700, 8701.

- 4 -

**A236**

## STANDARD OF REVIEW

"The decision whether to stay an order [from a magistrate judge] pending appeal [to the district judge] is guided by four well-established factors: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *In re Aso*, 2019 WL 2572491, at *2 (S.D.N.Y. June 21, 2019) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)) (denying application to stay magistrate judge's non-dispositive discovery order); *see also*, *e.g.*, *Google LLC v. United States*, 443 F. Supp. 3d 447, 455 (S.D.N.Y. 2020) (applying the same standard and concluding that the moving party "cannot bear the burden of showing that the circumstances justify an exercise of the court's discretion") (cleaned up). Because a "'stay is an intrusion into the ordinary processes of administration and judicial review,'" it "'is not a matter of right.'" *Aso*, 2019 WL 2572491, at *2 (quoting *Nken*, 556 U.S. at 427). "Ultimately, the decision as to whether to grant a stay is committed to the court's discretion." *Id.*

## ARGUMENT

### A.      Kreindler & Kreindler Cannot Show That It Will Likely Succeed on the Merits

Because of Kreindler & Kreindler's procedural error and delays in refiling its motion, Saudi Arabia's opposition to the firm's Rule 72(a) objections is already on file. ECF No. 8751. To avoid unnecessary duplication, this opposition does not repeat the arguments in that opposition in full, but summarizes them only briefly. They show that Kreindler & Kreindler is unlikely to succeed in its challenge to its removal from the PECs.

*First*, Kreindler & Kreindler is unlikely to succeed in arguing that Judge Netburn acted contrary to law in imposing sanctions under Rule 37(b). It never raised this argument before Judge Netburn, despite knowing that Saudi Arabia had asked the Court to invoke Rule 37(b), and

has therefore forfeited any challenge to that aspect of her ruling. *Id.* at 20-21. Even if preserved, Kreindler & Kreindler's argument lacks merit. Rule 37(b)(2)(A) gives courts broad authority to issue "just orders" when a "party" violates a discovery order. When an attorney or law firm representing a party violates such an order, the violation is attributed to its client. *Id.* at 21-23. Moreover, Rule 37(b)(2)(A) does not require the sanction for such a violation to fall solely on the party. When doing so is "just," courts can and do issue Rule 37(b)(2)(A) sanctions against law firms, attorneys, and outside experts. *Id.* at 23-25. Kreindler & Kreindler's contrary arguments fail to engage with the text of Rule 37(b) and make inaccurate comparisons to other Rules with different language. *Id.* at 25-27.

*Second*, Kreindler & Kreindler is unlikely to succeed in arguing that Judge Netburn's findings are unsupported by the evidence. Her credibility determinations were well supported by the factual record and easily withstand the deferential clear-error review that applies to such findings. *Id.* at 27-28. She was not required to believe the testimony of Kreindler and Fawcett that Kreindler did not know of or approve Fawcett's actions. *Id.* at 28-30. She had ample basis to conclude that Kreindler & Kreindler acted willfully, including not only Kreindler's deliberate coordination with Fawcett but also the other attorneys' obstruction and misrepresentations to the Court. *Id.* at 32-34. Kreindler & Kreindler's contrary arguments fail to show any error, much less clear error, in Judge Netburn's careful weighing of the evidence. *Id.* at 30-32, 34-36.

*Third*, Kreindler & Kreindler is unlikely to succeed in arguing that Judge Netburn abused her discretion in determining that its removal from the PECs was an appropriate sanction. She considered the appropriate factors required by Circuit precedent and gave proper weight to her conclusion that the firm as a whole has shown it cannot be trusted to follow the Court's orders or deal with the Court candidly. *Id.* at 36-37. She also appropriately considered (contrary to Kreindler & Kreindler's claims) the substantial harms caused by the breach, *id.* at 37-38, and the

lack of injury to Plaintiffs from the loss of the firm as a representative on the PECs, *id.* at 38-39. Kreindler & Kreindler's failed attempts to show inconsistency with other cases, *id.* at 39, its minimization of the seriousness of its conduct, *id.* at 39-40, and its protestation that financial sanctions would provide sufficient deterrence, *id.* at 40, do not come close to the showing required to overturn Judge Netburn's exercise of discretion.

**B.      Kreindler & Kreindler Cannot Show That Plaintiffs Will Be Irreparably Harmed Without a Stay**

Kreindler & Kreindler's removal from the PECs has not caused, and will not cause, irreparable harm to Plaintiffs.  As set forth above, the September 21, 2022 order removed the firm from the PECs "immediately."  Its motion and the two supporting declarations of Andrew Maloney fail to identify any meaningful work that the firm has been unable to do in the past two months or any harm suffered by Plaintiffs as a whole as a result.  Nor has it identified any such harm in the future, and certainly not in the immediate future.

Kreindler & Kreindler's attempt to show irreparable harm rests on the self-serving assertion that, before its removal, it "effectively led all aspects of the litigation against Saudi Arabia" and "handled *nearly every* aspect of this complex case."  ECF No. 8608, at 21.  The first Maloney declaration makes similar claims and minimizes the role of the other PEC firms. ECF No. 8610, ¶¶ 3, 18, 20.  Shortly after it was filed, the current members of the PECs indicated that they felt "compelled to inform the Court" that they "dispute the veracity of the facts and characterizations as recited in Mr. Maloney's declaration."  ECF No. 8620.  They further stated that they did not find it "necessary or productive to engage in any further distractions created by the Kreindler firm."  *Id.*  The PECs' statements are consistent with and reinforce Judge Netburn's findings that Maloney personally made untruthful and knowingly misleading statements to the

Court, Op. 12-13, 28-29, 40, and that, at least since July 5, 2021, Kreindler & Kreindler "cost the PECs more than they contributed," Op. 58.

Further, the dispute over whether Maloney's statements are truthful reinforces Judge Netburn's reasoning that "[t]he benefits of centralized leadership evaporate when the court cannot depend on a committee member's professionalism, ethics, and honesty," Op. 1; that "[t]he PECs cannot efficiently perform their functions if the Court cannot trust their statements," Op. 57; and that removing Kreindler & Kreindler from the PECs is "a necessary step to ensure that body's continuing efficacy and credibility," *id.* Although Kreindler & Kreindler's own clients have the right to choose their counsel, Op. 49-50, Judge Netburn reasonably concluded that the interests of all Plaintiffs are not well served by representatives whose credibility the Court, other Plaintiffs' firms, and defense counsel must constantly second-guess. That determination further weighs against any finding of irreparable harm here.

In any event, even taken at face value, Maloney's statements about Kreindler & Kreindler's role in the litigation against Saudi Arabia do not show irreparable injury. Fact discovery against Saudi Arabia ended in June 2021, and expert discovery ended in June 2022. The next phase of the litigation will be the briefing of *Daubert* motions and a renewed motion to dismiss, but no schedule for that briefing has been set. *See* ECF No. 8542. In the unlikely event that Kreindler & Kreindler's Rule 72(a) objections are still pending when work on those motions begins, the remaining PEC members are fully capable of handling those filings. Those firms have represented to the Court that they stand ready to "conduct[ ] all pre-trial proceedings involving common legal and factual issues, whether relating to liability or damages, on behalf of all Plaintiffs" and that no "structural changes to the PECs" are necessary following Kreindler & Kreindler's removal. ECF No. 8603, at 1. Other PEC members have attended and participated in every fact and expert deposition taken in the case against Saudi Arabia. To the extent those

PEC members may find useful any work product generated in the past by Kreindler & Kreindler, nothing in Judge Netburn's September 21 order prevents Kreindler & Kreindler from protecting the interests of its clients by sharing that work product.

Maloney's Supplemental Declaration further asserts that Kreindler & Kreindler's removal from the PECs removes an incentive for Plaintiffs' lawyers to work "cooperatively and collaboratively," citing the different positions taken by Plaintiffs' attorneys on how to proceed with pending motions for judgment against the Taliban.  ECF No. 8701, ¶¶ 4-5.  The June 16, 2004 order that established the PECs already requires them to "coordinate and, wherever possible, submit joint . . . filings regarding all matters common to the Individual Actions."  ECF No. 248-2, ¶ 9.  It further provides that "[a]ny plaintiffs' attorney may give advice and suggestions to the Plaintiffs' Executive Committees; [and] may, when necessary, present individual and divergent positions to the positions of the Plaintiffs' Executive Committees at pretrial conferences."  *Id.* ¶ 13.  A court order requiring coordination, a mechanism for Plaintiffs' attorneys to raise divergent positions, and the potential for a common-benefit fund to reward the PECs' coordination efforts provide sufficient incentive to cooperate.  That Plaintiffs' attorneys may not agree on every issue is no reason to reinstate Kreindler & Kreindler to a leadership position after Judge Netburn's conclusion that it can no longer be trusted.

Also, Kreindler & Kreindler's refusals to join in filings with other firms long predate its removal from the PECs.  *See*, *e.g.*, ECF No. 3482, at 1-2 (order discussing filing of separate complaint); ECF No. 3781 (separate opposition to motion to dismiss); ECF No. 7481 (separate motion for reconsideration).  Earlier this year, Kreindler & Kreindler even attempted to file an entire separate class action (promptly dismissed) in what this Court described as a "totally inappropriate attempt to simply advantage one set of plaintiffs" in negotiations over funds belonging to the central bank of Afghanistan, with "no legal basis" to do so.  ECF No. 7966,

at 6:2-4.  The best way for Kreindler & Kreindler to achieve greater cooperation with other Plaintiffs' firms is for it to cooperate with them.

**C.      A Stay Would Injure the Other Parties in This Proceeding and Harm the Public Interest**

Reinstating Kreindler & Kreindler to a leadership position in this MDL will cause substantial injury to parties other than Plaintiffs and harm the public interest.  The firm and its attorneys willfully breached the Court's orders, obstructed the Court's investigation, misled the Court and the parties, orchestrated the submission of false and misleading declarations, and gave false and misleading testimony under oath.  *See supra* pp. 2-3.  Their conduct has wasted the resources of the Court, the other PEC members, and Saudi Arabia alike.  As Judge Netburn observed, it has taken "months to overcome Kreindler & Kreindler's obstruction. . . .  Another draining debacle is out of the question."  Op. 50.

The speedy and final resolution of this matter, which arises from the worst terrorist attack in the nation's history, also serves the public interest.  Saudi Arabia is confident that, when it renews its motion to dismiss, the evidence developed in jurisdictional discovery will show that no one (Al Jarrah included) directed either Omar Al Bayoumi or Fahad Al Thumairy to assist the 9/11 hijackers, consistent with the FBI's final conclusion when it closed its investigation.  Plaintiffs will presumably argue in opposition that the evidence shows the opposite.  The public interest favors a return to that core dispute rather than indulging Kreindler & Kreindler's attempts to "fight tooth and nail to avoid accountability for discovery violations."  *Id.*

**CONCLUSION**

The Court should deny Kreindler & Kreindler's motion to stay.

Dated:  November 17, 2022          Respectfully submitted,

*/s/  Michael K. Kellogg*
Michael K. Kellogg
Mark C. Hansen
Gregory G. Rapawy
Andrew C. Shen
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036-3209
(202) 326-7900
(202) 326-7999 (fax)

*Attorneys for the Kingdom of Saudi Arabia*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on November 17, 2022, I electronically filed the foregoing

Opposition to Kreindler & Kreindler's Motion To Stay Non-Monetary Sanctions Pending

Resolution of Rule 72(a) Objections, using the ECF system, which sent notice of filing in this

matter to all counsel of record.

*/s/  Michael K. Kellogg*
Michael K. Kellogg

*Attorney for the Kingdom of Saudi Arabia*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | No. 03-MD-01570 (GBD) (SN) |
| | This document relates to: *All Actions* |

**REPLY IN SUPPORT OF MOTION TO STAY**
**KREINDLER & KREINDLER LLP'S IMMEDIATE REMOVAL FROM THE**
**PLAINTIFFS' EXECUTIVE COMMITTEE FOR DEATH AND INJURY CLAIMS**

Emily Kirsch
Paul Niehaus
KIRSCH & NIEHAUS PLLC
950 Third Avenue, 19th Floor
New York, NY 10022
(212) 832-0170
emily.kirsch@kirschniehaus.com

Edward M. Spiro
MORVILLO ABRAMOWITZ GRAND
 IASON & ANELLO P.C.
565 Fifth Avenue
New York, NY 10017
(212) 856-9600
espiro@maglaw.com

*Counsel for Non-Party Kreindler & Kreindler LLP*

**A245**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ........................................................................................................................... 2

I.      The Threat of Irreparable Harm to Plaintiffs Is Strong...................................................... 2

II.     K&K Is Likely to Succeed on the Merits............................................................................. 5

CONCLUSION......................................................................................................................... 8

## PRELIMINARY STATEMENT

Defendant Kingdom of Saudi Arabia ("Saudi Arabia")'s opposition papers confirm that a partial stay of the order removing Kreindler & Kreindler LLP ("K&K") from the Plaintiffs' Executive Committee for Death and Injury Claims ("PEC") is appropriate, pending resolution of K&K's Rule 72(a) objections.  As detailed in K&K's objections, ECF No. 8681 ("Obj."), the full record shows that a longtime, trusted consultant of K&K secretly leaked a deposition transcript on his own initiative after he learned disturbing information about the deponent, and then repeatedly lied to K&K for over two months to hide his misconduct.  K&K's attorneys were unaware of the consultant's betrayal and reported the facts to the Court immediately after uncovering the truth.

Saudi Arabia claims that there is a "small chance" of success on the merits of K&K's objections, ECF No. 8760 ("Stay Opp'n") at 1, but its opposition to K&K's objections proves otherwise, ECF No. 8751 ("Obj. Opp'n").  *First*, Saudi Arabia repeatedly ignores objective, documentary evidence (which the Magistrate Judge overlooked) that disproves many of the court's key "fact" findings and, instead, recites those findings verbatim.  Saudi Arabia also avoids addressing the holding of binding Second Circuit precedent, which confirms that the Magistrate Judge exceeded her authority when she issued sanctions pursuant to Rule 37(b).  *Second*, the threat of irreparable injury only increases the longer that K&K's meritorious objections remain undecided.  It is only Saudi Arabia that benefits from the immediate removal of K&K, its lead adversary, from the PEC.  The Court should maintain the nearly 20-year status quo while it resolves the objections. *Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 565 (2d Cir. 1991).

## **ARGUMENT**

### I.     **The Threat of Irreparable Harm to Plaintiffs Is Strong**

K&K's continued involvement on the PEC is critical to ensure the proper representation of the 9/11 death and injury plaintiffs and the successful prosecution of their claims against Saudi Arabia.

Saudi Arabia offers no evidence to dispute the facts set out in the declarations of K&K attorney Andrew Maloney, ECF Nos. 8613, 8701, which detail how over the past five years K&K has undertaken the lead role on behalf of death and injury plaintiffs in prosecuting the litigation against the Kingdom of Saudi Arabia.  Saudi Arabia claims that Mr. Maloney's declarations are "self-serving."  Stay Opp'n at 8.  Saudi Arabia, however, knows full well from its own day-to-day involvement in this litigation over the past five years (as reflected in the case docket) that the facts detailed in Mr. Maloney's declarations are accurate and true, including that K&K: (1) argued the 2018 motion to dismiss brought by Saudi Arabia and all the discovery motions for the PEC;[1] (2) conducted a world-wide investigation with the help of former FBI and Joint Terrorism Task Force ("JTTF") agents and other investigators that uncovered important witnesses and evidence;[2] (3) tracked down and obtained key third-party witness testimony through declarations and

---

[1] *See, e.g.*, ECF No. 3898 (Jan. 18, 2018 hearing of Saudi Arabia's motion to dismiss); ECF No. 4456 (Feb. 26, 2019 hearing of plaintiffs' first motion to compel production from Saudi Arabia); ECF No. 4586 (May 13, 2019 pre-motion conference regarding the FBI's production); ECF No. 5334 (Nov. 15, 2019 conference on the FBI's production and scheduling); ECF No. 5777 (Jan. 13, 2020 conference on production of Saudi Arabia's witnesses); ECF No. 6051 (Mar. 4, 2020 conference on plaintiffs' submissions regarding witness intimidation); ECF No. 6157 (Apr. 17, 2020 conference on various discovery issues involving Saudi Arabia and the FBI); ECF No. 6274 (May 21, 2020 hearing on motions regarding production of Saudi Arabia's witnesses, including the Kingdom's motion to assert immunity under the Vienna Convention on Diplomatic Relations).

[2] *See, e.g.*, ECF No. 3780-4 (Sept. 15, 2017 declaration of Stephen Moore, former FBI agent who led the Los Angeles 9/11 task force in 2001-2002); ECF No. 6154-3 (Apr. 2020 declaration of former FBI agent Catherine Hunt regarding her investigation and interviews with witnesses Mohamed Johar and Akram Alzamari); *see also* Oct. 26, 2018 sealed declaration of Hunt; May 30, 2019 sealed declaration of Bassem Youssef, former FBI Unit Chief; May 26, 2021 declaration of former FBI agent Daniel Gonzalez; May 26, 2021 declaration of former JTTF agent Efrain Vazquez.

depositions in the U.S. and abroad;[3] (4) conducted all depositions of Saudi Arabia's witnesses;[4] (5) worked to secure document productions from the U.K.'s Metropolitan Police Service;[5] and (6) hired, consulted, and obtained reports from all but one of plaintiffs' seven expert witnesses.[6]

Saudi Arabia makes highly misleading arguments to minimize the PEC's remaining work, stating that "fact discovery ended in June 2021," and that the case now involves the "briefing of *Daubert* motions and a renewed motion to dismiss." Stay Opp'n at 8.

*First*, thousands of key documents about Fahad al Thumairy, Omar al Bayoumi, and the Saudi government's operations inside the U.S. were not obtained until recently, after (1) President

---

[3] *See, e.g.*, ECF No. 6154-3 (Apr. 2020 Hunt declaration); *see also* Osman Kaldirim (June 13, 2019 deposition of Director at King Fahad Mosque in Los Angeles); Akram Alzamari (Mar. 11, 2020 deposition of eyewitness); Ed and Judith Chimielewski (Apr. 14, 2021 declaration of eyewitnesses); Al-Mohdar Mohamed Abdullah Zeid (May 7 & 10, 2021 deposition of eyewitness); Dietrich Snell (May 10, 2021 declaration of 9/11 Commission official); Mahmood Sultan (May 17, 2021 deposition of eyewitness); Afrah Johar (May 18, 2021 deposition of eyewitness); Ibrahim Johar (May 20, 2021 deposition of eyewitness); Mohamed Johar (May 21, 2021 deposition of eyewitness); Daniel Gonzalez (May 26, 2021 declaration of former FBI Special Agent and eyewitness); Efrain Vazquez (May 26, 2021 declaration of former JTTF agent and eyewitness); Kaysan Morgan (declaration and June 21, 2021 deposition of eyewitness); Samuel Coombs (declaration and June 22, 2021 deposition of former employee of Saudi Presidency of Civil Aviation); Usman Madha (declaration and June 25, 2021 deposition of eyewitness).

[4] *See, e.g.*, Khalil al-Khalil (June 14, 2019 deposition of Saudi Embassy Islamic Affairs Deputy and Director of the Foundation overseeing the King Fahad Mosque in Los Angeles); Abdul Aziz Abdul Kareem al-Anqari (Jan. 13-14, 2021 deposition of Saudi Presidency of Civil Aviation official); Abdurrahman bin Gurmanal al-Shahri (Jan. 26-27, 2021 deposition of member of Saudi Royal Committee reviewing Ministry of Islamic Affairs (MOIA) officials working abroad); Ahmed al Qattan (Feb. 10, 2021 deposition of Saudi Embassy official); Saud Abdullah al-Ghudaian (Feb. 23-24, 2021 deposition of MOIA official); Abdullah al-Awad (Mar. 9, 2021 deposition of official at Saudi Consulate in Los Angeles); Sami al Ibrahim (Mar. 21, 2021 deposition of Saudi Consulate official); Saleh al-Shaikh (Mar. 23-24, 2021 deposition of MOIA Minister); Adel al-Sadhan (Mar. 30-31, 2021 deposition of MOIA Propagator); Mutaeb al-Sudairy (Apr. 1-2, 2021 deposition of MOIA Propagator); Abdullah al-Jaithen (Apr. 7-9, 2021 deposition of MOIA Propagator); Ismail Mana (Apr. 21, 2021 deposition of official at Saudi Consulate in Los Angeles); Majed al-Mersal (May 27-28, 2021 deposition of MOIA ropagator); Faisal al-Muhanna (June 3, 2021 deposition of Saudi government agent); Omar al-Bayoumi (June 9-11, 2021 deposition of Saudi government agent); Musaed al-Jarrah (June 17-18, 2021 deposition of Saudi Embassy Islamic Affairs Deputy); Zeinab Afifi (June 23, 2021 deposition of receptionist at Saudi Embassy); Fahad al-Thumairy (June 28-30, 2021 deposition of MOIA Propagator and Imam of the King Fahad Mosque).

[5] *See, e.g.*, ECF No. 6834 (June 2021 letters of request to obtain MPS production filed by K&K); ECF No. 7832 (Apr. 2022 declaration of K&K attorney James Gavin Simpson describing the efforts to obtain the MPS discovery).

[6] The expert reports, served on April 1, 2022, were from Lawrence Dunham (former U.S. Assistant Chief of Protocol, U.S. Department of State), Dr. Alexander Meleagrou-Hitchens (Lecturer in Terrorism and Radicalisation, King's College London), Dr. Emile A. Nakhleh (former Senior Intelligence Service Officer, U.S. Central Intelligence Agency), Capt. Barry Schiff (piloting and aviation expert), Steven N. Simon (former member of the U.S. National Security Council, Senior Director for the Middle East and North Africa), and Bassem Youssef (former FBI Unit Chief and FBI Special Agent).

Biden signed Executive Order 14040 in September 2021, which led to the production of FBI and other U.S. government documents (some of which had previously been withheld by former Attorney General Barr as "state secrets") over a seven-month period ending in May 2022; and (2) the Metropolitan Police Service produced thousands of pages of documents in March 2022, including numerous contemporaneous videos and photographs from Omar al Bayoumi's time in California when he sponsored the 9/11 hijackers in San Diego.[7]

*Second*, Saudi Arabia ignores that the investigation of these newly discovered facts by K&K and its investigators is active and ongoing.  *See* ECF No. 8613 at ¶ 3; ECF No. 8701 at ¶ 2. As stated by Mr. Maloney, "the immediate removal of K&K from the PEC threatens harm to the development of K&K's investigatory and discovery work to the detriment of all 9/11 death and injury plaintiffs."  ECF No. 8701 at ¶ 2.  Because of work product concerns and security issues, further details regarding K&K's current work can only be provided to the Court on an *ex parte* basis.  *Id.*

*Third*, Saudi Arabia's off-hand suggestion that the next stage of the case will only involve "briefing," Stay Opp'n at 8, is sharply disputed.  ECF No. 8157 at 2-3 (June 2022 submission of PEC, then including K&K).  Among other things, Saudi Arabia misconstrues the governing procedures, including the burden of proof on Saudi Arabia, and the need for a jurisdictional hearing with testimony from fact and expert witnesses on the determinative issues, particularly where, as here, those issues turn on questions of witness credibility.  *Id.*  Nor does Saudi Arabia consider that this case will require merits discovery and proceed to trial after K&K successfully opposes (again) Saudi Arabia's renewed motion to dismiss.

---

[7] In December 2021, the *Ashton* Plaintiffs, represented by K&K, moved for expedited additional discovery of Saudi Arabia based on the first tranche of documents produced pursuant to the Executive Order.  ECF No. 7481.  That motion remains undecided.

*Fourth*, as to any *Daubert* motions, K&K handled the reports and depositions of six of the seven experts offered by plaintiffs.  K&K has the working relationships with those experts and the background necessary to properly respond to any motions regarding the testimony.  K&K also led the depositions of Saudi Arabia's three experts and is best positioned to lead any challenges to their opinions.

*Finally*, and most importantly, Saudi Arabia completely overlooks the sheer complexity of assembling the vast factual record in this case for any motions and hearings before this Court and the importance of K&K's knowledge and experience, as the lead PEC firm prosecuting the case against Saudi Arabia for the past five years, to properly execute these critical tasks.  ECF No. 8701 at ¶ 3.

Saudi Arabia continues its extraordinary and dangerous campaign to hobble the proper representation of its party-opponent, the death and injury plaintiffs.  It is wholly inappropriate for Saudi Arabia to make suggestions as to how K&K and other plaintiffs' counsel should best handle the plaintiffs' claims.  Saudi Arabia's arguments must be viewed through the lens of its overarching efforts to advance its own defenses and defeat the 9/11 plaintiffs' claims in this litigation.  *See, e.g.*, Stay Opp'n at 10 (Saudi Arabia concluding its brief with the argument that "no one . . . directed Omar Al Bayoumi or Fahad Al Thumairy to assist the 9/11 hijackers . . . .").

## II.     K&K Is Likely to Succeed on the Merits

Because K&K refiled its stay motion for the Court's consideration at the upcoming December 8 oral argument along with the submission and full briefing of K&K's objections, ECF No. 8700, K&K presents this short response to Saudi Arabia's opposition to the stay motion in order to spare duplication of arguments found in K&K's objections and (soon to be filed) reply

5

brief in support of its objections. Saudi Arabia's tactics in its opposition to K&K's objections demonstrate the high likelihood of K&K's success on the merits.

The Magistrate Judge acted contrary to law when the court exceeded its authority under Rule 37(b). As stated in K&K's objections, Rule 37(b)(2)(A) "requires 'party' misconduct as the foundation for any sanctions, including sanctions against an attorney" and "there is no allegation of such misconduct" in this case. Obj. 16. The Second Circuit's analysis in *Apex Oil Co. v. Belcher Co. of New York*, 855 F.2d 1009, 1013-14 (2d Cir. 1988), which held that the term "party" under an earlier provision of Rule 37 does not include the party's attorney, confirms that the Magistrate Judge contravened the law. *See also, e.g.*, *Kleiman v. Chertoff*, 2007 WL 9706519, at *9 (E.D.N.Y. July 10, 2007) (applying *Apex Oil Co.* in holding that "Rule 37 cannot provide the basis for the imposition of sanctions on [plaintiff's counsel]"). It was inappropriate for Saudi Arabia to submit its post-hearing proposed findings seeking broad Rule 37 sanctions while failing to disclose *Apex Oil Co.* to the court, ECF No. 7389 ¶¶ 301-03, 308, particularly where the Magistrate Judge did not allow a reply to the post-hearing submissions and denied K&K's request for oral argument, ECF Nos. 7317, 8544 at 64. Tellingly, Saudi Arabia continues to avoid discussion of *Apex Oil Co.*'s holding in all of its papers and instead (i) cites Second Circuit caselaw where the court engaged in the fact-intensive inquiry of whether an attorney's actions should be imputed to their client for purposes of a default judgment under Rule 55, and (ii) otherwise attacks a strawman, namely the scope of "just orders" sanctions *once Rule 37 "party" conduct is established*. Stay Opp'n at 5-6; Obj. Opp'n 21-27. As will be detailed in K&K's reply brief in support of its objections, K&K did not forfeit this legal argument, as the Magistrate Judge failed to notify K&K "of the authority under which sanctions [we]re being considered," *Ted Lapidus, S.A. v. Vann*, 112 F.3d 91, 97 (2d Cir. 1997), and subsequently concluded that K&K "may file Rule 72(a) objections

6

A252

to this Opinion and Order, which will cure any possible notice issues." ECF No. 8544 at 35. The

Magistrate Judge's clear legal error in misconstruing Rule 37, by itself, warrants a stay of K&K's

immediate removal. *See In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir.

2007).

Moreover, the Magistrate Judge clearly erred in finding that that the K&K firm willfully

breached the governing protective orders. All direct evidence—including multiple declarations by

John Fawcett and K&K attorneys, hours of testimony, personal cell phone records, and internal

emails and documents—confirm the truth of Fawcett's confession: he acted alone, destroyed

evidence of his misconduct, and leaked the transcript because the public "must be forewarned in

order to have some chance to protect themselves" from Musaed al Jarrah. *See* Obj. 11 (Fawcett's

Statement), 21-26. No circumstantial evidence supports the finding that K&K was involved with

Fawcett's leak. Obj. 26-35. In concluding otherwise, the Magistrate Judge overlooked—and

therefore did not engage with—documentary evidence that disproves many of the key "facts" that

the court "found." *See Anderson v. City of Bessemer*, 470 U.S. 564, 575 (1985) (courts may "find

clear error even in a finding purportedly based on a credibility determination" where "[d]ocuments

or objective evidence" contradict the finding). Saudi Arabia's opposition ignores this objective

evidence and recites the erroneous "fact" findings verbatim. Obj. Opp'n 27-36. It also

misleadingly (and repeatedly) claims that the court made "credibility determinations" that it did

not in fact make. *See, e.g.*, Obj. Opp'n 27-28 & n.11, 29, 34.

Finally, the removal of K&K from the PEC was not commensurate with Fawcett's breach.

Because K&K attorneys were deceived by Fawcett, it was an abuse of discretion to impose such a

draconian sanction. Obj. 38-40. The sanction was also out of step with caselaw in this Circuit

involving similar violations of protective orders, Obj. 38, and particularly misplaced as the

7

**A253**

Magistrate Judge found that the leaked transcript itself was not all that "important," ECF No. 8544

at 49, and identified no "litigation advantage" or "actual prejudice" to Saudi Arabia.  Obj. 36-37

(quoting *Jay v. Spectrum Brands Holdings, Inc.*, 2015 WL 6437581 (S.D.N.Y. Oct. 20, 2015)).[8]

## CONCLUSION

The Court should stay the immediate removal of K&K from the PEC pending the Court's

resolution of K&K's meritorious objections.

Dated:  November 25, 2022
        New York, New York

                                            Respectfully submitted,

                                             */s/ Edward M. Spiro*

Emily Kirsch                                Edward M. Spiro
Paul Niehaus                                MORVILLO ABRAMOWITZ GRAND
KIRSCH & NIEHAUS PLLC                         IASON & ANELLO P.C.
950 Third Avenue, 19th Floor                565 Fifth Avenue
New York, NY 10022                          New York, NY 10017
(212) 832-0170                              (212) 856-9600
emily.kirsch@kirschniehaus.com              espiro@maglaw.com

---

[8] Although the first and second factors (likelihood of success on the merits and irreparable injury absent a stay) are "the most critical," *Nken v. Holder*, 556 U.S. 418, 434 (2009), the remaining two factors (whether a stay will substantially injure other parties and where the public interest lies) also heavily favor K&K.  Given the firm's central role on the PEC for nearly two decades and its lead role in prosecuting the case against Saudi Arabia, maintaining the decades-long status quo will serve the public interest by promoting a more efficient resolution of this matter and by avoiding significant disruptions to the internal structure of the PEC before K&K's meritorious objections are resolved. No other party will be "substantially injured" by maintaining a decades-long status quo until K&K's objections are resolved.  *See* Nken, 556 U.S. at 434.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE TERRORIST ATTACKS ON
SEPTEMBER 11, 2001

No. 03-MD-01570 (GBD) (SN)

This document relates to: *All Actions*

ORAL ARGUMENT SCHEDULED
DECEMBER 8, 2022 @ 10:00 AM

**REPLY IN SUPPORT OF RULE 72 OBJECTIONS TO**
**MAGISTRATE JUDGE SARAH NETBURN'S ORDER IMPOSING**
**SANCTIONS ON KREINDLER & KREINDLER LLP**

Emily Kirsch
Paul Niehaus
KIRSCH & NIEHAUS PLLC
950 Third Avenue, 19th Floor
New York, NY 10022
(212) 832-0170
emily.kirsch@kirschniehaus.com

Edward M. Spiro
MORVILLO ABRAMOWITZ GRAND
 IASON & ANELLO P.C.
565 Fifth Avenue
New York, NY 10017
(212) 856-9600
espiro@maglaw.com

*Counsel for Non-Party Kreindler & Kreindler LLP*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................................ 1

STANDARD OF REVIEW ............................................................................................................... 1

ARGUMENT ..................................................................................................................................... 2

I.     The Magistrate Judge's Finding that K&K "Willfully Breached" the Protective Orders, in Light of the Full Record, Cannot be Sustained as a Matter of Law. ............................. 2

        A.     Direct Evidence Confirms the Truth of Fawcett's Confession .............................. 2

        B.     No Circumstantial Evidence Supports the Finding that K&K Willfully Breached the Protective Order ............................................................................... 4

                1.     K&K's "Litigation Strategy" ................................................................... 4

                2.     K&K's Post-Leak Investigation ............................................................... 5

                3.     K&K's Responses to the Magistrate Judge's Orders ................................ 7

                4.     The Timing of Phone Calls .................................................................... 8

II.    The Magistrate Judge's Order Is "Contrary to Law" Because Rule 37(b) Did Not Authorize Sanctions Against K&K ................................................................................... 11

CONCLUSION ................................................................................................................................ 15

i

**A256**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Cash Card Corp. v. AT&T Corp.*,
   2000 WL 357670 (2d Cir. Apr. 6, 2000) .............................................................................. 12

*Anderson v. City of Bessemer*,
   470 U.S. 564 (1985) .............................................................................................................. 2, 4, 8

*Apex Oil Co. v. Belcher Co. of New York*,
   855 F.2d 1009 (2d Cir. 1988) ........................................................................................... *passim*

*Blackrock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, Nat'l Ass'n*,
   2018 WL 3863447 (S.D.N.Y. Aug. 13, 2018) ....................................................................... 1

*Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*,
   602 F.2d 1062 (2d Cir. 1979) ............................................................................................... 12

*Copeland v. Rosen*,
   194 F.R.D. 127 (S.D.N.Y. 2000) .......................................................................................... 14

*Doe v. Menefee*,
   391 F.3d 147 (2d Cir. 2004) .................................................................................................. 11

*Env't Def. v. Duke Energy Corp.*,
   549 U.S. 561 (2007) ............................................................................................................... 13

*Fonar Corp. v. Magnetic Resonance Plus, Inc.*,
   128 F.3d 99 (2d Cir. 1997) ............................................................................................... 13, 14

*Grider v. Keystone Health Plan Cent., Inc.*,
   580 F.3d 119 (3d Cir. 2009) .................................................................................................. 13

*Homaidan v. Sallie Mae, Inc.*,
   3 F.4th 595 (2d Cir. 2021) .................................................................................................... 12

*In re Asia Glob. Crossing, Ltd.*,
   322 B.R. 247 (Bankr. S.D.N.Y. 2005) .................................................................................... 6

*Ins. Ben. Administrators, Inc. v. Martin*,
   871 F.2d 1354 (7th Cir. 1989) .............................................................................................. 13

*Kleiman v. Chertoff*,
   2007 WL 9706519 (E.D.N.Y. July 10, 2007) ....................................................................... 13

ii

*MacNamara v. City of New York*,
  249 F.R.D. 70 (S.D.N.Y. 2008) ........................................................................... 1

*Markus v. Rozhkov*,
  615 B.R. 679 (S.D.N.Y. 2020) ........................................................................... 14

*NPF Franchising, LLC v. SY Dawgs, LLC*,
  37 F.4th 369 (6th Cir. 2022) ........................................................................... 13

*Schoenberg v. Shapolsky Publishers, Inc.*,
  971 F.2d 926 (2d Cir. 1992) ...................................................................... 14, 15

*SEC v. McNulty*,
  137 F.3d 732 (2d Cir. 1998) ........................................................................... 12

*Shipstad v. One Way or Another Prods., LLC*,
  2017 WL 2462657 (S.D.N.Y. June 6, 2017) ...................................................... 14

*Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*,
  685 F.3d 486 (5th Cir. 2012) ........................................................................... 14

*Sun River Energy, Inc. v. Nelson*,
  800 F.3d 1219 (10th Cir. 2015) ....................................................................... 13

*Ted Lapidus, S.A. v. Vann*,
  112 F.3d 91 (2d Cir. 1997) ........................................................................ 14, 15

*Thompson v. Jam. Hosp. Med. Ctr.*,
  2015 WL 7430806 (S.D.N.Y. Nov. 20, 2015) ..................................................... 7

*U.S. ex rel. Eisenstein v. City of New York*,
  556 U.S. 928 (2009) ....................................................................................... 13

*United States v. Pauling*,
  924 F.3d 649 (2d Cir. 2019) ....................................................................... 9, 11

*United States v Thorn*,
  446 F.3d 378 (2d Cir. 2006) ............................................................................. 2

*Williams v. Beemiller, Inc.*,
  527 F.3d 259 (2d Cir. 2008) ............................................................................. 1

*Wolters Kluwer Fin. Servs., Inc. v. Scivantage*,
  564 F.3d 110 (2d Cir. 2009) ............................................................................. 2

**<u>Statutes</u>**

28 U.S.C. § 636(e)(6)(B) ............................................................................................................ 14

**<u>Rules</u>**

Fed. R. Civ. P. 11(c)  ................................................................................................................ 11

Fed. R. Civ. P. 37(a)(5)(A)  ....................................................................................................... 12

Fed. R. Civ. P. 37(b)(2)(A) ................................................................................................. *passim*

Fed. R. Civ. P. 37(b)(2)(C) ........................................................................................................ 12

Fed. R. Civ. P. 37(c) (1987) ....................................................................................................... 13

Fed. R. Civ. P. 37(d)(3) .............................................................................................................. 12

Saudi Arabia ignores the objective, documentary evidence undermining the findings of Magistrate Judge Sarah Netburn and, instead, repeats the erroneous findings verbatim. ECF Nos. 8751 ("Opp'n"), 8544 ("Ord."). Saudi Arabia proposed those very findings to the court in its post-hearing submission. Saudi Arabia also avoids addressing the plain textual analysis of Rule 37(b), which requires "party" misconduct as the foundation of any sanctions, and the Second Circuit's holding in *Apex Oil Co.*, which confirms that a law firm is not a Rule 37 "party." As demonstrated in Kreindler & Kreindler LLP ("K&K")'s objections, the full record shows that

- a longtime, trusted consultant secretly leaked a deposition transcript on his own initiative to "forewarn[]" the public after learning disturbing information about the deponent;
- the consultant took substantial steps to prevent K&K from discovering the source of the leak and lied to K&K for over two months to hide his misconduct;
- K&K's attorneys were unaware of the consultant's betrayal and, due to the steps taken by the consultant, could not have learned of it until the day that he confessed; and
- K&K reported the facts to the Court the same day that it learned the truth.

ECF No. 8681 ("Obj."). By adopting Saudi Arabia's proposed findings, the Magistrate Judge overlooked documents that disprove the court's key "fact" findings, analyzed the record under the wrong evidentiary standard, and sanctioned K&K without authority under Rule 37(b).

## STANDARD OF REVIEW

The parties agree that, under Rule 72(a), this Court must modify or set aside an order that is "contrary to law" or "clearly erroneous." *See* Opp'n 19; Obj. 15. On the law, Saudi Arabia incorrectly suggests (at 19) that this Court should defer to the Magistrate Judge's views, even though it is settled that an "interpretation of the Federal Rules of Civil Procedure" is reviewed *de novo*. Obj. 15 (quoting *Williams v. Beemiller, Inc.*, 527 F.3d 259, 264 (2d Cir. 2008)).[1] On the

---

[1] Cited by Saudi Arabia (at 19), *Blackrock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, Nat'l Ass'n*, 2018 WL 3863447, at *3 (S.D.N.Y. Aug. 13, 2018), involved an attorney-client privilege determination (a mixed question of fact and law), not a textual interpretation (a pure question of law). *Cf. MacNamara v. City of New York*, 249 F.R.D. 70, 77 (S.D.N.Y. 2008) (Sullivan, J.) ("An order is 'contrary to law' when it fails to apply or misapplies relevant statutes, case law or rules of procedure." (cleaned up)).

facts, Saudi Arabia argues (at 19) for heightened deference to the Magistrate Judge's findings because they were "at least partially based on a credibility determination" and because the Magistrate Judge has previously been "deeply involved in discovery matters in the case for years." As detailed below, however, Saudi Arabia misrepresents which findings were based on credibility determinations.  Such determinations require an assessment of a "witness's demeanor" or another "quality that a review of the transcript would not reveal." *United States v Thorn*, 446 F.3d 378, 384 (2d Cir. 2006).  Otherwise, the "substance of testimony," even if labeled as "incredible" by the trial judge, is "reviewed meaningfully by examining the transcripts." *Id.*  Moreover, a reviewing court may "find clear error even in a finding purportedly based on a credibility determination" where "[d]ocuments or objective evidence" contradict the finding or the finding itself is "internally inconsistent or implausible on its face." *Anderson v. City of Bessemer*, 470 U.S. 564, 575 (1985).  Where, as here, the court is the "accuser, fact finder and sentencing judge all in one," review is "more exacting than under the ordinary" deferential standard. *Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 113-14 (2d Cir. 2009) (cleaned up).

## ARGUMENT

I. **The Magistrate Judge's Finding that K&K "Willfully Breached" the Protective Orders, in Light of the Full Record, Cannot be Sustained as a Matter of Law**

As an initial matter, Saudi Arabia misleadingly frames its response, claiming that the court made many "credibility determinations."  Opp'n 27-28 & n.11; *id.* at 28 ("[Her] findings were supported by her observation of the witnesses.").  The only such determination involved John Fawcett's testimony about his July 22 phone calls, Ord. 19, 39, and is erroneous, *infra* Part I.B.4.

A. **Direct Evidence Confirms the Truth of Fawcett's Confession**

Saudi Arabia does not and cannot dispute that all direct evidence—including multiple declarations by Fawcett and K&K attorneys, hours of testimony, firm documents,

2

**A261**

contemporaneous emails, phone logs, and personal text messages—support the truth of Fawcett's

September 27 written confession: he acted alone, destroyed evidence of his misconduct, and leaked

the transcript because the public "must be forewarned in order to have some chance to protect

themselves" from Musaed al Jarrah. *See* Obj. 21-26; KSAX-108A (full written confession).

Saudi Arabia strategically avoids discussion of Fawcett's written confession, Opp'n 27-36,

which the court found "he had drafted himself" and "wrote . . . in his own words," Ord. 26. The

document undermines the court's reasons for finding that he acted in concert, rather than alone:

- The court found Fawcett's "motive" for leaking the transcript—apparently to "protect the children of Morocco"—was "fabricated." Ord. 28. But Fawcett wrote in his confession that he decided to leak the transcript because "the public at least must be forewarned in order to have some chance to protect themselves" from Jarrah and that he "could not allow Musaed al Jarrah's criminal acts to remain a secret." KSAX-108A; Obj. 25.

- The court "doubt[ed]" the "genuineness" of Fawcett's motive because he "did not alert anyone in the U.S. or Moroccan governments about his concerns." Ord. 28. But Fawcett wrote that "the Saudi [and U.S. governments] continue to protect Musaed al Jarrah rather than prosecute him" and so "[t]he only venue for such warning is the media." KSAX-108A; Obj. 23, 25 n.10, 26.

- The court declined to find that Fawcett acted alone because he learned about Jarrah's conduct "about six to eight months" before the deposition "on an unconfirmed basis." Ord. 28. But Fawcett wrote that confirmation at the deposition that Jarrah was "a child pornographer" was a "revelation[]" to him. KSAX-108A; Obj. 25-26; *accord* Tr. 469:11 (Fawcett: "It [had been] a rumor.").

- The court also found (remarkably) that, Fawcett's adoption of two children from Morocco following his human rights work, *undermined* the truth of his confession because "[h]is 'children' referenced in his declaration were at least 21 by the time of the leak." Ord. 28.[2]

- The court found, as to Fawcett's September 27 declaration, that "there was *no evidence at the hearing or in Fawcett's phone records* that he participated in th[e] additions" regarding his knowledge of Morocco's history of child sex trafficking. Ord. 27 (emphasis added). But that overlooks: (a) phone records showing multiple calls between Fawcett and Benett or Pounian on September 27, KSAX-136 at 2-3; (b) Fawcett's testimony that "we talked about [the additions] on the phone. . . . long phone calls," Tr. 466:22-467:2; and (c) Fawcett's testimony that "I signed what I believed to be a correct declaration . . . . I felt that was my declaration," Tr. 467:12-19; *see also* Obj. 26 n.11.

---

[2] The court concluded the hearing by *sua sponte* asking Fawcett the current age of the children he previously adopted, without any follow-up questions regarding his written motive (*i.e.*, Jarrah's conduct) for the leak. *See* Tr. 489:12-17.

3

**A262**

This evidence—overlooked by the court—demonstrates Fawcett's actual motive and disproves the court's bedrock finding that additional details in his September 27 declaration were "fabricated."[3]

**B.      No Circumstantial Evidence Supports the Finding that K&K Willfully Breached the Protective Order**

Saudi Arabia uses the same diversionary tactics to avoid addressing the record evidence undermining the "circumstantial evidence" proposed by Saudi Arabia and wrongly adopted by the Magistrate Judge.  *Compare* Opp'n 27-36, *with* Obj. 26-35.

**1.      K&K's "Litigation Strategy"**

Saudi Arabia does not dispute that it makes no sense for a *U.S. law firm* to think it could "force" any sovereign nation—let alone Saudi Arabia—into a settlement through press attention, when the *U.S government* cannot move Saudi Arabia through press attention.  Obj. 27.  Nor does Saudi Arabia dispute that it makes even less sense for the firm to leak a document unrelated to the merits and (as the Magistrate Judge concluded) not "important" to the litigation.  Obj. 27 (quoting Ord. 49).  The court's finding that K&K's "motive for the leak"—a quixotic "litigation strategy," laden with risk, that seeks to "force" Saudi Arabia into a settlement with such attention, *see* Obj. 27-28 (quoting Ord. 37)—should be rejected as "implausible on its face."  *Anderson*, 470 U.S. at 575.  And the evidence cited by Saudi Arabia is threadbare.  *See* Opp'n 31 n.13, 28.  Kreindler's testimony—that he has made public statements for plaintiffs "to put pressure on the defendant" and the "form of a resolution may or may not be what we traditionally think of as a settlement,"

---

[3] In addition to overlooking the documents, it was "internally inconsistent," *Anderson*, 470 U.S. at 575, for the court to credit Fawcett's September 30 declaration (which included the substantial steps he took to hide his misconduct) but not credit Fawcett's September 27 declaration (which included his knowledge, from his human rights work, that "Morocco has a dreadful history of child sex trafficking").  It was also internally inconsistent for the court to conclude that Fawcett was "unwilling to sign a perjurious declaration" (in "finding" that K&K attorneys attempted to "fabricate" additions to the September 27 declaration) while failing to credit the remaining portions of the same declaration, avowing (under penalty of perjury) that he acted alone and stating his reason for leaking the transcript.  Obj. 25 n.10. And despite phone calls between Fawcett and Pounian (about which Saudi Arabia asked no questions), it was erroneous for the court to speculate that Pounian "did not object" when Fawcett removed draft language from his declaration.  Opp'n 8 (citing Ord. 13, 40 (citing only the declaration itself)).

4

*see* Obj. 27 (quoting Tr. 24:3-25:5)—is unremarkable and true of almost any major case.  And

Kreindler's past criticism of the Protective Orders as overbroad supports *the opposite* inference:

that, as an officer of the court, he has taken the orders seriously despite his chagrin.  Obj. 28.

### 2.    K&K's Post-Leak Investigation

As demonstrated in the objections, the Magistrate Judge's finding that other K&K attorneys

were "willfully blind"—because K&K's investigation was supposedly "lackadaisical," "paltry,"

"facially deficient," and "almost designed to avoid implicating Fawcett," Ord. 2, 39, 41, 44, 45—

should also be rejected.  Obj. 28-30.  The court did not address objective evidence—including

contemporaneous emails amongst the investigative team—that demonstrates K&K's attorneys

took the investigation seriously from the start and were *lied to and deceived* by Fawcett.  Obj. 29.[4]

Rather than compare K&K's investigation to the nearly identical investigations by other PEC

members and other plaintiffs and defense firms, Obj. 28, the court (despite evidence of the

substantial steps Fawcett took to hide his misconduct) unfairly criticized K&K based on steps it

could have taken to potentially catch Fawcett after the leak occurred—steps that no other firm

took.  Obj. 29; *see also, e.g.*, ECF Nos. 6981-4 (Kellogg Hansen), 6991 (Cozen O'Connor), 6992

(Motley Rice); *accord* Tr. 293:23-295:3 (Maloney).

Saudi Arabia repeats the court's erroneous finding that K&K "never 'directly question[ed]'

Fawcett about his role in the breach.'"  Opp'n 30, 34; *see also* Ord. 13 ("Fawcett does not recall

---

[4] An email from Maloney to K&K's IT manager, John Hartney, shows that on July 16, the day after the publication, Fawcett told Maloney that he sent a copy of the transcript to a consultant overseas but did not send it to anyone else. *See* KK-53 (email); *accord* Tr. 252:1-10 (Maloney: "I was in his office and I asked [Fawcett]."), 407:8-9 (Pounian: "I asked Mr. Fawcett if he knew anything about how Mr. Isikoff got the transcript.").  Maloney then directed Hartney to confirm that no one else at K&K had sent the transcript to Isikoff.  *See* KK-53.  When that search came up empty, Maloney directed Hartney to "check to see if it was emailed to[ ]*anyone* outside of" K&K to determine "if it was sent to someone else who may have in turn sent it to Isikoff."  KK-41 at 1 (emphasis in original); *accord* Tr. 285:8-15 (Maloney).  The following week, in a July 22 email to the entire 9/11 litigation team, Maloney wrote that "it is fair to say . . . no Jarrah depo transcript was sent outside the firm save for one sent by John Fawcett to one of our investigating consultants."  KK-54.  Fawcett was included on that email yet remained silent until his September 27 confession.  (For a catalogue of overlooked K&K email communications throughout the investigation, see ECF No. 8768-1 to -32.)

being questioned by anyone."). Fawcett testified, however, that K&K attorneys asked him "in substance" whether he "disclosed the transcript to Michael Isikoff." Obj. 30 (quoting Tr. 436:12-23).[5] Realizing that the Magistrate Judge failed to engage with this evidence, Saudi Arabia attempts to lace the court's order with its own "credibility determination" where none occurred. *See* Opp'n 34 ("As finder of fact watching Fawcett answer those questions, Judge Netburn could see him attempting to equivocate and ultimately failing." (citing nothing)).[6] It also claims that the court "reasonably interpreted his entire testimony as meaning that he was never directly asked," Opp'n 34, but (tellingly) fails to identify where the court weighed such evidence. The court ultimately misread Fawcett's testimony, *see* Ord. 40 (citing Tr. 436:12-23), likely prompted by Saudi Arabia's misleading post-hearing submission, *see, e.g.*, ECF No. 7389 ¶¶ 84-86.[7]

Saudi Arabia does not dispute that the court improperly evaluated K&K's investigation through hindsight, rather than in comparison to the investigations conducted by other firms. Its attempt to argue that K&K "could have" revealed Fawcett's misconduct sooner had it impounded his personal devices is unpersuasive. Opp'n 34-35. *First*, it would have been unreasonable under the circumstances for K&K to attempt to collect the personal devices of its attorneys and staff for examination; indeed, no other law firm took such a step, *see, e.g.*, ECF Nos. 6981-4, 6991, 6992; *accord* Tr. 293:23-295:3, and such an action would raise serious legal and privacy issues, *see In re Asia Glob. Crossing, Ltd.*, 322 B.R. 247, 257 (Bankr. S.D.N.Y. 2005). Even had K&K made

---

[5] Saudi Arabia (at 34) misleadingly claims that the court cited "the exact testimony" in its order, Opp'n 34, but the order only contains a general page citation, Ord. 40 (citing Tr. 436:11-439:12), and fails to address Fawcett's testimony that K&K's attorneys asked him in substance about the leak.

[6] If anything, to the extent the court assessed Fawcett's credibility as to his confession and declarations, it found him to be truthful. *See, e.g.*, Ord. 13 ("Although Fawcett has admitted to violating Protective Orders, he was apparently unwilling to sign a perjurious declaration.").

[7] Fawcett testified that he did not recall being asked the exact words "did you disclose this transcript," Tr. 439:1-12, but made clear that he was asked "in substance" if he leaked the transcript, Tr. 436:12-17; that he "misled" K&K, Tr. 436:23, that he "prevaricated and dissembled" and "avoided letting [K&K attorneys] know" what he had done, Tr. 486:24-25; *accord* Tr. 407:8-9 (Pounian: "I asked Mr. Fawcett *if he knew anything* about how Mr. Isikoff got the transcript." (emphasis added)).

such an extraordinary attempt, Fawcett previously destroyed evidence and there is no guarantee that he would not have similarly deleted the two (obscure) Signal messages with Isikoff. KSAX-82 at 1, 3 (messages). *Second*, the contacts themselves did not evidence wrongdoing: phone calls among the K&K employees were commonplace (not "suspicious"); Fawcett and Kreindler spoke regularly about the case, *see* KSAX-134, -135, -136; *accord* Tr. 59:19-23; Kreindler undisputedly communicated with Isikoff and his team in the lead up to his podcast appearance, Tr. 59:18-24, ECF 7147-6 at 6; and Liz Crotty was a long-time friend of Fawcett and former K&K employee, Tr. 447:5-16. This Court should reject the finding of "willful blindness" by K&K attorneys. *See Thompson v. Jam. Hosp. Med. Ctr.*, 2015 WL 7430806, at *3 (S.D.N.Y. Nov. 20, 2015) (no "willfulness" where breach "due to factors beyond the party's control" (cleaned up)).

### 3. K&K's Responses to Magistrate Judge's Orders

As demonstrated in the objections, the court likewise erred when it found that K&K attempted to "frustrate," "foil," and "obstruct" the court's investigation. Obj. 30-32; *see* Ord. 2, 41, 42, 45, 50, 57, 59, 65. K&K submitted its declarations by the required deadlines and in compliance with the terms of the court's orders. Obj. 30-31; *see* ECF Nos. 7011, 7147 (declarations). It was not reasonable to compare K&K's timely compliance with the early compliance or volunteered information provided by only some of the other law firms that received the transcript. Obj. 31 & n.14. As the lead firm prosecuting the case against Saudi Arabia, K&K had unique work product and security concerns, including to protect the identity and safety of an investigator in Turkey who received the transcript, and Saudi Arabia's discovery demands after the leak were vastly overbroad. Obj. 31 (citing KK-52 (email); ECF No. 6981 (motion)).

Saudi Arabia dismisses K&K's unique concerns as "self-serving assertions," Opp'n 35, and claims that, if K&K "truly thought Fawcett was innocent," it "would have had every reason"

7

to dispel "suspicion" by obtaining a declaration from Fawcett "sooner," *id.* at 30.  But (once again) Saudi Arabia ignores contemporaneous documentary evidence to the contrary.  *See, e.g.*, KK-52 at 1 (Pounian to Benett (July 29 email): "I'm also concerned about sharing [REDACTED]'s name with [Saudi Arabia] since he is living abroad.").[8]  Although Saudi Arabia claims that the court's "meticulous catalogue" of the record deserves "deferential review," Opp'n 35, failure to account for such conflicting documentary evidence constitutes clear error.  *See Anderson*, 470 U.S. at 575.

Saudi Arabia also repeats the court's findings regarding purported "misrepresentations" in the declarations.  Opp'n 33.  But since Fawcett acted alone and K&K attorneys did not learn of his breach until his September 27 confession, it was true that "no firm attorneys knew who was responsible for the breach until September 27."  Opp'n 33.  To the extent that, with hindsight, any K&K attorney described the firm's document retention system or the details of their investigation imprecisely, Opp'n 33, Saudi Arabia cites no evidence that the inaccuracies were intentional.  In any event, the alleged "misrepresentations" do not show that the firm knew about Fawcett's leak.[9] Because inferences drawn from K&K's declarations do not reasonably support the finding that it was "willfully blind" to Fawcett's leak, the Court should reject these findings.

### 4.    The Timing of Phone Calls

The timing of phone calls does not "evidence" a conspiracy to leak the transcript.  Obj. 32-35.  Saudi Arabia does not dispute that Kreindler spoke with Isikoff and his staff before his July 1 podcast appearance, which was unrelated to the breach.  Obj. 32 (citing ECF No. 7147-6 at 6); *accord* Tr. 59:18-24.  Instead, Saudi Arabia repeatedly misleads regarding the two, one-minute

---

[8] Given the recent murder of Jamal Khashoggi, who had been interviewed by a K&K representative and killed in Turkey, K&K was worried about protecting the identity of its investigator who was in Turkey.  *See* Obj. 14, 21 (citing KK-52; Tr. 372:4-10 (Benett)).

[9] Saudi Arabia also repeats the court's finding that Benett "used" the hearing as a "forum" to "compound the damage caused by the breach."  Opp'n 35-36 (quoting Ord. 42).  But it is not possible to describe Fawcett's motivation for his acts (*i.e.*, Jarrah's conduct) without some (in the court's words) "disparagement [of] Saudi Arabian personnel."  Obj. 31 (quoting Ord. 42).

calls between Fawcett and Kreindler on June 28.  *See* Obj. 32-33; KSAX-134 at 1-2 (stamped

12:22 p.m. and 12:23 p.m.).  *First*, it selectively quotes Kreindler's testimony, suggesting that

Kreindler was "very familiar with the terms" of the FBI Protective Order, Opp'n 31 (quoting Tr.

18:17), when moments earlier he testified that he "did not recall the 30-day window" for the FBI

to propose redactions because he last "read [that protective order] when [he] signed it" in 2018.

Tr. 18:25.[10]  Saudi Arabia then misrepresents the record, claiming that the Magistrate Judge made

a credibility determination about *the June 28 calls* after having "witnessed Fawcett on the stand,"

Opp'n 29 (quoting Ord. 39), when that credibility determination (the only such determination on

the record) addressed Fawcett's explanation of his *July 22 calls.  See* Ord. 19 (finding), 39

(conclusion).  The court's "suspicion" surrounding these short phone calls—which were consistent

with the regular and well-documented communications between Fawcett and Kreindler, and with

Kreindler's testimony regarding a quick question, Obj. 32-33—does not constitute a permissible

"inference" of a conspiracy.  *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019).[11]

The Court should also reject the Magistrate Judge's finding that the July 22 phone call, the

morning after Saudi Arabia informed the PECs that it intended to move for discovery into the leak,

was only between Fawcett and Kreindler, and that they probably discussed the leak.  Obj. 33-35.

A Verizon phone bill shows that Pounian was also on that 46-minute conference call, which (at

9:17 a.m.) naturally involved discussion of Saudi Arabia's email (at 9:14 p.m.) the night before.

Obj. 33-35; *see also* ECF No. 7359-1 (phone bill and Pounian declaration).

---

[10] Saudi Arabia also ignores evidence (which the Magistrate Judge did not address) demonstrating that Kreindler usually relied on other attorneys and staff members for case details, because he operated at a strategy level.  *See* Obj. 32-33 (citing Tr. 310:10-16; Tr. 74:16-19; Tr. 89:14-22).

[11] Saudi Arabia regurgitates the court's findings of "extreme reciprocal loyalty" between Fawcett and Kreindler. Opp'n 28-29 (citing Ord. 9, 43).  The court only cited testimony that Kreindler viewed Fawcett as "honest and trustworthy," that Fawcett had worked at K&K for about 20 years, and that he had (in the words of Saudi Arabia's counsel) "a certain amount of loyalty" to his colleague.  Ord. 9 (citing Tr. at 128:11-129:16, 417:15-18), 43 (citing Tr. 416:3-5).  There is no evidence to support the inference that Fawcett's "certain amount of loyalty" (whatever that means) rose to the level of committing criminal misconduct for the firm.

9

**A268**

Saudi Arabia defends the court's decision to ignore Pounian's declaration because it was an out-of-court statement. Opp'n 32 n.14 (citing Ord. 17 n.8). But Saudi Arabia does not dispute that, because of the extraordinary procedures imposed by the court before and during the hearing (*e.g.*, barring K&K attorneys and Fawcett from discussing the leak in the month before the hearing, no exchange of exhibits, direct testimony limited to the declarations, and sequestration of K&K attorneys during the hearing), it was impossible for K&K to offer testimony from Pounian about the July 22 call. Obj. 12-13, 34 n.15. Saudi Arabia also repeats the court's reasoning that Pounian's declaration "undercut" Kreindler's testimony because he declared the call involved, among other topics, discussion of a response to Saudi Arabia's July 21 email regarding discovery, while Kreindler testified that the call "was not about the leak." Opp'n 32 n.14 (citing Ord. 17 n.8). That is rhetorical hairsplitting and inaccurate. Kreindler testified that he did not "recall what this phone call was about," but that "[m]aybe" it was about "the fact that the Court might order an investigation." Tr. 84:13-16; *accord* Tr. 446:9-20 (Fawcett: "[It] might have been a conference call with others."). Kreindler (and Pounian) otherwise categorically and repeatedly denied—in sworn declarations and testimony—communication or knowledge that Fawcett was the source of the leak, before his September 27 confession. Fawcett also wrote and testified that prior to that confession he never told anyone at K&K that he was the source of the leak. KSAX-108A.[12]

Saudi Arabia doubles down on the Magistrate Judge's refusal to credit Fawcett's testimony that he did not discuss the leak with Kreindler on the July 22 call, based in part on Fawcett's demeanor on the stand. Opp'n 29 (citing Ord. 39). But because that determination was also "supported" by the court's numerous "findings" that overlooked conflicting documentary

---

[12] Although not clear from the Magistrate Judge's order, given the extraordinary procedures imposed by the court before and at the hearing, *see* Obj. 12-13, 34 n.15, any potential adverse inference the court made from an attorney's (or Fawcett's) inability to recall the discussion during a specific phone call (out of many) three months before the November hearing should be rejected.

10

evidence, and given the trial-by-surprise procedures surrounding the hearing, this Court should afford no deference to the Magistrate Judge's limited credibility determination—and otherwise unsubstantiated inference—that Fawcett and Kreindler had a private conversation on July 22 about Fawcett being the source of the leak.  The Court "may not credit inferences within the realm of possibility when those inferences are unreasonable." *Pauling*, 924 F.3d at 657 (quotes omitted).

On the full record, there is neither clear-and-convincing nor a preponderance of evidence, supporting the Magistrate Judge's findings.  The order should be set aside as clearly erroneous. *See Doe v. Menefee*, 391 F.3d 147, 164 (2d Cir. 2004) (collecting cases where the lower court erroneously failed to "accoun[t] for conflicting evidence or the gaps in a party's evidentiary presentation" or made "factual inferences that the evidence did not permit").

## II.   The Magistrate Judge's Order Is "Contrary to Law" Because Rule 37(b) Did Not Authorize Sanctions Against K&K

As demonstrated in K&K's objections, the Magistrate Judge exceeded her authority by sanctioning the K&K firm, because Rule 37(b) "requires 'party' misconduct as the foundation for any sanctions, including sanctions against an attorney" and "there is no allegation of such misconduct" here.  Obj. 16 (quoting Fed. R. Civ. 37(b)(2)(A)).  That conclusion is confirmed by the plain meaning of the term "party"; the text of Rule 37(b) and surrounding provisions; the text of Rule 11(c); and, binding caselaw, including the Second Circuit's decision in *Apex Oil Co. v. Belcher Co. of New York*, 855 F.2d 1009 (2d Cir. 1988), which held that a "party" under an earlier version of Rule 37 does not include the party's law firm.  Obj. 16-19.

Saudi Arabia avoids addressing K&K's textual analysis of a Rule 37 "party" and *Apex Oil Co.*'s holding.  Attempting to confuse the issue, Saudi Arabia (1) dedicates one paragraph to its interpretation of a Rule 37 "party," Opp'n 21-22, and then (2) misrepresents K&K's argument and

11

attacks a strawman—namely, the scope of "just orders" sanctions *after "party" misconduct has been found*. Opp'n 23-27.[13]

Relying heavily on *SEC v. McNulty*, 137 F.3d 732 (2d Cir. 1998), Saudi Arabia argues that attorney conduct is "imputed to their client" under Rule 37(b). Opp'n 22. *McNulty*, however, engaged in the fact-intensive inquiry of whether a court should "impute" an attorney's conduct to the client for purposes of a Rule 60 or Rule 55 default judgment, not Rule 37. *See* 137 F.3d at 738-40. That inquiry turns on whether *the client* makes an evidentiary "showing" that he "attempt[ed] to monitor counsel's handling of the lawsuit." *Id.* at 740. The Circuit did not address—nor did it need to address—the application of *Apex Oil Co.*'s holding (as a matter of textual interpretation) that a Rule 37 "party" does not include the party's lawyer.[14]

Saudi Arabia's argument that "party," under Rule 37(b), really means "attorney, law firm, or party" fails on its own terms. Saudi Arabia's "interpretation would render superfluous another part of" Rule 37. *See Homaidan v. Sallie Mae, Inc.*, 3 F.4th 595, 602 (2d Cir. 2021) (quotation marks omitted). Under Rule 37(b)(2)(C), there would be no need to expressly authorize a monetary sanction against "the disobedient party, *the attorney advising that party, or both*" for failure to obey a discovery order. Similar language in other provisions of Rule 37 would also be redundant. *See* Fed. R. Civ. P. 37(a)(5)(A), (d)(3). What is more, under Saudi Arabia's theory, the term "party" would have different meanings in the first clause of Rule 37(b)(2)(A). An attorney representing their client during discovery would not have an "officer, director, or managing agent,"

---

[13] Saudi Arabia's strawman argument that a law firm falls within the scope of the "just orders" provision fails under the same textual analysis and caselaw raised in the objections. Obj. 15-19.

[14] In the other Second Circuit opinion cited (at 22), the Circuit made clear that by the "Magistrate [Judge]'s finding and counsel's own admission," the client-company's principal officer "was aware of every aspect of discovery and intimately involved with the progress of the case." *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 n.10 (2d Cir. 1979). The unpublished disposition cited (at 22) is not precedential, *see* 2d Cir. Local Rule 32.1.1(b), and in any event, similarly turned on the district court's "amply supported," "factual determination" of "bad faith" by the "parties" themselves in failing to produce discovery and answer interrogatories. *See Am. Cash Card Corp. v. AT&T Corp.*, 2000 WL 357670, at *1-3, *5 (2d Cir. Apr. 6, 2000).

12

**A271**

or even a "[Rule 30(b)(6)] witness" to designate on behalf of himself, separate from the client. *Cf.*

*Env't Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) (identical words presumed to bear the

same meaning throughout a text).  By contrast, the plain meaning of the term "party"—*i.e.*, the

"one by or against whom a lawsuit is brought," *U.S. ex rel. Eisenstein v. City of New York*, 556

U.S. 928, 933-34 (2009) (cleaned up)—gives effect to every clause and word of Rule 37's text.

Most significantly, Saudi Arabia's theory contravenes the Second Circuit's holding in *Apex*

*Oil Co.*  There, the Circuit held that an earlier provision of Rule 37(c)—which authorized sanctions

after "a party fail[ed] to admit the genuineness of any document or the truth of any matter"—did

"not permit sanctions against a party's attorney" because "[b]y its express terms, Rule 37(c) applies

only to a party," not the party's law firm.  855 F.2d at 1011, 1013-14 (quoting Fed. R. Civ. P. 37(c)

(1987)).  Former Rule 37(c)'s requirement of "party" misconduct before imposing sanctions is

identical to current Rule 37(b)(2)(A)'s requirement.  *See, e.g.*, *Kleiman v. Chertoff*, 2007 WL

9706519, at *9 (E.D.N.Y. July 10, 2007) (applying *Apex Oil Co.* in holding that "Rule 37 cannot

provide the basis for the imposition of sanctions on [plaintiff's counsel]").  Rather than explain

how its theory can survive *Apex Oil Co.*'s holding—or similar analyses of Rule 37 by sister

circuits—Saudi Arabia simply ignores their holdings.  *See* Obj. 18-19.[15]

Saudi Arabia also cites the same three cases erroneously relied upon by the Magistrate

Judge.  *See* Opp'n 22 n.7, 24 & n.8.  In *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 128 F.3d

99, 100-03 (2d Cir. 1997), the misconduct of the party's Rule 30(b)(6) witness (the company's

president) served as the foundation for sanctions, including a $500 fine against the party's

individual attorney for "his role in [the Rule 30(b)(6) witness]'s failure to appear for deposition."

---

[15] All circuits that have addressed the issue are unanimous.  *See* Obj. 18-19 (citing *NPF Franchising, LLC v. SY Dawgs, LLC*, 37 F.4th 369, 383 (6th Cir. 2022)); *see also Sun River Energy, Inc. v. Nelson*, 800 F.3d 1219, 1226 (10th Cir. 2015); *Grider v. Keystone Health Plan Cent., Inc.*, 580 F.3d 119, 141 (3d Cir. 2009); *Ins. Ben. Administrators, Inc. v. Martin*, 871 F.2d 1354, 1360 (7th Cir. 1989).

*Fonar* had no reason to address the implications of *Apex Oil Co.*'s holding or analyze the meaning

of a Rule 37 "party."  In *Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 488-

90 (5th Cir. 2012), the Fifth Circuit addressed whether a protective order under Rule 26(c) qualifies

as "an order to provide or permit discovery" under Rule 37(b)(2)(A).  And in *Markus v. Rozhkov*,

615 B.R. 679, 701-04, 708 (S.D.N.Y. 2020), the district court vacated Rule 37(b)(2)(A)(vii)

sanctions against an individual attorney because his client was not a "party" to the action.  *See also*

Obj. 19.[16]

Finally, the record refutes Saudi Arabia's assertion that K&K forfeited its challenge to the

applicability of Rule 37(b).  Opp'n 20-21.  As detailed in K&K's objections, *see* Obj. 9-14, the

Magistrate Judge failed to notify K&K of the specific "authority under which sanctions [we]re

being considered."  *Ted Lapidus, S.A. v. Vann*, 112 F.3d 91, 97 (2d Cir. 1997).[17]  The Magistrate

Judge's October 4 order scheduling a hearing did not reference any authority under which the court

was considering sanctions but listed potential remedies available *only* under the court's inherent

authority.  ECF No. 7167 at 1.  The court later stated it "intend[ed] to issue findings of fact and

recommend remedies to District Judge Daniels," ECF No. 7277 at 1, and described the upcoming

proceeding as a "contempt hearing," ECF No. 7310 at 3; *cf.* 28 U.S.C. § 636(e)(6)(B) (titled

"Certification of Other Contempts to the District Court").  After the hearing, the court required

concurrent briefing, ECF Nos. 7386, 7389, did not allow reply briefing, and denied K&K's request

for oral argument on the issues, ECF Nos. 7317, 8544 at 64.  K&K argued in its submission that

---

[16] The two district cases within this Circuit cited by Saudi Arabia (at 22 n.6) neither address *Apex Oil Co.* nor involve a law firm.  *See Shipstad v. One Way or Another Prods., LLC*, 2017 WL 2462657, at *3, *5 (S.D.N.Y. June 6, 2017); *Copeland v. Rosen*, 194 F.R.D. 127, 133 (S.D.N.Y. 2000).  And the remaining out-of-circuit cases—on which Saudi Arabia relies for its distraction about the scope of "just orders" sanctions—similarly fail to address the meaning of a "party" under Rule 37.  *See* Opp'n 24-25.

[17] *See, e.g., Schoenberg v. Shapolsky Publishers, Inc.*, 971 F.2d 926, 927, 929-30, 934 (2d Cir. 1992), (insufficient notice where the district court ordered counsel to show cause "why sanctions should not be imposed" on counsel "pursuant to Rule 11 . . . or other authority" and then held counsel in contempt under Rule 37(b)), *abrogated on other grounds by Bassett v. Mashantucket Pequot Tribe*, 204 F.3d 343 (2d Cir. 2000).

14

contempt and inherent authority sanctions were not warranted against the firm, ECF No. 7386 at 35-55, and objected to the general sufficiency of notice in its post-hearing briefing, *id.* at 56 ("The Court permitted [a hearing] without notice of what rule or authority was invoked.").  The court subsequently held that K&K "may file Rule 72(a) objections to this Opinion and Order, which will cure any possible notice issues."  ECF No. 8544 at 35.  Saudi Arabia (at 20-21) cites no case supporting its suggestion that *its own* July 2021 letter *requesting discovery*—pursuant to inherent powers, Rule 37, or even the MDL Protective Order itself, ECF No. 6981—provided sufficient notice of the authority under which *the court* was *considering sanctions* at the November 2021 hearing, over three months later.  *Cf. Schoenberg*, 971 F.2d at 929 (insufficient notice by court, where opposing party informed counsel of intent to move for contempt sanction).  Such failure to notify K&K about the specific "standard by which [its] conduct will be assessed"—namely, clear-and-convincing evidence under contempt or inherent authority, or a preponderance of evidence under Rule 37—unquestionably affected K&K "opportunity to defend [it]self against th[e] charge."  *Ted Lapidus*, 112 F.3d at 97.

Saudi Arabia does not dispute that there is insufficient evidence to meet its higher evidentiary burden.  *See* Obj. 16, 20-21 (detailing standard); Opp'n 20-27.  Rule 37(b) should not be a vehicle for opposing counsel to avoid that burden in an attempt to sideline its opponent.

## **CONCLUSION**[18]

For each and all of the forgoing reasons and as set forth in the objections, the Magistrate Judge's order should be set aside as contrary to law and clearly erroneous.

---

[18] The Magistrate Judge's harsh sanctions were also not commensurate with Fawcett's leak.  *See* Obj. 35-40.  Saudi Arabia (at 37-40) does not dispute that the court found that the transcript was not "important" to the litigation, fails to identify any harm to itself other than "embarrassing" information, and boldly argues that 9/11 death and injury plaintiffs will not be harmed by the removal of their counsel in the case against Saudi Arabia.  *But see* Obj. 36-37; ECF No. 8772 at 2-5 & n.1-7 (K&K reply in support of stay).  Because the Magistrate Judge's sanctions were based on erroneous findings, the sanctions are also out of step with other cases involving leaked transcripts.  *See* Obj. 38.

Dated: December 1, 2022
New York, New York

Respectfully submitted,

_/s/ Edward M. Spiro_____

Emily Kirsch                          Edward M. Spiro
Paul Niehaus                          MORVILLO ABRAMOWITZ GRAND
KIRSCH & NIEHAUS PLLC                    IASON & ANELLO P.C.
950 Third Avenue, 19th Floor          565 Fifth Avenue
New York, NY 10022                    New York, NY 10017
(212) 832-0170                        (212) 856-9600
emily.kirsch@kirschniehaus.com        espiro@maglaw.com

16

**A275**

**MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES**
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y.)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley (1944-2013)<br>Jodi Westbrook Flowers, *Co-Chair*<br>Donald A. Migliori, *Co-Chair*<br>Robert T. Haefele, *Liaison Counsel*<br>MOTLEY RICE LLC | Stephen A. Cozen, *Co-Chair*<br>Sean Carter, *Co-Chair*<br>J. Scott Tarbutton, *Liaison Counsel*<br>COZEN O'CONNOR |

**VIA ECF**

December 2, 2022

The Honorable George B. Daniels
United States District Court
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

RE:     *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD) (SN)

Dear Judge Daniels:

The Plaintiffs' Executive Committees ("PECs") write to address certain issues in the recent filings of Kreindler & Kreindler ("Kreindler") and the Kingdom of Saudi Arabia ("Saudi Arabia"), concerning Judge Netburn's Opinion and Order of September 21, 2022 ("Order"; ECF No. 8544).[1]  The PECs have sought to stay out of these ancillary disputes and have participated only to the extent directed by the Court or where necessary to protect the privileges and interests of the Plaintiffs and the PECs themselves.  Because several of the filings relating to the Order implicate those privileges and interests, we are compelled to write to clarify the record on a few points and to object to any oral argument that discloses work product or strategy of the plaintiffs' law firms, as that work product and strategy are privileged and have no bearing on the questions before the Court.

*First,* in service of their respective interests, both Kreindler and Saudi Arabia have proffered arguments that presume that the jurisdictional inquiry concerning the claims against Saudi Arabia will require further proceedings concerning the involvement of Fahad al Thumairy, Omar al-Bayoumi, and other Saudi officials in establishing the support network for the first arriving hijackers. These arguments largely or completely ignore Plaintiffs' pending Rule 54(b) Motion pursuant to the Second Circuit's decisions in *Kaplan v. Lebanese Canadian Bank* SAL, 999 F.3d 842 (2d Cir. 2021) and *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021).  As set forth in the PECs' briefs in support of that Motion, those decisions demonstrate that no further jurisdictional proceedings as to

---

[1] The filings concerning the Order include the filings regarding Kreindler's objections (ECF No. 8681/8754); Saudi Arabia's response to those objections (ECF No. 8751); Saudi Arabia's fee and cost petition and Kreindler's opposition to that petition (ECF Nos. 8623 (motion), 8624 (supporting declaration), 8685 (Kreindler opposition), 8699 (Saudi Arabia reply)), and Kreindler's motion for a stay and Saudi Arabia's opposition to that motion (ECF Nos 8700 (motion), 8701 (supporting declaration), 8760 (Saudi Arabia opposition), 8772 (Kreindler reply), and 8781).

The Honorable George B. Daniels
December 2, 2022

_____

Saudi Arabia are necessary, because jurisdiction has been established already.  *See* ECF No. 7432 (Memorandum of Law in Support of Rule 54(b) Motion); ECF No. 7704 (Reply In Support of Rule 54(b) Motion); *see also* ECF No. 8157 (PECs' letter of June 28, 2022).  On September 20, 2022, Judge Netburn issued an Order denying Saudi Arabia's request to set a schedule for a renewed motion to dismiss as to jurisdictional issues, finding that it would be inappropriate to do so "given the pending motions under Rule 54."  ECF No. 8542.

*Second*, Kreindler has in various filings claimed credit for "leading" the litigation against Saudi Arabia.  *See, e.g.*, ECF Nos. 8754 at 9, 22, 33, 37, 43; 8772 at 4, 7, 10; 8781 at 13.  While we previously have expressed our view that the Kreindler narrative distorts the actual record, ECF No. 8620, we have refrained from addressing any of the specific claims, because doing so in a fulsome manner would require members of the PECs to disclose confidential and privileged aspects of the PECs' work and internal operations in a public setting.  Although the PECs intend to continue to fulfill our obligation to protect Plaintiffs' privileges and work product, we are compelled to express our concerns that Kreindler continues to invite public inquiry into privileged matters, in service of its own interests.[2]

*Third*, regarding Kreindler's arguments about potential "prejudice," the PECs note (in addition to our first point above) that the Case Management Order establishing the PECs contemplates and provides a mechanism for "any plaintiffs' attorney" in this MDL to "give advice and suggestions to the" PECs.  *See* ECF No. 248 at ¶ 13. We have invited Kreindler to cooperate pursuant to that mechanism.

*Fourth*, while the PECs take no position with regard to the Kellogg firm's fee and cost petition, we do reserve all rights with regard to the standards and rates this Court should apply in granting attorney's fees and cost awards in this complex multi-district litigation. As the Court is aware, the Anti-Terrorism Act (ATA) provides for mandatory attorney's fees and cost awards in favor of a prevailing plaintiff, and this Court has on several occasions awarded attorney's fees and costs to plaintiffs' counsel as a sanction against defendants for discovery abuses. The disputes relating to the Kellogg firm's fee and cost petition against the Kreindler firm thus indirectly implicate the interests of the Plaintiffs and PECs. Because the PECs believe the Plaintiffs' and their own interests are most

---

[2] Merely by way of one example, we point to Kreindler's claim in a recent Reply Brief, where it claimed that only Kreindler argued Saudi Arabia's Motion to Dismiss "for the PEC" (ECF No. 8772 at 4).  In the case of that example, the public record demonstrates that Kreindler's assertion is not correct.  In point of fact, Kreindler, on behalf of the *Ashton* Plaintiffs, and only the *Ashton* Plaintiffs, insisted on filing a separate post-JASTA complaint and separate brief in response to Saudi Arabia's motion to dismiss, and on presenting separate argument on behalf of the *Ashton* Plaintiffs. As the Court recognized at the time, Kreindler separated itself from the PECs for purposes of those filings, and it argued solely on behalf of the *Ashton* plaintiffs.  Counsel for the PECs also presented key arguments in response to Saudi Arabia's motion to dismiss, and Kreindler did not argue for the PECs or any plaintiffs who joined the PECs' Consolidated Amended Complaint and brief.  *See* Tr. (Jan. 18, 2018) at 36:7-83:7 (arguments presented by Sean Carter on behalf of the PECs' Consolidated Amended Complaint which includes the case within this MDL in which the largest number of 9/11 death claims are made, *Burnett, et al. v. Al Baraka Inv. & Dev. Corp., et al.*, Case No. 03-CV-9849 (GBD)(SN)); *cf. id.* at 83:10 (Mr. Pounian of Kreindler begins his argument that he "represent[s] the Ashton plaintiffs in this case"); 99:15-99:16 (Judge Netburn noting that positions taken by Kreindler are "different than what the Plaintiffs' Executive Committee's position is"). *See also* Tr. at 22 (Oct. 13, 2018) (Kreindler attorney acknowledging that "[t]here are four different law firms working on this and we are all working separately and together trying to collaborate to get the job done….")

The Honorable George B. Daniels
December 2, 2022

_____

properly addressed and protected in the context of any later fee or cost petition by the PECs themselves, we will not burden the Court with any formal brief in relation to the present dispute, and instead simply reserve our rights and privileges without waiver.

Respectfully submitted,

MOTLEY RICE LLC                          COZEN O'CONNOR

By:  /s/ Robert T. Haefele               By:  /s/ Sean P. Carter
JODI WESTBROOK FLOWERS                    SEAN P. CARTER
DONALD A. MIGLIORI                        COZEN O'CONNOR
ROBERT T. HAEFELE                         One Liberty Place
MOTLEY RICE LLC                           1650 Market Street, Suite 2800
28 Bridgeside Boulevard                   Philadelphia, Pennsylvania 19103
Mount Pleasant, SC 29465                  Tel.: (215) 665-2105
Tel.: (843) 216-9184                      Email: scarter@cozen.com
Email: rhaefele@motleyrice.com            For the Plaintiffs' Exec. Committees
For the Plaintiffs' Exec. Committees

cc:     The Honorable Sarah Netburn (via ECF)
        All MDL Counsel of Record (via ECF)

3

**A278**

MC85terA

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   IN RE: TERRORIST ATTACKS ON
    SEPTEMBER 11, 2001,
4
                                        03 MDL 1570 (GBD)
5
    ------------------------------x
6                                       New York, N.Y.
                                        December 8, 2022
7                                       10:05 a.m.

8   Before:

9                   HON. GEORGE B.  DANIELS,

10                                      U.S. District Judge

11
                            APPEARANCES
12

13  MORVILLO ABRAMOWITZ GRAND IASON & ANELLO, PC
            Attorneys for Kreindler & Kreindler
14  BY:  EDWARD M. SPIRO
         RAYMOND D. MOSS
15       -and-
    KIRSCH & NIEHAUS PLLC
16  BY:  EMILY KIRSCH
         -and-
17  KREINDLER & KREINDLER LLP
    BY:  ANDREW J. MALONEY, III
18       STEVEN POUNIAN
         JAMES KREINDLER
19       MEGAN W. BENETT

20  MOTLEY RICE
            Attorneys for Burnett and Plaintiffs Executive Committee
21  BY:  ROBERT T. HAEFELE
         DONALD MIGLIORI
22       JODI FLOWERS
         MARLON KIMPSON
23

24

25

MC85terA

1                    APPEARANCES (Cont'd)

2

COZEN O'CONNOR
3      Attorneys for Federal Insurance – Plaintiffs Executive
Committee
4  BY:  SEAN P. CARTER
       J. SCOTT TARBUTTON
5

ANDERSON KILL P.C.
6      Attorneys for O'Neill – Plaintiffs Executive Committee
BY:  JERRY S. GOLDMAN
7      ETHAN GREENBERG
       BRUCE STRONG
8      REGAN SAMSON
       ALEX GREENE
9      JOSHUA ZELEN

10

11  KELLOGG, HUBER, HANSEN, TODD FIGEL & FREDERICK, PLLC
       Attorneys for Defendant Kingdom of Saudi Arabia
12  BY:  GREGORY G. RAPAWY
       ANDREW C. SHEN
13     CHRISTOPHER YOUNG
       CAROLINE A. SCHECHINGER
14

MOLO LAMKEN, LLP
15     Attorneys for Dallah Avco
BY:  ROBERT K. KRY
16

17

18

19

20

21

22

23

24

25

MC85terA

1          (Case called)

2          THE DEPUTY CLERK:  Will the parties please rise and

3    make their appearances, beginning with the plaintiff.

4          MR. SPIRO:  Edward Spiro of Morvillo Abramowicz Grand

5    Iason & Anello for Kreindler & Kreindler LLP.  With me is my

6    colleague Raymond Moss.  Mr. Moss is a member of the bars of

7    Maryland and District of Columbia but has an application

8    pending for admission to the bar of the State of New York.  So,

9    with your Honor's permission?

10          THE COURT:  Sure.

11          MR. SPIRO:  I ask that Mr. Moss be with me.  Thank

12    you, Judge.

13          MR. POUNIAN:  Steven Pounian, your Honor, with

14    Kreindler & Kreindler.

15          THE COURT:  Good morning.

16          MR. MALONEY:  Good morning, your Honor.  Andrew

17    Maloney from Kreindler & Kreindler.

18          THE COURT:  Good morning.

19          MR. KREINDLER:  Good morning, your Honor.  Jim

20    Kreindler.

21          THE COURT:  Good morning, Mr. Kreindler.

22          MS. BENETT:  Good morning, Judge Daniels.  Megan

23    Benett, for Kreindler.

24          THE COURT:  Good morning.

25          MS. KIRSCH:  Good morning, Emily Kirsch from Kirsch &

MC85terA

1  Niehaus, also representing Kreindler & Kreindler.

2          THE COURT:  Good morning.

3          Yes?

4          MR. RAPAWY:  Good morning, your Honor.  Gregory Rapawy

5  of Kellogg Hansen for the Kingdom of Saudi Arabia, and with me

6  are my colleagues, Andrew Shen, Christopher Young and Caroline

7  Schechinger.

8          THE COURT:  Good morning.

9          Mr. Spiro, why don't I hear from you.

10         MR. SPIRO:  Thank you, your Honor.

11         First, your Honor, on behalf of the Kreindler firm, I

12  would like to thank your Honor for scheduling oral argument in

13  this very important matter.  The removal of the Kreindler firm

14  from the Plaintiffs Executive Committee for death and injury

15  claims is of utmost important to the firm.  This is a motion of

16  enormous consequences and this is an appeal of enormous

17  consequences for the firm in the September 11th death and

18  injury plaintiffs.  The firm has represented this group of

19  individuals and their families on the committee for nearly 20

20  years.  In addition, your Honor, the magistrate judge's opinion

21  has caused substantial, substantial reputational harm to the

22  firm and is likely to continue to do so.

23         We submit, your Honor, that Magistrate Judge Netburn's

24  opinion is clearly erroneous on the facts when viewed against

25  the full record including especially the documentary evidence,

1   and, in fact, I want to spend most of my time today, with your

2   Honor's permission, focusing on those documents which the

3   magistrate judge overlooked in her opinion and which disproved

4   the bedrock findings underlying her conclusion that the firm

5   willfully breached the protective orders.  But, before I do so,

6   your Honor, I want to briefly touch on the threshold Rule 37

7   issue.

8           As your Honor knows, an interpretation of the Federal

9   Rules of Civil Procedure is reviewed de novo and we submit that

10  Judge Netburn's analysis of Rule 37 was flawed as a matter of

11  law.

12          The Second Circuit's opinion in the *Apex Oil* case

13  should be the beginning and end of your Honor's decision to set

14  aside the magistrate judge's opinion as contrary to law.  In

15  *Apex Oil*, a law firm appealed sanctions imposed under former

16  Rule 37.  In vacating the sanctions, the Second Circuit made

17  clear that the term "party," under Rule 37, by its express

18  terms, does not include a party's attorney.  The reasoning of

19  *Apex Oil* has been followed by every circuit court to address

20  the issues and those include the Third Circuit, the Sixth

21  Circuit and the Seventh Circuit and the Tenth Circuit.

22          THE COURT:  Let me ask you a question right away

23  because I'm not sure that the *Apex* opinion stands for as broad

24  a proposition as you are urging.

25          The *Apex* opinion deals with whether or not it was

---

appropriate to utilize 37(c) with regard to the sanction against the law firm.  It does not, my reading of it, it does not say that you can't sanction a law firm and, as a matter of fact, it says two things that are inconsistent with that.  It says that, one, when they discuss Judge McLaughlin's opinion below, they say, because the sanction imposed by Judge McLaughlin may be justified under Rule 26(g), we consider the applicability of that rule to the instant case.  And they cite a case for the proposition that an order imposing sanctions must be upheld if there is any basis upon which it can be justified.  That's the language from the case.  And going closer to the conclusion, the Court finally says, We reverse the imposition of sanctions against Shea & Gould regarding their responses to requests for admissions, except for the one that is remanded.  We affirm as to the Section 1927 sanctions.

So, this case doesn't say you can't sanction a law firm.  They did sanction a law firm.  Judge McLaughlin sanctioned a law firm and the Second Circuit upheld that and this case doesn't discuss any other basis for their decision other than the application of 37(c), which the other side argues that that's not the basis on which this Court ruled.

So, I'm not quite sure where you get the language that says beyond 37(c) no sanctions can be imposed against a law firm, and I don't see anywhere in this case where you say they can't sanction a law firm.  Now, maybe your argument is that

1   you can sanction under some other rule, but the Court also

2   said, hey look, if there is any rule to uphold the sanction

3   then they're going to uphold the sanction.  And they did uphold

4   the sanction against the law firm.

5         So, I'm not quite sure that I understand nature of

6   your argument based on *Apex*.

7         MR. SPIRO:  Judge Netburn based her opinion on

8   Rule 37.

9         THE COURT:  Not 37(c).

10        MR. SPIRO:  37(b), your Honor.

11        THE COURT:  Right, 37(b).  This case doesn't address

12  37(b).

13        MR. SPIRO:  Well, the *Apex* holding with regard to

14  37(c) is that with regard to the word "party" that "party" does

15  not include an attorney and "party" does not include a law

16  firm.  In this case, Saudi Arabia is arguing that under 37(b)

17  "party" includes not only the actual parties but it includes

18  the lawyers representing the parties.

19        THE COURT:  But this case does not stand for that

20  proposition.  This case does not say you cannot impose

21  sanctions under any other rule outside of 37(c).  As a matter

22  of fact, it is just the opposite, it says that you can't

23  impose -- I mean, is it your position that -- and I have two

24  issues with this argument.  Is it your position that this

25  Court -- I want to separate two things because there are two

1   different buckets of sanctions.  There is removal from the

2   committee and there is reasonable attorneys fees.  Now, is it

3   your position -- let's forget about the sanction.  Is it your

4   position that the Court doesn't have the authority to either

5   eliminate or replace the Kreindler lawyers or any other lawyers

6   on the committee, short of sanctions?

7          MR. SPIRO:  Your Honor, the Court certainly would have

8   the authority to remove the members of the Kreindler firm who

9   were on the Plaintiffs Executive Committee but it does not have

10  authority to do that under Rule 37.

11         THE COURT:  So, what do you interpret the language in

12  the case to be that if there is any rule under which it can be

13  done the Court would affirm that even as a sanction?

14         MR. SPIRO:  There is a significant difference between

15  basing the Court's authority or basing the Court's decision

16  under Rule 37 and basing its decision on the Court's inherent

17  authority.  Under Rule 37 the standard is generally

18  preponderance of the evidence.  Under the Court's inherent

19  authority, it's clear and convincing evidence.

20         THE COURT:  OK.

21         MR. SPIRO:  In this case, Magistrate Judge Netburn

22  based her decision on Rule 37 and therefore applied an

23  incorrect standard and burden of proof, namely preponderance of

24  the evidence.  Whether sanctions would be appropriate we don't

25  believe sanctions would be appropriate under the Court's

1    inherent authority.  The fact is that the Court's decision

2    applied the wrong standard, the wrong burden of proof, and we

3    submit that requires --

4            THE COURT:  Wasn't it your responsibility to make sure

5    that the Court was applying the right standard of proof?  I

6    don't see in your arguments to the Court that this was a

7    controversial or disputed issue about what was attempting to be

8    decided on the basis of it being decided.  You never argued to

9    the Court that the Court was, during the hearing, applying the

10   wrong standard.

11           MR. SPIRO:  The Court never identified Rule 37 as the

12   basis for the hearing.  Instead, the Court said this was going

13   to be a contempt hearing and the Court indicated it was going

14   to make a recommendation to your Honor with regard to what the

15   sanction ought to be.

16           THE COURT:  So, what didn't you get an opportunity to

17   do at this hearing?

18           MR. SPIRO:  So, at the hearing, evidence was

19   presented.  After the hearing we briefed, provided proposed

20   findings of fact and conclusions of law that were based on the

21   Court's statement that this was going to be a contempt hearing

22   and that there were various potential remedies that the Court

23   was considering.

24           THE COURT:  But I thought even in your papers to the

25   Court, my recollection is even in your arguments to the Court

1    after the hearing you laid out what you thought was the

2    appropriate standard.

3        MR. SPIRO:  Based on what the Court indicated the

4    hearing was, which was a contempt hearing where the burden of

5    proof is by clear and convincing evidence and we had no

6    opportunity to submit reply papers.  We had no opportunity,

7    although we requested oral argument, oral argument was denied.

8    We had no opportunity to address the inapplicability --

9        THE COURT:  Well, you did have that opportunity.  You

10   could have addressed that issue if you thought that that was

11   unclear or you were proceeding on different standards or the

12   wrong standard.  You could have raised that during a hearing

13   and you could have and, to some extent, you did address that in

14   your submission.  What didn't you get an opportunity to do?

15       MR. SPIRO:  We never got an opportunity to address

16   whether or not Rule 37 was applicable.  It was never indicated

17   in any order of the Court that that was a potential basis for

18   decision.  Rather, the Court treated --

19       THE COURT:  Wasn't that the subject of discussion in

20   your brief?  My recollection is you did, you had a section on

21   that.

22       MR. SPIRO:  We did not discuss in the conclusions of

23   law and proposed findings of fact that the Kreindler firm

24   submitted to Magistrate Judge Netburn, we did not discuss

25   Rule 37.  It was a surprise to my client --

1          THE COURT:  Wait, wait, wait.  But you keep -- I'm

2   trying to follow you and you keep jumping back and forth.

3          The question of whether you discussed Rule 37 is a

4   different issue, as far as I'm concerned, than the question of

5   whether or not you had a full and fair opportunity to apply

6   what you thought was going to be the appropriate standard for

7   the Court to apply and then urge upon the Court to apply the

8   appropriate standard.  Those are two different issues.  One is

9   a technical argument, as far as I'm concerned, and one is

10  fairness argument.  You say you didn't get an opportunity, the

11  Kreindler firm didn't get an opportunity to defend itself

12  because it had no idea that the Court was going to use a

13  different standard than what you thought they should have used

14  and it didn't dawn on you until after the magistrate judge

15  issued her opinion.

16         MR. SPIRO:  Your Honor, I don't believe that's a fair

17  statement with regard to what transpired below.  The magistrate

18  indicated this was going to be a contempt hearing.  In the

19  post-hearing submissions we briefed this as if it were a

20  contempt hearing.  We addressed the various sanctions that the

21  Judge had identified.  She never indicated that they were going

22  to be sanctions under Rule 37.  We submitted that there was no

23  clear and convincing evidence of contempt.

24         THE COURT:  Right.  So, you did lay out, in your

25  written papers -- my recollection -- that you thought that the

1   standard should be clear and convincing evidence, right?

2           MR. SPIRO:  That's right.

3           THE COURT:  OK.

4           MR. SPIRO:  And Judge Netburn applied a different

5   standard that we had no notice was going to be applied and that

6   was fundamentally unfair.  We tried to have oral argument.

7   Oral argument was denied.  We had no right to put in a reply

8   brief.  So, there was really not an opportunity to address it.

9   So, to argue --

10          THE COURT:  I'm not sure I can accept that.  You had

11  an opportunity to address it in your papers.  You could have

12  addressed it.  It was partially, if not primarily, your

13  responsibility to make sure you knew what standard of proof was

14  being used.

15          MR. SPIRO:  That's right.

16          THE COURT:  And you urged upon the Court that you used

17  a particular standard.

18          MR. SPIRO:  Under Second Circuit case law it is the

19  responsibility of the Court to identify the statutory basis

20  that it is proceeding under in the hearing of the type that the

21  Court conducted.

22          THE COURT:  Of course, but they're not supposed to

23  assume that you have some different view than the Court has.

24  You had an opportunity to expressly make clear what it is that

25  you thought the standard was and that somehow you were under

MC85terA

1  the impression that she was applying the wrong standard during

2  the hearing.

3       MR. SPIRO:  We relied on what the Court said.  The

4  Court said she was going to make a recommendation --

5       THE COURT:  That's not advocacy.  I am talking about

6  the advocacy of it.  The advocacy of it is that obviously, in

7  representing the client it's, you know, for you to be

8  successful you need to make sure that it's clear to you and

9  clear to the Court and clear to the other side what the

10 standard is that is being applied and I'm not sure that I see

11 any -- I mean, I'm not sure I see any place where the Court

12 misled you about what standard the Court was going to use.

13      MR. SPIRO:  I think, your Honor, if you go back and

14 you look at the various orders that the magistrate judge

15 issued, starting with the order that was filed October 4 where

16 Magistrate Judge Netburn lists the various potential remedies

17 that she was considering, and then if you look at the

18 memorandum endorsement that was filed on November 1 where she

19 talks about there being a contempt hearing, you will see

20 exactly where we believed, in good faith, that there was going

21 to be a recommendation to your Honor with regard to a remedy

22 and that this was really proceeding under 636 under the

23 Magistrate's Act.  And that's what we did.

24      THE COURT:  So, what do you say is the appropriate

25 relief for me to give you?

MC85terA

1          MR. SPIRO:  That there ought to be a reversal and that

2     to the extent that either your Honor or the magistrate judge

3     wants to revisit this issue that it be revisited under the

4     appropriate evidentiary standard, namely clear and convincing

5     evidence.

6          THE COURT:  Even if you were to convince me that the

7     appropriate standard is clear and convincing evidence, why

8     would that require reversing the decision or why would it

9     require anything more than you convincing me to review this

10    case on that standard?

11         MR. SPIRO:  Your Honor could review it under a clear

12    and convincing evidence standard but, clearly --

13         THE COURT:  Isn't that the issue?  Your ultimate issue

14    is that the hearing evidence does not meet the clear and

15    convincing standard that should have been and should be applied

16    in this case.

17         MR. SPIRO:  Your Honor, Saudi Arabia doesn't dispute

18    that there is no evidence rising to the level of clear and

19    convincing evidence of bad faith by each Kreindler & Kreindler

20    attorney.  You can't impute bad faith, it is a particular

21    attorney-by-attorney determination that needs to be made.  In

22    the Walters court case --

23         THE COURT:  Well, that's not -- it depends on whether

24    the sanction is being imposed.  One, if the sanction is being

25    imposed on the firm you don't have to determine that every

1    single lawyer at the firm acted in bad faith.  I assume that's

2    not what you are arguing.

3         MR. SPIRO:  Well, I think under the Court's inherent

4    authority, if the Court is going to make a finding of a

5    violation, you need to determine that there was bad faith, and

6    under the Walters case --

7         THE COURT:  Well, bad faith by Mr. Fawcett.

8         MR. SPIRO:  Well, Mr. Fawcett (a) was not an attorney

9    at the firm, he was a consultant; and (b) it doesn't impute his

10   knowledge to Mr. Pounian, Ms. Benett, Mr. Kreindler.

11        THE COURT:  But why do I have to determine whether

12   Ms. Benett had bad faith?  The two issues that seem to be that

13   are most important that seem to concern me, so you can focus on

14   those, one is the evidence that Magistrate Judge Netburn used

15   to reach the conclusion that there was complicity between

16   Mr. Kreindler and Mr. Fawcett, and maybe Mr. Isikoff, and maybe

17   others at the firm, that this was a -- that they were involved

18   in this bad faith effort to leak confidential material that

19   they knew should not have been leaked.  That's the first

20   question, it seems.

21        The second question that concerns me is that what was

22   the nature of their -- did the law firm meet its

23   responsibilities in the nature of its investigation?  Was this

24   a good faith investigation reasonably calculated to uncover the

25   culprit?  And, on the scale of things did they do everything

1    they could to find out?  Or did they do the minimum and go

2    through the motions?  And if at one end I characterize doing,

3    meeting responsibilities not just as lawyers in this

4    litigation, not just as officers of the court, but also as head

5    of the Plaintiffs Executive Committee because they would have

6    had a higher responsibility, as far as I'm concerned, than just

7    a bunch of other lawyers who happen to have an interest in this

8    case because they're in charge and the Court is relying upon

9    them to make sure that this litigation -- complex litigation --

10    proceeds efficiently.  And I must -- look.  I will be candid

11    with you.  My disappointment that we are here discussing this

12    issue is great.  This was not the law firm's finest hour.  OK?

13    Let's be honest about this, this is, you know, to find out that

14    somebody at the law firm had leaked this information and then

15    the only reason that it's uncovered is because Mr. Fawcett

16    panics at the last minute when he is supposed to sign the

17    affidavit that's a lie to mislead the Court to say he had

18    nothing to do with it, he, at least at that point, realizes

19    that it would be a serious transgression if he made that

20    representation under oath to this Court.

21        So, I am analyzing, OK, one, what does the direct and

22    circumstantial evidence point to and what standard does it

23    meet?  And, two, what was the nature of the investigation?

24    Quite frankly, to put it in further context for you, this is

25    the scenario that I have and unfortunately I have the benefit

1   of a little hindsight that obviously is unfair with regard to

2   those lawyers at the firm that I know and respect who are in

3   charge of doing an investigation. But, as soon as they were

4   tasked with doing this investigation, let's think about how

5   this investigation should have begun. The first question is,

6   which law firm has a relationship with this reporter? That

7   would be the reasonable first question to ask. And then, the

8   second question would be -- and I'm just picking these as

9   examples -- a second question would be, OK, if the Kreindler

10   firm is the firm that has a relationship with this reporter who

11   obviously got this information inappropriately, the question

12   is, who knows this reporter at the firm? Who is friends with

13   this reporter at the firm? Who has a personal relationship

14   with this person at the firm? That would narrow it down to

15   Mr. Kreindler, Mr. Fawcett. OK? Is there any evidence that

16   they had any communications between them at and about around

17   this time? Well, ultimately, it wouldn't take a whole lot to

18   find out then -- although it wasn't found out until later --

19   yes, there is evidence of numerous communications between those

20   three participants.

21         The third thing is Mr. Kreindler's position is it

22   absolutely wasn't me. So, what does that do for him, at least,

23   not necessarily for everybody else? That makes Mr. Fawcett the

24   prime suspect. OK? That's not rocket science to figure that

25   out. Mr. Fawcett was the prime suspect.

1      So, the question should have been, OK, what can we do

2  to determine, first of all, whether Mr. Kreindler or

3  Mr. Fawcett had a motive and an opportunity.  And the evidence,

4  direct and circumstantial points in their direction, what can

5  we do to either prove that or disprove that?  I think we would

6  all agree that if you were doing an investigation, if I tasked

7  you to do an investigation for this Court you would do more,

8  significantly more, than simply going to Mr. Fawcett and asking

9  Mr. Fawcett did he do it.  OK?  And that, in my mind, I still

10  have some problems with that because it's like the bell rings

11  at the bank that somebody just robbed a bank.  There is a guy

12  standing outside who has a mask, a gun, and a bag of money.  I

13  say, Do an investigation, figure out who robbed the bank.  The

14  main thing you do in an investigation is you go over to the guy

15  and you ask him, Did you rob the bank?  Do you know anything

16  about the bank being robbed?  And he says no.  And I say OK,

17  fine.  Bye.

18      It's hard for me to say that what was done by the firm

19  was the maximum that they could have done to uncover the

20  culprit or the minimum that they could have done simply to

21  protect the firm's interest at the expense of the litigants in

22  this case and the other parties in this case.

23      So, when you say the facts are important, the facts

24  are important, and I'm trying to figure out how it wasn't

25  obvious at the beginning that the prime suspect was Mr. Fawcett

1   so the appropriate conduct would be to immediately see if there

2   is any information that is consistent or inconsistent with him

3   being the culprit, figuring out whether or not they could prove

4   or disprove, arming themselves in such an investigation with

5   that information and then posing specific questions to him that

6   you know that you can independently verify or not verify the

7   answers that you might give? I mean, I'm not saying stuff you

8   don't know and that you are not experienced to do and that you

9   probably would say to me, yeah, that's the way I would conduct

10  an investigation if we were trying to find the culprit. But,

11  after -- I don't see anything -- two things that are a problem

12  and I still have to review it, there is a lot that I have been

13  looking at. I don't see anything that was done, one. I don't

14  see anything that indicates that anyone thought that if it's

15  anybody at the firm it's probably Fawcett and so let's try to

16  exculpate him or incriminate him one way or the other. OK?

17  And I don't see any real -- quite frankly, I don't even know,

18  from the affidavits that I got from everyone else, including

19  Mr. Kreindler, I have no idea what he was asked specifically,

20  what answers he gave, what the Q & A was. He wasn't

21  interrogated. I don't -- even when -- well, no. I will back

22  up.

23          There is nothing -- and I do think this is a weakness

24  in the way the investigation was conducted because I think it

25  was conducted in a manner that was even unfair to those parties

1  and even unfair to Mr. Kreindler because he is in a situation

2  where he wants to say, look, it wasn't me, I didn't know

3  anything about it, I didn't do anything about it.  And my

4  single question is what evidence is there for me to look at

5  that corroborates your position that you had nothing to do with

6  it that demonstrates I don't have to just rely on your denial,

7  that I should expect, out of a fulsome investigation, that you

8  would give me some facts, evidence, that is either going to be

9  consistent with or inconsistent with that fact.  Quite frankly,

10  Magistrate Judge Netburn pointed out significant evidence that

11  is inconsistent with a claim that he had nothing to do with it

12  and it was inconsistent with the claim that Fawcett had nothing

13  to do with it.

14       The fact, as I say, when you look at the basic facts

15  of who has the relationship with the reporter, how could he

16  have gotten this information, which firm is likely to have

17  given him this information, which people at the firm have a

18  relationship with him, which people at the firm spoke to him at

19  that period of time.  And I have very little evidence about

20  what was discussed in those -- I have no details about those

21  discussions.  You know, the vagueness of, well, OK,

22  Mr. Fawcett -- I can't really remember what was said and that's

23  pretty much what everybody says and, you know, that was his

24  position when he was lying and that's his position when he

25  fessed up.

MC85terA

1          So, you know, all of that being said, if I am looking

2     at this in the wrong way, if I am analyzing this in the wrong

3     way, tell me, but those are the things I am looking for.  I am

4     looking for what evidence negates the inference that points to

5     these two individuals and why should I be satisfied that the

6     minimal investigation that was done here, one, was appropriate

7     to represent to the Court that a sufficient investigation was

8     done to rule out anybody at the firm and we know that's not

9     true because it was somebody at the firm.  And so, it is

10    troubling.  It is not about, well, is it -- should the

11    Kreindler lawyers get an award for their conduct here?  No,

12    they shouldn't get an award for their conduct here.  You know?

13    It was the firm's actions and the firm's personnel that allowed

14    this to occur and contributed significantly to not uncovering

15    this a lot sooner.

16         So, that's what I am concerned about.  That's what I

17    am trying to focus on.  So, is that a wrong way to look at

18    this?

19         MR. SPIRO:  No, your Honor.  We are prepared to

20    address those points as we move forward.

21         THE COURT:  All right.

22         MR. SPIRO:  If we may, your Honor, we have a binder of

23    documents that we would like to share with your Honor and

24    provide to the Kingdom of Saudi Arabia's counsel.

25         THE COURT:  All right.

1    MR. SPIRO:  Your Honor, Magistrate Judge Netburn's

2  opinion is really built on five bedrock findings and I think

3  those bedrock findings speak to the concerns that your Honor

4  has expressed and I would like to go through each of them, and

5  I think in the process of doing that we will address your

6  Honor's concerns.

7    Your Honor knows that Magistrate Judge Netburn found

8  that John Fawcett leaked the transcript as part of what she

9  termed Kreindler & Kreindler's longstanding litigation strategy

10  to pressure the Kingdom of Saudi Arabia to a settlement and he

11  did so with the knowledge, or at least tacit consent of lead

12  attorney James Kreindler.  And then she said that other

13  attorneys at the firm were, at best, willfully blind to the

14  leak as evidenced by their paltry investigation and knowingly

15  misleading statements to the Court.  We submit that that

16  conclusion was erroneous.

17    What were the five bed rock findings that she made?

18  First, she challenged what Mr. Fawcett said was his motive for

19  the leak; second, she found that the firm had a motive, namely

20  trying to engender adverse publicity for Saudi Arabia; third,

21  she challenged the quality of the firm's post-leak

22  investigation and your Honor has spoken very directly to that;

23  fourth, she questioned the appropriateness of the Kreindler

24  firm's response to the magistrate judge's orders during the

25  investigation; and then she identified two allegedly suspicious

1    phone calls on June 28th and July 22nd.

2              So, let me start with the first finding.

3              THE COURT:  Let me put it in this context so you know

4    where I am focusing.

5              My first focus is what evidence did this investigation

6    produce or that you have as of today that demonstrates that

7    those inferences are unreasonable?

8              MR. SPIRO:  So, we start with the first finding that

9    the magistrate judge concluded that in leaking the transcript,

10   Mr. Fawcett's apparent motive was to protect the children of

11   Morocco and the --

12             THE COURT:  I don't want to get into the details.

13             There are two things I don't want to do.  One, I don't

14   want to spend a lot of time discussing what his motive was.

15             MR. SPIRO:  OK.

16             THE COURT:  His motive was to break the law.  OK?  He

17   knew what his responsibilities were and I don't care why he did

18   it.  Two, that -- the second point that you were making?  I'm

19   sorry.

20             MR. SPIRO:  The motive was fabricated.

21             THE COURT:  Yes.  I know what I was going to say.

22             I don't want it on this record -- discuss in any

23   further detail -- the confidential information that he leaked.

24   OK?  So let's stay away from that because I really don't

25   particularly care about Mr. Fawcett at this point.  He is not

1  the subject of this sanction and nobody -- I don't think there

2  is anybody here who is getting ready to stand up and defend

3  Mr. Fawcett's actions.

4  MR. SPIRO:  Your Honor, if you turn to the first,

5  actually the second tab in the binder --

6  THE COURT:  Yes.

7  MR. SPIRO:  -- you will see that is the declaration

8  that Mr. Fawcett drafted.  The magistrate judge found --

9  THE COURT:  The first draft or the last draft?

10  MR. SPIRO:  It was the first draft, your Honor.

11  THE COURT:  OK.

12  MR. SPIRO:  The magistrate judge found that he drafted

13  it himself in his own words and that he believed that it was

14  accurate.  That's in her opinion at page 26.

15  THE COURT:  OK.

16  MR. SPIRO:  So, what has happened is that that

17  declaration, it has been suggested, became a vehicle for the

18  Kreindler firm to make up an explanation for why Mr. Fawcett

19  did what he did.  I'm not going to get into the details of it.

20  But, I think if you look at Exhibit 2 and you see the

21  highlighting which we have done and then look at Exhibit 3

22  which then includes the highlighting that we have done, I think

23  you will see that the final declaration, Exhibit 3, is the

24  final declaration that was filed with the Court, it is

25  KSAX-56J.  That declaration essentially mirrors what

1    Mr. Fawcett said in his own words.

2            THE COURT:  Well, I'm not quite sure what you say -- I

3    know what inferences Magistrate Judge Netburn reached.  I'm not

4    sure what contrary inference that you say that I'm supposed to

5    reach based upon this document.

6            MR. SPIRO:  Oh.  For starters, Mr. Fawcett is very

7    clear that no one at Kreindler & Kreindler instructed him to

8    send the transcript to Michael Isikoff, who is the --

9            THE COURT:  You are not going to particularly argue at

10   this point that Magistrate Judge Netburn doesn't have a good

11   reason to not believe anything he has to say at this point.

12           MR. SPIRO:  Well, Magistrate Judge Netburn, in her

13   decision, repeatedly found that portions of his declarations

14   were truthful.

15           THE COURT:  I know, but you know -- look.  I have

16   respect for your abilities, you know what the rule is, you know

17   what I tell jurors with regard to witnesses, that if you find

18   that a witness has been untruthful in any aspect of that

19   testimony you can accept part of that testimony, you can reject

20   part of the testimony, or you can still accept all of the

21   testimony.  You can't argue that Magistrate Judge Netburn, if

22   he said, *oh, it was raining that day*, and you said, *well, that*

23   *was true*, that that means that she's supposed to believe

24   everything he says in his affidavit.

25           MR. SPIRO:  But Magistrate Judge Netburn did say that

1  he had drafted this document himself, in his own words, and

2  that he believed it was accurate.  That's in Magistrate Judge

3  Netburn's opinion.

4          THE COURT:  Well, I'm not sure that I can read from

5  that statement of Magistrate Judge Netburn that she was trying

6  to say to you that she has concluded that every single word of

7  what he put in his affidavit is accurate.

8          MR. SPIRO:  But the central point of his declaration

9  is that no one at the Kreindler firm instructed him to send the

10 transcript to Michael Isikoff, nor did anyone at the Kreindler

11 firm have any knowledge of his sending it to Mr. Isikoff.

12         THE COURT:  But your argument is that we should

13 believe that and I'm trying to understand, given the fact that

14 he is a clear liar -- that he lied to the people who he claimed

15 were the closest to him, that he put them in this situation --

16 that somehow we are supposed to believe him without some

17 corroborating evidence that supports something that he has to

18 say?  He said one set of facts before he submitted this

19 affidavit and swore that that was true, and that was a lie.

20 And now you say that he submits a written declaration where he

21 wants to take responsibility, so we should assume that that

22 means that not only is he guilty of what he is fessing up to,

23 what he says about other people to exonerate them must be

24 accepted by the magistrate judge.

25         MR. SPIRO:  It is not simply what he had to say.

MC85terA

```
 1              THE COURT:  OK.

 2              MR. SPIRO:  It is what every attorney and the

 3    Kreindler firm, who submitted a sworn statement and who

 4    testified under oath, said.

 5              THE COURT:  No.  Every attorney at the Kreindler firm

 6    said that no one at the firm disclosed this information.  That

 7    was their opinion.  I think that was the silver lining in

 8    almost everybody's affidavit.

 9              MR. SPIRO:  It is more than that.  It is Mr. Pounian

10    who said he specifically asked Mr. Fawcett whether he knew how

11    the --

12              THE COURT:  And he says that Mr. Fawcett lied.

13              MR. SPIRO:  That's right.

14              THE COURT:  OK.

15              MR. SPIRO:  That's right.

16              THE COURT:  OK.  So, as I say, you know how the rule

17    goes.  Was he lying then or was he lying now?

18              MR. SPIRO:  The point is Mr. Maloney asked and had the

19    same conversation that was told by Mr. Fawcett.

20              THE COURT:  What else did you expect Mr. Fawcett to

21    say at that point?

22              MR. SPIRO:  Well, whether Mr. Fawcett was being

23    truthful at that point -- and I believe that he was --

24              THE COURT:  Why?  Why do you believe that he is?  What

25    is the evidence?
```

1      MR. SPIRO:  There is no contrary evidence of the
2  Court's idea that the Kreindler firm knew anything about this
3  transcript sent to Michael Isikoff.
4      THE COURT:  What is the evidence that supports his
5  statement other than their denials?  What is the evidence that
6  supports his statement that they knew nothing.
7      MR. SPIRO:  Your Honor, if you go to tab 7 -- and this
8  is pretty small font and I apologize -- but this is the form
9  that we have it.  So, that is a July 16, 2021 e-mail from
10  Andrew Maloney to John Hartney.
11      THE COURT:  Right.
12      MR. SPIRO:  John Hartney is the IT director at the
13  Kreindler firm.
14      THE COURT:  Right.
15      MR. SPIRO:  Mr. Maloney was beginning his
16  investigation on the day before, July 15, the story is
17  published by Mr. Isikoff in Yahoo! News.
18      THE COURT:  Right.
19      MR. SPIRO:  And what does this say?  It says the
20  attached deposition transcript of Jarrah was sent to us on June
21  28.  The transcript is under a protective order, it is not to
22  be shared with clients or the public and only with people on
23  the 911 team who signed the confidentiality order, which
24  includes our consultants.
25      It goes on to say that Yahoo! News reporter, Michael

1 Isikoff, published an article purporting to quote from the

2 deposition transcript.  He did not reveal when or how he

3 obtained the transcript, but whoever gave it to him violated

4 the Court's protective order.

5          THE COURT:  Right.

6          MR. SPIRO:  And here is -- I think -- the key

7 paragraph.

8          THE COURT:  OK.

9          MR. SPIRO:  The PEC is investigating if any of the

10 plaintiff firms leaked the transcript to the media, or a

11 client, or other who may have leaked it.  Our experts are

12 permitted to see a copy and John F. -- obviously Mr. Fawcett --

13 sent a copy to consultant --

14          THE COURT:  Right.

15          MR. SPIRO:  And the consultant is blacked out, which

16 is fine -- but did not see any other -- and the word "see" may

17 be actually a typo and probably meant to say "send any other."

18          THE COURT:  Right.

19          MR. SPIRO:  And then Mr. Maloney goes on to ask that

20 Mr. Hartney do a search of outgoing e-mails.

21          THE COURT:  Right.

22          MR. SPIRO:  So, the only way -- the only way -- that

23 Mr. Maloney could have learned that Mr. Fawcett had sent a

24 transcript to the consultant but had not sent it to anyone else

25 was based on a conversation that Mr. Maloney had with

MC85terA

1   Mr. Fawcett either on the 15th or 16th of July.

2          THE COURT: Well, what does that prove?

3          MR. SPIRO: It proves --

4          THE COURT: You can't argue it proves his innocence

5   because we know he is guilty.

6          MR. SPIRO: Number one, that there was an effort made

7   by Mr. Maloney to get --

8          THE COURT: First of all, my recollection is they

9   didn't even have the complete e-mails at that point, they

10   didn't search all the e-mails, and they missed correspondence

11   contemporaneous with the leak between Isikoff and Fawcett, and

12   Kreindler and Fawcett.

13          MR. SPIRO: But the e-mail tells us that Mr. Fawcett

14   told Mr. Maloney that the transcript had only been sent to the

15   consultant, it had not been sent by Mr. Fawcett anywhere else.

16          THE COURT: See, the problem I have with that --

17          MR. SPIRO: So, that is evidence --

18          THE COURT: No, that's not evidence. The problem I

19   have with that --

20          MR. SPIRO: -- that the Kreindler firm did not know.

21          THE COURT: The problem I have with that is that no

22   reasonable investigation would have relied solely on the

23   statement of the suspect. OK?

24          MR. SPIRO: So we didn't rely solely on the statement.

25          THE COURT: On this you did. Matter of fact, when I

1 read this, that was not what was emphasized to me.  What was

2 emphasized to me is that it's consistent with focusing in on,

3 in an aggressive way, Mr. Fawcett, because this is the only

4 evidence that anybody accessed that deposition.  Mr. Fawcett

5 and nobody else.  There was one other person that I think that

6 we read who accessed but this says he accessed it.  So, not

7 only do we know he has motive, he has opportunity.  This

8 doesn't exculpate anybody and it doesn't make a person who --

9 Mr. Maloney is trying to gather this information.  It doesn't

10 make it, give him any greater comfort that this guy didn't do

11 it because the fact is, anybody who did it who is smart enough

12 to do it would have downloaded it, would probably not try to

13 give it to him from the office, would probably try to give it

14 to the reporter some other way.  So, none of that is consistent

15 with his innocence.  And, again, it is hard for me to have this

16 debate about what is consistent with his innocence because we

17 know he is the guilty party.

18          MR. SPIRO:  The firm searched its e-mail.  It did not

19 find any evidence that Mr. Isikoff received the transcript --

20          THE COURT:  As a matter of fact, they didn't

21 adequately search the e-mails.  When they searched the e-mails

22 at this point in time they didn't find any of those e-mails

23 that were searched and found once the lawyers were hired after

24 September 27th.  And if you go back to --

25          MR. SPIRO:  That's not accurate, your Honor.  They

MC85terA

1    continued to conduct additional searches during --

2              THE COURT:  On your Exhibit 1 --

3              MR. SPIRO:  -- during August and September.

4              THE COURT:  On your Exhibit 1, page 10, all of those

5    phone calls in that box, when were those phone calls

6    discovered?

7              MR. SPIRO:  Those were phone calls that were --

8              THE COURT:  When were they discovered?

9              MR. SPIRO:  After September 27th.

10             THE COURT:  That's what I just said.  A reasonable

11   investigation should have looked for this on January 17th.

12             MR. SPIRO:  Those phone calls wouldn't tell us

13   anything.

14             THE COURT:  It does tell us something.  It tells us

15   that Fawcett and Isikoff are having numerous conversations

16   around the time that it was leaked.

17             MR. SPIRO:  Something else was going on during that

18   time and that --

19             THE COURT:  Well, a lot else could have been going on

20   but that's not consistent with this.

21             MR. SPIRO:  That is when Mr. Kreindler was going on

22   Mr. Isikoff's podcast so he went and recorded on July --

23             THE COURT:  Wouldn't it have been --

24             MR. SPIRO:  There were negotiations back and forth

25   between Mr. Fawcett and Mr. Isikoff about that, and between

MC85terA

1  Mr. Kreindler and Mr. Isikoff.

2          THE COURT:  Well, let's be honest here.

3          MR. SPIRO:  That wouldn't tell us anything.

4          THE COURT:  It doesn't tell you anything?

5          MR. SPIRO:  It does not, your Honor.

6          THE COURT:  It doesn't tell you that the only evidence

7  that you have of any contact with Isikoff, who got this

8  transcript, was contact with Mr. Kreindler and contact with

9  Mr. Fawcett?  Is there any other person at the law firm where

10 you have this kind of evidence that they had any contact

11 directly with Mr. Isikoff?

12         MR. SPIRO:  So, we went through probably 100,000 or

13 more e-mails.  There were searches done, this is post-September

14 27th, of phone records of the various partners at the firm.

15         THE COURT:  Right.

16         MR. SPIRO:  There were searches done of texts.

17         THE COURT:  Yes.

18         MR. SPIRO:  And not a single document reflected any

19 knowledge on the part of the Kreindler firm --

20         THE COURT:  Wait, wait, wait.  That's not my question.

21         MR. SPIRO:  -- as to what Mr. Fawcett had done.

22 Nothing.  There was nothing there.

23         THE COURT:  Let's be reasonable.  The most effective

24 advocacy is to be consistently reasonable.  You cannot tell me

25 that the fact that there are numerous phone calls and

1  communications between Mr. Isikoff, and particularly

2  Mr. Fawcett and Mr. Isikoff and Mr. Kreindler, you can't say to

3  me that that makes it less likely that they're involved rather

4  than more likely that they are involved.

5        MR. SPIRO:  So, what would have happened if

6  Mr. Maloney went to Mr. Fawcett and said, John, I see that

7  there are all these phone calls between you and Isikoff.

8  What's that about?  Then the short answer would be,

9  Mr. Kreindler had been on the podcast, Mr. Isikoff is doing a

10  followup story.

11        THE COURT:  But that wasn't his response.  He never

12  gave that response.

13        MR. SPIRO:  That would not be anything that would be

14  remarkable.

15        THE COURT:  No.  His response was always, even to this

16  day, I can't even remember what I talked to him about.  That's

17  his response.  His response doesn't give us any evidence that

18  they talked about a particular thing.  Matter of fact, he has

19  very vague recollection.  So does Mr. Kreindler, about what

20  those conversations were about.  So, you know, I have two

21  different images in my mind when I say run off and do an

22  investigation.  I have the image in my mind that they walked

23  into -- they walked by Mr. Fawcett's office, stick their head

24  in the door and say, *Hey, did you give this guy the transcript?*

25  *Do you know anything about it?  No, I don't.  OK, have a nice*

1    *day. OK.*

2        Or, I have an image of Mr. Fawcett in a room being

3    questioned about his contacts, seeing if he is going to give

4    truthful answers consistent with the evidence that we already

5    have, following up questions, asking him detailed questions,

6    recording those questions and answers so that I can tell the

7    Court exactly what I asked him and exactly what he responded.

8        You know, this whole argument that, well, in substance

9    I told him this. That's not even admissible evidence in a

10    trial. That's not the kind of investigative information that

11    you want. You want to know, OK, I have got a phone call here

12    from such and such a date. Why did you call him? What was the

13    subject matter of that call? Who spoke first? What did you

14    say? What did he say?

15        MR. SPIRO: Mr. Fawcett had easy answers to all of

16    those questions.

17        THE COURT: No, he didn't, because he was never asked

18    those questions.

19        MR. SPIRO: Mr. Fawcett spoke with Mr. Kreindler on

20    almost a daily basis, he spoke with other members of the 911

21    terror team on almost a daily basis. The idea that he was

22    going to be able to necessarily be able to recall specifically

23    what happened on a particular day, in a particular

24    conversation, months after, is just not realistic.

25        The fact is what happened here is that Mr. Fawcett

1    took a thumb drive, put it in his computer, downloaded the

2    transcript, then used a different software package which

3    automatically disappeared e-mails after seven days.

4         THE COURT:  Is that a surprise that he did it in that

5    manner?

6         MR. SPIRO:  And there was no way that that was going

7    to be discovered.  It was done in a way to hide this from the

8    Kreindler firm.

9         That's what happened.

10        THE COURT:  You know, the fact is that I can't accept

11   that statement.  Why?  Because as soon as they put the

12   affidavit, the declaration in front of him, he fessed up.

13   Nobody interrogated him to get him to fess up.  They said sign

14   this, this is what you say is the truth, and we are going to

15   submit this to the Court.  And he calls hisself a criminal

16   lawyer.  All right?  He speaks to the lawyer -- who knows what

17   he speaks to the lawyer about -- it is not clear to me what he

18   spoke to the lawyer about, nobody asked him that or presented

19   that evidence to the Court.  His testimony about what he did

20   and what he talked about is inconsistent, but the fact is that

21   nobody ever confronted him, nobody ever said, you know what?

22   You know, it sort of looks like you might be the guy, you know,

23   so let's nail this down now.  These are the questions we have.

24        I mean, think about also the evidence that -- and I

25   assume that you uncovered, after September 27th, there is also

1    evidence that Mr. Kreindler had a conversation with Mr. Isikoff

2    in which Mr. Isikoff was trying to find out whether

3    Mr. Kreindler could get this information, get the information

4    and transcript out of, as they call it, the gag order.  Right?

5              MR. SPIRO:  Right.

6              THE COURT:  Now, I know in general that they had that

7    conversation but to this day I can't tell you after -- and

8    another thing, maybe you can explain it to me, I don't

9    understand and it doesn't prove anything by itself, but I don't

10   understand why Mr. Kreindler thought it was necessary to ask

11   Mr. Fawcett whether or not this was covered by the protective

12   order.  The lawyer is going to ask the grunt whether or not

13   this is protected by the protective order?  What is the

14   explanation for that conversation around the time that the

15   reporter is obviously asking him to see if you can get this

16   transcript out of the protective order?  And then, I don't even

17   have -- and you say, about the investigation I have to call my

18   Mr. Maloney, *You mean you didn't even ask him:  Well, did you*

19   *get back to Isikoff and tell Isikoff that, no, it can't happen?*

20   *Did you discuss it with Mr. Fawcett?  Obviously Fawcett knew*

21   *that you weren't going to give it to him.*  I don't have any of

22   that.

23             No one questioned any of these witnesses in any

24   detail.  Given the seriousness of these allegations about

25   people at the firm, it's tough for me to say that they did the

1  most that they could have done during this period of time.

2      MR. SPIRO:  Your Honor, I think you need to separate

3  what we now know from what was happening in real-time and I

4  think there is a real risk in basing your conclusion on

5  hindsight.

6      THE COURT:  No, no.  You had the benefit of hindsight.

7  You can tell me now what exactly was going on that indicates

8  that anybody -- I won't say anybody -- that Mr. Kreindler and

9  Mr. Fawcett, that Mr. Kreindler was not involved and

10 Mr. Fawcett's efforts were successful, by himself, to get this

11 information and give it to Isikoff when Isikoff was having

12 conversations with both Fawcett and Kreindler about whether or

13 not he could get this information.

14      And I still -- and maybe you can't answer the

15 question, but I have got no reasonable explanation, as they

16 say, why Kreindler is asking Fawcett whether or not he is

17 supposed to keep this secret.

18      MR. SPIRO:  I think the answer is that Mr. Fawcett had

19 been working with the Kreindler firm for almost 20 years.

20      THE COURT:  OK.

21      MR. SPIRO:  The firm had enormous trust and confidence

22 in him.

23      THE COURT:  So, how is his opinion somehow greater

24 than the lawyers'?

25      MR. SPIRO:  The question, Can we send it to the

1   reporter? And when he was told that, no, there was a 30-day

2   hold, period, end of conversation.

3           THE COURT: Are you telling me that --

4           MR. SPIRO: Mr. Kreindler never said, John, go ahead

5   and send this transcript.

6           THE COURT: So you are telling me that Mr. Kreindler

7   didn't know, had no idea before he asked and got that

8   information from Mr. Fawcett, that this was protected by the

9   protective order and there was no way he anybody could give

10  this?

11          MR. SPIRO: Obviously he had a question in his mind --

12          THE COURT: Well, why would he have a question in his

13  mind? See, that's the part that Magistrate Judge Netburn

14  factors into her determinations. So, I say to myself, well,

15  what is the evidence to the contrary? Where am I supposed to

16  look to see that there is an innocent explanation that is

17  supported by facts rather than a reasonable explanation that it

18  makes absolutely no sense that he needs to consult with

19  Mr. Fawcett, who is not even a lawyer, after he has been in

20  this case for 10 years and signed the protective order himself,

21  personally, why he needs Mr. Fawcett's opinion about whether or

22  not he can give this -- and you know what it also indicates?

23  It indicates that they had some communication between them

24  about whether or not Isikoff is going to get this information.

25          MR. SPIRO: Yes, and the conclusion was that it

MC85terA

1  couldn't be provided.

2          THE COURT:  Well, you say that was Mr. Kreindler's

3  conclusion.

4          MR. SPIRO:  He was asking to make sure that they're

5  proceeding appropriately.

6          THE COURT:  So why isn't he asking Mr. Maloney?  Why

7  isn't he asking any lawyers?

8          MR. SPIRO:  He was having a conversation with

9  Mr. Fawcett.  Mr. Fawcett was an integral part of this team.

10          THE COURT:  Mr. Fawcett's opinion about whether the

11  protective order covers this transcript is totally worthless.

12  Worthless.

13          MR. SPIRO:  So, your Honor, why in the world would

14  Mr. Kreindler, a very smart, experienced lawyer, undertake a

15  course of action where he would essentially authorize the

16  leaking of a transcript knowing that at the same time that's

17  going on he was going on the podcast of the reporter who was

18  doing this story?  Why would he do that?  He is not a stupid

19  man.  It just makes absolutely no sense.  He knew anyone would

20  understand that if that was leaked that the Kingdom of Saudi

21  Arabia would be all over the Kreindler firm hoping to push the

22  Kreindler firm out of this case.

23          THE COURT:  So, point to me something in this record

24  that points to an innocent explanation rather than a guilty

25  explanation.

1          MR. SPIRO:  Let's start with all of the sworn

2     statements, two sworn statements --

3          THE COURT:  No.  Put aside the sworn statement --

4          MR. SPIRO:  The testimony is that Mr. Fawcett --

5          THE COURT:  When I talk you don't talk.

6          Put aside people's statements.  You know and I know,

7     and Mr. Maloney even knows, that it would not have been a

8     sufficient investigation and it would not have been appropriate

9     to come to the Court and say we did a thorough investigation

10    and determined it was no one and the primary or sole part of

11    that investigation was simply asking the people at the firm did

12    they do it.

13         MR. SPIRO:  And, your Honor, I understand your

14    frustration with the investigation that Mr. Maloney conducted

15    but frustration is one thing --

16         THE COURT:  It wasn't Mr. Maloney alone.  I'm not

17    blaming just Mr. Maloney.  The law firm, Mr. Hartney, anybody

18    involved, I don't see where they were focused.  You see?  They

19    should have been focused.  And they clearly should have been

20    focused -- the first focus was on Mr. Kreindler and

21    Mr. Fawcett, even if that focus was, look, we have to -- you

22    know, Mr. Kreindler and Mr. Fawcett, we have got to exculpate

23    them right away, we have to get them out from under this so

24    let's dig under every rock and find any evidence of innocence

25    rather than, you know, the evidence of a consistent

1  communication with the reporter about whether or not he can get

2  a copy of the transcript.

3       MR. SPIRO:  But where is the evidence of bad faith on

4  the part of Mr. Maloney?  Where is the evidence of bad faith on

5  the part of Mr. Pounian?  Where is the evidence of bad faith on

6  the part of Mr. Hartney?  It is not there.  Your Honor can be

7  critical of the investigation that they did but they proceeded

8  in good faith.

9       THE COURT:  I have to evaluate that.  I am not

10  debating that with you, I am asking tough questions, and if you

11  can withstand my questions you are probably going to win but

12  they're tough questions.  I'm not here to try to argue with you

13  about Mr. Maloney's bad faith but I know that this was, on the

14  scale of an aggressive investigation and a pro forma

15  investigation, this was not on the side of an exhaustive

16  investigation.  And you even know that by the time you got in

17  here you got all kinds of evidence that nobody looked at that

18  they could have readily looked at.

19       So, I understand what you are saying.  I'm not to the

20  point, as far as this part of the conversation, I don't think,

21  on the bad faith issue.  We started this conversation on the

22  issue of you telling me and I was asking you, all right, I see

23  the things that -- I look at this through a different lens now,

24  I didn't make this decision, but I am looking at the things

25  that Magistrate Judge Netburn had in front of her when she made

1   certain conclusions:  One, about the credibility of certain

2   witnesses and statements; two, about the reasonable inferences

3   to be drawn from facts that could have or do have a reasonable

4   inculpatory inference and I'm trying to figure out what am I

5   missing and what did she miss with regard to the reasonable

6   exculpatory inference?  I don't see a whole lot of stuff here

7   that weighs on the side in a reasonable exculpatory explanation

8   for, as you say, either the guilty person, the admitted guilty

9   person -- Fawcett -- or the innocent person -- Kreindler.  So,

10  I have to say, well, wait a minute.  You want to argue to me

11  that the magistrate judge, the inferences she drew were

12  unreasonable inferences.  For me to assess that I have to

13  figure out what evidence is there that points to an innocent

14  inference.  And, you know, the only thing I can say is that the

15  only evidence that was uncovered during this investigation is

16  that everybody that they talked to -- and I had no evidence

17  that they asked him anything other than a one-sentence:  Did

18  you do it?  Everybody that they talked to claimed they didn't

19  do it and I don't -- you know, if your argument is that, well,

20  Magistrate Judge Netburn should have accepted that testimony

21  and the magistrate judge should have, even though she knew that

22  that testimony -- that the statements from Fawcett, the claims

23  of innocence were lies, that it was reasonable for everyone to

24  have accepted those lies without trying to test the veracity of

25  what he was saying, even though the spotlight should have been

1  on him from day one.

2         MR. SPIRO:  So, your Honor, the firm did conduct an

3  investigation.  Mr. Hartney looked at the Citrix Share, which

4  was a cloud-based storage thing to determine if the transcripts

5  had been downloaded for that.  In the other case media he went

6  and looked to see was there any evidence in the e-mail within

7  the firm of the transcript being sent to anyone, and there was

8  no evidence of that.

9         THE COURT:  But, wait a minute.  Stop.  Slow down.  I

10  want to address this.

11         One, when you say evidence that it had been

12  downloaded, there was evidence it was downloaded.  We know that

13  Fawcett downloaded it.  We know that because he gave it to

14  other people in the firm.

15         MR. SPIRO:  Correct.

16         THE COURT:  So, to argue that we had no evidence that

17  it would have been downloaded, no.  We have no evidence that

18  anybody else downloaded it and was the guilty party, could have

19  been the guilty, other than Fawcett because he did download it.

20  OK?  And the fact that when he downloaded it we don't know what

21  he did with it outside the firm -- I don't even know -- is

22  there any -- I know he sent it to a consultant or someone

23  else --

24         MR. SPIRO:  Which he was authorized to do.

25         THE COURT:  Right.  Did he send that, was that

1    discovered, did he send that on this network?

2            MR. SPIRO:  The day after the story was published --

3    the story was published on July 15 -- on July 16 there is an

4    e-mail that we looked at where Mr. Maloney essentially confirms

5    that he had spoken with Mr. Fawcett.  Mr. Fawcett said he had

6    sent the transcript to the consultant.

7            THE COURT:  I know, but how did he send that

8    transcript?  Was there any evidence that that transcript was

9    sent via the law firm network?  Or sent outside of the law firm

10   network?

11           MR. SPIRO:  I believe it was -- and I can confirm this

12   with my client, I believe it was sent through the e-mail

13   network.

14           THE COURT:  All right.  But, you see, the thing is

15   that neither I nor at one point Magistrate Judge Netburn should

16   be asking those questions at this point in time.  Those

17   questions should have been asked and should have been answered

18   right up front.  And, as I say, for you to say, well, we had an

19   affidavit saying nobody downloaded the transcript, well, that's

20   not what the affidavit says.  They said the only person that we

21   have evidence of downloading the transcript was Fawcett.  So,

22   he is not eliminated as a suspect and you had to put that in

23   conjunction with the other evidence that points to Fawcett.

24           MR. SPIRO:  The questions were asked of Mr. Fawcett on

25   July 15 or 16, immediately after the story came out.

MC85terA

1        THE COURT:  Right.

2        MR. SPIRO:  He was a long-standing trusted employee.

3        THE COURT:  Well, that trust was misplaced.  Let's not

4   act that like that.

5        MR. SPIRO:  And there was no other evidence suggesting

6   that he acted inappropriately with regard to the transcript.

7   It was entirely --

8        THE COURT:  I am going to ask this question and you

9   don't have to answer if you don't want to, but do you really

10  think that what was done in this case was likely to have

11  discovered the culprit?

12       MR. SPIRO:  I don't think anything could have been

13  done that would have discovered this.

14       THE COURT:  Something was done.  They stuck a

15  declaration in his face and he fessed up.  That's all that

16  needed to be done, apparently.

17       MR. SPIRO:  At the last minute, yes.

18       THE COURT:  Well, they could have -- wait a minute.

19       At the last minute?  Whose responsibility was that

20  that it was done at the last minute?  The fact is that that

21  could have been done in July, it could have been done in early

22  September, it could have been done long before September 27th.

23  And even when the motion was filed and there is conversation

24  about whether or not they're going to wait until the motion is

25  decided, it might make sense if you want to wait until the

1  motion is decided before you submit the declarations.  But

2  don't tell me it is consistent with an aggressive investigation

3  if you say we are not even going to ask him to sign the

4  declaration until after the Court orders us to do so.

5          MR. SPIRO:  Your Honor, the Kreindler firm was in a

6  difficult position --

7          THE COURT:  They were.

8          MR. SPIRO:  -- for the following reason:  They were

9  counsel of record, they were the lead counsel in prosecuting

10  Saudi Arabia in connection with this case.

11          THE COURT:  Right.

12          MR. SPIRO:  They had serious concerns about what they

13  can or should disclose in the context of the investigation.

14          THE COURT:  But in this investigation --

15          MR. SPIRO:  Obviously, if they had to do it over

16  again, they would have done it differently.

17          THE COURT:  I don't know that.

18          MR. SPIRO:  But this is based on the facts and

19  information that they had at the time where they had no reason

20  to suspect that Mr. Fawcett was --

21          THE COURT:  But they had every reason to suspect

22  Mr. Fawcett.  He was the prime suspect.  Who else knows the

23  reporter?  Who else is talking to the reporter?  Who else had

24  communications with the reporter around that time?  Who else is

25  talking to Mr. Kreindler about whether or not that the reporter

1 can get the transcript?  You can't stand here and say they had

2 no reason to suspect Mr. Fawcett.

3      MR. SPIRO:  There were probably 90 or a hundred people

4 who received the transcript or who had access to the

5 transcript.

6      THE COURT:  And no Isikoff?  Nobody else had a

7 relationship with Isikoff.

8      MR. SPIRO:  Isikoff is a good investigative reporter,

9 he could reach out to and attempt to get the transcript from --

10      THE COURT:  He could.  And then you see?  That's a

11 good example if you say there was some contrary evidence, they

12 had a reasonable explanation, then you should have presented

13 that evidence to Magistrate Judge Netburn.  But nobody has

14 presented any evidence to her that he had some other source for

15 this transcript.  And we know that that's not what happened.  I

16 mean, I'm not -- it is hard for me to debate this in the

17 abstract with you when we know it was Fawcett and we know how

18 it -- you know, at least in general terms and not much detail

19 but we know how he did it and we know he was lying and we know

20 that it was not impossible to find that out because it,

21 ultimately, was found out and it was found out simply because

22 they put an affidavit -- the declaration in front of him that

23 is consistent with the lies that he was telling and they were

24 going to submit it to the Court and he decided, with or without

25 being counseled by attorneys, he decided that he could not do

1    that because he would only complicate the situation for

2    himself.  And he didn't fess up out of some altruistic decision

3    that he was going to do the right thing, he fessed up when they

4    forced him to fess up, when they put him in a situation that

5    was awkward for him to keep lying.  That was the only thing

6    that was done that made it awkward for him to continue to lie.

7              MR. SPIRO:  At the time the firm had no reason to

8    believe that he would want to go ahead and leak this

9    transcript.

10             THE COURT:  But that's true of everybody.  That's true

11   of the whole world.  That doesn't give them a reason not to be

12   aggressive and not to suspect everyone.  Give me an example of

13   who falls under that category of somebody they should have

14   suspected.

15             MR. SPIRO:  You know, you could ask a whole host of

16   other people as to why different people would have a whole host

17   of the motivations for wanting to leak it but, from Mr. Fawcett

18   and the firm's perspective leaking that transcript, as today

19   evidences, was a ridiculous thing to do.

20             THE COURT:  Right you are.

21             MR. SPIRO:  It was something that was going to bring

22   the wrath of the Court down on the Kreindler firm, it was going

23   to bring the wrath of the Court down on Mr. Fawcett.

24             THE COURT:  Right.  I feel sorry for the firm that

25   they're in this situation.

1    MR. SPIRO:  It made no sense.  So, the suggestion that

2    people would like and say it must be Fawcett, we can sit here

3    today and stand here today and say that.

4    THE COURT:  No, that's not true.  I can't accept that.

5    MR. SPIRO:  But, if it was Kreindler, it was a very,

6    very different perspective.

7    THE COURT:  The list of things that we have already

8    discussed plus the things we didn't discuss all point to either

9    Fawcett or Kreindler.  And if it wasn't Kreindler, it was

10   Fawcett.  So, you know, that argument could be made if there

11   had been no phone calls.  I don't think it could be made if he

12   didn't have a personal relationship with the reporter.  That

13   argument maybe couldn't be made if they didn't specifically

14   discuss whether he could get a copy of the transcript.  There

15   are a lot of arguments that could have been made if the facts

16   were different but the facts are not different.  It is not --

17   you know, you need a more persuasive argument than they should

18   have never, in their wildest dreams, thought it was Fawcett.

19   Fawcett was the primary suspect.  He should have been the

20   primary suspect.

21   MR. SPIRO:  But Fawcett, by his own admission, misled

22   the firm.

23   THE COURT:  Right.  And that's what crooks do.

24   MR. SPIRO:  He prevaricated his word, dissembled his

25   word.

MC85terA

| | |
|---|---|
| 1 | THE COURT:  That's what criminals do. |
| 2 | MR. SPIRO:  And someone that you work with for almost |
| 3 | 20 years, who you trust like a brother, that's not someone that |
| 4 | you ordinarily think -- |
| 5 | THE COURT:  Then you are not in the position to do a |
| 6 | thorough and effective investigation if you are going to hold |
| 7 | back because of your personal relationship with the people you |
| 8 | are investigating. |
| 9 | MR. SPIRO:  But it also suggests, your Honor, that the |
| 10 | investigation was done in good faith and I think that is a very |
| 11 | critical point in terms of your Honor's analysis. |
| 12 | THE COURT:  All right.  Explain to me why -- and |
| 13 | again, I have to review Magistrate Judge Netburn's decision |
| 14 | more carefully -- but explain to me why, if being the firm |
| 15 | that's doing the primary investigation and being the lawyers |
| 16 | from the firm that's running the Plaintiffs Executive |
| 17 | Committee, explain to me why everybody else, in terms of their |
| 18 | representations to the Court did so immediately and the |
| 19 | Kreindler firm. |
| 20 | MR. SPIRO:  The Kreindler firm was unique in that they |
| 21 | were taking the lead in prosecuting this case.  They had one |
| 22 | consultant who was located in the Middle East who was the |
| 23 | source of valuable information? |
| 24 | THE COURT:  And you think they had, under those |
| 25 | circumstances -- |

1    MR. SPIRO:  And they were concerned about a security.

2    THE COURT:  You think they had, under those

3  circumstances, to put their own interest ahead of their

4  responsibilities as head of the committee and as officers of

5  the court?

6    MR. SPIRO:  Your Honor, the firm responded.  When the

7  Court set a deadline for submissions and declarations, the firm

8  responded and met each deadline that Magistrate Judge Netburn

9  set.

10    THE COURT:  Shouldn't the firm have been anxious to

11  uncover the culprit.

12    MR. SPIRO:  They were.  They were very anxious, which

13  is why the day of the news story the firm understood that it

14  needed to conduct an investigation and they conducted a good

15  faith investigation.

16    THE COURT:  All right.  And other than checking those

17  e-mails and some basic questions to those people who had

18  access, asking them to confess to whether they did it, what

19  else do you say was done that could have reasonably led to

20  uncovering -- possibly uncovering the culprit?

21    MR. SPIRO:  Obviously, with the value of hindsight,

22  had Mr. Fawcett been asked for a declaration and he then

23  refused, that would have been helpful but no one knew at the

24  time that that was going to be something that was

25  determinative.  In fact, Mr. Fawcett was in the loop with

1  regard to the investigative work that was being done.  You will

2  see one of the e-mails that was in the folder that your Honor

3  has reflects him actually being copied on the e-mail showing

4  what's being done.  And obviously, understanding that people

5  believed that the only person who got this transcript outside

6  of the firm was the consultant, he gets the e-mail and doesn't

7  say, folks, I have to tell you something, I'm responsible for

8  sending this transcript.  He told a lie to several people

9  within the firm and compounded it.

10         THE COURT:  That's what people do.  People lie.

11  That's what you expect them to do.  When you investigate

12  criminal conduct the first thing you expect is not that they're

13  going to break down and confess.  You are going to expect them

14  to lie.  So, you have to be in a position to conduct an

15  investigation in a way that you can catch them in that lie.  I

16  don't understand what was done other than, you know, *Did you do*

17  *it?  No.  OK.  Thanks.  Bye.*

18         MR. SPIRO:  I don't expect one of my law partners,

19  whom I have known for 20 or more years, whom I trust enormously

20  who I have been through wars with together, if he tells me

21  something --

22         THE COURT:  Right.

23         MR. SPIRO:   -- and said I didn't send that transcript

24  to Isikoff, I believe him and I don't necessarily treat him the

25  way I treat a stranger who needs to be cross-examined.

MC85terA

1        THE COURT:  But what you just said -- think about what

2    you just said.  If somebody stole your wallet at the firm and

3    your first concept would be:  *I can't imagine who would have*

4    *done this.  Nobody would have done this.*  And you were tasked

5    with finding out who stole your wallet.  Would you avoid

6    questioning those people who you were closest to?

7        MR. SPIRO:  I would ask them, Do you know anything

8    about it?

9        THE COURT:  You would treat them differently than you

10   would treat everyone else?  The questions that you would ask of

11   witnesses and potential perpetrators, you would treat them

12   differently if they had not been ruled out by any evidence as

13   the perpetrator?

14       MR. SPIRO:  Yes.  If it is someone that I have known

15   for 20 years and know their personal integrity and have a high

16   opinion of it, I would absolutely treat them differently.

17       THE COURT:  Then you would not be in a good position

18   to make a good faith representation to the Court that you have

19   done a completely thorough investigation and ruled out

20   everybody at the firm.

21       MR. SPIRO:  I don't agree with that, your Honor.

22       THE COURT:  Why?  Just because you trust somebody at

23   the firm?  That's exactly what happened here.  Just because

24   they trusted Fawcett that it is still a thorough investigation

25   not to pursue him as a possible suspect?

1          MR. SPIRO:  Your Honor, it goes to the issue of

2     whether the investigation was conducted in good faith and there

3     is no doubt in my mind that this investigation was conducted by

4     Mr. Maloney in good faith.  Obviously we all sit here with the

5     benefit of hindsight and can point to things that maybe could

6     have been done differently, but the reality is that given the

7     information they had, the relationships that they had, and the

8     good faith belief that to take this firm and remove it from the

9     PEC based upon a good faith investigation, even if it were

10    flawed, is simply unfair, inappropriate, not certainly the

11    least draconian remedy under the circumstances, and we would

12    urge that your Honor reconsider that portion of the remedy here

13    so that the 911 victims, the families who are relying on the

14    Kreindler firm, can be assured that this case will continue to

15    be prosecuted aggressively and appropriately.

16         THE COURT:  Let's take a break and then I will hear

17    from Kingdom of Saudi Arabia.  We will take a 10-minute break.

18         (Recess)

19         THE COURT:  Mr. Rapawy?

20         MR. RAPAWY:  Thank you, Judge Daniels.  May it please

21    the Court:

22         Judge Netburn found that Kreindler & Kreindler,

23    through its supervising attorney James Kreindler and its

24    researcher John Fawcett, willfully violated the Court's order

25    by deliberately giving a confidential deposition transcript to

1  reporter Michael Isikoff as part of the firm's press-oriented

2  litigation strategy.  And, she also found that

3  Kreindler & Kreindler's other attorneys were -- I think the

4  phrase she used was, *at best, was willfully blind to*

5  *Kreindler's and Fawcett's violations*, and they obstructed the

6  Court's investigation and made a series and false and

7  misleading statements to conceal facts to the Court.  Those

8  findings were made after a two-day evidentiary and the record

9  here supports them.

10  I intend, your Honor, to begin with the factual

11  support for the findings and then to talk a little bit about

12  the law at the end, if that's acceptable, but I am happy to go

13  in whatever order your Honor prefers.

14  THE COURT:  Go ahead.

15  MR. RAPAWY:  So, as your Honor knows, we are here on

16  essentially clear error review of the factual findings, and you

17  have a detailed opinion before you in which Judge Netburn

18  carefully assembled the documentary evidence and also relied on

19  her personal observations of the witnesses and her long

20  familiarity with the case and the record.  And I do think

21  that's important here because I think the cold record can't

22  really fully convey things -- the impact of the things that

23  happened at the hearing like Mr. Kreindler bursting into tears

24  when he was discussing Mr. Fawcett, like Mr. Hartney admitting

25  on the stand that Ms. Benett told him that she did not want to

1    reveal certain information to the Court about how

2    Kreindler & Kreindler restricted access or, rather, didn't

3    restrict access to confidential information, about how

4    Ms. Benett, during her own testimony, made gratuitous attacks

5    on Musaed al Jarrah that went well beyond even what the

6    declaration she had edited for Mr. Fawcett said, and about

7    Mr. Fawcett's only inability to keep his story straight, in

8    particular, about the calls with Liz Crotty that I think were

9    part of the circumstantial evidence on which Judge Netburn

10   relied to determine that Fawcett did not act alone and could

11   not act without the knowledge, or at least tacit approval, of

12   Mr. Kreindler.

13        On that point, the question of a finding of knowledge

14   or tacit approval, I think that there is essentially three

15   pieces that I would draw the Court's attention to.  The first

16   is the inference that Judge Netburn reasonably drew from the

17   phone calls between and among Kreindler, Fawcett, and Isikoff

18   in late June and early July 2021, and then the calls and

19   messages between and among Mr. Kreindler and Mr. Fawcett and

20   Ms. Crotty on July 22nd, immediately after the Kreindler firm

21   became aware that they were going to -- that we were going to

22   take this issue to the Court.

23        Your Honor has already touched on the basic

24   implausibility of the story that Mr. Kreindler was asking

25   Mr. Fawcett whether the transcripts were still confidential,

1    but there was another implausible statement that Judge Netburn

2    also relied on about that series of phone exchanges and that

3    was that based on her observation of Mr. Kreindler and the way

4    he talked about Mr. Fawcett and her observation of Mr. Fawcett

5    and the way that he talked about Mr. Kreindler, she also

6    thought it was implausible that Mr. Fawcett would have told his

7    employer and friend this could not be released and then turn

8    around and release it without Mr. Kreindler's -- again, at

9    least tacit -- approval.  So, she did not find that

10   Mr. Kreindler necessarily said to Mr. Fawcett, go and send the

11   documents, but that it was -- she did find that, based on those

12   conversations, Mr. Kreindler was aware that Mr. Fawcett was

13   going to send those documents and that Mr. Fawcett understood

14   that he was acting with the authorization of his employer and

15   friend rather than betraying him.

16          And, similarly, with regard to the July 22nd phone

17   calls, Judge Netburn found that, first, that Mr. Fawcett gave

18   false testimony twice on the stand about his calls with

19   Ms. Crotty saying first it was purely about personal matters

20   and then, when he was confronted with evidence -- well, not

21   even evidence -- he was confronted with his own attorney's

22   assertion of privilege over those July 22nd calls, he then came

23   back after a break and said, well, they were about the Court's

24   order when, in fact, there was no court order pending at the

25   time, there was only our letter.  So, the inference that she

1    drew was that he had something to hide about those calls.  But,

2    he didn't have anything to hide about his personal culpability

3    at this point.  If he had really betrayed Mr. Kreindler at that

4    time, really acted without his knowledge or approval, there was

5    no reason he couldn't have said, yes, I was worried about my

6    legal exposure and that that was why I talked to a lawyer.

7    But, if, on the other hand, he was tipped off that morning by

8    other members of the firm that it was time for him to consider

9    his own exposure because they knew or had good reason to

10   believe that something was going on, that he had done something

11   to cause him that deal of exposure, he would have had a very

12   clear motive to conceal that in order to protect the people who

13   I think she could reasonably infer he wanted to protect.

14           THE COURT:  Well, remind me of what exactly the

15   testimony ended up being when he changed his testimony.  What

16   was the nature -- and maybe I don't remember it because maybe

17   it is not there, but what do you say is in the nature of the

18   conversation that he testified about with Ms. Crotty?

19           MR. RAPAWY:  I'm sorry.  You want the after he revised

20   it, your Honor?

21           THE COURT:  Yes.

22           MR. RAPAWY:  OK.  After he revised it he said that he

23   called her because he had seen the Court's order and was

24   concerned about it.

25           THE COURT:  Concerned about it in what way?  Did he

1  say?

2         MR. RAPAWY:  I would refer, your Honor, let me see if

3  I have the transcript cites, your Honor.  This is all on page

4  480 of the transcript and he testified that he called her on

5  the morning of July 22nd, "after the Court's order had come

6  out," and that he was calling her "about the Court's order."  I

7  don't think he got much more specific than that but I think the

8  implication was that he had seen an order from Judge Netburn

9  that caused him to be concerned about his personal exposure and

10  the problem with that testimony is that she hadn't issued an

11  order when those calls were made.

12         THE COURT:  But I'm not sure -- since no one followed

13  up on this question I'm not sure I understand what it is you

14  say that occurred in that conversation.

15         MR. RAPAWY:  Well, we think he was calling her because

16  he was concerned -- we told them at that point that we were

17  going to go to the Court and ask the Court to investigate.

18         THE COURT:  Right.

19         MR. RAPAWY:  And we think that what happened is they

20  all got on the phone that morning, and whether Mr. Pounian was

21  on the call or not there is dispute about whether there is

22  evidence to show that, but at least Mr. Kreindler and

23  Mr. Fawcett got on the phone and they talked about what they

24  were going to do about this investigative request.

25         THE COURT:  Are you sure we are all taking about the

1    same phone call?

2          MR. RAPAWY:  This is the July 22nd, 2021 series of

3    phone calls.

4          THE COURT:  OK.  Well, which phone call are we talking

5    about?  All three of them were supposedly on the call.

6          MR. RAPAWY:  There is two.  There is the one that --

7    I'm being handed -- just so I can get the exact time right.

8          So, at 11:18 a.m., Mr. Fawcett texts Ms. Crotty and

9    the content of that text is privileged and was withheld from us

10   and not produced to the Court, he asserted personal

11   attorney-client privilege over that text.  And then, at

12   9:17 a.m., we have there is a phone record that shows a

13   46-minute phone call from Mr. Fawcett to Mr. Kreindler.  And

14   then, at 10:41 a.m., there is a phone call from Mr. Fawcett to

15   Ms. Crotty that lasts 22 minutes.  And then, at 12:07 p.m.,

16   there is an e-mail from Mr. Fawcett to Ms. Crotty, the contents

17   of which are unknown, he asserted personal attorney-client

18   privilege over that and it was upheld.  At then, 12:56 p.m.,

19   there is another five-minute phone call from Mr. Fawcett to

20   Mr. Kreindler.  And this is all set out at page 17 of Judge

21   Netburn's opinion, your Honor.

22         So, the testimony at the hearing was that neither

23   Mr. Fawcett nor Mr. Kreindler could initially recall what their

24   conversation was about but they insisted it wasn't about the

25   leak.  And then, when Mr. Fawcett was asked about the contents

1   of the call with Ms. Crotty and he was directed to give a

2   general description of the subject matter, he initially

3   testified, well, you know, it was about her recent run for

4   district attorney and she hadn't been elected district attorney

5   and they were discussing that and he insisted there was no

6   discussion of the leak whatsoever.  And so, it was pointed out

7   to him several times by my partner, Mr. Hansen, that that was

8   inconsistent with his attorney's assertion of attorney-client

9   privilege as to the general contents of that phone call and

10  that at that point the cross-examining went on to other topics,

11  it ended, there was a recess.  After the recess, Mr. Fawcett

12  comes back and says that he wants to correct his testimony and

13  then he -- and that's what he says that it was about, the

14  Court's order.  I think he actually said that directly in

15  response to questioning from Judge Netburn.

16          THE COURT:  What does that mean, it is about the

17  Court's order?

18          MR. RAPAWY:  I don't know, your Honor.  I mean that's

19  what you have got in the record.  But, I do think --

20          THE COURT:  Was Mr. Kreindler questioned about the

21  content of that phone call?

22          MR. RAPAWY:  Mr. Kreindler was questioned about the

23  content of the phone call from Mr. Fawcett to Mr. Kreindler,

24  yes, and he testified that he did not recall what it was about

25  but was sure that it also wasn't about the leak.

1          THE COURT:  Who was supposedly on that phone call?

2          MR. RAPAWY:  We know that Mr. Kreindler and

3     Mr. Fawcett were on the phone call and that after the hearing

4     there was an attempt to submit a declaration from Mr. Pounian

5     saying that he was also on the phone call and Judge Netburn

6     declined to accept the declaration.

7          THE COURT:  Is there any independent evidence that

8     those phone calls, that they were on those phone calls?

9          MR. RAPAWY:  The phone records show that -- so, the

10    phone records that were accepted at the hearing showed that

11    Mr. Fawcett and Mr. Kreindler were on the phone calls and also

12    that Mr. Fawcett had his phone call to Ms. Crotty.

13         THE COURT:  So, we are not -- I thought we were

14    talking about a phone call or phone calls in which at least

15    three or four people were on that phone call.

16         MR. RAPAWY:  So, we know there were two and then we

17    have the Pounian declaration that says there were three and

18    this is referring to the July 22nd phone call at 9:17 a.m.  The

19    Pounian declaration was not in the record, it was excluded.

20         THE COURT:  And that was a phone call -- who was on

21    that phone call?

22         MR. RAPAWY:  Mr. Fawcett, and Mr. Kreindler, and again

23    possibly Mr. Pounian, depending on the status of that

24    declaration.

25         THE COURT:  Is there any evidence that those three

1    people were on the phone call at that time?

2              MR. RAPAWY:  There are phone records.

3              THE COURT:  Do the phone records indicate that all

4    three of them were on that same phone call?

5              MR. RAPAWY:  So, Mr. Fawcett's phone records, which is

6    what went into evidence at the hearing, show him and

7    Mr. Kreindler.  Mr. Pounian submitted his declaration after the

8    fact and he submitted a phone record of his own that would show

9    that he was also on the phone call.  I don't think that the

10   time matches exactly but it was about that time and his

11   testimony was it was a conference call with all three of them

12   on it.

13             THE COURT:  And who supposedly made this phone call?

14             MR. RAPAWY:  The 9:17 phone call, Mr. Fawcett's

15   records show him as the sender so he was the one who initiated

16   the phone call to Mr. Kreindler, according to the records.

17             THE COURT:  What was the substance of the text

18   messages with Mr. Kreindler?

19             MR. RAPAWY:  The text messages, we don't know the

20   substance of it.  So, Mr. Fawcett's individual counsel asserted

21   privilege over the --

22             THE COURT:  There was no testimony about what was in

23   that text message?

24             MR. RAPAWY:  That is correct.

25             THE COURT:  Was Mr. Kreindler asked about whether or

1  not he knew what the conversation was about with Ms. Crotty?

2       MR. RAPAWY:  The discussion is at page 84 of the

3  transcript and I think he said he did not know about the call

4  to Ms. Crotty but I would --

5       THE COURT:  What is the content of the, if we know if

6  it is in evidence, of the content of the 12:07 e-mail?

7       MR. RAPAWY:  The 12:07 e-mail is not in evidence

8  because privilege was asserted over that as well.

9       THE COURT:  OK.  So, how many of these phone calls

10  were, did Mr. Fawcett assert a privilege and it was sustained?

11       MR. RAPAWY:  He asserted privilege over the contents

12  of the call with Ms. Crotty, that's the 10:41 a.m. call that

13  lasted 21 minutes and he was asked to give a general

14  description of the subject matter of the call and that's when

15  he said, the first time, that it was about her unsuccessful run

16  for DA.

17       With regard to the Mr. Kreindler's knowledge of the

18  call to Ms. Crotty, he testified -- this is on page 85 of the

19  transcript -- that he has "no idea why John called Ms. Crotty.

20  I don't think I have spoken to her for years."  And then, lower

21  on the same page:  "I have no idea why John called Ms. Crotty,

22  absolutely none."

23       THE COURT:  So, who is supposed to be on this

24  multi-conversation phone call?

25       MR. RAPAWY:  The 9:17 a.m. call is at least

1  Mr. Fawcett and Mr. Kreindler and possibly Mr. Pounian.  The

2  10:41 a.m. call is Mr. Fawcett and Ms. Crotty and I don't think

3  there is any reason to think anyone else was on that call.

4          THE COURT:  All right.

5          MR. RAPAWY:  Then there is the 12:56 p.m. call from

6  Mr. Fawcett back to Mr. Kreindler.  I think that one -- I don't

7  know that there is any evidence that anyone but the two of them

8  were on that call.  I don't believe there is.

9          Anyway, so the inference that, and if I may, your

10  Honor, the inference that Judge Netburn drew from that sequence

11  is she did not think it was plausible that Mr. Fawcett would be

12  able to deceive Mr. Kreindler in that way of having a call

13  about something else and then going and talking to his lawyer

14  about his personal exposure and then having another call with

15  Mr. Kreindler later that same day and just never dropping a

16  hint to Mr. Kreindler, *Actually, I did it, Jim, and I'm the*

17  *reason that the firm is going to be in trouble.*  She did not --

18          THE COURT:  So, what did Mr. Fawcett claim was the

19  nature of the phone call to Mr. Kreindler?

20          MR. RAPAWY:  He claimed that he did not remember but

21  that he was sure it was not about the leak.

22          THE COURT:  OK.  OK.  Go ahead.

23          MR. RAPAWY:  OK.  And the last point I want to make on

24  that is that Kreindler & Kreindler has complained that the

25  Pounian declaration should have come in.  We think Judge

MC85terA

1  Netburn acted within her discretion excluding it. But, even if

2  it comes in -- and she made this point in her opinion -- it

3  said that they were discussing the e-mail from counsel for

4  Saudi Arabia -- in fact it was an e-mail from me -- in which we

5  said we were going to investigate the leak -- or ask the Court

6  to investigate the leak rather, I should say. And so, even if

7  you accept what Mr. Pounian wanted to put in after the fact, it

8  would still contradict Mr. Kreindler and Mr. Fawcett's

9  testimony that the call wasn't about the leak.

10      THE COURT: What was supposedly the relevance of the

11  offer of the Pounian affidavit?

12      MR. RAPAWY: I believe they wanted to proffer it to

13  show that Mr. Fawcett did not confess to Mr. Kreindler on that

14  call that he was the guy who did it which, you know, an

15  inference that the evidence might otherwise support.

16      THE COURT: Mr. Pounian, was he questioned about this?

17      MR. RAPAWY: Mr. Pounian was not questioned about this

18  at the hearing. We did not know at the time that there was any

19  reason to think he was on that call. And we did ask

20  Mr. Kreindler about the call when he was on the stand and we

21  asked Mr. Fawcett about the call because we had the phone

22  records to show the two of them were on it. Mr. Pounian's

23  phone records showing he was on the call, if I recall

24  correctly, your Honor -- and the record will confirm this if I

25  am right -- if I recall correctly it was his personal phone

1    records and therefore they were never produced to us so we had

2    no reason, at the hearing, to think he was.  But, counsel for

3    and Kreindler & Kreindler presumably could have asked him about

4    the call if they knew he had been on the call.  And it seems

5    like a reasonable thing for them to have known.  It was not

6    something we knew at the time.

7           THE COURT:  So he had testified earlier without

8    producing the phone record or he just testified after these

9    records?

10          MR. RAPAWY:  He testified at the hearing.  The phone

11   records that they wanted to put in were not previously produced

12   to us.  They were his personal phone records so I guess the

13   position was that they weren't within the firm's possession,

14   custody, or control.  We objected to the consideration of these

15   documents that hadn't been previously produced and hadn't been

16   introduced at the hearing.

17          THE COURT:  And he only testified once.

18          MR. RAPAWY:  He testified at the hearing under oath

19   and in his declaration, of course.

20          THE COURT:  I know, but you saw the declaration when?

21          MR. RAPAWY:  I'm sorry.  I may have been unclear, your

22   Honor.

23          We got two declarations of Mr. Pounian before the

24   hearing but not discussing the phone calls, those are the ones

25   in which he gave the denials.  And then, at the hearing, he was

MC85terA

1 crossed about those declarations. And then, after the hearing,

2 they wanted to put in another declaration from him that

3 introduced additional information about his participation in

4 that phone call.

5 THE COURT: And did he proffer what the phone call was

6 about?

7 MR. RAPAWY: He proffered that the phone call was

8 about the discussion of the e-mail that we had sent the

9 previous day.

10 THE COURT: And?

11 MR. RAPAWY: And what they should do about it.

12 THE COURT: Any more detail than that? Who said what?

13 MR. RAPAWY: I don't think the declaration goes into

14 who said what. I don't have it in front of me. But, it is

15 cited in Judge Netburn's opinion.

16 MR. SPIRO: Your Honor, it is tab 11.

17 THE COURT: Tab 11?

18 MR. SPIRO: Yes.

19 MR. RAPAWY: Great.

20 THE COURT: I'm looking at tab 1, page 17. Is that

21 the same?

22 MR. RAPAWY: Oh. The Pounian declaration that they

23 wanted to put in after the fact is at tab 11 of their binder so

24 that's -- you can look at it and see what it says.

25 THE COURT: OK.

1          MR. RAPAWY:  He has something about who says -- not

2     about who said what but about general subject matter, in

3     paragraph 4.

4          THE COURT:  OK.

5          MR. RAPAWY:  So, your Honor can look at that and -- I

6     think it's properly --

7          THE COURT:  What I don't understand is which one of

8     these phone calls that he said he was on.

9          MR. RAPAWY:  That he, Mr. Pounian, said he was on?

10         THE COURT:  Yes.

11         MR. RAPAWY:  He said he was on the 9:17 phone call

12    that lasted for 46 minutes so it is the second call that is

13    listed in the table on page 17.

14         THE COURT:  OK.  And which phone call did Mr. Fawcett

15    assert a privilege?

16         MR. RAPAWY:  The privilege was asserted over the

17    10:41 a.m. phone call from Mr. Fawcett to Ms. Crotty so it

18    would not be in Mr. Pounian's affidavit.

19         THE COURT:  Go ahead.

20         MR. RAPAWY:  And then, just briefly, on the other

21    facts supporting the finding of knowledge or tacit approval, I

22    think that Judge Netburn was also entitled to draw some support

23    from her finding that Mr. Kreindler's really quite

24    extraordinary long-running public disparaging of the Court's

25    orders and he gave testimony that that was just criticism and

1    that everybody knew that they sought to comply with the orders

2    but I don't think that's the only evidence that could be drawn

3    from his describing these orders as disgusting gag orders that

4    we all hate.

5            And then, also, there was the 2017 previous violation

6    that involved Mr. Kreindler and Mr. Fawcett working together to

7    disclose confidential information to a reporter from the

8    Politico magazine which I think goes to sort of the method of

9    operations, if you will, and at least would have contributed to

10   the overall feeling that perhaps more questions should have

11   been asked of, frankly, both Mr. Kreindler and Mr. Fawcett when

12   the firm was purportedly trying it figure out what had gone on.

13   And then, further to that point, I think that she also was

14   entitled to rely on what she found was willful blindness on the

15   part of other attorneys because if Mr. Maloney, for example,

16   who knows how to run an investigation and testified that he

17   knows how to run an investigation, didn't run an investigation

18   here, I think it might not be enough on its own but it is a

19   reasonable supporting inference that he didn't want to ask the

20   questions because he was a little bit concerned about what he

21   might find out if he did.

22           Now, to go to the evidence that the investigation

23   was --

24           THE COURT:  Let me back up.  I'm not sure what

25   questions you are referring to.

1      MR. RAPAWY:  So, your Honor talked about the

2  insufficiency of the investigation before and I am going to

3  turn to that next and the point I was trying to make is that if

4  the investigation was insufficient, why was the investigation

5  insufficient?  One possible reason is that the attorneys at the

6  Kreindler firm generally had a fairly good idea of where the

7  leak came from and they did not want to generate proof that

8  would be disadvantageous to their firm.  And that would be

9  another reason to think, as Judge Netburn concluded, that

10  Mr. Fawcett did not act on his own and did not act without

11  Mr. Kreindler's authorization or mere tacit approval because if

12  he had, if he had really acted completely on his own, they had

13  every motive to establish that he was the one who did it and

14  that he acted on his own.

15      THE COURT:  Except I'm not sure I follow -- and I will

16  look closely on that part of her opinion -- but I'm not sure I

17  follow your logic that because Kreindler, you argue that

18  Kreindler had incentive to not do an investigation, that that

19  somehow spills over to Mr. Maloney or anybody else who was

20  involved in this.

21      MR. RAPAWY:  I would say it is one piece of evidence,

22  your Honor, but if you are not persuaded by it there is plenty

23  of other evidence.

24      THE COURT:  I am trying to figure out how powerful

25  that inference is.  You are saying it implies that Mr. Maloney

1 did what?

2       MR. RAPAWY:  That Mr. Maloney did a very superficial

3 investigation.

4       THE COURT:  Why?

5       MR. RAPAWY:  That it is not the investigation he could

6 have done, not because he likes doing superficial

7 investigations but because he was concerned that if he did a

8 thorough investigation, he might find something that would

9 damage Mr. Kreindler.

10       THE COURT:  Is there anything in this record that is

11 consistent with that?

12       MR. RAPAWY:  Only the insufficiency of the

13 investigation, your Honor.  That's what I am arguing from.

14 And, again, if you don't think that's a strong inference there

15 is plenty of other stuff.

16       THE COURT:  Well, as you were discussing earlier, what

17 is your position as to who needs to be culpable?

18       MR. RAPAWY:  So, our position is that there is a

19 sanction against the law firm and the law firm needs to be

20 culpable.  And to be culpable, the law firm, like any entity

21 that isn't a natural person, has to act through its agents.

22       THE COURT:  OK.

23       MR. RAPAWY:  I do think that the Kreindler & Kreindler

24 could be held to have willfully violated the Court's orders

25 based just on what Mr. Fawcett did.  Even if Mr. Kreindler

1    didn't know.  I think we argued to Judge Netburn on that there

2    would be a basis to hold them, just on that basis.

3          THE COURT:  I'm not sure if she did or did not hold

4    them.

5          MR. RAPAWY:  She went further and she found that

6    Mr. Kreindler knew or gave tacit approval.  And so, I think

7    that is an extremely defensible finding, we argued that, too,

8    and I think there is a lot of evidence to support.  But if you

9    are asking who needs to be culpable, what is the legal

10   standard; I think one agent acting willfully at the firm.

11         THE COURT:  Which agent is that other than the

12   evidence you argue that supports that conclusion with regard to

13   Kreindler and with regard to Fawcett?

14         MR. RAPAWY:  It would be Kreindler and Fawcett.  So, I

15   guess my answer to your question is I think she could have done

16   this based on either a finding as to Mr. Fawcett or a finding

17   as to Mr. Kreindler.

18         THE COURT:  Again, let me go back to what we were

19   discussing before that I was discussing with Mr. Spiro.  Are

20   you making that argument in the context of this illegal

21   disclosure or are you making that argument in the context of

22   the investigation?

23         MR. RAPAWY:  I think that she -- that argument when

24   you say that argument, your Honor --

25         THE COURT:  Well, you say that they're culpable, that

1   Kreindler and Fawcett alone can be culpable to hold the firm

2   culpable and I am trying to understand whether you are saying

3   that based on the inference to be drawn about the nature of the

4   investigation or the inference to be drawn about who was

5   involved in the disclosure.

6           MR. RAPAWY:  I see, your Honor.

7           Let me put it this way.  For the disclosure itself,

8   leaving the investigation aside, I think there are findings of

9   culpability and they are supported by the record as to

10  Mr. Fawcett and Mr. Kreindler.  For the investigation and the

11  misstatements that were made to the Court in the course of the

12  investigation -- which I would like to get into a little more

13  detail in a minute -- I think there are findings of culpability

14  as to Mr. Kreindler, Mr. Maloney, Ms. Benett, and Mr. Pounian,

15  because they all put in these declarations and there were

16  things in those declarations that should not have been said to

17  the Court.

18          THE COURT:  OK.

19          MR. RAPAWY:  And I think that with regard to holding

20  the law firm responsible, any of its attorneys who were

21  involved would have been sufficient but, in fact, there is

22  basis to support a finding of culpability as to all of the

23  attorneys who were involved.

24          THE COURT:  Well, before you move on to that there is

25  an issue that I have yet to resolve.  I understand your request

1    with regard to the sanction of attorneys fees against the firm

2    but, technically, with regard to removal from the committee,

3    the firm is not a member of the committee, there are

4    individuals that are members of the committee.  So, this is not

5    about -- I believe my recollection is that there are three or

6    four people who are from the Kreindler firm.  I have reviewed

7    Judge Casey's original order, and you can tell me whether this

8    is still correct, it says the Court designates, in relevant

9    part it says James P. Kreindler, of Kreindler & Kreindler, as

10   co-chair of the Plaintiffs Executive Committee for personal

11   injury and death claims.  It says the Court designates Justin

12   T. Green to the committee.  And it says the Court designates

13   Mark Moller to the committee.  Those are the three lawyers who

14   are members of the committee.  I don't see any designation of

15   the firm itself as a member of the committee.

16              MR. RAPAWY:  I see, your Honor.

17              So, I would say to that certainly your Honor is

18   certainly correct that the order designates individual

19   attorneys.  Many of the duties that the firm performs in this

20   litigation, frequently Mr. Maloney, Ms. Benett, Mr. Pounian

21   signed letters on behalf of Kreindler & Kreindler as a member

22   of the Plaintiffs Executive Committee.  And I believe that

23   there was a request pending at the time that the -- shortly

24   before the hearing to have -- I believe it was Ms. Benett and

25   Mr. Pounian added, formally, to the committee.

1          THE COURT:  Yes.

2          MR. RAPAWY:  Which Judge Netburn denied in her order.

3          THE COURT:  Yes, she denied that.

4          MR. RAPAWY:  But, if you look at the July 27th letter,

5     the letter that is signed to the Court from the Plaintiffs

6     Executive Committees in which they said that their

7     investigation was complete.  That is signed by Mr. Pounian and

8     then Ms. Benett and Mr. Maloney are also on the letter,

9     Mr. Kreindler wasn't, it actually came up at the hearing.

10          THE COURT:  They're technically not members of the

11     committee.

12          MR. RAPAWY:  They're technically not members of the

13     committee but they frequently act on behalf of the committee,

14     and the FBI protective order allows them access to confidential

15     material because they are members or they were members of a

16     firm that was on the executive committee.  So, there is a sense

17     in which, although the individuals obviously hold the seats on

18     the committee, the firm acts as a -- member is the wrong word

19     but the firm, we frequently interact with them in the course of

20     the litigation and they write us e-mails that say this is from

21     the PECs and so on and so forth.  So, your Honor can give that

22     whatever weight you like.

23          The way I read Judge Netburn's order is that based on

24     the conduct of the firm in the investigation, she does not

25     think that the lawyers who were acting for

1   Kreindler & Kreindler in this litigation have demonstrated that

2   anyone from that firm should continue to be on the executive

3   committee.  Now, it is true that there are some individuals who

4   currently hold those seats who are not involved in this

5   particular episode, Mr. Green, for example, and there is no

6   sanction individually as to Mr. Green, certainly, but the -- I

7   don't think that prevents her from finding that as a just order

8   in response to the firm's conduct and the conduct of the

9   attorneys who were authorized to act for the firm in this

10  matter, including Mr. Kreindler personally, that no members of

11  the firm should be on the committee anymore.

12          As your Honor pointed out before, you don't need to

13  sanction anybody to take them off the committee.  In this case

14  the removal from the committee was imposed as a just order of

15  sanction under Rule 37(b)(2)(A).  I would also say at no point

16  did Kreindler & Kreindler suggest, oh well, you should take

17  Mr. Kreindler off the committee but you should leave Mr. Green

18  and others on.  There was never an argument made to Judge

19  Netburn.

20          So, your Honor obviously has a great deal of

21  discretion about what goes on in this litigation but I did want

22  to make that point of about why she did what she did.  the firm

23  presented itself as a firm and the position they took and take

24  before your Honor is that nobody at the firm did anything

25  wrong.

1            So, I would like to go on to the evidentiary basis for

2    finding that the investigation was insufficient and I think

3    your Honor already went over that in some detail in your

4    questioning so I will try not to repeat ground that's already

5    been covered.  I did want to make a few points.  One is that

6    Judge Netburn found that there was not even a direct question

7    as to Mr. Fawcett about whether he was the one who leaked and I

8    think she had a reasonable basis to do that because when he

9    prepared that draft declaration that was shown to you before

10   and then Mr. Pounian and Ms. Benett edited that declaration,

11   they wanted to add language saying that he had told

12   Kreindler & Kreindler that he was not responsible for the leak

13   and he struck that out in redline.  And I think that it is

14   reasonable for Judge Netburn to infer from that contemporaneous

15   documentary evidence -- and it is certainly not clear error --

16   that in fact that's not a question that was ever asked of him.

17   And we have gone, in our briefing, in more detail into sort of

18   the colloquy when he said he was asked in substance but then,

19   when he was asked whether he specifically recalled being asked

20   by Mr. Kreindler, Mr. Pounian, by Ms. Benett, by Mr. Maloney,

21   he answered he did not recall that with regard to each of them.

22           I also want to touch briefly on the question of what

23   could have been found with a more thorough investigation, and

24   your Honor made the point that, of course, one thing that could

25   have been done was get him on the record, make him sign a

1   declaration.  But another thing that could have been done was

2   to search his personal devices and that would have turned up

3   the texts between him and Mr. Isikoff, including –– and I will

4   refer your Honor to our Exhibits 82 and 150 which are in the

5   record, including the text on July 5th in which Isikoff asks

6   Fawcett did Thumairy also invoke the Vienna Convention.  And

7   that text is a pretty good piece of evidence that, by July 5th,

8   Mr. Fawcett and Mr. Isikoff were already discussing the

9   substance of somebody else who invoked the Vienna Convention or

10  on his behalf or –– really Saudi Arabia is the entity that

11  invokes the Vienna Convention, but they're talking about it in

12  shorthand.  The point being, it would have been pretty obvious

13  to ask a follow-up question at that point:  Why are you talking

14  about the contents of the Thumairy deposition with Isikoff?  It

15  is confidential.  And did you send him anything else?  And

16  then, if you look at our Exhibit 150 which is another text

17  message that we got only after the Kreindler firm retained

18  outside counsel, that's the one in which Mr. Fawcett writes to

19  Mr. Isikoff and says there is a witch hunt on for the source of

20  your al Jarrah story.  That may not be a direct quote but he

21  definitely uses the phrase witch hunt.

22         Then, if you see that, do you go and ask, *Why is it

23  *you are talking to this guy about the investigation and what*

24  *other conversations have you had with him that are relevant?*

25  And even if you thought it was reasonable before seeing those

MC85terA

1    texts to ask him a simple yes or no question, if it was even

2    asked, *Did you do it?* had you done that follow up and looked at

3    personal devices you would have found –– Mr. Maloney would have

4    found and Mr. Hartney would have found, working with him,

5    substantial reason to ask Mr. Fawcett different and more

6    detailed questions that could have uncovered the result.  So, I

7    would contest the idea that there is nothing more they could

8    have done.

9         Now, they point out that other firms, including our

10   own, did not search the personal devices of everybody who could

11   have possibly been involved and that's true.  But, the argument

12   is there was a substantial reason to drill down on

13   Mr. Fawcett's involvement in a way that would have included

14   searches of his personal devices, would have included something

15   closer to formal interview, and would have involved any one of

16   a number of investigative steps that could have revealed this

17   months before it actually came out.

18        I also want to touch on some of the misleading

19   statements that were made to the Court in the context of the

20   investigation and the reporting about the investigation and

21   that would include the statement in the July 27th letter that

22   they already completed their investigation and were confident

23   about the source of the leak even though Mr. Hartney admitted

24   during his testimony he could not have said that with

25   confidence at that time because he hadn't finished running the

1    searches of one particular server, because he hadn't finished

2    running the search that were necessary to see who had even

3    downloaded the transcript.

4         Then, you also have, in Mr. Hartney's later

5    declaration, the one submitted on September 27th in response to

6    the Court's order, the misleading information -- misleading

7    language I should say -- that was included about who had access

8    to the firm, or to the information at the firm, or who was

9    allowed access and they went through a number of series of

10   different ways to phrase it, but --

11        THE COURT:  I'm not sure I understood that argument

12   but I'm not sure that would have made a difference.

13        MR. RAPAWY:  At that point it wouldn't have made a

14   difference as to finding Mr. Fawcett.  At that point it was a

15   question -- I guess I maybe switched topic a little bit and

16   moved to candor with the Court as opposed to what the

17   investigation could have done, if not, to find Mr. Fawcett.

18        I think the point was that Mr. Hartney testified that

19   he had told Ms. Benett this particular language, he didn't

20   think it was truthful, because anybody at the firm could access

21   these documents.  And she said that she drafted the language

22   carefully and it went in, with her carefully drafted language,

23   that the witness who signed it had warned her it wasn't

24   truthful.

25        So, that doesn't go to the investigation but it does

1    go -- the investigation, because by that point they knew it was

2    Fawcett, but it does go to degree of candor to the Court that I

3    think is important for a firm that is going to hold itself out

4    as leading this case on behalf of the 911 families and to then

5    be granted a title by the Court, and at least Mr. Kreindler was

6    granted a title by the Court that gives him the opportunity to

7    hold himself out in that way.

8           Then also in the Hartney declaration you have the

9    other misstatement that there was no evidence of downloading or

10   printing.  And he admitted in his testimony and I refer your

11   Honor to pages 145 and 146 of the transcript, that there would

12   never have been any evidence of downloading and tracking off

13   the system because they didn't have the ability to track that.

14   So, Judge Netburn found that to be misleading as well.

15          Then, in the Fawcett declaration, you have language

16   about how only portions of the transcript was sent when in fact

17   the entire transcript was sent.  And, Mr. Pounian added that

18   language.

19          You have the whole back and forth about the personal

20   motive.  Your Honor can read his draft declaration for yourself

21   but I read it and I don't see anything in there that suggests

22   that he was acting based on a personal motive or personal

23   interest and that language does show up in the final version, I

24   think, after it gets edited by Ms. Benett and Mr. Pounian.  And

25   I think Judge Netburn reasonably took that as a not entirely

1  candid attempt to distance the firm from the actions of this

2  individual and make it appear that he had acted on his own for

3  his own motives unrelated to the firm's strategy.

4      And then there are also additional findings about

5  failure to produce communications attached to the Kreindler

6  declaration and the failure to search for or produce

7  Mr. Fawcett's communications with Isikoff even after it was

8  revealed he was the source of the leak until outside counsel

9  was retained.

10     And then I think Judge Netburn was also entitled, in

11 just viewing this matter as a whole, to look at what she

12 referred to as repeated attempts to use the Court's

13 investigation as a forum for getting derogatory information out

14 about Mr. al Jarrah and about the Kingdom of Saudi Arabia in

15 general, and in that context, in particular, Ms. Benett's

16 testimony which went beyond what was in the declarations, and

17 to the declaration they tried to submit after the fact from

18 Mr. Weidener, which Judge Netburn ordered sealed on her own

19 motion because it contained what she determined would be

20 gratuitous and irrelevant material that was directed at

21 Mr. Jarrah.

22     Those are the points I wanted to hit on the facts,

23 your Honor and if your Honor has further questions about the

24 factual findings I'm happy to address them.

25     THE COURT:  I have some questions with regard to

1  Mr. Kreindler's affidavit and I wasn't -- given the care that

2  was exercised to make sure the language was appropriate in the

3  affidavits, there are certain questions that I don't think were

4  answered in the affidavit and I was trying to figure out

5  whether or not there is any such representation with regard to

6  these issues if I can find my question.  (pause)

7          Well, I can't find what I am looking for but I do

8  have, I believe, the Kreindler declaration.  Oh, no.  Let's

9  see.  I'm looking at Mr. Fawcett's declaration and

10  Mr. Fawcett's declaration says, at paragraph 8, the September

11  30th declaration, it says:  After I sent Isikoff the Jarrah

12  transcript, I believe I had a second phone call with him about

13  the timing of his article discussing Jarrah.  I was worried

14  that if he published an article around the same time as he

15  aired the podcast with Jim Kreindler, people would assume that

16  Jim Kreindler had given Isikoff the information about Jarrah --

17  and this is the relevant portion -- even though I knew that Jim

18  hadn't done so, didn't know I had done it, and hadn't

19  encouraged me to do it or suggested that I do it.

20          What I don't see in either one, and maybe it is in the

21  testimony, but what I don't see in either Mr. Fawcett's

22  declaration or Mr. Kreindler's declaration is an answer or an

23  affirmative statement about the following question:  Neither

24  affidavit answers the question, and maybe this is simply in the

25  drafting or maybe it's not something that can affirmatively be

1  stated, but nothing I saw answered this question:  Did

2  Mr. Kreindler know that Fawcett intended to tell Isikoff what

3  was in the deposition?  I don't see an answer to that question.

4  I don't see a representation about that.

5      Two.  Did Mr. Kreindler know that Mr. Fawcett had

6  discussed the content of the deposition with Mr. Isikoff?

7      Three.  Did Mr. Kreindler know that Mr. Fawcett

8  intended to give a copy of the deposition transcript to

9  Mr. Isikoff and did Isikoff request a copy of the deposition

10 transcript from Mr. Kreindler or Mr. Fawcett?

11     And did -- I guess two other questions.  Did

12 Mr. Kreindler ever discuss with Mr. Isikoff where Mr. Isikoff

13 got the transcript?

14     And, finally, did Mr. Isikoff tell Mr. Kreindler that

15 he was aware of the contents of the deposition or that he had

16 had a copy of the transcript after he received it, or after he

17 was given the information?  Because it appears to me, given the

18 sequence of communication, that -- and I am only inferring this

19 from the testimony -- that Mr. Fawcett first told Mr. Isikoff

20 what was in the transcript and then, at some subsequent date or

21 time, gave him a copy of that transcript.

22     So, I don't see anywhere that those questions that I

23 just posed were answered in anyone's declaration, either

24 Mr. Fawcett or Mr. Kreindler, or anyone else in the

25 declaration.

1          Is there an answer to any of those questions in these

2     declarations or in the testimony?

3          MR. RAPAWY:  So, in the declarations, your Honor,

4     that's a long list of questions, your Honor, and I will do my

5     best.

6          in the declarations I think you are correct that they

7     are somewhat vague about exactly when -- Mr. Kreindler's

8     declaration contains a statement that:  For the first time

9     today he learned the information set forth in the declaration

10    of John Fawcett.

11         THE COURT:  Right.

12         MR. RAPAWY:  But that's kind of general and it doesn't

13    tell you --

14         THE COURT:  The declaration of John Fawcett does not

15    answer these questions, as I saw it.

16         MR. RAPAWY:  Yes.  So, to the extent there is a denial

17    of prior knowledge, I think that's the closest he gets to it,

18    but --

19         THE COURT:  Well, prior knowledge of what?

20         MR. RAPAWY:  That was my point, your Honor.  It is a

21    denial of prior knowledge of the information in the September

22    27th declaration of John Fawcett.

23         THE COURT:  John Fawcett does not say that he didn't

24    discuss with Mr. Kreindler that he intended to give the

25    transcript.  It says he didn't direct him, it says he didn't --

MC85terA

1    now, both sides addressed this in their answers to these

2    questions, that I don't -- and I think I did have one more

3    question, I don't see anywhere where it says -- and this is a

4    little unrelated, but I can't find who told Isikoff and, when

5    that happened, who told Isikoff he couldn't have the

6    transcript.

7            MR. RAPAWY:  I don't think we have any evidence in the

8    record that Isikoff was ever told he couldn't have the

9    transcript.

10           THE COURT:  Well, Isikoff had asked -- was asking

11   Mr. Kreindler whether Mr. Kreindler could get the transcript or

12   the deposition outside of the protective order.  The evidence

13   that had been given is that Mr. Kreindler asked Mr. Fawcett

14   whether or not this could be given to Mr. Isikoff and then

15   there is some communication and I don't know, I forget whether

16   it is written or otherwise, there is some communication that

17   says that it was -- they were unsuccessful in getting it

18   outside of the protective order and that they determined that

19   he couldn't have it but I don't have anything, communicating

20   that to me.

21           MR. RAPAWY:  Right.

22           So, you have Mr. Kreindler's testimony that he asked

23   Mr. Fawcett about the declaration.  I don't think you have

24   it -- but the transcript will say -- but I don't think that you

25   have evidence that that was communicated back to Mr. Fawcett as

MC85terA

1  a refusal.

2         Now, there was the podcast discussion and there is a

3  great deal of discussion of the protective order in the podcast

4  discussion, and Mr. Kreindler did say in the podcast discussion

5  that there was a lot of important evidence that he couldn't

6  share with Mr. Isikoff and the sort of general statement of

7  that.  But, in terms of a specific request of the Jarrah

8  transcript -- Mr. Spiro will correct me if this is in the

9  record, I'm sure -- but I don't think there was evidence that

10  he was told that.

11         MR. SPIRO:  Your Honor, if you look at Exhibit 5, I

12  think that may shed some light.

13         THE COURT:  Exhibit 5?

14         MR. SPIRO:  Tab 5.

15         THE COURT:  Of what?

16         MR. SPIRO:  Of the thin binder.  It is an e-mail

17  exchange between Mr. Isikoff and Mr. Kreindler where

18  Mr. Isikoff asks Mr. Kreindler:  Where do you stand on your

19  request to DOJ to lift the state secret privilege and gag

20  order?

21         THE COURT:  OK.  And his response is?

22         MR. SPIRO:  And this is on July 13th:  Still working

23  on motion, too many chefs.

24         THE COURT:  Right.  So there is no definitive response

25  to whether or not he has got an answer yet.

1    MR. SPIRO:  Right.

2    THE COURT:  Is there any record indicating that there

3    was a response by Mr. Kreindler to Mr. Isikoff?

4    MR. SPIRO:  The next thing we have, your Honor, is

5    just Mr. Isikoff responding:  OK.  Aiming to write something

6    for Thursday or Friday, so if any update by then let me know.

7    And Mr. Kreindler writes:  Will do.

8    Obviously our view is that this reflects that

9    Mr. Kreindler was completely unaware that by this point, which

10   was July 13, Mr. Isikoff already had the Jarrah transcript.

11   THE COURT:  Well, I'm not sure that I can reach that

12   conclusion.  It tells me that at that point Mr. Isikoff doesn't

13   have the -- if he uses this information he will be using it in

14   violation of the protective order.  It doesn't tell me whether

15   or not he did or didn't, or when he did or didn't.  It just

16   tells me that, look, he would prefer to have it not covered by

17   the protective order when he issues it.  He obviously already

18   has it and he is trying to see whether or not when he issues it

19   it is still going to be under the protective order that people

20   can complain about.  I'm not sure that tells me one way or the

21   other who was involved and who is not involved.

22   I don't have complete conversations and followups with

23   regards to these questions, and for Mr. Fawcett to submit an

24   affidavit saying that Mr. Kreindler didn't give him, give

25   Isikoff the information about Jarrah and that he didn't know

1  that Fawcett had in fact done so and he hadn't encouraged him

2  to do it or suggested that he do it, doesn't tell me anything

3  about his knowledge at the time or the discussions they had

4  which would have been about whether or not -- which would have

5  led Mr. Kreindler to know that, without saying so, that the

6  next step was going to be that Fawcett was going to give this

7  transcript to him.  He doesn't deny that he knew that Fawcett

8  intended to do that.

9      MR. RAPAWY:  I do think, your Honor, that there is --

10  that that and some of the other statements in the Fawcett

11  declaration can be read as hedging a little bit on the sort of

12  tacit approval question.  Well, you know, Mr. Kreindler doesn't

13  know that I sent it because I never told him those words but

14  that's not inconsistent with a discussion at some point in the

15  June 28th to July 3rd period where they're having the calls

16  right before the leak happens in which Mr. Kreindler indicates

17  to Mr. Fawcett that it certainly would be a great thing if

18  Mr. Isikoff could somehow get this transcript without ever

19  saying the words "go ahead and break the Court's order."

20      But, you know, and that I think is the type of

21  communication that Judge Netburn was envisioning when she made

22  her finding of knowledge or at least tacit approval.

23      So, I would like to take a minute or two to talk about

24  the legal issue and the Rule 37 issue.  There is basically two

25  points I would like to make here.  The first is the question of

1    whether this was properly preserved.  And you have heard that

2    they claim that Mr. Spiro claimed they did not have proper

3    notice, that this was going to be invoked again, that this

4    particular rule was going to be invoked against them.  But our

5    July 27th letter motion specifically asked the Court to invoke

6    Rule 37(b), that's ECF no. 6981 at pages 3 to 4.  And then, on

7    August 12th -- and this was before Mr. Spiro got involved --

8    Judge Netburn issued an order and she granted our order for

9    investigation.  That's ECF no. 7011 at page 3.

10         So, I think that at that point they had fair notice

11   that one of the things that might possibly happen to them was a

12   Rule 37 sanction.  It wasn't the only thing that might possibly

13   happen to them but that would be one thing that the person who

14   was ultimately found or entity was ultimately found responsible

15   for this leak might have to face, it would be Rule 37

16   sanctions.  And then, of course, the specific possibility that

17   the Court might invoke its authority to possibly remove

18   attorneys from the PECs was given on August 4th.

19         So, if you read those together, they had a pretty good

20   sense that if they wanted to make the argument, *actually, you

21   can't do anything to us at all under 37(b)(2)(A)*, they should

22   do that in their post-hearing submissions.

23         And it said in the reply, I believe, that our letter

24   doesn't constitute notice under the Second Circuit precedent

25   but I would refer the Court to page 35 of Judge Netburn's

1    opinion and to the two Second Circuit cases that are cited on

2    that page, *Margo v. Weiss* and the *International Ore Case.*

3    Those cases, they happen to involve Rule 11 sanctions but they,

4    I believe, stand fairly for the proposition that if there is a

5    motion for sanctions, you are on notice that sanctions might be

6    imposed, can be given by the motion, and your opportunity to be

7    heard is in your response to that motion.  They had many

8    opportunities to respond to our letter and say, Rule 37?  What

9    are you talking about?  Rule 37 doesn't even apply to us.  But

10   they never did that until after there was a rule.

11          THE COURT:  So, what do you say was the appropriate

12   standard of proof and what standard of proof did Magistrate

13   Judge Netburn say she knew?

14          MR. RAPAWY:  Our position is Rule 37(b)(2)(A) is

15   appropriate, that the just orders provision of that is broad

16   enough to encompass a sanction against the law firm that the

17   Court finds to be just, including the sanction of removing all

18   of its attorneys from the Plaintiffs Executive Committees in

19   this case.  And our position is that that finding need only be

20   made by a preponderance of the evidence and that clear and

21   convincing evidence is not required.

22          Now, we did argue with Judge Netburn in the

23   alternative, that she should use her inherent powers and/or she

24   should certify the facts to you for a finding of contempt.  And

25   she declined to do those things because she found that Rule 37

1  sanctions were enough and that she didn't need to go further.

2  So, I think it would have been an extremely relevant thing for

3  Kreindler & Kreindler to say, actually, we are going to contest

4  whether Rule 37 sanctions are available because had they said

5  that to Judge Netburn, she likely would have gone into a

6  considerably more detailed analysis in her opinion on whether

7  the record would support an imposition of, or finding of bad

8  faith by clear and convincing evidence.

9          I think there is lots of stuff about this

10  investigation, even leaving aside the disclosure, lots of stuff

11  about the investigation that is to be recapped that could

12  support a finding of bad faith if the Court were inclined to

13  make one.  I think that the question, they claim that we

14  haven't said that clear and convincing evidence supports the

15  findings, well, our position is preponderance of the evidence

16  is enough.  We certainly said to her in our findings of fact

17  and conclusions of law that there is also enough for a clear

18  and convincing evidence finding if the Court were to apply that

19  standard.  We absolutely made that argument to the judge.  But,

20  in defending her ruling, I think she had authority under

21  37(b)(2)(A) and I think she had every right to make her

22  findings by a preponderance of the evidence.

23          So, I would defend the order upon the grounds on which

24  it was given without, even for a moment, suggesting that there

25  wouldn't have been authority to issue sanctions on other

1    grounds and even under a more rigorous evidentiary standard.

2            I guess in saying -- the other thing I wanted to

3    address very briefly, your Honor, because I know we have been

4    here for a while was the *Apex Oil* case.  If you look at

5    pages -- so *Apex Oil*, as your Honor observed earlier, was

6    interpreting former Rule 37(c) and that rule has language

7    stating that "if a party fails to admit" in response to an RFA,

8    then the requesting partly can "apply to the Court for an order

9    requiring the other party to pay monetary sanctions."  And that

10   second piece of language, the order requiring the other party

11   to pay language, is what the Second Circuit relied on in *Apex

12   Oil*.  It says, well, you can require the party to pay.  It

13   doesn't say that you can require the attorney to pay.  That's

14   different from saying that if a party violates a protective

15   order -- and these protective orders are certainly binding on

16   the parties, the plaintiffs, the Kingdom, everybody else -- if

17   a party, it was determined, violates that order and the Court

18   then, under Rule 37(b)(2)(A), can issue further just orders,

19   that those further just orders can't include a sanction on the

20   law firm through which the parties -- here the Ashton

21   plaintiffs -- violate the order.

22           Then, turning very briefly to the sort of

23   discretionary exercise of the sanctions, I think that if your

24   Honor finds that either the violation itself or the

25   investigation that factual findings are supported on either of

1    those issues and certainly on both, then the conclusion that

2    representations from Kreindler & Kreindler on behalf of all

3    plaintiffs in this litigation should no longer be made because

4    the attorney should not be serving on the Plaintiffs Executive

5    Committee is extremely reasonable and sensible and, frankly,

6    restrained compared to some of the things that can happen to

7    firms whose employees and attorneys make misleading and false

8    statements to the Courts.

9            With that, I would urge your Honor to overrule the

10   objections in their entirety and uphold Judge Netburn's careful

11   and well-considered order.

12           THE COURT:  Thank you.

13           Did you want to have any further argument, Mr. Spiro?

14           MR. SPIRO:  Can I have five minutes, your Honor?  Just

15   to consult with my client.

16           THE COURT:  Sure.  I want to see if we can wind up for

17   lunch.

18           (Recess)

19           THE COURT:  Yes, Mr. Spiro.

20           MR. SPIRO:  Thank you, your Honor.

21           Your Honor asked a series of questions concerning what

22   communications occurred between Mr. Kreindler and Mr. Fawcett

23   or between Mr. Kreindler and Mr. Isikoff, and I would just like

24   to direct your attention to some questions and answers of

25   Mr. Kreindler at 129 of the hearing transcript:

MC85terA

1    "Q  Did you order or direct Mr. Fawcett to send the copy of the

2    Jarrah transcript to Mr. Isikoff?

3    "A  No.

4    "Q  Did you know that Mr. Fawcett was going to send the Jarrah

5    transcript to Mr. Isikoff?

6    "A  No.

7    "Q  Did you know at any time prior to September 27 that

8    Mr. Fawcett had sent the transcript to Mr. Isikoff?

9    "A  No.  I had no idea at all until I heard that afternoon.

10   "Q  Did you ever have any reason to suspect that Mr. Fawcett

11   would send the Jarrah transcript to Mr. Isikoff?

12   "A  None whatsoever."

13          Your Honor, Mr. Kreindler is here in court.  If you

14   have any further questions he is available to testify --

15          THE COURT:  No, that's helpful.  I didn't find that

16   and that's buried in the transcript so those are the answers to

17   most of my questions.  I appreciate it.

18          MR. SPIRO:  And, your Honor, I would just add that

19   during the time period in the beginning of July when

20   Mr. Isikoff was interested in writing a story, there were

21   discussions between Mr. Fawcett and Mr. Kreindler about, well,

22   what can we share with Mr. Isikoff?  And the decision was,

23   well, we can send him a privilege log from the FBI which has

24   been publicly filed.

25          THE COURT:  Right.

1    MR. SPIRO:  And that's what Mr. Kreindler authorized

2  Mr. Fawcett to do and Mr. Fawcett, in fact, sent the privilege

3  log to Mr. Isikoff.  Again, that reflects an entirely innocent

4  state of mind on the part of Mr. Kreindler.

5    So, we don't believe that there is evidence -- any

6  evidence -- reflecting that Mr. Kreindler knew what Mr. Fawcett

7  was up to with Mr. Isikoff and I would ask your Honor to make

8  sure that when the Court considers the evidence, that it

9  consider it from the framework and the lens that it's not the

10  Kreindler's firm's burden to prove its innocence, although I

11  think it was innocent in this situation.  It was Saudi Arabia's

12  burden to show evidence rising to the level of bad faith by

13  each attorney.  The *Walters* case, which I mentioned earlier,

14  clearly reflects that you cannot impute bad faith but, instead,

15  the Court needs to make an attorney-by-attorney determination

16  with regard to whether or not there is evidence of bad faith by

17  clear and convincing evidence.

18    The contemporaneous documents, your Honor, show that

19  the investigation was conducted in good faith.  The

20  investigation was begun even before being directed by the Court

21  to do so.  Mr. Fawcett was asked directly about that and he

22  lied.  I know there is some testimony that's been referenced

23  about whether Mr. Fawcett was asked directly, but when you look

24  at the overall testimony, I think Mr. Fawcett was very clear

25  that he prevaricated, he dissembled, he misled, and we know

1    from Mr. Pounian and from Mr. Maloney that he was asked

2    directly whether he had leaked the transcript and he lied about

3    it.

4        All of the employee and lawyer e-mails were searched

5    and to the extent that there could be a review of people who

6    looked at the transcript, that was done.

7        So, critical to this is that we not allow the

8    information we have now to color our determination as to

9    whether or not the law firm proceeded in good faith.  We

10   submit, your Honor, that this is a classic case where hindsight

11   tells us much more than in the fog that was the period of July

12   15, 16 and forward of 2021 that the firm faced and Mr. Maloney

13   did the best he could under very, very difficult circumstances.

14       THE COURT:  I have one further question.

15       MR. SPIRO:  Please.

16       THE COURT:  Is there some reason that there is no

17   evidence in this case of any communication between

18   Mr. Kreindler and Mr. Isikoff after Mr. Kreindler realized that

19   Isikoff, his close friend, received and utilized a copy of the

20   document under the protective order?

21       MR. SPIRO:  I'm not sure I would characterize

22   Mr. Isikoff as a close friend of Mr. Kreindler.

23       THE COURT:  I take that back.

24       MR. SPIRO:  But I think the answer is --

25       THE COURT:  Would he have been upset about that?

MC85terA

1          MR. SPIRO:  I think he understood that to ask the

2     reporter for a source of information is not going to result in

3     getting that information.  Obviously --

4          THE COURT:  He didn't express any outrage about being

5     able to utilize this information, the very information that he

6     told him that he couldn't provide to him and he is now under a

7     cloud of suspicion as to whether or not he was responsible for

8     it?

9          MR. SPIRO:  He clearly expressed that unhappiness and

10    annoyance and anger over the circumstance but --

11         THE COURT:  Is that in the record somewhere?

12         MR. SPIRO:  It is not in the record, your Honor, but

13    it is certainly something that would have been a natural

14    reaction for Mr. Kreindler to have.

15         Bear with me one second?

16         THE COURT:  Yes.

17         (Pause)

18         MR. SPIRO:  Yes.  So this is Mr. Kreindler's testimony

19    on page 130, line 18:

20    "Q  Did anyone on the PEC side ask you, given your relationship

21    with Mr. Isikoff, to reach out to him to find out how he got

22    the transcript?

23    "A  No.  That never came up.  And we all expect that if he was

24    ever asked, I'm not going to reveal my sources."

25         Your Honor, with regard to the issue of personal

1    devices, which I know counsel for Saudi Arabia raised, the fact

2    is that no firm asked for people to turn in the personal

3    devices, the Kellogg Hansen firm did not ask their folks to

4    turn in their personal devices, nor did the other members of

5    the PEC.  So, to impose that on the Kreindler firm was not a

6    reasonable ask.  It would have been, I think, a significant

7    invasion of privacy for the Kreindler firm to turn to its

8    lawyers and consultants and say you need to turn over your

9    phones.  In any event, what would that have disclosed?

10            So, there were two signal messages that counsel for

11   Saudi Arabia referenced to.  Neither of them suggested that the

12   deposition transcript -- the Jarrah transcript -- had been

13   disclosed.  At most, one was a text about whether a particular

14   witness had also cited the Vienna Convention but that only

15   would say that it would be like someone saying, Did the person

16   assert the attorney-client privilege?  It was not the kind of

17   thing that necessarily suggests that the reporter had learned

18   that information from reading the transcript.  And, in any

19   event, this line of investigation assumes that John Fawcett

20   would have turned around and just turned over the phone, turned

21   over the signal messages without deleting them and we all

22   understand now, given his use of an automatic e-mail deleting

23   program, that that's not what his modus operandi was.  He would

24   have, frankly, in our view, hidden those signal messages as he

25   had hidden the e-mail that he used to send the Jarrah

1 transcript to Mr. Isikoff in the first place.  So, we think

2 that argument is a bit of a red herring that was being

3 presented.

4 There were many other points made by Saudi Arabia's

5 counsel.  In the interest of time I will not go point by point.

6 We do have responses to each, I think they are in our papers

7 already.

8 I just want to come back to Rule 37 because

9 Rule 37(c), which *Apex Oil* dealt with, has the same language

10 with regard to party as is found in 37(b).  So, while 37(b)

11 deals with disobedience of Court orders and 37(c) deals with

12 request to admit, the fact of the matter is they both focus on

13 party conduct and there is no reasonable basis to conclude that

14 the word "party" in Rule 37(b) has a different meaning than in

15 37(c).  And, we have not found any cases in this circuit where

16 37(b) has been used as a basis for sanctioning a law firm.

17 But, beyond that, in this case, 37(b), there is no party

18 involvement here whatsoever.  The cases that the magistrate

19 judge relied on were all cases where there was some party

20 involvement here, there was zero involvement, it was the

21 conduct of a consultant for a law firm that was at issue, not

22 any individual -- not a client or even any individual lawyers

23 so 37(b) just doesn't apply.

24 With regard to the issue of waiver, why wasn't the

25 argument raised?  I just would point to -- the July 27, 2021

1   letter motion that counsel alluded to was a request for

2   discovery, it was not part of the sanctions hearing, it was not

3   part of what Judge Netburn termed a contempt hearing.  This was

4   in July and it really just was the initial request by Saudi

5   Arabia for discovery.  So, the fact that they cited Rule 37 as

6   support for discovery has nothing at all to do whether Rule 37

7   ultimately was the appropriate rule to use or to be relied on

8   with regard to any lawyer sanctions.

9        So, again, there is nothing in a Court order issued by

10  Judge Netburn to suggest she was relying on Rule 37.  In fact,

11  the opposite, all the indications were that she was relying on

12  the Court's contempt power on 636 of the Federal Magistrate's

13  Act, Section 636 as the basis for proceeding forward, that she

14  intended to make recommendations to your Honor as to the

15  appropriate sanction, but for whatever reason she shifted here

16  and applied Rule 37 using a preponderance of the evidence

17  standard rather than the clear and convincing evidence

18  standard.

19       So, your Honor, the *Schoenberg* case in the Second

20  Circuit which we cite in our papers, I think, is an indication

21  that the sort of notice here was clearly inadequate, but

22  particularly to the extent that it's being used by Saudi Arabia

23  as a basis that there was a waiver of our Rule 37 argument,

24  that simply does not work.

25       We have addressed in the motion for a stay why the

1   status quo ought to be preserved.  We respectfully ask that

2   your Honor Rule at the earliest possible time with regard to

3   whether the Kreindler firm can continue on the PEC.  There is

4   much significance going on in the litigation we go through in

5   some level of detail in our reply submissions in support of our

6   motion for stay, what's involved, and to take the Kreindler

7   firm off the PEC at this point is going to negatively affect

8   the prosecution in the case.  It simply is not the same for the

9   Kreindler firm to be another law firm in the case, it needs to

10  be part of the leadership team so that our client and the

11  firm's clients can be effectively represented, that this case

12  against Saudi Arabia can be prosecuted, and the case can move

13  forward in an efficient and effective way.

14          THE COURT:  Well, part of the problem that I am

15  struggling with on that issue is that none of the other lawyers

16  from the other law firms are supporting you on that point.  No

17  one else thinks that you are so critical that they can't move

18  on and move past this and effectively represent the plaintiffs

19  in this case.  So -- and it is difficult for me, at this

20  point -- I am looking more carefully at the papers, to

21  articulate what you say the prejudice is to you or your clients

22  because the other lawyers are taking, at this point in the

23  interim, a leadership role and feel that they are totally

24  capable of effectively doing that.

25          MR. SPIRO:  Respectfully, with regard to the other

MC85terA

1  members of the PEC, they have not been the people who have

2  interviewed the witnesses, reviewed the documents, taken the

3  critical depositions of the Saudi Arabia witnesses.  We have

4  been responsible for six of the seven expert reports.  I mean,

5  this is a case that the Kreindler firm has put together and

6  they worked with other members of the PEC, occasionally there

7  have been disagreements, but the point is that those

8  disagreements get sorted out and the Court gets presented with

9  arguments that advance the best interests of the families whose

10  interests, I think, all the lawyers are seeking to protect

11  here.

12       So, your Honor, we understand that each firm has their

13  distinctive perspective but none of the firms that have come in

14  and said, *Well, we're OK with the PEC as formulated,* have

15  challenged in any kind of detail the factual averments that we

16  have made which support the Kreindler firm continuing on on the

17  PEC and which reflect the significant contributions and

18  significant work that the Kreindler firm has done in putting

19  together the case against Saudi Arabia.

20       THE COURT:  Thank you.

21       MR. SPIRO:  Thank you, your Honor.

22       THE COURT:  Thank you, ladies and gentlemen.  I will

23  get back to you very quickly.

24                           o0o

25



140 Broadway, 46th Floor                                                                    212-363-1200
New York, NY 10005                                                                          866-363-1200
                                                                                            212-363-1346 Fax
MICHEL F. BAUMEISTER                                                                        www.baumeisterlaw.com
mbaumeister@baumeisterlaw.com

December 11, 2022

**VIA ECF**

Honorable Judge George B. Daniels
United States District Court
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, NY 10007

   Re:  <u>In Re: September 11, 2001 Terror Attacks, 03-mdl-1570 (GBD)(SN)</u>

Dear Judge Daniels:

   I write to the Court as a member of the Plaintiffs' Executive Committee for the Wrongful Death and Personal Injury plaintiffs (WD/PI PEC) in the 9/11 litigation proceeding before this Court, having been appointed to serve in this role by Judge Casey in his June 16, 2004 Case Management Order #3 (ECF 248-2).   I have previously served as a member or co-lead counsel in dozens of complex multi-district litigation matters filed throughout the country for decades beginning with the crash of Eastern Airlines Flight 401 in the Florida Everglades in 1972.   Notably, I served as co-lead counsel for the families of the victims of the bombing of Pan Am 103 over Lockerbie Scotland on December 21, 1988 which included a three-month trial against the air carrier before the late Judge Thomas C. Platt in the Eastern District of New York prosecuted by myself and members of the Kreindler and Speiser Krause law firms.   Following the conclusion of this trial, Congress enacted a change to the Foreign Sovereign Immunities Act that permitted the 103 families to file civil suits against Libya as a state-sponsor of terrorism.   Several years later, we successfully negotiated a private settlement with Libya that brought compensation to the families, the first and only time such an agreement was made without the direct involvement of the U.S. government.

   Due to the illness of a family member out of state, I was not able to be present at the hearing held on December 8, 2022 in which the Court held oral arguments as to the sanctions imposed on Kreindler & Kreindler which has resulted in their removal from the WD/PI PEC by Magistrate Judge Netburn in her Order of September 21, 2022 (ECF 8544).   I was, however, able to listen to the entire proceedings through the conference line established by the Court.   I write now in response to Your Honor's comments that the Court was unaware of any members of the PEC who support the continuation of the

1

**A384**

Kreindler attorneys on the WD/PI PEC since I was unable to express my comments to the Court in person.

I, and members of my firm, have worked with the lawyers for the Kreindler firm and other members of the WD/PI PEC to protect the interests of the victims of the 9/11 terror attacks and their families in this unprecedented litigation for more than 20 years.   My involvement in the 9/11 case and my work with the Kreindler firm and other members of the WD/PI PEC began within days of the attacks when I and others were appointed to serve as members of a task force established by the American Bar Association in response to draft legislation seeking to limit the liability of the air carriers involved in the 9/11 attacks which came to be known as the Air Transportation Safety and System Stabilization Act of 2001.   Our collective efforts resulted in the preservation of the families' right to pursue civil remedies against the individuals, entities and nation-states who were involved in or supported the hijackers efforts.   I spent months discussing strategies to pursue these rights with Jim Kreindler and the late Ron Motley basing our conclusions on similar strategies we successfully deployed in the Pan Am 103 case against Libya.   Although our litigation tactics may have differed at times, we worked together collaboratively and remained committed to protecting the interests of the 9/11 families in the civil suits we filed beginning in 2002 against hundreds of potential defendants who we believed played a role in facilitating the attacks.

The prosecution of the 9/11 litigation significantly differed from the Pan Am 103 litigation in that the Kingdom of Saudi Arabia (KSA) had never been designated as a state sponsor of terrorism rendering it immune to the families' claims despite the existence of substantial evidence pointing to its facilitation and support for the attacks.   This recognition sparked the beginning of years-long efforts to enact legislation to provide the 9/11 families with the legal right to sue the KSA for its actions.   The Kreindler firm, and particularly Jim Kreindler, led those efforts which ultimately secured the passage of the Justice Against State Sponsors of Terrorism Act in 2016 (JASTA) enabling all families of the victims of the 9/11 attacks to commence civil suits against the KSA beginning in 2017.   Since that time, this Court has devoted countless hours to addressing the parties' disputes beginning with the constitutionality of JASTA, and now managing document and jurisdictional discovery disputes that involve the federal government and protected classified information.   The Court has also been called upon to address ancillary issues relating to the addition of thousands of new plaintiffs and the availability of assets to satisfy judgments against the Taliban to identify just a few of the issues currently before this Court.

There is no way to overstate the complexity and uniqueness of the 9/11 litigation.   Over the years, and particularly since the enactment of JASTA, the workload of the WD/PI PEC has settled into an informal division of focus and support amongst its members.   The Kreindler firm has focused its efforts and resources at developing the 9/11 families' claims against the KSA, while other members of the WD/PI PEC have devoted substantial time and resources to assisting the Kreindler firm's efforts while actively and zealously pursuing other defendants in the case, including those who helped finance the hijackers' operations.   There is no dispute that all aspects of this massive litigation are critically important and require the undivided focus of the exceptional plaintiffs' attorneys involved.

All of this background brings me to the reason for my letter, which is to specifically express to this Court the critical role the Kreindler firm has played in prosecuting the claims against the KSA on behalf of **all** of the 9/11 victims and their families, regardless of which law firm these individuals retained decades ago.   I have been personally involved in, and have witnessed these efforts, and I am

2

certain that the removal of the Kreindler firm from the WD/PI PEC will harm all of the 9/11 families. In making this statement, I in no way seek to disparage the work of other members of the WD/PI PEC who are also working tirelessly every day on the case.   I respect these attorneys and the work they continue to do every day on behalf of the 9/11 families.

It is simply beyond dispute that the Kreindler firm has taken the lead in connection with the 9/11 families' claims against the KSA.   They have orchestrated and accumulated hundreds of thousands of documents evidencing the Saudis' connection to the 9/11 attacks with the aid of a team of investigators they put together made up of former FBI agents and other intelligence experts who spent years of their professional lives pursuing the wrongdoers involved in the attacks.   The lawyers from the Kreindler firm have taken the lead on putting together dozens of discovery motions most of which also include disputes with the federal government over access to classified documents pertaining to the 9/11 attacks. Lawyers from the Kreindler firm conducted more than 30 depositions over the last few years of Saudi and third-party witnesses, accumulating thousands and thousands of pages of sworn testimony.   They identified and retained 6 highly qualified experts to speak to the Saudis' culpability and took the lead on deposition testimony of almost every expert proffered in the case to date.

In short, there are no lawyers on the WD/PI PEC with a greater breadth of direct personal knowledge as to the facts and the strategies essential to continue to pursue the KSA on behalf of **all** of the 9/11 victims and their families than the lawyers from the Kreindler firm.   The sanction of removal of the Kreindler lawyers from the WD/PI PEC, particularly at this stage of the case when the parties are directing their focus to the KSA's next motion to dismiss on jurisdictional grounds, would be unreasonable and would have a catastrophic effect and do irreparable harm to all of the plaintiffs that will be impossible to overcome.   I urge this Court to reflect upon the impact the removal of the Kreindler lawyers from the WD/PI PEC will have on the 9/11 families to avoid imposing even more harm upon them than they have already suffered.

Respectfully,


 /s/ *Michel F. Baumeister*
Michel F. Baumeister

MFB:cml

cc:      All MDL Counsel of Record (via ECF)

3

**A386**

## MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y.)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley (1944-2013)<br>Jodi Westbrook Flowers, *Co-Chair*<br>Donald A. Migliori, *Co-Chair*<br>Robert T. Haefele, *Liaison Counsel*<br>MOTLEY RICE LLC | Stephen A. Cozen, *Co-Chair*<br>Sean Carter, *Co-Chair*<br>J. Scott Tarbutton, *Liaison Counsel*<br>COZEN O'CONNOR |

**VIA ECF**

December 13, 2022

The Honorable George B. Daniels, U.S.D.J.
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY  10007

    RE:    *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD) (SN)

Dear Judge Daniels:

On behalf of the leadership of the Plaintiffs' Executive Committees ("PECs"), who have represented plaintiffs dating to before the inception of this MDL in 2003 and continue to represent the interests of all plaintiffs in this MDL through the PECs, we write with three short points in response to the December 11, 2022, post-hearing letter from *Ashton* counsel Michel Baumeister (ECF No. 8795).

*First*, we reaffirm the PECs' continuing commitment to lead this complex MDL on behalf of all plaintiffs, *see* ECF Nos. 8603, 8620, representing plaintiffs' interests zealously, no matter the Court's determination in the sanctions proceedings.

*Second*, though we dispute many of Mr. Baumeister's assertions,[1] we agree with his central premise that the Plaintiffs come first. This MDL is not about any one lawyer or law firm. It is essential for the Court to take the action necessary to retain trust in the PECs and re-focus the parties and the Court from the distraction that has resulted from the disclosure and the response to that disclosure, and to adjudicating the Plaintiffs' claims.

*Finally*, Mr. Baumeister's letter focuses on the Kreindler firm's purported necessity for proceedings (*i.e.*, Saudi Arabia's proposed renewed motion to dismiss) that *all* Plaintiffs have asserted are unnecessary given the Second Circuit's decisions in *Kaplan v. Lebanese Canadian Bank*, 999 F.3d 842 (2d Cir. 2021) and *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021).  That focus also

---

[1] As the PECs previously explained, at ECF No. 8787, though the PECs dispute many of Mr. Baumeister's assertions as distortive of the actual record and are certain that a full record would prove many of them to be demonstrably inaccurate, we continue to refrain from occupying the Court's attention with those details.

**A387**

The Honorable George B. Daniels
December 13, 2022
Page 2

ignores this Court's Order that it would be inappropriate to set a schedule for any renewed motion to dismiss, given Plaintiffs' pending Rule 54(b) motions.[2]

Respectfully submitted,

<table>
<tr><td>MOTLEY RICE LLC</td><td>COZEN O'CONNOR</td></tr>
<tr><td></td><td></td></tr>
<tr><td>By:  /s/ Robert T. Haefele</td><td>By:  /s/ Sean P. Carter</td></tr>
<tr><td>JODI WESTBROOK FLOWERS</td><td>SEAN P. CARTER</td></tr>
<tr><td>DONALD A. MIGLIORI</td><td>STEPHEN A. COZEN</td></tr>
<tr><td>ROBERT T. HAEFELE</td><td>J. SCOTT TARBUTTON</td></tr>
<tr><td>MOTLEY RICE LLC</td><td>COZEN O'CONNOR</td></tr>
<tr><td>28 Bridgeside Boulevard</td><td>One Liberty Place</td></tr>
<tr><td>Mount Pleasant, SC 29465</td><td>1650 Market Street, Suite 2800</td></tr>
<tr><td>Tel.: (843) 216-9184</td><td>Philadelphia, Pennsylvania 19103</td></tr>
<tr><td>Email: rhaefele@motleyrice.com</td><td>Tel.: (215) 665-2105</td></tr>
<tr><td>For the Plaintiffs' Exec. Committees</td><td>Email: scarter@cozen.com</td></tr>
<tr><td></td><td>For the Plaintiffs' Exec. Committees</td></tr>
</table>

cc:    The Honorable Sarah Netburn (via ECF)
       All MDL Counsel of Record (via ECF)

---

[2] *See* ECF No. 8157 (correspondence of PECs, also signed by *Ashton* counsel, objecting to Saudi Arabia's request for motion to dismiss schedule on grounds that jurisdiction already has been established); ECF No. 8542 (Order denying Saudi Arabia's motion to schedule its renewed jurisdictional motion to dismiss, finding it inappropriate to set such a schedule until Plaintiffs' pending Rule 54(b) motions are resolved); *see also* ECF No. 7432 (PECs' MOL in support of CAC Plaintiffs' Rule 54(b) motion); ECF No. 7740 (PECs' Reply MOL); ECF No. 7481 (*Ashton* counsel joining the CAC Plaintiffs' Rule 54(b) motion); ECF No. 7742 (*Ashton* counsel adopting the CAC Plaintiffs' Reply MOL).

SPEISER KRAUSE

COUNSELLORS AT LAW

*800 Westchester Avenue*
*Suite South 608*
*Rye Brook, New York 10573*

PHONE: (914) 220-5333    FAX: (914) 220-5334

WWW.SPEISERKRAUSE.COM

5555 GLENRIDGE CONNECTOR, NE
SUITE 550
ATLANTA, GA 30342
T: (404) 751-0632
F: (866) 936-6382

610 OLD YORK ROAD
SUITE 200
JENKINTOWN, PA 19046
T: (215) 884-8190
F: (215) 884-8266

**70**
*years*

December 13, 2022

**VIA ECF**

The Honorable George B. Daniels
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

　　　　　*Re:　03 MDL 1570*
　　　　　*In Re Terrorist Attacks of September 11, 2001*
　　　　　*Ashton v. Kingdom of Saudi Arabia, No.17-cv-2003*

Dear Judge Daniels,

I am compelled to submit this letter after listening to the argument held before this Court on December 8, 2022, concerning the sanctions imposed against the Kreindler & Kreindler law firm, wherein the Court noted lack of support from other lawyers on the PEC for the Kreindler firm. This could not be further from the truth. I regret that I was in quarantine following a COVID-19 diagnosis on the day of the hearing, and otherwise would have asked the Court for an opportunity to respond and express support for the Kreindler lawyers. I was appointed by Judge Casey as a member of the Plaintiffs' Executive Committee for Personal Injury and Death Claims (PEC) in the June 16, 2004, Case Management Order #3, ECF 248-2.

I and the attorneys at my firm have had the good fortune to work alongside the attorneys from the Kreindler & Kreindler firm in this litigation for more than 20 years. Our firms have worked together cooperatively and successfully for more than 50 years on countless aviation disasters, including the successful resolution of the Pan Am 103 litigation against Libya. I have first-hand knowledge of the character of the Kreindler attorneys that has been doubted as well as of the magnitude and significance of the work they have accomplished in the prosecution of claims in this litigation, significantly against the Kingdom of Saudi Arabia.

During the period of Kreindler's investigation into the most unfortunate leak of the Jarrah transcript, we were in frequent communication with the lawyers of their firm as we all questioned the source of the leak. We shared the same astonishment and bewilderment as to the happening

SPEISER KRAUSE

**Letter to Judge Daniels**
**December 13, 2022**
**Page 2**

and the source of the leak. I know now as I knew then that the Kreindler attorneys had no role in the leak and were devastated to learn that John Fawcett, a consultant who for 20 years had worked tirelessly for all 9/11 victims, was the source. Mr. Fawcett's stunning lapse in judgment was successfully hidden from the Kreindler lawyers until the day it was promptly disclosed to this Court.

Kreindler's work to advance the litigation against Saudi Arabia had included primary oversight of the factual investigation; locating and hiring all but one of the Plaintiffs' experts in the case; taking the lead for the PEC on all depositions of Saudi government and third-party witnesses; and always advocating for the interests of all 9/11 victims. These contributions to the work of the PEC are beyond dispute, though the ability of all 9/11 victims to fully benefit from that work is now at risk.

From my experience over the more than 30 years I have worked with them, Kreindler attorneys have the utmost respect for this Court and their obligations to protect confidential information. I do not believe the leak of the Jarrah transcript was condoned or encouraged by any of the Kreindler attorneys. I continue to have faith in Kreindler's attorneys and their work, and I strongly believe that it is in the best interests of all 9/11 victims to have Kreindler attorneys continue their work on the WD/PI PEC.

Respectfully submitted,

Frank H. Granito, III

**A390**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE:                                            :

TERRORIST ATTACKS ON                              :
SEPTEMBER 11, 2001                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MEMORANDUM DECISION
AND ORDER

03 MDL 1570 (GBD) (SN)

GEORGE B. DANIELS, United States District Judge:

On July 15, 2021, reporter Michael Isikoff of *Yahoo! News* published an article about

the deposition of Musaed Al Jarrah, a non-party in this multi-district litigation. A subsequent

Court-ordered investigation revealed that Kreindler & Kreindler LLP consultant John

Fawcett leaked the confidential transcript to Isikoff in violation of two Protective Orders

governing information in this case.[1]  Magistrate Judge Sarah Netburn's Opinion and Order

dated September 21, 2022, ("Op.," ECF No. 8544), sanctioned Kreindler & Kreindler by,

*inter alia*, removing Kreindler & Kreindler attorneys from the Plaintiffs' Executive

Committee ("PEC") for Personal Injury and Death Claims.

In response to Magistrate Judge Netburn's Opinion and Order, Kreindler & Kreindler

filed a motion by proposed order to show cause for a stay pending resolution of objections

pursuant to Federal Rule of Civil Procedure 72(a), (Proposed Order to Show Cause with

Emergency Relief, ECF No. 8607).  On October 17, 2022, this Court denied that motion as

procedurally improper but granted oral argument as to the parties' Rule 72 objections to

Magistrate Judge Netburn's Opinion and Order.  (Mem. Decision and Order, ECF No. 8642.)

Kreindler & Kreindler subsequently filed its Rule 72 objections, ("Objections," ECF No.

---

[1] The factual and procedural background of this case has been discussed at length in Magistrate
Judge Netburn's Opinion and Order.  Except for minor distinctions made in this Decision, this
Court appropriately incorporates such background by reference.

1

8681), and the instant motion to stay nonmonetary sanctions pending resolution of its Objections, (Mot. to Stay, ECF No. 8700). For the reasons stated herein, Kreindler & Kreindler's motion to stay Magistrate Judge Netburn's decision pending resolution of its Objections is DENIED.

## I.   LEGAL STANDARD FOR GRANTING A STAY

Courts consider four factors when determining whether to grant a stay: "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether [it] will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties . . . ; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *accord SEC v. Daspin*, 557 F. App'x 46, 47–48 (2d Cir. 2014).

The first two factors are "the most critical." *Nken*, 556 U.S. at 434. The first factor— likelihood of success on the merits—can be satisfied when "there are 'serious questions' going to the merits of the dispute and the applicant is able to establish that the balance of hardships tips *decidedly* in its favor." *In re A2P SMS Antitrust Litig.*, No. 12-CV-2656, 2014 WL 4247744, at *2 (S.D.N.Y. Aug. 27, 2014) (quoting *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010)). "The degree to which a factor must be present varies with the strength of the others." *Daspin*, 557 F. App'x at 48. Specifically, the "'probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay.'" *Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006) (quoting *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002)).

2

**A392**

## II.   KREINDLER & KREINDLER HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS

Kreindler & Kreindler has failed to show that it is likely to succeed on the merits in preventing its removal from the PEC for Personal Injury and Death Claims.  Kreindler & Kreindler's principal argument in opposition to Magistrate Judge Netburn's Opinion and Order is that the "sanctions against the entire [Kreindler & Kreindler] firm [were] without authority under Rule 37(b)(2)(A)."  (*See* Br. on Proposed Order to Show Cause, ECF No. 8608, at 20; *see also* Objections at 15–21.)  Yet, "[t]he failure to abide by a protective order is sanctionable under Rule 37."  *City of Almaty, Kazakhstan v. Ablyazov*, No. 15-CV-5345, 2018 WL 1229730, at *4 (S.D.N.Y. Mar. 5, 2018); (*see also* Op. at 36 (citing same)).  Rule 37(b) applies to attorneys as well as parties.  *See e.g., Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 128 F.3d 99, 102–03 (2d Cir. 1997) (sanctioning attorney for violating court order); *Markus v. Rozhkov*, 615 B.R. 679, 701 (S.D.N.Y. 2020) (sanctioning attorney for discovery misconduct).

Here, Judge Richard Conway Casey's 2004 Order establishing the PECs designates *individual* attorneys from Kreindler & Kreindler—not the law firm itself—to the PEC for Personal Injury and Death Claims, namely: James P. Kreindler, "Justin T. Green or Andrew J. Maloney," and Marc S. Moller.  (*See* Case Management Order No. 3, ECF No. 248, ¶ 6.)  In his Declaration, Kreindler & Kreindler partner Andrew Maloney agrees.  (*See* Corrected Decl. Maloney, ECF No. 8613, ¶ 6 ("Judge Casey appointed individual attorneys from various firms (and did not appoint law firms) to positions on the PEC.").)  Magistrate Judge Netburn's Order removing "Kreindler & Kreindler" from the PECs necessarily requires the removal of *individual* attorneys from the PEC for Personal Injury and Death Claims, (*see* Op. at 63)—an Order that the PECs swiftly implemented, (*see* 10/4/22 Letter to Magistrate

3

**A393**

Judge Netburn from PECs, ECF No. 8603; 10/11/22 Letter to Judge Daniels from PECs, ECF No. 8620). Kreindler & Kreindler has failed to advance a sufficient showing that it will succeed on the merits of its Rule 72 Objections, *i.e.*, that the removal of individual Kreindler & Kreindler attorneys from the PEC was beyond the bounds of Rule 37 or the inherent powers of this Court.

### III.    KREINDLER & KREINDLER HAS FAILED TO DEMONSTRATE IRREPARABLE INJURY

In arguing for irreparable harm, Kreindler & Kreindler mistakenly emphasizes work the firm *previously* handled in opposition to the Kingdom of Saudi Arabia. (*See* Br. on Proposed Order to Show Cause, at 20–22; Corrected Decl. Maloney, ¶¶ 9–18; Supplemental Decl. Maloney, ECF No. 8701, ¶ 2.) Irreparable harm "must be imminent or certain, not merely speculative." *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995). Kreindler & Kreindler's previously incurred or sunk "litigation costs do not rise to the level of irreparable injury." *See Glatt v. Fox Searchlight Pictures Inc.*, No. 11-CV-6784, 2013 WL 5405696, at *4 (S.D.N.Y. Sept. 17, 2013) (quoting *Daniels v. City of New York*, 138 F. Supp. 2d 562, 564 (S.D.N.Y. 2001)). Going forward, the remaining leaders of the PECs "are confident that [they] have ample resources available to fulfill their obligations in this complex case" without Kreindler & Kreindler on the PEC. (*See* 10/4/22 Letter to Magistrate Judge Netburn from PECs, at 2.) The PEC leaders have also reaffirmed their commitment to lead "this complex consolidation on behalf of *all* Plaintiffs." (10/11/22 Letter to Judge Daniels from PECs (emphasis in original).)

Furthermore, the *future* purported harm to the Plaintiffs that Kreindler & Kreindler has identified is neither "imminent [n]or certain"; indeed, it is "merely speculative." *See Jayaraj*, 66 F.3d at 39. The Supplemental Declaration of Andrew Maloney argues that the

4

**A394**

PEC will have to "make strategic decisions and take the proper steps to move the litigation forward" once this Court resolves pending motions to revise a March 2018 Order and allows for any further discovery. (*See* Supplemental Decl. Maloney, ¶ 3.) The Declaration also points to the possibility of a renewed motion to dismiss from Saudi Arabia. (*Id.*) Such vague and hypothetical "strategic decisions" and "proper steps" fail to rise to the level of "imminent or certain" irreparable harm required for a stay. *See Jayaraj*, 66 F.3d at 39.

There are also substantial avenues to mitigate any of the hypothetical harm Kreindler & Kreindler presents. The 2004 Order establishing the PECs requires that "[a]ny plaintiffs' attorney may give advice and suggestions to the Plaintiffs' Executive Committees." (Case Management Order No. 3, ¶ 13.) Despite removal from the PECs, Kreindler & Kreindler may still advise the Committees on such "strategic decisions," if and when they occur. Indeed, the PECs have explicitly "invited Kreindler to cooperate pursuant to [this] mechanism." (12/2/22 Letter to Judge Daniels from PECs, ECF No. 8787, at 2.) Additionally, should the Plaintiffs be in disagreement, Kreindler & Kreindler may "present individual and divergent positions to the positions of the Plaintiffs' Executive Committees at pretrial conferences," (Case Management Order No. 3, ¶ 13), as the firm has been inclined to do. (*see, e.g.*, Kreindler & Kreindler's separate Opp'n Br. to Saudi Arabia's Mot. to Dismiss, ECF No. 3781; Kreindler & Kreindler's separate Mot. for Recons., ECF No. 7481). Kreindler & Kreindler has therefore failed to demonstrate irreparable injury absent a stay.

## IV.  THE ISSUANCE OF A STAY RISKS INJURING OTHER PARTIES

Staying the removal of Kreindler & Kreindler attorneys from the PEC and placing them back in a leadership position for this litigation risks further violations of the Court's Orders, to the detriment of all parties. The findings of fact in Magistrate Judge Netburn's

5

**A395**

Opinion and Order are significant—nothing short of a law firm's personnel repeatedly flouting the Court's Protective Orders and then misrepresenting the truth of their actions. (*See, e.g.*, Op. at 52 ("[T]his investigation has revealed an almost complete lack of respect for the Court and its orders.").) This Court will thoroughly consider the parties' submissions in response to the Opinion and Order. Prior to that determination, this Court is unwilling to restore a law firm's attorneys to leadership positions when the attorneys have purportedly abused their position of influence to the detriment of all Plaintiffs, and indeed their own clients. (*See, e.g.*, Op. at 55 ("[T]he Court has lost faith in the [Kreindler & Kreindler] firm's ability to conduct this litigation responsibly and report honestly as a representative of all plaintiffs . . . .").

Further, the remaining leaders on the PECs have consistently indicated their concurrence with Magistrate Judge Netburn's findings, going so far as to "dispute the veracity of the facts and characterizations as recited in Mr. Maloney's [October 4, 2022] declaration." (*See* 10/11/22 Letter to Judge Daniels from PECs.) The immediate restoration of Kreindler & Kreindler's attorneys to the PEC runs the risk of further violations of the Protective Orders, injuring both Defendants and Plaintiffs in litigating the merits of this case. (*See generally* Op. at 53–54 (describing repeated violations of the Protective Orders by the Kreindler & Kreindler firm).)

## V.     THE ISSUANCE OF A STAY LIES OUTSIDE THE PUBLIC INTEREST

Finally, staying Magistrate Judge Netburn's nonmonetary sanctions is not within the public interest. The public interest in this multi-district litigation lies in swiftly holding all those responsible for the worst terrorist attack in our nation's history. Rather than focusing on the merits of this dispute twenty one years after 9/11, this Court and Magistrate Judge

**A396**

Netburn have spent the last year and a half adjudicating a law firm's purported misconduct. This Court agrees with the remaining leadership on the PEC that it is not "productive to engage in any further distractions created by the Kreindler firm." (*See* 10/11/22 Letter to Judge Daniels from PECs.)

Moreover, while the public interest lies in uncovering the truth of all those responsible for 9/11, Kreindler & Kreindler has been found to be unable to uncover the truth behind its own leak, or represent the truth to the Court regarding the firm's deficient and self-inhibited investigation. Kreindler & Kreindler could have conducted a thorough investigation on its own in July 2021, when the leak first surfaced, to discover how the transcript leaked. Instead, in the words of a Kreindler & Kreindler partner, the firm chose a strategy of "sticking to . . . 'only answer what [Magistrate Judge Netburn] asked for'" because the partner was "so irritated" by the Court's scrutiny of her firm. (*See* App. of Exs. from Nov. 1-2, 2021 Hr'g, ECF No. 8768-25, at KK61.) It was Magistrate Judge Netburn's "irritat[ing]" August 30, 2021 Order, (*see* ECF No. 7082), not any proactive investigative steps by Kreindler & Kreindler, that ultimately prompted John Fawcett to confess to the leak, (*see* Decl. Fawcett, ECF No. 7166-1). Now, Kreindler & Kreindler requests this Court to continue uninterrupted to trust in the firm to "actively investigate the facts" of 9/11 by restoring its attorneys as leaders on the PEC. (*See* Supplemental Decl. Maloney, ¶ 2.) Although "[a] litigant chooses counsel at his peril," *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir. 1979), while reviewing the Magistrate Judge's Order, this Court cannot allow Kreindler & Kreindler to lead the Plaintiffs' investigation of 9/11 when the firm proved utterly incapable of leading an

7

**A397**

investigation into the firm's own illegal activity. The Plaintiffs—and indeed the public—deserve better.

## V.    CONCLUSION

Attorneys from Kreindler & Kreindler may continue to advocate for 9/11 families and draw on their expertise litigating against the Kingdom of Saudi Arabia, but this Court will not now restore them to the PEC during its review of the Objections to Magistrate Judge Netburn's Opinion and Order. As ordered by Magistrate Judge Netburn on September 21, 2022, (*see* Op. at 63), the following Kreindler & Kreindler attorneys remain removed from the PEC: James P. Kreindler, Justin T. Green, Andrew J. Maloney, and Marc S. Moller, (*see* Case Management Order No. 3, ¶ 6). This Court will also not disturb Magistrate Judge Netburn's denial of Kreindler & Kreindler's request to replace Justin T. Green with Steven R. Pounian and Marc S. Moller with Megan Wolfe Benett on the PEC. (*See* Op. at 64 (denying request at ECF No. 7153).)

Therefore, Kreindler & Kreindler's motion to stay nonmonetary sanctions pending resolution of its Rule 72 Objections is DENIED. The Clerk of Court is directed to close the open motion at ECF No. 8700.

Dated: January 12, 2023
       New York, New York

SO ORDERED.

*George B. Daniels*

GEORGE B. DANIELS
United States District Judge

8

**A398**